Bridget Psarianos (AK Bar No. 1705025)
Brook Brisson (AK Bar No. 0905013)
Valerie Brown (AK Bar No. 9712099)
TRUSTEES FOR ALASKA
1026 W. Fourth Avenue, Suite 201
Anchorage, AK 99501
Phone: (907) 276-4244
Fax: (907) 276-7110
bpsarianos@trustees.org
bbrisson@trustees.org
vbrown@trustees.org

*Attorneys for Plaintiffs*

## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| FRIENDS OF ALASKA NATIONAL WILDLIFE REFUGES, THE WILDERNESS SOCIETY, NATIONAL AUDUBON SOCIETY, WILDERNESS WATCH, CENTER FOR BIOLOGICAL DIVERSITY, DEFENDERS OF WILDLIFE, NATIONAL WILDLIFE REFUGE ASSOCIATION, ALASKA WILDERNESS LEAGUE, and SIERRA CLUB, | Case No. 3:19-cv-00216-JWS |
| Plaintiffs, | |
| v. | |
| DAVID BERNHARDT, in his official capacity as Secretary of the U.S. Department of the Interior, U.S. DEPARTMENT OF THE INTERIOR, and U.S. FISH AND WILDLIFE SERVICE, | |
| Defendants. | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
(Admin. Procedure Act, 5 U.S.C. §§ 702–06; Alaska Nat'l Interest Lands Conservation Act, 16 U.S.C. § 3101 et. seq., Nat'l Envtl. Policy Act, 42 U.S.C. §§ 4321–4370h)

Plaintiffs Friends of Alaska National Wildlife Refuges, The Wilderness Society, Defenders of Wildlife, National Audubon Society, Wilderness Watch, Center for Biological Diversity, National Wildlife Refuge Association, Alaska Wilderness League, and Sierra Club (collectively "Friends") file this Complaint for Declaratory and Injunctive Relief, alleging:

## I.    NATURE OF THE CASE

1.    This action seeks to protect Friends', and their members' and supporters', interest in the Izembek National Wildlife Refuge (Izembek or Refuge) and Izembek's designated Wilderness from the unlawful exchange of Refuge lands in violation of the Alaska National Interest Lands Conservation Act (ANILCA), the National Environmental Policy Act (NEPA), and the Administrative Procedure Act (APA).

2.    The U.S. Department of the Interior (Interior) recently entered into a land exchange agreement (Exchange Agreement) with the King Cove Corporation (KCC) to trade away lands within Izembek's Wilderness for KCC-owned lands to allow for the construction of a road connecting the community of King Cove to the Cold Bay airport. This action challenges the Exchange Agreement and the Secretary of the Interior's (Secretary) decision to enter into the Exchange Agreement for failing to comply with ANILCA, NEPA, and the APA.

3.    The exchange does not further the purposes of ANILCA, as required by section 1302(h), 16 U.S.C. § 3192(h). In entering into the Exchange Agreement, the Secretary failed to adequately justify the reversal in position from prior Secretarial and

Case 3:19-cv-00216-JWS   Document 1   Filed 08/07/19   Page 2 of 42

agency decisions rejecting similar exchanges. The Secretary also failed to follow the requirements of both Title XI of ANILCA and NEPA, and their implementing regulations, in executing the Exchange Agreement.

4.     The Secretary's decision and the Exchange Agreement are arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, or without observance of procedure required by law. 5 U.S.C. § 706(2).

5.     Friends seeks vacatur, declaratory, and injunctive relief.

## II.     JURISDICTION AND VENUE

6.     This Court has jurisdiction over the parties and subject matter of this action pursuant to 5 U.S.C. §§ 702–06 (Administrative Procedure Act), 28 U.S.C. §§ 2201–02 (declaratory judgment), and 28 U.S.C. § 1331 (federal question jurisdiction).

7.     Venue is proper in the District of Alaska under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims occurred within the District of Alaska and the lands at issue are in Alaska.

## III.     PARTIES

8.     Plaintiff Friends of Alaska National Wildlife Refuges is a nonprofit organization founded in 2005 and based in Anchorage, Alaska. It is a volunteer group that works to assist the U.S. Fish and Wildlife Service (FWS) to accomplish its congressionally-mandated mission for the sixteen National Wildlife Refuges in Alaska. Its mission is to promote the conservation of all Alaska National Wildlife Refuges

through understanding and appreciation, and to assist the FWS through outreach to decision-makers. It has sent members and supporters to Izembek for volunteer projects in the past and is planning to organize another volunteer project to Izembek in the summer or fall of 2020.

9.     Plaintiff The Wilderness Society is a nonprofit organization headquartered in Washington, D.C., with offices throughout the country, including Alaska. Its overall mission is to protect wilderness and inspire Americans to care for wild places. The goal of its Alaska program is to protect and steward federal lands and waters in and around the state, including Alaska's national wildlife refuges and designated Wilderness areas in Alaska. This includes Izembek and the designated Wilderness lands there.

10.    Plaintiff National Audubon Society (Audubon) is a nonprofit organization. Its mission is to conserve and restore natural ecosystems, focusing on birds, other wildlife, and their habitats, for the benefit of humanity and the earth's biological diversity. Audubon uses science, advocacy, education, and conservation to achieve its goal. Audubon operates state programs around the country, including in Alaska. Audubon Alaska works to conserve Alaska's incredible birds, including birds that rely on Izembek and the bird habitat in the Refuge.

11.    Plaintiff Wilderness Watch is a nonprofit organization founded in 1989. Its mission is to defend the nation's 111 million-acre National Wilderness Preservation System. Wilderness Watch advocates for appropriate stewardship according to the requirements of the Wilderness Act of 1964. Wilderness Watch monitors agency

stewardship of designated Wilderness in Alaska and organizes its members to participate in public processes in Alaska that impact designated Wilderness.

12. Plaintiff Center for Biological Diversity (the Center) is a nonprofit organization that works through science and environmental law to advocate for the protection of endangered, threatened, and rare species and their habitats throughout the United States, including Alaska. The Center has a long-standing interest in the conservation of threatened and endangered species and their habitats in Alaska. Specifically, the Center has advocated for protections of the northern sea otter, Steller's eider, Steller sea lion, brown bear, and other wildlife that occur in or near Izembek.

13. Plaintiff Defenders of Wildlife is a nonprofit organization founded in 1947. Its mission is to protect all native animals and plants in their natural communities. It advocates for the sound management of our public lands, including national wildlife refuges. Defenders of Wildlife has an office in Anchorage and one of the refuges that Defenders of Wildlife works to protect is Izembek. Defenders of Wildlife has over 1.8 million members and supporters nationwide, including over 6,000 in Alaska.

14. Plaintiff National Wildlife Refuge Association is a nonprofit organization focused exclusively on protecting and promoting the 850 million-acre National Wildlife Refuge System, the world's largest network of lands and waters set aside for wildlife conservation. Founded in 1975, its mission is to conserve America's wildlife heritage for future generations through strategic programs that enhance the National Wildlife Refuge System and the landscapes beyond its boundaries. With approximately 80% of the land

mass of the National Wildlife Refuge System in Alaska, the National Wildlife Refuge Association has throughout its history focused significant resources on protecting and enhancing Refuge System resources throughout the state.

15.     Plaintiff Alaska Wilderness League is a nonprofit organization founded in 1993 to further the protection of public lands and waters in Alaska. Its mission is to lead the effort to preserve Alaska's wild lands and waters by engaging citizens and decision makers. It has offices in Anchorage and Washington, D.C., as well as other locations.

16.     Plaintiff Sierra Club is the nation's oldest and largest grassroots environmental organization. The Sierra Club is a national nonprofit organization with over 779,000 members dedicated to exploring, enjoying, and protecting the wild places of the Earth; to practicing and promoting the responsible use of the Earth's ecosystems and resources; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives. The Sierra Club's concerns encompass a variety of environmental issues in Alaska and beyond, including an interest in protecting designated Wilderness. The Alaska Chapter of the Sierra Club has just over 1,800 members.

17.     Friends and their members and supporters have long-standing interests in protecting Izembek from a land exchange and road construction. These interests include preserving and enjoying the wildlife, habitat, and wilderness values of Izembek for recreational, aesthetic, and environmental protection purposes. Friends' staff, members, and supporters have visited Izembek, enjoyed viewing its wildlife, and experienced the

Wilderness and habitat that Izembek provides. Friends and their members have strong recreational, aesthetic, scientific, and other interests in the wildlife that uses and depends on Izembek, including migratory birds and terrestrial mammals.

18.     Friends and their members and supporters have engaged in various past public processes, including NEPA and other administrative processes, regarding a land exchange for a road to protect their interests in Izembek. They have also engaged in lobbying and other legislative work to protect their interests in Izembek. They would have engaged in a public process, environmental review, or congressional outreach regarding the Exchange Agreement had the Secretary undertaken a NEPA or Title XI process.

19.     Friends members' and supporters' interests in Izembek are adversely affected by the Exchange Agreement. The removal of public lands and designated Wilderness from the National Wilderness Preservation System and the National Wildlife Refuge System harms the recreational, aesthetic, scientific, and other interests of Friends' members and supporters, who use and enjoy these lands and the wildlife that depends on them.

20.     The execution of the Exchange Agreement without following NEPA's and ANILCA Title XI's procedures harms the interests of Friends' and their members and supporters in engaging in public processes and informing agency decision making.

21.     The purpose of this exchange is for construction of a road through Izembek. The Exchange Agreement states that "time is of the essence" and commits the parties to

Case 3:19-cv-00216-JWS   Document 1   Filed 08/07/19   Page 7 of 42

the Exchange Agreement to expediting "all aspects and tasks of this Agreement." KCC

has indicated that it would pursue permitting of the road. The removal of lands from

Wilderness and federal ownership and use for road construction further exacerbates the

injuries to Friends' members and supporters and harms Friends' and their members'

strong recreational, aesthetic, scientific, and wildlife interests in Izembek.

22.     These actual, concrete injuries are fairly traceable to Interior's decision to

enter into the Exchange Agreement, and to do so without adhering to required processes

and decision-making procedures, and would be redressed by the relief sought in this case.

23.     Defendant David Bernhardt is the Secretary of the U.S. Department of the

Interior and is being sued in his official capacity. As the Secretary, he is charged with the

supervision and management of all decisions, operations, and activities of the Department

and its divisions.

24.     Defendant U.S. Department of the Interior is an executive agency of the

United States responsible for oversight of the National Wildlife Refuge System and

public lands.

25.     Defendant U.S. Fish and Wildlife Service is an agency within the U.S.

Department of the Interior and is responsible for the management of the National

Wildlife Refuge System.

## IV.     STATUTORY FRAMEWORK

26.     Congress passed ANILCA to "preserve unrivaled scenic and geological

values associated with natural landscapes; to provide for the maintenance of sound

_Friends of Alaska National Wildlife Refuges, et al., v. Bernhardt, et al._

Case 3:19-cv-00216-JWS   Document 1   Filed 08/07/19   Page 8 of 42

populations of, and habitat for, wildlife species of inestimable values to the citizens of Alaska and the Nation, including those species dependent on vast relatively undeveloped areas; to preserve in their natural state extensive unaltered arctic tundra, boreal forest, and coastal rainforest ecosystems; to protect the resources related to subsistence needs; to protect and preserve historic and archeological sites, rivers, and lands, and to preserve wilderness resource values and related recreational opportunities . . . ; and to maintain opportunities for scientific research and undisturbed ecosystems." 16 U.S.C. § 3101(b).

27.     ANILCA provides that "the Secretary is authorized, consistent with other applicable law in order to carry out the purposes of this Act, to acquire by purchase, donation, exchange, or otherwise any lands within the boundaries of any conservation system unit." 16 U.S.C. § 3192(a).

28.     The Secretary is permitted to exchange lands under ANILCA "on the basis of equal value" or, if the parties agree to an unequal-value exchange, the Secretary must determine that the exchange is in the public interest. 16 U.S.C. § 3192(h)(1).

29.     The Secretary may only exchange lands under ANILCA if the exchange furthers "the purposes of [ANILCA]." 16 U.S.C. § 3192(h)(1).

30.     Congress included this exchange provision to authorize the Secretary to acquire inholdings in conservation system units to further the purposes of those units, without resorting to condemnation proceedings.

31.     Title XI of ANILCA establishes a "single comprehensive statutory authority for the approval or disapproval of applications for [transportation and utility]

systems" through Alaska public lands. 16 U.S.C. § 3161(c). This applies to roads constructed through conservation system units, including National Wildlife Refuges and designated Wilderness. 16 U.S.C. § 3162(4).

32.     Title XI of ANILCA requires that transportation facilities "be approved or disapproved in accordance with the procedures set forth in this subchapter." 16 U.S.C. § 3162; *see also* 16 U.S.C. § 3164(a) ("Notwithstanding any provision of applicable law, no action by any Federal agency under applicable law with respect to the approval or disapproval of the authorization, in whole or in part, of any transportation or utility system shall have any force or effect unless the provisions of this section are complied with.").

33.     Transportation systems may not be constructed through designated Wilderness without a recommendation by the President and approval by Congress. 16 U.S.C. § 3166(b), (c).

34.     Congress passed the Alaska Native Claims Settlement Act (ANCSA) to provide for the expeditious, fair, and just settlement of certain land claims of Alaska Natives. 43 U.S.C. § 1601.

35.     ANCSA requires that where a patent conveys lands within the National Wildlife Refuge System to any Village Corporation, that patent "shall contain a provision that such lands remain subject to the laws and regulations governing use and development of such Refuge." 43 U.S.C. § 1621(g).

36.     The Wilderness Act was passed to protect for "present and future generations the benefits of an enduring resource of wilderness" and establish the National Wilderness Preservation System to protect areas and provide for their use and enjoyment as unimpaired Wilderness. 16 U.S.C. § 1131(a).

37.     Congress directed that Wilderness be managed to preserve its wilderness character, and it devoted Wilderness to "the public purposes of recreational, scenic, scientific, educational, conservation, and historical use" 16 U.S.C. § 1133(b); *see also* Alaska National Interest Lands Conservation Act, Pub. L. No. 96–487, § 707, 94 Stat. 2371 (1980) (stating "wilderness designated by this Act shall be administered in accordance with applicable provisions of the Wilderness Act").

38.     The Wilderness Act provides that "except as necessary to meet minimum requirements for the administration of the area for the purpose of this [Act] . . . , there shall be . . . no use of motor vehicles, motorized equipment or motorboats, no landing of aircraft, no other form of mechanical transport, and no structure or installation within any such area." 16 U.S.C. § 1133(c).

39.     The mission of the National Wildlife Refuge System is "to administer a national network of lands and waters for the conservation, management, and where appropriate, restoration of fish, wildlife, and plant resources and their habitats within the United States for the benefit of present and future generations of Americans." 16 U.S.C. § 668dd(a)(2).

_____
*Friends of Alaska National Wildlife Refuges, et al., v. Bernhardt, et al.*
Case No. 3:19-cv-00216-JWS                                      Page 11 of 42

Case 3:19-cv-00216-JWS   Document 1   Filed 08/07/19   Page 11 of 42

40.     Refuges must "be managed to fulfill the mission of the System, as well as the specific purposes for which that refuge was established." 16 U.S.C. § 668dd(a)(3)(A); *see also* 16 U.S.C. § 668dd(a)(4)(B) & (D) (requiring the Secretary to administer the refuge to achieve the purposes of the refuge and the mission of the Refuge System); ANILCA § 304(a) ("Each refuge shall be administered by the Secretary . . . in accordance with the laws governing the administration of units of the National Wildlife Refuge System, and this Act.").

41.     NEPA is "our basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). NEPA's twin aims are to ensure that federal agencies take a hard look at the environmental impacts of their proposed actions before taking an action and to ensure that agencies provide relevant information to the public so the public can play a role in both the decision-making process and the implementation of the decision. 40 C.F.R. § 1502.1.

42.     NEPA requires federal agencies to prepare a detailed environmental impact statement (EIS) for every major federal action that will have a significant impact on the quality of the human environment. 42 U.S.C. § 4332. Such a statement is required to "provide full and fair discussion of significant environmental impacts and shall inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1.

43.    The APA provides for judicial review of actions taken by administrative

agencies. 5 U.S.C. §§ 702–06.

44.    The APA instructs a reviewing court to "hold unlawful and set aside agency

action, findings, and conclusions" if they are "arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law" or are "without observance of

procedure required by law." 5 U.S.C. § 706(2).

45.    When an agency reverses a prior decision, the agency is "obligated to

supply a reasoned analysis for the change." *Motor Vehicles Mfrs. Ass'n of U.S., Inc. v.

State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983). An agency change in position is

arbitrary and capricious under the APA unless the agency (1) displays "awareness that it

is changing position," (2) shows that "the new policy is permissible under the statute," (3)

"believes" the new policy is better, and (4) provides "good reasons" for the new policy,

which, if the "new policy rests upon factual findings that contradict those which underlay

its prior policy," must include "a reasoned explanation . . . for disregarding facts and

circumstances that underlay or were engendered by the prior policy." *F.C.C. v. Fox

Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009); *see also Organized Village of

Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 966 (9th Cir. 2015) (en banc).

## V.    IZEMBEK REFUGE HISTORY AND VALUES

46.    Izembek has been recognized for decades as an area with particularly

valuable wildlife habitat.

Case 3:19-cv-00216-JWS   Document 1   Filed 08/07/19   Page 13 of 42

47.     Efforts to protect Izembek began in the early 1940s. The area was first protected in 1960 as the Izembek National Wildlife Range (Range) as a "refuge, breeding ground, and management area for all forms of wildlife" because of the importance of the area to waterfowl, brown bear, and caribou. Establishing the Izembek National Wildlife Range, Pub. Land Order 2216, 25 Fed. Reg. 12599, 12600 (Dec. 6, 1960). In establishing the Range, the Department of the Interior recognized that it "contain[s] the most important concentration point for waterfowl in Alaska." Office of the Secretary, Department of the Interior, Information Service, Press Release Dec. 7, 1960.

48.      The area's importance was reaffirmed in 1980, when Congress renamed the Range as the Izembek National Wildlife Refuge and designated approximately 307,982 of the 315,000 acres as Wilderness. ANILCA §§ 303(3)(A), 702(6).

49.     Congress established Izembek because of its ecologically unique habitat and wilderness characteristics. Specifically, Congress established Izembek for the following purposes:

(i)     [T]o conserve fish and wildlife populations and habitats in their natural diversity including, but not limited to, waterfowl, shorebirds and other migratory birds, brown bears and salmonids;

(ii)    [T]o fulfill the international treaty obligations of the United States with respect to fish and wildlife and their habitats;

(iii)   [T]o provide, in a manner consistent with the purposes set forth in subparagraphs (i) and (ii), the opportunity for continued subsistence uses by local residents; and

(iv)    [T]o ensure, to the maximum extent practicable and in a manner consistent with the purposes set forth in paragraph (i), water quality and necessary water quantity within the refuge.

*Id.* § 303(3)(B).

50.     When drafting ANILCA, Congress noted:

The Izembek Wilderness possesses outstanding scenery, key populations of
brown bear, caribou and other wilderness-related wildlife, and critical
watersheds to Izembek Lagoon. About 68 percent of the total lands in
Izembek Lagoon are covered with the largest eelgrass beds in the world.
These beds are utilized by millions of waterfowl for migration and
wintering purposes. A wilderness designation will protect this critically
important habitat by restricting access to the lagoon.

H. R. REP. NO. 96-97, at 136 (1979).

51.     Izembek is one of the world's most important migratory bird staging and

wintering habitats, supporting millions of migratory waterfowl and shorebirds in its

coastal lagoons and freshwater wetlands complex.

52.     Izembek and its adjacent wetlands and nearshore marine environment

provide habitat for several federally-protected species, such as the Steller's eider,

northern sea otter, and Steller sea lion.

53.     The Alaska breeding population of Steller's eider was listed as threatened

in 1997, and its designated critical habitat includes areas within the Izembek Refuge. U.S.

Dep't of the Interior, U.S. Fish and Wildlife Service, Izembek Nat'l Wildlife Refuge

Land Exchange/Road Corridor Final Environmental Impact Statement ["Final EIS"] at 3-

173 to 3-174 (Feb. 5, 2013).

54.     Northern sea otters, listed as threatened in 2005, appear year round in

marine waters adjacent to the Izembek Refuge. Izembek Lagoon was designated as part

of the northern sea otters' critical habitat in 2009. Final EIS at 3-179 to 3-181.

55.     Steller's eiders and northern sea otters are species under the jurisdiction of FWS for purposes of the Endangered Species Act (ESA).

56.     The National Marine Fisheries Service (NMFS) classified the western distinct population segment of Steller sea lion as endangered in 1997, and its 20-nautical mile critical habitat buffer extends into the Izembek Lagoon. Final EIS at 3-185.

57.     Izembek also provides high quality brown bear, wolf, and caribou habitat. In particular, the Joshua Green River watershed supports the highest concentration of brown bears for the lower Alaska Peninsula. Izembek's isthmus is an important migration corridor and provides wintering habitat for the Southern Alaska Peninsula caribou herd.

58.     Izembek is internationally-recognized for its unique and ecologically significant wetlands and wildlife. It was designated as a Wetland of International Importance by the Ramsar Convention on Wetlands of International Importance in 1986 (Ramsar Convention). Listing under this Convention "reflects a national commitment to maintain the ecological characteristics of the area." Letter from Director, U.S. Fish and Wildlife Service, to Robin West, Manager, Izembek National Wildlife Refuge (June 16, 1989).

## VI.    HISTORY OF LAND EXCHANGE PROPOSALS AND EXCHANGE AGREEMENT

59.     The Interior and the FWS have evaluated the effects of a road from King Cove to Cold Bay multiple times.

Case 3:19-cv-00216-JWS   Document 1   Filed 08/07/19   Page 16 of 42

60.     In the early 1980s, Interior conducted an analysis of a road through Izembek, concluding that a road could cause long-term damage to the Refuge's unique and ecologically important habitats.

61.     In 1985, Interior acknowledged that a road through Izembek Wilderness could only be built with congressional approval under Title XI of ANILCA. Bristol Bay Reg'l Mgmt. Plan and Final Environmental Impact Statement at 8-16, 8-101, U.S. Dep't of Interior (1985); *see also* Record of Decision for the Izembek Nat'l Wildlife Refuge Comprehensive Conservation Plan, 122 & Appendix A (August 1, 1985) (noting that congressional approval will be required to build a road across Izembek Wilderness).

62.     In 1985, Interior also concluded that "[t]he presence of a road [connecting King Cove and Cold Bay], vehicular traffic, and intensified human use could alter migratory patterns" of the "nearly 6,000–7,000" caribou that migrate through the isthmus twice a year between their wintering range and calving grounds, and that roads built in other areas of the state have "pose[d] a serious barrier to caribou movements." Bristol Bay Reg'l Mgmt. Plan and Final Environmental Impact Statement at 8-32.

63.     The Bristol Bay Regional Management Plan further found that a road "would result in expanded human presence and traffic . . . provid[ing] greater access into a relatively remote, undisturbed region in the Joshua Green River drainage and in key bear use areas in Right and Lefthand valleys" such that "[b]ears could be expected to change their behavior . . . and might abandon some traditional use areas." Bristol Bay Reg'l Mgmt. Plan and Final Environmental Impact Statement at 8-38.

64.     Interior concluded that "[t]he King Cove-Cold Bay road could have major, local impacts" to wilderness values. Bristol Bay Reg'l Mgmt. Plan and Final Environmental Impact Statement at 8-69.

65.     In 1996, FWS again addressed the issue of a road through Izembek and again found that a road would have unacceptable environmental impacts.

66.     In 1997, KCC offered to exchange KCC lands at the mouth of the Kinzarof Lagoon for a right-of-way through Izembek. FWS declined the offer because of adverse impacts of a road to wildlife. Land Protection Plan for Izembek National Wildlife Refuge Complex, Cold Bay, Alaska at 53, U.S. Dep't of Interior, FWS, Region 7, Anchorage, AK (March 1998)

67.     Also in 1997, Senator Frank Murkowski introduced a bill that would have required the Secretary to allow road construction through Izembek. That bill was amended and eventually passed as part of an appropriations act. Instead of mandating a road, the legislation expressly prohibited a road. Rather, it authorized $37.5 million for various projects to improve health and safety infrastructure and services in King Cove. Omnibus Consolidated and Emergency Supplemental Appropriations Act, Pub. L. No. 105–277, § 353, 112 Stat. 2681, 302–03 (1999) (specifically prohibiting the construction of any road or other facilities within Izembek). One of the projects authorized was the purchase of a hovercraft and construction of a hovercraft facility outside of the Refuge.

68.     In 1998, FWS called the proposal to build a road "the greatest known potential threat to wildlife and wilderness values within the Izembek complex." Land

Protection Plan for Izembek National Wildlife Refuge Complex, Cold Bay, Alaska at 53, U.S. Dep't of Interior, FWS, Region 7, Anchorage, AK (March 1998). FWS again noted the "significant wildlife and wilderness resources in the area," including important wintering area and migration corridor of caribou, an adjacent "key brown bear natal area that supports the highest densities of bears on the lower Alaska Peninsula," and "outstanding and essential habitat for a variety of species, including the threatened Steller's eider, Pacific black brant, tundra swan and emperor goose." Land Protection Plan for Izembek National Wildlife Refuge Complex, Cold Bay, Alaska at 53, U.S. Dep't of Interior, FWS, Region 7, Anchorage, AK (March 1998).

69.     From 2001 to 2004, the U.S. Army Corps of Engineers (Corps) completed a NEPA review for the hovercraft terminal. As part of the analysis, the Corps concluded that a hovercraft operating between two terminals was the preferred alternative.

70.     Following the Corps' analysis and decision, the Aleutians East Borough (Borough) purchased a hovercraft with appropriated federal funds and constructed a portion of the road to the hovercraft facility. The hovercraft began operating in 2007 and successfully completed all requested medical evacuations during its operation.

71.     Despite calling the hovercraft a "life-saving machine . . . doing what it is supposed to do," the Borough suspended hovercraft operations in 2010, citing unreliability and cost. The Borough has since sold the hovercraft.

72.     Despite suspending hovercraft service, the Borough sought to continue road construction to what was supposed to serve as the hovercraft facility. To justify continued

road construction under its permit, the Borough told the Corps that the facility would be used for a landing craft or passenger ferry instead, if a land exchange did not proceed. Letter from Stanley Mack, Mayor, Aleutians East Borough, to Kevin Morgan, Division Chief, Alaska District, Regulatory Division, U.S. Army Corps of Engineers (Feb. 24, 2012); *see also* Letter to Stanley Mack, Mayor, Aleutians East Borough, from Terri Stinnett-Herczeg, Deputy Chief, Regulatory Division, U.S. Army Corps of Engineers (Mar. 20, 2012) (both letters included in Appendix I to U.S. Dep't of the Interior, U.S. Fish and Wildlife Service, Izembek Nat'l Wildlife Refuge Land Exchange/Road Corridor Final Environmental Impact Statement (Feb. 5, 2013)).

73.     During this same time, new bills were introduced in Congress to mandate a land exchange to allow for road construction through Izembek. Rather than passing legislation that mandated an exchange for road construction, Congress amended the bill to instead allow the Secretary to decide whether to exchange the Refuge lands if doing so was in the public interest.

74.     That legislation was included in a national lands bill that passed in 2009: the Omnibus Public Lands Management Act (OPLMA). Pub. L. No. 111-11, 123 Stat. 991 (2009).

75.     In OPLMA, Congress directed the Secretary to comply with NEPA and determine "whether to carry out the land exchange."

76.     Under OPLMA, road use was limited to primarily health and safety purposes and only noncommercial purposes.

77.    For the land exchange considered under OPLMA, KCC offered 13,300 acres of its land and the State of Alaska offered to exchange 43,093 acres of its lands to the federal government. In exchange, slightly more than 200 acres within Izembek would have been exchanged out of federal ownership.

78.    FWS prepared an EIS to analyze the impacts of the exchange under OPLMA, and to document the results of this extensive scientific and public process. U.S. Dep't of the Interior, U.S. Fish and Wildlife Service, Izembek Nat'l Wildlife Refuge Land Exchange/Road Corridor Final Environmental Impact Statement ("Final EIS") (Feb. 5, 2013).

79.    The Final EIS evaluated two potential road alignments, as well as two alternatives for providing marine transport between King Cove and Cold Bay via hovercraft or ferry. The environmental consequences for each of these transportation alternatives, as well as a No Action alternative, were considered for the various resources in Izembek.

80.    After completion of the Final EIS, former Secretary Jewell made a decision to not proceed with the land exchange. U.S. Dep't of the Interior, U.S. Fish and Wildlife Service, Record of Decision, Izembek Nat'l Wildlife Refuge Land Exchange/Road Corridor Final Environmental Impact Statement (ROD) (Dec. 23, 2013).

81.    In her decision, former Secretary Jewell described how a road would impact the wildlife and habitat of Izembek, including Pacific black brants, tundra swans, emperor geese, Steller's eiders, brown bear, caribou, and wolves. ROD at 7–8.

82.     Former Secretary Jewell concluded that the impacts of a road through Izembek would significantly and adversely affect the Refuge and "would not be offset" by adding the exchange lands to Izembek. ROD at 2–4; *see also* ROD at 9 (noting that the lands offered would not likely be developed in a way that would have the same impacts as a road).

83.     Former Secretary Jewell explained that not moving forward with the land exchange "protects the unique resources the Department administers for the entire Nation." ROD at 20. By rejecting the land exchange, Secretary Jewell protected Izembek's "unique and internationally recognized habitats," maintained the integrity of designated Wilderness, and ensured that the Refuge would continue to meet the purposes that it was originally established for in 1960 and re-designated to achieve in ANILCA. ROD at 4; *see also* ROD at 7 (noting that a road would diminish the ability of FWS to meet ANILCA purposes 1, 2, and 4 for Izembek), 20 ("Selecting Alternative 1 preserves the integrity of the Izembek Refuge and Izembek Wilderness, ensures continued protection of unique and internationally recognized habitats, and maintains the integrity of designated Wilderness.").

84.     Former Secretary Jewell determined that not allowing the exchange would comply with the obligations under the National Wildlife Refuge Administration Act. ROD at 7.

Case 3:19-cv-00216-JWS   Document 1   Filed 08/07/19   Page 22 of 42

85.     Secretary Jewell found that a land exchange would "diminish the ability of the Service to meet the objectives of the Wilderness Act" because the impacts to the remaining Wilderness in Izembek would be "irreparabl[e] and significant[]." ROD at 9.

86.     Secretary Jewell explained that Izembek's wetlands are designated as a Wetland of International Importance under the Ramsar Convention, which the U.S. is "obligated to protect pursuant to treaties." ROD at 5.

87.     Secretary Jewell found that a road would lead to increased "human access and activity" that would have "profound adverse effects on wildlife use and habitats of the narrow isthmus." ROD at 4; *see also* ROD at 9 (noting that damage from off-road use cannot be prevented through regulation, enforcement, or barriers).

88.     Secretary Jewell also found that travel times for other forms of transportation (air, hovercraft, and ferry options) could be similar to, or at times quicker than, a road. ROD 10–11.

89.     Secretary Jewell ultimately found that not proceeding with the exchange "best satisfies Refuge purposes, and best accomplishes the mission of the Service and the goals of Congress in ANILCA." ROD at 20.

90.     KCC, along with the Agdaagux Tribe of King Cove, the Native Village of Belkofski, the Aleutians East Borough, the City of King Cove, and two individuals, challenged former Secretary Jewell's decision in federal court. The State of Alaska joined that litigation as an intervenor-plaintiff. Friends of Alaska National Wildlife Refuges, Defenders of Wildlife, Wilderness Watch, Center for Biological Diversity, The

Wilderness Society, National Audubon Society, the National Wildlife Refuge Association, and the Sierra Club joined as intervenor-defendants.

91.     The U.S. District Court of Alaska upheld former Secretary Jewell's decision to not move forward with a land exchange and road construction. The plaintiffs and the State of Alaska appealed that decision to the Ninth Circuit, but later voluntarily dismissed the case.

92.     In May 2017, KCC wrote to former Secretary Zinke asking him to exchange land under ANCSA and ANILCA "that would allow King Cove to complete a road connection between King Cove and Cold Bay, Alaska." KCC "request[ed] that [Interior] enter into a process to consider a land exchange between the King Cove Corporation and the U.S. Government and Department of the Interior in accordance with AN[CS]A, ANILCA, and other pertinent laws."

93.     Former Secretary Zinke "mandated that the Fish and Wildlife Service explore the option of a land trade between the Izembek Refuge and the King Cove Native Corporation." Minimum Requirements Decision Guide Workbook, Project Title: Proposed King Cove-Cold Bay Road Corridor Engineering Reconnaissance, signed by Gregory S. Risdahl (June 23, 2017), at 1–2.

94.     As a result, FWS issued a permit to the Alaska Department of Transportation and Public Facilities to conduct a ground-based reconnaissance of two proposed road alignments between King Cove and Cold Bay. This survey was to collect data "to determine the feasibility of road alignments, potential material sources, localized

topography, and geologic and environmental conditions in order to analyze the best possible location for the road. *Id.*

95.     Former Secretary Zinke signed an "Agreement for the Exchange of Lands" with KCC on January 22, 2018. U.S. Dep't of the Interior, Fish and Wildlife Service, Agreement for the Exchange of Lands (Jan. 22, 2018) (2018 Exchange Agreement).

96.     The 2018 Exchange Agreement stated that "the United States will convey to KCC the surface and subsurface estate of up to 500 acres from within [the Refuge] that are identified by KCC as being needed for the construction, operation, and maintenance of a road linking King Cove with the Cold Bay airport (the U.S. Exchange Lands)."

97.     In return, KCC was to convey to the United States the surface estate of certain lands it owns in Izembek and Alaska Peninsula National Wildlife Refuges.

98.     The 2018 Exchange Agreement imposed road construction standards and some use prohibitions, including a requirement that the road would be used primarily for health and safety purposes, and generally restricting commercial use of the road. These standards and prohibitions had to be included in any patent issued by the Secretary to ensure that the Izembek lands remain subject to the laws and regulations governing use and development in the Izembek Refuge. 43 U.S.C. § 1621(g).

99.     The Alaska Department of Transportation and Public Facilities has assisted KCC with the engineered design, environmental permitting and construction of the proposed transportation system through Izembek Refuge. Brief for State of Alaska as

Case 3:19-cv-00216-JWS   Document 1   Filed 08/07/19   Page 25 of 42

Amici Curiae Supporting Defendants at 4–5, 13, *Friends of Alaska Nat'l Wildlife Refuges v. Bernhardt*, Case No. 3:18-cv-00029 (D. Alaska filed Aug. 29, 2018).

100.    Friends' brought a lawsuit challenging the 2018 Exchange Agreement on January 31, 2018. KCC and other road proponents intervened as intervenor-defendants.

101.    Friends' moved for summary judgment on July 11, 2018, requesting the District Court to vacate and void the Exchange Agreement, and prevent any activities from moving forward pursuant to it.

102.    Pursuant to the 2018 Exchange Agreement, the Bureau of Land Management (BLM) conducted a cadastral survey aided by a helicopter of the potential road corridor within the Izembek Wilderness on July 10–11, 2018.

103.    BLM staff conducted approximately 86 helicopter landings in the process of installing 122 survey monuments along the road corridor in Izembek's Wilderness. Though foot traffic was identified as an option to reduce impacts from helicopters landing in Wilderness areas, this option was disregarded as "inconsistent with direction from the Secretary to expedite our process" and for other reasons. Memo to the File from Mitch Ellis, Regional Chief, National Wildlife Refuge System-Alaska Region (July 12, 2018).

104.    A Minimum Requirements Analysis (MRA) for the cadastral survey was not conducted to determine compliance with the Wilderness Act, because, according to FWS, the survey was expressly required by the Secretary under the 2018 Land Exchange Agreement and under the Secretary's authority under ANILCA 1302(h). FWS stated that

Case 3:19-cv-00216-JWS   Document 1   Filed 08/07/19   Page 26 of 42

the survey "does not meet the MRA requirement of necessity for administering the area

as wilderness and to accomplish refuge purposes." *Id*. at 2.

105.    FWS did not complete a compatibility determination for the cadastral

survey on the grounds that it was a "management action" under the 2018 Exchange

Agreement. U.S. Fish and Wildlife Service, Region 7, Statement of Compliance, Izembek

Land Exchange Boundary Cadastral Survey, Izembek NWR (undated).

106.    There was no public notice prior to this survey taking place and no permits

were issued.

107.    On September 12, 2018, the BLM published a Notice of Filing Plats of

Survey for U.S. Survey No. 14495, Alaska, which failed to include location information

for the survey. Department of the Interior, Bureau of Land Management, Filing of Plats

of Survey: Alaska, 83 Fed. Reg. 46,188 (Sept. 12, 2018). An official correction was

published on October 10, 2018, which made it possible for the public to identify U.S.

Survey No. 14495 as the survey of lands within Izembek Refuge. Department of the

Interior, Bureau of Land Management, Filing of Plats of Survey: Alaska; correction, 83

Fed. Reg. 50,956 (Oct. 10, 2018).

108.    On November 9, 2018, environmental groups submitted a notice of protest

against the plats of survey for U.S. Survey No. 14495, Alaska. The groups submitted a

statement of reasons for the protest on December 10, 2018.

109.    The protest questioned the legality of the survey. Groups alleged that

BLM's survey and plat filing was prematurely executed due to the ongoing litigation

associated with the land exchange, and BLM's use of helicopters in designated

Wilderness. The protest also alleged that BLM did not perform the cadastral survey in

compliance with legal mandates and the agency's own policies and procedures set forth

in the BLM Manual of Survey Instructions (2009), rendering the survey invalid.

110.    BLM dismissed the protest on March 11, 2019 and filed the survey. On

information and belief, the survey has not been withdrawn or otherwise revoked.

111.    On March 29, 2019, the U.S. District Court issued its Order on the Motion

for Summary Judgment, granting summary judgment to the Plaintiffs.

112.    The District Court found that the 2018 Exchange Agreement violated the

APA because Interior failed to justify the change in policy from the prior administration.

*Friends of Alaska Nat'l Wildlife Refuges v. Bernhardt*, 381 F. Supp. 3d 1127 (D. Alaska

2019).

113.    The District Court found that the 2018 Exchange Agreement did not

contain an acknowledgment of the Secretary's fundamental change in agency policy,

provided no reasoned explanation regarding prior determinations that viable alternatives

exist, and ignored findings concerning a road's environmental impact on Izembek

Refuge. *Id*. at 1140–41. The Court therefore found that the Secretary's decision to enter

into the 2018 Exchange Agreement constituted an unlawful agency action and was

arbitrary and capricious under the APA. *Id*. at 1143.

Case 3:19-cv-00216-JWS   Document 1   Filed 08/07/19   Page 28 of 42

114.    Specifically, the Court determined that "the Secretary's failure to acknowledge the change in agency policy and his failure to provide a reasoned explanation for that change in policy are serious errors." *Id*.

115.    In light of this ruling, the Court did not reach the Plaintiffs' other ANILCA, NEPA, or ESA claims. *Id*. at 1143 n.124.

116.    The Court entered Judgment and set aside and vacated the 2018 Exchange Agreement. *Friends of Alaska Nat'l Wildlife Refuges v. Bernhardt*, Case No. 3:18-cv-00029-SLG, Judgement in a Civil Case (Mar. 29, 2019).

117.    On May 21, 2019, KCC wrote to Secretary Bernhardt asking him to consider another land exchange that allows for a "transportation system between the City of King Cove and the Cold Bay airport." Letter from Dean Gould, KCC President, to Hon. David Bernhardt, Secretary (May 21, 2019). The letter included a draft exchange agreement.

118.    On May 24, 2019, Defendants in the *Friends* case appealed the decision to the U.S. Court of Appeals for the Ninth Circuit.

119.    On July 3, 2019, Secretary Bernhardt signed the new Exchange Agreement.

120.    On July 12, 2019, a representative from KCC signed the new Exchange Agreement.

121.    The executed Exchange Agreement is substantively identical to the draft agreement proposed by KCC with its May 21 letter.

122.     On July 16, 2019, the Secretary moved to dismiss the appeal of the 2018

Exchange Agreement. The Ninth Circuit Court of Appeals granted the motion on July 22,

2019.

123.     On July 23, 2019, a news outlet reported that a new exchange agreement

had been executed. Liz Ruskin, *It's Back: Interior Signs New Land Swap for King Cove*

*Road*, Alaska Public Media, July 23, 2019, available at:

https://www.alaskapublic.org/2019/07/23/its-back-interior-signs-new-land-swap-for-

king-cove-road/.

124.     The Exchange Agreement is a final agency action that binds the United

States to exchange lands with KCC.

125.     The Exchange Agreement states that the United States "intends to convey

to KCC the surface and subsurface estate of the lands delineated in U.S. Survey No.

14495, Alaska, that have been previously identified by KCC as being needed for the

construction, operation, and maintenance of a road linking King Cove with the Cold Bay

airport (U.S. Exchange Lands)." Exchange Agreement at 1.

126.      The remaining actions that the Department of the Interior will take under

the Exchange Agreement are to conduct a contaminants survey, to appraise both the U.S.

Exchange Lands and the KCC Exchange Lands Pool and notify KCC of the exact number

of acres of land from the KCC Exchange Lands Pool that will equal the value of the U.S.

Exchange Lands, and to conduct a National Historical Preservation Act survey.

127.    The Secretary states in the Exchange Agreement "that this land exchange with KCC that allows for construction of a road" strikes "the proper and appropriate balance between protecting the national interest in the scenic, natural, cultural and environmental values of the public lands in Alaska and providing an adequate opportunity for satisfaction of the economic and social needs of the State of Alaska." *Id.* at 2.

128.    The Exchange Agreement includes some limitations and restrictions on road construction and design. These standards and prohibitions must be included in any patent issued by the Secretary to ensure that the Izembek lands remain subject to the laws and regulations governing use and development in the Izembek Refuge. 43 U.S.C. § 1621(g).

129.    The Exchange Agreement does not include a provision limiting use of the road for health and safety purposes nor impose any restrictions on commercial use of the road.

130.    The Exchange Agreement states that the land exchange does not count against KCC's ANCSA entitlement.

131.     Under the Exchange Agreement, the conveyances of land may occur sequentially, with conveyance of the previously surveyed U.S. Exchange Lands to KCC occurring first in time.

132.    Pursuant to the Exchange Agreement, the United States will select lands from the KCC Exchange Lands Pool within 12 months.

133. The Exchange Agreement states that the conveyance of the U.S. Exchange Lands will be by patent issued by the Bureau of Land Management, "preceded by Interim Conveyance if necessary." Exchange Agreement at 5.

134. Under the Exchange Agreement, KCC would relinquish its selection rights under ANCSA to 5,430 acres located within Izembek. KCC will be entitled to the conveyance of 5,430 acres previously selected, but not yet conveyed, under ANCSA outside of Izembek.

135. The Exchange Agreement was accompanied by a memorandum from the Secretary. Findings and Conclusions Concerning a Proposed Land Exchange Between the Secretary of the Interior and King Cove Corporation for Lands Within Izembek National Wildlife Refuge, Alaska (July 3, 2019) (Bernhardt Memo).

136. The Bernhardt Memo purports to explain the Secretary's decision. In the Bernhardt Memo, the Secretary provides a summary of the factual background for the Exchange Agreement. The Secretary partially describes and summarizes the 2013 ROD, the use of medevacs and Coast Guard vessels for emergency transportation from King Cove, and a 2015 report prepared by the U.S. Army Corps of Engineers evaluating non-road transportation alternatives to connect King Cove and Cold Bay. Bernhardt Memo at 3–12.

137. The Secretary states that Secretary Zinke considered the following factors in entering the 2018 Exchange Agreement: (1) King Cove's need for emergency transport (2) Secretary Jewell's decision relying on alternative transportation methods was

misplaced based on new evidence (3) Izembek would benefit from the acreage acquired via exchange and (4) marine transportation would harm endangered sea otters. The Secretary does not identify any decision document or findings by Secretary Zinke in support of these statements. Bernhardt Memo at 11.

138.    The Secretary purports to describe the legal background for the exchange, including ANILCA, ANCSA, NEPA, and the ESA. Bernhardt Memo at 12–16.

139.    The Secretary states the Exchange Agreement formalizes a decision "whether to authorize land exchange pursuant to ANILCA that will afford KCC the ability to use its land selections in the pursuit of a better range of health and safety options for their community." Bernhardt Memo at 16.

140.    The Secretary asserts that the exchange serves the purposes of ANILCA and ANCSA by balancing "the national interest in the scenic, natural, cultural, and environmental values of the public lands in Alaska and providing an adequate opportunity for satisfaction of the economic and social needs of the Alaska Native people of King Cove." Bernhardt Memo at 19.

141.    The Secretary states that "[t]he balancing of needs would be enhanced through the adoption of restrictions on the nature of any road to a single-land gravel construction on which non-medical uses and access would be severely limited." Bernhardt Memo at 19.

142.    The Exchange Agreement does not restrict use of the road against non-medical use, commercial use, or otherwise limit access.

143. The exchange is not a land selection under ANCSA and will not result in any charge against KCC's ANCSA entitlement. Exchange Agreement at 3, ¶ C.

144. The Bernhardt memo does not provide detailed findings on the 1960 and ANILCA purposes for Izembek, or the Wilderness Act or National Wildlife Refuge System Act purposes.

145. The Secretary did not ensure that the Exchange Agreement met the requirements for an exchange under ANILCA Section 1302(h), 16 U.S.C. § 3192(h).

146. The Secretary did not comply with the procedures of ANILCA Title XI prior to executing the Exchange Agreement.

147. The Secretary did not comply with the procedures mandated by NEPA prior to executing the Exchange Agreement.

148. The Secretary did not complete consultation under ESA Section 7 prior to executing the Exchange Agreement.

149. Pursuant to 16 U.S.C. § 1540(g)(2), on August 7, 2018, Friends provided written notice of violation of the ESA to the Secretary, and informed the Secretary of Friends' intent to sue if consultation was not commenced within sixty days of transmittal.

## FIRST CLAIM FOR RELIEF
(Violation of Alaska National Interest Lands Conservation Act, 16 U.S.C. § 3192 and APA, 5 U.S.C. §§ 704–706)

150. Friends re-alleges and incorporates by reference the allegations made in all preceding paragraphs.

151.    The Exchange Agreement is a final agency action for which there is no other adequate remedy in a court. 5 U.S.C. § 704.

152.    ANILCA mandates that acquiring lands be for the purposes of the Act. 16 U.S.C. § 3192(h).

153.    Prior Secretaries and FWS have declined to exchange lands in Izembek, finding that doing so would not further the purposes of ANILCA, Izembek, the Wilderness Act, or the National Wildlife Refuge System Administration Act, and would cause serious harm to Refuge resources, among other reasons.

154.    Secretary Bernhardt determined that the Exchange Agreement would meet the purposes of ANILCA.

155.    When an agency changes policy or course, it must "supply a reasoned analysis for the change." *Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 42. More specifically, it must acknowledge the change in course, show that the new rule is permissible under the statute, express that it is a better policy, and provide good reasons for the change in policy. *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. at 515–16; *Organized Village of Kake v. U.S. Dep't of Agric.*, 795 F.3d at 966. When reversing a policy, "an agency may not simply discard prior factual findings without reasoned explanation." 795 F.3d at 968. Instead, when a policy change rests on new factual findings that contradict prior findings and circumstances, the agency must "provide a more detailed justification than what would suffice for a new policy

created on a blank slate." *F.C.C. v. Fox*, 556 U.S. at 515–16; *see also Organized Village of Kake v. U.S. Dep't of Agric.*, 795 F.3d at 966.

156.    The Secretary failed to show that a land exchange is permissible under the statute because the exchange does not further the purposes of ANILCA .

157.    In executing the Exchange Agreement and issuing the Bernhardt Memo, the Secretary failed to adequately explain the change in Interior's and FWS's long-held position to reject a land exchange in Izembek and confront multiple prior decisions finding that a land exchange would not meet ANILCA's purposes for multiple reasons, which may include, but are not limited to:

      a.  Failure to address the fact that the Exchange Agreement does not impose restrictions on the road to limit use to health, safety, medical, or generally noncommercial uses and consider or explain his conclusions in light of this fact;

      b.  Failure to address the prior findings regarding the specific purposes of Izembek that would not be met by an exchange;

      c.  Failure to acknowledge or consider the finding in the 1998 Land Protection Plan that a road is "the greatest known potential threat to wildlife and wilderness values within the Izembek complex;"

      d.  Failure to acknowledge prior findings regarding the impacts of a land exchange and road on the purposes of the Wilderness Act and National Wildlife Refuge System Administration Act with respect to Izembek;

e. Failure to address the fact that this Exchange Agreement results in more than twice the acreage being included in the road corridor than the 2013 proposed exchange and also includes gravel sites and failure to consider or explain his conclusions in light of this fact;

f. Failure to address the fact that no additional lands other than those necessary to achieve an equal value exchange will be acquired by the United States, in contrast to the exchange considered in 2013 where over 13,000 acres of KCC lands and over 43,000 of State of Alaska lands would also be exchanged with the United States;

g. Failure to address the agency's prior finding that acquisition of KCC-selected lands did not support an exchange because those lands were unlikely to be developed in a manner that would have a similar impact to Izembek as a land exchange for a road;

h. Failure to consider the prior findings that a land exchange and road would lead to increased impacts on wildlife and habitat from human access and activity;

i. Mischaracterization of the 2013 ROD's failure to consider impacts from ferry travel through sea otter critical habitat, where such impacts were discussed and considered in the Final EIS;

j. Failure to justify his determination regarding viability of non-road transportation alternatives in light of prior statements by the Aleutians East

Borough to federal agencies regarding its intent to construct a marine link, and findings regarding viability of non-road transportation options, including cost, travel time, and reliability;

k.  Failure to acknowledge or consider the finding in the 2013 ROD that increased activity from a road would put a strain on Refuge management at a time of decreasing Refuge budget and capacity;

l.  Failure to consider Izembek's designation under the Ramsar Convention and management obligations under that designation;

m.  Failure to explain or justify his conclusion that the costs of Coast Guard medical evacuations were underestimated in 2013; and

n.  Failure to explain or justify his conclusion that the acute necessity for a road was underestimated in 2013.

158.    Secretary Bernhardt's failure to demonstrate that the Exchange Agreement is permissible under ANILCA and to provide the required justification for the change in policy to support the Exchange Agreement renders the Exchange Agreement and Bernhardt Memo arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, or without observance of the procedure required by law. 5 U.S.C. § 706.

## SECOND CLAIM FOR RELIEF
(Violation of Alaska National Interest Lands Conservation Act, 16 U.S.C. § 3192)

159.    Friends re-alleges and incorporates by reference the allegations made in all preceding paragraphs.

160.    ANILCA Section 1302(h) mandates that acquiring lands be for the purposes of the Act. 16 U.S.C. § 3192(h).

161.    The exchange does not further the purposes of ANILCA.

162.    Secretary Bernhardt's decision to exchange Izembek lands for KCC lands does not further the purposes of ANILCA and is arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, or without observance of procedure required by law. 5 U.S.C. § 706.

## THIRD CLAIM FOR RELIEF
(Violation of Alaska National Interest Lands Conservation Act, 16 U.S.C. §§ 3161–3173)

163.    Friends re-alleges and incorporates by reference the allegations made in all preceding paragraphs.

164.    Title XI of ANILCA requires that transportation systems through conservation system units in Alaska be approved or disapproved through its "single comprehensive statutory authority." 16 U.S.C. § 3161(c).

165.    Title XI of ANILCA mandates the use of specific forms, preparation of an EIS, compliance with specific timelines and public involvement, and that each agency make eight detailed findings. 16 U.S.C. § 3164.

166.    Title XI of ANILCA prohibits the construction of transportation systems through designated Wilderness without recommendation by the President and approval by Congress. 16 U.S.C. § 3166.

167.    KCC specifically sought the land exchange to allow for a "transportation system" between the City of King Cove and the Cold Bay airport.

168. The Exchange Agreement specifically states that it is for the purpose of allowing the construction of a road.

169. The Exchange Agreement was not adopted pursuant to Title XI's procedures.

170. The President has not recommended to Congress that a road be constructed through Izembek pursuant to Title XI's procedures.

171. Congress has not approved a road through Izembek pursuant to Title XI's procedures.

172. ANILCA Section 1302(h), 16 U.S.C. § 3192(h), does not exempt the Exchange Agreement from Title XI's requirements.

173. Secretary Bernhardt's decision to exchange Izembek lands for KCC lands for the purpose of allowing the construction of a road through the Refuge without complying with Title XI of ANILCA is arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, or without observance of procedure required by law. 5 U.S.C. § 706.

174. Because Title XI mandates that any action "by any Federal agency under applicable law with respect to the approval or disapproval of the authorization, in whole or in part, of any transportation or utility system shall not have any force or effect unless the provisions of this section are complied with," the Exchange Agreement is null and void. 16 U.S.C. § 3164(a).

## FOURTH CLAIM FOR RELIEF
### (Violation of the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321–4370h)

175.    Friends re-alleges and incorporates by reference the allegations made in all preceding paragraphs.

176.    NEPA requires the preparation of an EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.4.

177.    The Exchange Agreement for the purpose of allowing the construction of a road through Izembek is a major federal action significantly affecting the quality of the human environment.

178.    The Exchange Agreement states that "the Parties [] agree the land exchange under this Agreement will not result in any charge against KCC's ANCSA entitlement."

179.    ANILCA Section 910, 43 U.S.C. § 1638, does not apply to the Exchange Agreement and does not exempt the Secretary from compliance with NEPA.

180.    Secretary Bernhardt's decision to exchange Izembek lands for KCC lands for the purpose of allowing the construction of a road through the Refuge without complying with NEPA is arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, or without observance of procedure required by law. 5 U.S.C. § 706.

### REQUEST FOR RELIEF

The Plaintiffs request that the Court grant the following relief:

A.     Declare that Secretary Bernhardt's decision to exchange Izembek lands for KCC lands is arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, or without observance of procedure required by law, in violation of ANILCA, NEPA, and the APA;

B.     Invalidate, vacate, and set aside the Exchange Agreement;

C.     Invalidate, vacate, and set aside the Bernhardt Memo;

D.     Invalidate, vacate, and set aside any agency actions or decisions relying on the vacated 2018 and/or unlawful 2019 Exchange Agreements, including but not limited to the: U.S. Survey 14495, Alaska, the contaminants survey referenced in paragraph L of the Exchange Agreement, and the appraisal referenced in paragraph D.3 of the Exchange Agreement;

E.     Enter appropriate injunctive relief;

F.     Award Friends all reasonable costs and fees as authorized by law; and

G.     Award Friends such other and further relief as this Court deems just and proper.

Respectfully submitted this 7th day of August, 2019,

s/ Bridget Psarianos
Bridget Psarianos (AK Bar No. 1705025)
Brook Brisson (AK Bar No. 0905013)
Valerie Brown (AK Bar No. 9712099)
TRUSTEES FOR ALASKA

*Attorneys for Plaintiffs*