Bridget Psarianos (AK Bar No. 1705025)
Brook Brisson (AK Bar No. 0905013)
Valerie Brown (AK Bar No. 9712099)
TRUSTEES FOR ALASKA
1026 W. Fourth Avenue, Suite 201
Anchorage, AK 99501
Phone: (907) 276-4244
Fax: (907) 276-7110
bpsarianos@trustees.org
bbrisson@trustees.org
vbrown@trustees.org


*Attorneys for Plaintiffs*

## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| FRIENDS OF ALASKA NATIONAL WILDLIFE REFUGES, THE WILDERNESS SOCIETY, NATIONAL AUDUBON SOCIETY, WILDERNESS WATCH, CENTER FOR BIOLOGICAL DIVERSITY, DEFENDERS OF WILDLIFE, NATIONAL WILDLIFE REFUGE ASSOCIATION, ALASKA WILDERNESS LEAGUE, and SIERRA CLUB, <br><br> Plaintiffs, <br><br> v. <br><br> DAVID BERNHARDT, in his official capacity as Secretary of the U.S. Department of the Interior, U.S. DEPARTMENT OF THE INTERIOR, and U.S. FISH AND WILDLIFE SERVICE, <br><br> Defendants. | Case No. 3:19-cv-00216-JWS |

## FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

(Admin. Procedure Act, 5 U.S.C. §§ 702–06; Alaska Nat'l Interest Lands Conservation Act, 16 U.S.C. § 3101 et. seq., Nat'l Envtl. Policy Act, 42 U.S.C. §§ 4321–4370h, Endangered Species Act, 16 U.S.C. §§ 1531–1544)

Plaintiffs Friends of Alaska National Wildlife Refuges, The Wilderness Society, Defenders of Wildlife, National Audubon Society, Wilderness Watch, Center for Biological Diversity, National Wildlife Refuge Association, Alaska Wilderness League, and Sierra Club (collectively "Friends") file this First Amended Complaint for Declaratory and Injunctive Relief, alleging:

## I.   NATURE OF THE CASE

1.     This action seeks to protect Friends', and their members' and supporters', interest in the Izembek National Wildlife Refuge (Izembek or Refuge) and Izembek's designated Wilderness from the unlawful exchange of Refuge lands in violation of the Alaska National Interest Lands Conservation Act (ANILCA), the National Environmental Policy Act (NEPA), the Administrative Procedure Act (APA) and the Endangered Species Act (ESA).

2.     The U.S. Department of the Interior (Interior) recently entered into a land exchange agreement (Exchange Agreement) with the King Cove Corporation (KCC) to trade away lands within Izembek's Wilderness for KCC-owned lands to allow for the construction of a road connecting the community of King Cove to the Cold Bay airport. This action challenges the Exchange Agreement and the Secretary of the Interior's (Secretary) decision to enter into the Exchange Agreement for failing to comply with ANILCA, NEPA, ESA, and the APA.

Case 3:19-cv-00216-JWS   Document 17   Filed 10/07/19   Page 2 of 48

3. The exchange does not further the purposes of ANILCA, as required by section 1302(h), 16 U.S.C. § 3192(h). In entering into the Exchange Agreement, the Secretary failed to adequately justify the reversal in position from prior Secretarial and agency decisions rejecting similar exchanges. The Secretary also failed to follow the requirements of Title XI of ANILCA, NEPA, and the ESA, and their implementing regulations, in executing the Exchange Agreement.

4. The Secretary's decision and the Exchange Agreement are arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, or without observance of procedure required by law. 5 U.S.C. § 706(2).

5. Friends seeks vacatur, declaratory, and injunctive relief.

## II. JURISDICTION AND VENUE

6. This Court has jurisdiction over the parties and subject matter of this action pursuant to 5 U.S.C. §§ 702–06 (Administrative Procedure Act), 28 U.S.C. §§ 2201–02 (declaratory judgment), and 28 U.S.C. § 1331 (federal question jurisdiction).

7. Venue is proper in the District of Alaska under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims occurred within the District of Alaska and the lands at issue are in Alaska.

8. Pursuant to 16 U.S.C. § 1540(g)(2), on August 7, 2019, Friends provided written notice of violation of the ESA to FWS and DOI, and informed the agencies of Friends' intent to sue if consultation was not commenced within sixty days of transmittal.

A true and correct copy of the notice letter is attached as Exhibit A. The allegations in Exhibit A are incorporated here by reference.

## III.   PARTIES

9.     Plaintiff Friends of Alaska National Wildlife Refuges is a nonprofit organization founded in 2005 and based in Anchorage, Alaska. It is a volunteer group that works to assist the U.S. Fish and Wildlife Service (FWS) to accomplish its congressionally-mandated mission for the sixteen National Wildlife Refuges in Alaska. Its mission is to promote the conservation of all Alaska National Wildlife Refuges through understanding and appreciation, and to assist the FWS through outreach to decision-makers. It has sent members and supporters to Izembek for volunteer projects in the past and is planning to organize another volunteer project to Izembek in the summer or fall of 2020.

10.     Plaintiff The Wilderness Society is a nonprofit organization headquartered in Washington, D.C., with offices throughout the country, including Alaska. Its overall mission is to protect wilderness and inspire Americans to care for wild places. The goal of its Alaska program is to protect and steward federal lands and waters in and around the state, including Alaska's national wildlife refuges and designated Wilderness areas in Alaska. This includes Izembek and the designated Wilderness lands there.

11.     Plaintiff National Audubon Society (Audubon) is a nonprofit organization. Its mission is to conserve and restore natural ecosystems, focusing on birds, other wildlife, and their habitats, for the benefit of humanity and the earth's biological

Case 3:19-cv-00216-JWS   Document 17   Filed 10/07/19   Page 4 of 48

diversity. Audubon uses science, advocacy, education, and conservation to achieve its goal. Audubon operates state programs around the country, including in Alaska. Audubon Alaska works to conserve Alaska's incredible birds, including birds that rely on Izembek and the bird habitat in the Refuge.

12.     Plaintiff Wilderness Watch is a nonprofit organization founded in 1989. Its mission is to defend the nation's 111 million-acre National Wilderness Preservation System. Wilderness Watch advocates for appropriate stewardship according to the requirements of the Wilderness Act of 1964. Wilderness Watch monitors agency stewardship of designated Wilderness in Alaska and organizes its members to participate in public processes in Alaska that impact designated Wilderness.

13.     Plaintiff Center for Biological Diversity (the Center) is a nonprofit organization that works through science and environmental law to advocate for the protection of endangered, threatened, and rare species and their habitats throughout the United States, including Alaska. The Center has a long-standing interest in the conservation of threatened and endangered species and their habitats in Alaska. Specifically, the Center has advocated for protections of the northern sea otter, Steller's eider, Steller sea lion, brown bear, and other wildlife that occur in or near Izembek.

14.     Plaintiff Defenders of Wildlife is a nonprofit organization founded in 1947. Its mission is to protect all native animals and plants in their natural communities. It advocates for the sound management of our public lands, including national wildlife refuges. Defenders of Wildlife has an office in Anchorage and one of the refuges that

Defenders of Wildlife works to protect is Izembek. Defenders of Wildlife has over 1.8 million members and supporters nationwide, including over 6,000 in Alaska.

15.     Plaintiff National Wildlife Refuge Association is a nonprofit organization focused exclusively on protecting and promoting the 850 million-acre National Wildlife Refuge System, the world's largest network of lands and waters set aside for wildlife conservation. Founded in 1975, its mission is to conserve America's wildlife heritage for future generations through strategic programs that enhance the National Wildlife Refuge System and the landscapes beyond its boundaries. With approximately 80% of the land mass of the National Wildlife Refuge System in Alaska, the National Wildlife Refuge Association has throughout its history focused significant resources on protecting and enhancing Refuge System resources throughout the state.

16.     Plaintiff Alaska Wilderness League is a nonprofit organization founded in 1993 to further the protection of public lands and waters in Alaska. Its mission is to lead the effort to preserve Alaska's wild lands and waters by engaging citizens and decision makers. It has offices in Anchorage and Washington, D.C., as well as other locations.

17.     Plaintiff Sierra Club is the nation's oldest and largest grassroots environmental organization. The Sierra Club is a national nonprofit organization with over 779,000 members dedicated to exploring, enjoying, and protecting the wild places of the Earth; to practicing and promoting the responsible use of the Earth's ecosystems and resources; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these

objectives. The Sierra Club's concerns encompass a variety of environmental issues in Alaska and beyond, including an interest in protecting designated Wilderness. The Alaska Chapter of the Sierra Club has just over 1,800 members.

18.     Friends and their members and supporters have long-standing interests in protecting Izembek from a land exchange and road construction. These interests include preserving and enjoying the wildlife, habitat, and wilderness values of Izembek for recreational, aesthetic, and environmental protection purposes. Friends' staff, members, and supporters have visited Izembek, enjoyed viewing its wildlife, and experienced the Wilderness and habitat that Izembek provides. Friends and their members have strong recreational, aesthetic, scientific, and other interests in the wildlife that uses and depends on Izembek, including migratory birds and terrestrial mammals, and federally-protected species.

19.     Friends and their members and supporters have engaged in various past public processes, including NEPA and other administrative processes, regarding a land exchange for a road to protect their interests in Izembek. They have also engaged in lobbying and other legislative work to protect their interests in Izembek. They would have engaged in a public process, environmental review, or congressional outreach regarding the Exchange Agreement had the Secretary undertaken a NEPA or Title XI process.

20.     Friends' members and supporters observe and enjoy species listed under the ESA present in the Izembek Refuge, including the Steller's eider, Steller sea lion, and

Case 3:19-cv-00216-JWS   Document 17   Filed 10/07/19   Page 7 of 48

northern sea otter, as well as their habitats through wildlife observation and study in the course of Friends' use of Izembek Refuge. Friends' activities depend on viable populations of these species that contribute to healthy, functioning ecosystems both onshore and in Izembek's marine environment.

21.     Friends members' and supporters' interests in Izembek are adversely affected by the Exchange Agreement. The removal of public lands and designated Wilderness from the National Wilderness Preservation System and the National Wildlife Refuge System harms the recreational, aesthetic, scientific, and other interests of Friends' members and supporters, who use and enjoy these lands and the wildlife that depends on them.

22.     The execution of the Exchange Agreement without following NEPA's and ANILCA Title XI's procedures harms the interests of Friends' and their members and supporters in engaging in public processes and informing agency decision making.

23.     The purpose of this exchange is for construction of a road through Izembek. The Exchange Agreement states that "time is of the essence" and commits the parties to the Exchange Agreement to expediting "all aspects and tasks of this Agreement." KCC has indicated that it would pursue permitting of the road. The removal of lands from Wilderness and federal ownership and use for road construction further exacerbates the injuries to Friends' members and supporters and harms Friends' and their members' strong recreational, aesthetic, scientific, and wildlife interests in Izembek.

24. These actual, concrete injuries are fairly traceable to Interior's decision to enter into the Exchange Agreement, and to do so without adhering to required processes and decision-making procedures, and would be redressed by the relief sought in this case.

25. Defendant David Bernhardt is the Secretary of the U.S. Department of the Interior and is being sued in his official capacity. As the Secretary, he is charged with the supervision and management of all decisions, operations, and activities of the Department and its divisions.

26. Defendant U.S. Department of the Interior is an executive agency of the United States responsible for oversight of the National Wildlife Refuge System and public lands.

27. Defendant U.S. Fish and Wildlife Service is an agency within the U.S. Department of the Interior and is responsible for the management of the National Wildlife Refuge System.

## IV.  STATUTORY FRAMEWORK

28. Congress passed ANILCA to "preserve unrivaled scenic and geological values associated with natural landscapes; to provide for the maintenance of sound populations of, and habitat for, wildlife species of inestimable values to the citizens of Alaska and the Nation, including those species dependent on vast relatively undeveloped areas; to preserve in their natural state extensive unaltered arctic tundra, boreal forest, and coastal rainforest ecosystems; to protect the resources related to subsistence needs; to protect and preserve historic and archeological sites, rivers, and lands, and to preserve

Case 3:19-cv-00216-JWS   Document 17   Filed 10/07/19   Page 9 of 48

wilderness resource values and related recreational opportunities . . . ; and to maintain opportunities for scientific research and undisturbed ecosystems." 16 U.S.C. § 3101(b).

29.     ANILCA provides that "the Secretary is authorized, consistent with other applicable law in order to carry out the purposes of this Act, to acquire by purchase, donation, exchange, or otherwise any lands within the boundaries of any conservation system unit." 16 U.S.C. § 3192(a).

30.     The Secretary is permitted to exchange lands under ANILCA "on the basis of equal value" or, if the parties agree to an unequal-value exchange, the Secretary must determine that the exchange is in the public interest. 16 U.S.C. § 3192(h)(1).

31.     The Secretary may only exchange lands under ANILCA if the exchange furthers "the purposes of [ANILCA]." 16 U.S.C. § 3192(h)(1).

32.     Congress included this exchange provision to authorize the Secretary to acquire inholdings in conservation system units to further the purposes of those units, without resorting to condemnation proceedings.

33.     Title XI of ANILCA establishes a "single comprehensive statutory authority for the approval or disapproval of applications for [transportation and utility] systems" through Alaska public lands. 16 U.S.C. § 3161(c). This applies to roads constructed through conservation system units, including National Wildlife Refuges and designated Wilderness. 16 U.S.C. § 3162(4).

34.     Title XI of ANILCA requires that transportation facilities "be approved or disapproved in accordance with the procedures set forth in this subchapter." 16 U.S.C. §

3162; *see also* 16 U.S.C. § 3164(a) ("Notwithstanding any provision of applicable law, no action by any Federal agency under applicable law with respect to the approval or disapproval of the authorization, in whole or in part, of any transportation or utility system shall have any force or effect unless the provisions of this section are complied with.").

35.    Transportation systems may not be constructed through designated Wilderness without a recommendation by the President and approval by Congress. 16 U.S.C. § 3166(b), (c).

36.    Congress passed the Alaska Native Claims Settlement Act (ANCSA) to provide for the expeditious, fair, and just settlement of certain land claims of Alaska Natives. 43 U.S.C. § 1601.

37.    ANCSA requires that where a patent conveys lands within the National Wildlife Refuge System to any Village Corporation, that patent "shall contain a provision that such lands remain subject to the laws and regulations governing use and development of such Refuge." 43 U.S.C. § 1621(g).

38.    The Wilderness Act was passed to protect for "present and future generations the benefits of an enduring resource of wilderness" and establish the National Wilderness Preservation System to protect areas and provide for their use and enjoyment as unimpaired Wilderness. 16 U.S.C. § 1131(a).

39.    Congress directed that Wilderness be managed to preserve its wilderness character, and it devoted Wilderness to "the public purposes of recreational, scenic,

scientific, educational, conservation, and historical use" 16 U.S.C. § 1133(b); *see also*

Alaska National Interest Lands Conservation Act, Pub. L. No. 96–487, § 707, 94 Stat.

2371 (1980) (stating "wilderness designated by this Act shall be administered in

accordance with applicable provisions of the Wilderness Act").

40.     The Wilderness Act provides that "except as necessary to meet minimum

requirements for the administration of the area for the purpose of this [Act] . . . , there

shall be . . . no use of motor vehicles, motorized equipment or motorboats, no landing of

aircraft, no other form of mechanical transport, and no structure or installation within any

such area." 16 U.S.C. § 1133(c).

41.     The mission of the National Wildlife Refuge System is "to administer a

national network of lands and waters for the conservation, management, and where

appropriate, restoration of fish, wildlife, and plant resources and their habitats within the

United States for the benefit of present and future generations of Americans." 16 U.S.C. §

668dd(a)(2).

42.     Refuges must "be managed to fulfill the mission of the System, as well as

the specific purposes for which that refuge was established." 16 U.S.C. § 668dd(a)(3)(A);

*see also* 16 U.S.C. § 668dd(a)(4)(B) & (D) (requiring the Secretary to administer the

refuge to achieve the purposes of the refuge and the mission of the Refuge System);

ANILCA § 304(a) ("Each refuge shall be administered by the Secretary . . . in accordance

with the laws governing the administration of units of the National Wildlife Refuge

System, and this Act.").

43.     NEPA is "our basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). NEPA's twin aims are to ensure that federal agencies take a hard look at the environmental impacts of their proposed actions before taking an action and to ensure that agencies provide relevant information to the public so the public can play a role in both the decision-making process and the implementation of the decision. 40 C.F.R. § 1502.1.

44.     NEPA requires federal agencies to prepare a detailed environmental impact statement (EIS) for every major federal action that will have a significant impact on the quality of the human environment. 42 U.S.C. § 4332. Such a statement is required to "provide full and fair discussion of significant environmental impacts and shall inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1.

45.     The APA provides for judicial review of actions taken by administrative agencies. 5 U.S.C. §§ 702–06.

46.     The APA instructs a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions" if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or are "without observance of procedure required by law." 5 U.S.C. § 706(2).

47.     When an agency reverses a prior decision, the agency is "obligated to supply a reasoned analysis for the change." *Motor Vehicles Mfrs. Ass'n of U.S., Inc. v.*

*State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983). An agency change in position is arbitrary and capricious under the APA unless the agency (1) displays "awareness that it is changing position," (2) shows that "the new policy is permissible under the statute," (3) "believes" the new policy is better, and (4) provides "good reasons" for the new policy, which, if the "new policy rests upon factual findings that contradict those which underlay its prior policy," must include "a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009); *see also Organized Village of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 966 (9th Cir. 2015) (en banc).

48.     Congress enacted the ESA to protect and conserve threatened and endangered species and the ecosystems upon which they depend. 16 U.S.C. § 1531(b). It is "the policy of Congress that all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of [the ESA]." 16 U.S.C. § 1531(c).

49.     The FWS and the National Marine Fisheries Service (NMFS) share responsibilities for administering the ESA and performing consultations. 50 C.F.R. § 402.01(b). Certain marine threatened or endangered species are under the jurisdiction of NMFS; all other listed species are under the jurisdiction of FWS. 50 C.F.R. § 402.01(b).

50.     Section 7(a)(2) of the ESA imposes the obligation on federal agencies to consult with FWS or NMFS to ensure protection of listed species: "Each Federal agency, shall, in consultation with and with the assistance of the [Secretary of the Interior or the

_____
*Friends of Alaska National Wildlife Refuges, et al., v. Bernhardt, et al.*
Case No. 3:19-cv-00216-JWS                                            Page 14 of 48

Case 3:19-cv-00216-JWS   Document 17   Filed 10/07/19   Page 14 of 48

Secretary of Commerce], insure that any action authorized, funded or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat . . . ." 16 U.S.C. § 1536(a)(2).

51.     The ESA prescribes a procedure to ensure compliance with its substantive provisions by federal agencies. A federal agency proposing to take an action must inquire of the Secretary of Interior or Secretary of Commerce whether any threatened or endangered species "may be present" in the area of the proposed action. 16 U.S.C. § 1536(c)(1). If the answer is affirmative, such agency shall conduct a biological assessment to determine whether such species "is likely to be affected" by the action. *Id*.

52.     If a federal agency's proposed discretionary action "may affect listed species or critical habitat," the agency must initiate formal consultation with FWS or NMFS" 50 C.F.R. §§ 402.03, 402.14(a).

53.     If it is determined by the federal agency, "with the written concurrence of [FWS or NMFS], that the action is not likely to adversely affect listed species or critical habitat, the consultation process is terminated, and no further action is necessary." 50 C.F.R. § 402.13.

54.     The "may affect" threshold that triggers Section 7 consultation is low; "any possible effect, whether beneficial, benign, adverse, or of an undetermined character, triggers the formal consultation requirement." *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 496 (9th Cir. 2011) (citing 51 Fed. Reg. 19,926, 19,949 (June 3, 1986)).

---

55.     Under ESA Section 7, the "effect" of a proposed action includes both direct and indirect effects. 50 C.F.R. § 402.02.

## V.     IZEMBEK REFUGE HISTORY AND VALUES

56.     Izembek has been recognized for decades as an area with particularly valuable wildlife habitat.

57.     Efforts to protect Izembek began in the early 1940s. The area was first protected in 1960 as the Izembek National Wildlife Range (Range) as a "refuge, breeding ground, and management area for all forms of wildlife" because of the importance of the area to waterfowl, brown bear, and caribou. Establishing the Izembek National Wildlife Range, Pub. Land Order 2216, 25 Fed. Reg. 12599, 12600 (Dec. 6, 1960). In establishing the Range, the Department of the Interior recognized that it "contain[s] the most important concentration point for waterfowl in Alaska." Office of the Secretary, Department of the Interior, Information Service, Press Release Dec. 7, 1960.

58.      The area's importance was reaffirmed in 1980, when Congress renamed the Range as the Izembek National Wildlife Refuge and designated approximately 307,982 of the 315,000 acres as Wilderness. ANILCA §§ 303(3)(A), 702(6).

59.     Congress established Izembek because of its ecologically unique habitat and wilderness characteristics. Specifically, Congress established Izembek for the following purposes:

(i)     [T]o conserve fish and wildlife populations and habitats in their natural diversity including, but not limited to, waterfowl, shorebirds and other migratory birds, brown bears and salmonids;

_____
*Friends of Alaska National Wildlife Refuges, et al., v. Bernhardt, et al.*
Case No. 3:19-cv-00216-JWS                                    Page 16 of 48

Case 3:19-cv-00216-JWS   Document 17   Filed 10/07/19   Page 16 of 48

(ii)     [T]o fulfill the international treaty obligations of the United States with respect to fish and wildlife and their habitats;

(iii)    [T]o provide, in a manner consistent with the purposes set forth in subparagraphs (i) and (ii), the opportunity for continued subsistence uses by local residents; and

(iv)    [T]o ensure, to the maximum extent practicable and in a manner consistent with the purposes set forth in paragraph (i), water quality and necessary water quantity within the refuge.

*Id.* § 303(3)(B).

60.     When drafting ANILCA, Congress noted:

The Izembek Wilderness possesses outstanding scenery, key populations of brown bear, caribou and other wilderness-related wildlife, and critical watersheds to Izembek Lagoon. About 68 percent of the total lands in Izembek Lagoon are covered with the largest eelgrass beds in the world. These beds are utilized by millions of waterfowl for migration and wintering purposes. A wilderness designation will protect this critically important habitat by restricting access to the lagoon.

H. R. REP. NO. 96-97, at 136 (1979).

61.     Izembek is one of the world's most important migratory bird staging and wintering habitats, supporting millions of migratory waterfowl and shorebirds in its coastal lagoons and freshwater wetlands complex.

62.     Izembek and its adjacent wetlands and nearshore marine environment provide habitat for several federally-protected species, such as the Steller's eider, northern sea otter, and Steller sea lion.

63.     The Alaska breeding population of Steller's eider was listed as threatened in 1997, and its designated critical habitat includes areas within the Izembek Refuge. U.S. Dep't of the Interior, U.S. Fish and Wildlife Service, Izembek Nat'l Wildlife Refuge

Land Exchange/Road Corridor Final Environmental Impact Statement ["Final EIS"] at 3-173 to 3-174 (Feb. 5, 2013).

64.     Northern sea otters, listed as threatened in 2005, appear year round in marine waters adjacent to the Izembek Refuge. Izembek Lagoon was designated as part of the northern sea otters' critical habitat in 2009. Final EIS at 3-179 to 3-181.

65.     Steller's eiders and northern sea otters are species under the jurisdiction of FWS for purposes of the Endangered Species Act (ESA).

66.     The NMFS classified the western distinct population segment of Steller sea lion as endangered in 1997, and its 20-nautical mile critical habitat buffer extends into the Izembek Lagoon. Final EIS at 3-185.

67.     Izembek also provides high quality brown bear, wolf, and caribou habitat. In particular, the Joshua Green River watershed supports the highest concentration of brown bears for the lower Alaska Peninsula. Izembek's isthmus is an important migration corridor and provides wintering habitat for the Southern Alaska Peninsula caribou herd.

68.     Izembek is internationally-recognized for its unique and ecologically significant wetlands and wildlife. It was designated as a Wetland of International Importance by the Ramsar Convention on Wetlands of International Importance in 1986 (Ramsar Convention). Listing under this Convention "reflects a national commitment to maintain the ecological characteristics of the area." Letter from Director, U.S. Fish and Wildlife Service, to Robin West, Manager, Izembek National Wildlife Refuge (June 16, 1989).

Case 3:19-cv-00216-JWS   Document 17   Filed 10/07/19   Page 18 of 48

## VI.     HISTORY OF LAND EXCHANGE PROPOSALS AND EXCHANGE AGREEMENT

69.     The Interior and the FWS have evaluated the effects of a road from King Cove to Cold Bay multiple times.

70.     In the early 1980s, Interior conducted an analysis of a road through Izembek, concluding that a road could cause long-term damage to the Refuge's unique and ecologically important habitats.

71.     In 1985, Interior acknowledged that a road through Izembek Wilderness could only be built with congressional approval under Title XI of ANILCA. Bristol Bay Reg'l Mgmt. Plan and Final Environmental Impact Statement at 8-16, 8-101, U.S. Dep't of Interior (1985); *see also* Record of Decision for the Izembek Nat'l Wildlife Refuge Comprehensive Conservation Plan, 122 & Appendix A (August 1, 1985) (noting that congressional approval will be required to build a road across Izembek Wilderness).

72.     In 1985, Interior also concluded that "[t]he presence of a road [connecting King Cove and Cold Bay], vehicular traffic, and intensified human use could alter migratory patterns" of the "nearly 6,000–7,000" caribou that migrate through the isthmus twice a year between their wintering range and calving grounds, and that roads built in other areas of the state have "pose[d] a serious barrier to caribou movements." Bristol Bay Reg'l Mgmt. Plan and Final Environmental Impact Statement at 8-32.

73.     The Bristol Bay Regional Management Plan further found that a road "would result in expanded human presence and traffic . . . provid[ing] greater access into a relatively remote, undisturbed region in the Joshua Green River drainage and in key

_____

*Friends of Alaska National Wildlife Refuges, et al., v. Bernhardt, et al.*
Case No. 3:19-cv-00216-JWS                                                  Page 19 of 48

bear use areas in Right and Lefthand valleys" such that "[b]ears could be expected to change their behavior . . . and might abandon some traditional use areas." Bristol Bay Reg'l Mgmt. Plan and Final Environmental Impact Statement at 8-38.

74. Interior concluded that "[t]he King Cove-Cold Bay road could have major, local impacts" to wilderness values. Bristol Bay Reg'l Mgmt. Plan and Final Environmental Impact Statement at 8-69.

75. In 1996, FWS again addressed the issue of a road through Izembek and again found that a road would have unacceptable environmental impacts.

76. In 1997, KCC offered to exchange KCC lands at the mouth of the Kinzarof Lagoon for a right-of-way through Izembek. FWS declined the offer because of adverse impacts of a road to wildlife. Land Protection Plan for Izembek National Wildlife Refuge Complex, Cold Bay, Alaska at 53, U.S. Dep't of Interior, FWS, Region 7, Anchorage, AK (March 1998)

77. Also in 1997, Senator Frank Murkowski introduced a bill that would have required the Secretary to allow road construction through Izembek. That bill was amended and eventually passed as part of an appropriations act. Instead of mandating a road, the legislation expressly prohibited a road. Rather, it authorized $37.5 million for various projects to improve health and safety infrastructure and services in King Cove. Omnibus Consolidated and Emergency Supplemental Appropriations Act, Pub. L. No. 105–277, § 353, 112 Stat. 2681, 302–03 (1999) (specifically prohibiting the construction

_____
*Friends of Alaska National Wildlife Refuges, et al., v. Bernhardt, et al.*
Case No. 3:19-cv-00216-JWS                                    Page 20 of 48

Case 3:19-cv-00216-JWS   Document 17   Filed 10/07/19   Page 20 of 48

of any road or other facilities within Izembek). One of the projects authorized was the purchase of a hovercraft and construction of a hovercraft facility outside of the Refuge.

78.     In 1998, FWS called the proposal to build a road "the greatest known potential threat to wildlife and wilderness values within the Izembek complex." Land Protection Plan for Izembek National Wildlife Refuge Complex, Cold Bay, Alaska at 53, U.S. Dep't of Interior, FWS, Region 7, Anchorage, AK (March 1998). FWS again noted the "significant wildlife and wilderness resources in the area," including important wintering area and migration corridor of caribou, an adjacent "key brown bear natal area that supports the highest densities of bears on the lower Alaska Peninsula," and "outstanding and essential habitat for a variety of species, including the threatened Steller's eider, Pacific black brant, tundra swan and emperor goose." Land Protection Plan for Izembek National Wildlife Refuge Complex, Cold Bay, Alaska at 53, U.S. Dep't of Interior, FWS, Region 7, Anchorage, AK (March 1998).

79.     From 2001 to 2004, the U.S. Army Corps of Engineers (Corps) completed a NEPA review for the hovercraft terminal. As part of the analysis, the Corps concluded that a hovercraft operating between two terminals was the preferred alternative.

80.     Following the Corps' analysis and decision, the Aleutians East Borough (Borough) purchased a hovercraft with appropriated federal funds and constructed a portion of the road to the hovercraft facility. The hovercraft began operating in 2007 and successfully completed all requested medical evacuations during its operation.

81.     Despite calling the hovercraft a "life-saving machine . . . doing what it is supposed to do," the Borough suspended hovercraft operations in 2010, citing unreliability and cost. The Borough has since sold the hovercraft.

82.     Despite suspending hovercraft service, the Borough sought to continue road construction to what was supposed to serve as the hovercraft facility. To justify continued road construction under its permit, the Borough told the Corps that the facility would be used for a landing craft or passenger ferry instead, if a land exchange did not proceed. Letter from Stanley Mack, Mayor, Aleutians East Borough, to Kevin Morgan, Division Chief, Alaska District, Regulatory Division, U.S. Army Corps of Engineers (Feb. 24, 2012); *see also* Letter to Stanley Mack, Mayor, Aleutians East Borough, from Terri Stinnett-Herczeg, Deputy Chief, Regulatory Division, U.S. Army Corps of Engineers (Mar. 20, 2012) (both letters included in Appendix I to U.S. Dep't of the Interior, U.S. Fish and Wildlife Service, Izembek Nat'l Wildlife Refuge Land Exchange/Road Corridor Final Environmental Impact Statement (Feb. 5, 2013)).

83.     During this same time, new bills were introduced in Congress to mandate a land exchange to allow for road construction through Izembek. Rather than passing legislation that mandated an exchange for road construction, Congress amended the bill to instead allow the Secretary to decide whether to exchange the Refuge lands if doing so was in the public interest.

84.     That legislation was included in a national lands bill that passed in 2009:
the Omnibus Public Lands Management Act (OPLMA). Pub. L. No. 111-11, 123 Stat.
991 (2009).

85.     In OPLMA, Congress directed the Secretary to comply with NEPA and
determine "whether to carry out the land exchange."

86.     Under OPLMA, road use was limited to primarily health and safety
purposes and only noncommercial purposes.

87.     For the land exchange considered under OPLMA, KCC offered 13,300
acres of its land and the State of Alaska offered to exchange 43,093 acres of its lands to
the federal government. In exchange, slightly more than 200 acres within Izembek would
have been exchanged out of federal ownership.

88.     FWS prepared an EIS to analyze the impacts of the exchange under
OPLMA, and to document the results of this extensive scientific and public process. U.S.
Dep't of the Interior, U.S. Fish and Wildlife Service, Izembek Nat'l Wildlife Refuge
Land Exchange/Road Corridor Final Environmental Impact Statement ("Final EIS")
(Feb. 5, 2013).

89.     The Final EIS evaluated two potential road alignments, as well as two
alternatives for providing marine transport between King Cove and Cold Bay via
hovercraft or ferry. The environmental consequences for each of these transportation
alternatives, as well as a No Action alternative, were considered for the various resources
in Izembek.

90.     Acknowledging that threatened and listed species "may be present" in the area under consideration for exchange, FWS prepared biological assessments under ESA section 7 to evaluate impacts to Steller's eiders, northern sea otters, and Steller sea lions. *See* U.S. DOI FISH & WILDLIFE SERVICE, BIOLOGICAL ASSESSMENT OF THE STELLER'S EIDER AND NORTHERN SEA OTTER FOR THE IZEMBEK NATIONAL WILDLIFE REFUGE LAND EXCHANGE/ROAD CORRIDOR EIS (Feb. 2013) [hereinafter FWS ASSESSMENT]; U.S. DOI FISH & WILDLIFE SERVICE, PROJECT DESCRIPTION AND EFFECTS ANALYSIS FOR ENDANGERED SPECIES STELLER SEA LION, IZEMBEK NATIONAL WILDLIFE REFUGE LAND EXCHANGE/ROAD CORRIDOR EIS (Feb. 2013) [hereinafter NMFS ASSESSMENT].

91.     FWS prepared its biological assessments solely to evaluate impacts of the preferred alternative in the Final EIS — the No Action Alternative — under which the land exchange would not occur and no road would be built. These biological assessments did not study the impacts of road construction. FWS ASSESSMENT, 11; NMFS ASSESSMENT, 10.

92.     After preparing these biological assessments, FWS determined through informal consultation that the No Action Alternative would have "no effect" on any listed species or critical habitat in the Izembek Refuge. FWS ASSESSMENT 15; NMFS ASSESSMENT 11. No further action was undertaken.

93.     In its Final EIS, FWS specifically stated that the selection of any road alternatives would likely require major permits, approvals, and consultations, including FWS and NMFS Section 7 Consultation under the ESA.  Final EIS at 1-25.

_____
*Friends of Alaska National Wildlife Refuges, et al., v. Bernhardt, et al.*
Case No. 3:19-cv-00216-JWS                                    Page 24 of 48

Case 3:19-cv-00216-JWS   Document 17   Filed 10/07/19   Page 24 of 48

94.     After completion of the Final EIS, former Secretary Jewell made a decision to not proceed with the land exchange. U.S. Dep't of the Interior, U.S. Fish and Wildlife Service, Record of Decision, Izembek Nat'l Wildlife Refuge Land Exchange/Road Corridor Final Environmental Impact Statement (ROD) (Dec. 23, 2013).

95.     In her decision, former Secretary Jewell described how a road would impact the wildlife and habitat of Izembek, including Pacific black brant, tundra swans, emperor geese, Steller's eiders, brown bear, caribou, and wolves. ROD at 7–8.

96.     Former Secretary Jewell concluded that the impacts of a road through Izembek would significantly and adversely affect the Refuge and "would not be offset" by adding the exchange lands to Izembek. ROD at 2–4; *see also* ROD at 9 (noting that the lands offered would not likely be developed in a way that would have the same impacts as a road).

97.     Former Secretary Jewell explained that not moving forward with the land exchange "protects the unique resources the Department administers for the entire Nation." ROD at 20. By rejecting the land exchange, Secretary Jewell protected Izembek's "unique and internationally recognized habitats," maintained the integrity of designated Wilderness, and ensured that the Refuge would continue to meet the purposes that it was originally established for in 1960 and re-designated to achieve in ANILCA. ROD at 4; *see also* ROD at 7 (noting that a road would diminish the ability of FWS to meet ANILCA purposes 1, 2, and 4 for Izembek), 20 ("Selecting Alternative 1 preserves the integrity of the Izembek Refuge and Izembek Wilderness, ensures continued

Case 3:19-cv-00216-JWS   Document 17   Filed 10/07/19   Page 25 of 48

protection of unique and internationally recognized habitats, and maintains the integrity of designated Wilderness.").

98.     Former Secretary Jewell determined that not allowing the exchange would comply with the obligations under the National Wildlife Refuge Administration Act. ROD at 7.

99.     Secretary Jewell found that a land exchange would "diminish the ability of the Service to meet the objectives of the Wilderness Act" because the impacts to the remaining Wilderness in Izembek would be "irreparabl[e] and significant[]." ROD at 9.

100.    Secretary Jewell explained that Izembek's wetlands are designated as a Wetland of International Importance under the Ramsar Convention, which the U.S. is "obligated to protect pursuant to treaties." ROD at 5.

101.    Secretary Jewell found that a road would lead to increased "human access and activity" that would have "profound adverse effects on wildlife use and habitats of the narrow isthmus." ROD at 4; *see also* ROD at 9 (noting that damage from off-road use cannot be prevented through regulation, enforcement, or barriers).

102.    Secretary Jewell also found that travel times for other forms of transportation (air, hovercraft, and ferry options) could be similar to, or at times quicker than, a road. ROD 10–11.

103.    Secretary Jewell ultimately found that not proceeding with the exchange "best satisfies Refuge purposes, and best accomplishes the mission of the Service and the goals of Congress in ANILCA." ROD at 20.

104. KCC, along with the Agdaagux Tribe of King Cove, the Native Village of Belkofski, the Aleutians East Borough, the City of King Cove, and two individuals, challenged former Secretary Jewell's decision in federal court. The State of Alaska joined that litigation as an intervenor-plaintiff. Friends of Alaska National Wildlife Refuges, Defenders of Wildlife, Wilderness Watch, Center for Biological Diversity, The Wilderness Society, National Audubon Society, the National Wildlife Refuge Association, and the Sierra Club joined as intervenor-defendants.

105. The U.S. District Court of Alaska upheld former Secretary Jewell's decision to not move forward with a land exchange and road construction. The plaintiffs and the State of Alaska appealed that decision to the Ninth Circuit, but later voluntarily dismissed the case.

106. In May 2017, KCC wrote to former Secretary Zinke asking him to exchange land under ANCSA and ANILCA "that would allow King Cove to complete a road connection between King Cove and Cold Bay, Alaska." KCC "request[ed] that [Interior] enter into a process to consider a land exchange between the King Cove Corporation and the U.S. Government and Department of the Interior in accordance with AN[CS]A, ANILCA, and other pertinent laws."

107. Former Secretary Zinke "mandated that the Fish and Wildlife Service explore the option of a land trade between the Izembek Refuge and the King Cove Native Corporation." Minimum Requirements Decision Guide Workbook, Project Title:

_____

*Friends of Alaska National Wildlife Refuges, et al., v. Bernhardt, et al.*
Case No. 3:19-cv-00216-JWS

Proposed King Cove-Cold Bay Road Corridor Engineering Reconnaissance, signed by Gregory S. Risdahl (June 23, 2017), at 1–2.

108. As a result, FWS issued a permit to the Alaska Department of Transportation and Public Facilities to conduct a ground-based reconnaissance of two proposed road alignments between King Cove and Cold Bay. This survey was to collect data "to determine the feasibility of road alignments, potential material sources, localized topography, and geologic and environmental conditions in order to analyze the best possible location for the road. *Id.*

109. Former Secretary Zinke signed an "Agreement for the Exchange of Lands" with KCC on January 22, 2018. U.S. Dep't of the Interior, Fish and Wildlife Service, Agreement for the Exchange of Lands (Jan. 22, 2018) (2018 Exchange Agreement).

110. The 2018 Exchange Agreement stated that "the United States will convey to KCC the surface and subsurface estate of up to 500 acres from within [the Refuge] that are identified by KCC as being needed for the construction, operation, and maintenance of a road linking King Cove with the Cold Bay airport (the U.S. Exchange Lands)."

111. In return, KCC was to convey to the United States the surface estate of certain lands it owns in Izembek and Alaska Peninsula National Wildlife Refuges.

112. The 2018 Exchange Agreement imposed road construction standards and some use prohibitions, including a requirement that the road would be used primarily for health and safety purposes, and generally restricting commercial use of the road. These standards and prohibitions had to be included in any patent issued by the Secretary to

Case 3:19-cv-00216-JWS   Document 17   Filed 10/07/19   Page 28 of 48

ensure that the Izembek lands remain subject to the laws and regulations governing use and development in the Izembek Refuge. 43 U.S.C. § 1621(g).

113.    The Alaska Department of Transportation and Public Facilities has assisted KCC with the engineered design, environmental permitting and construction of the proposed transportation system through Izembek Refuge. Brief for State of Alaska as Amici Curiae Supporting Defendants at 4–5, 13, *Friends of Alaska Nat'l Wildlife Refuges v. Bernhardt*, Case No. 3:18-cv-00029 (D. Alaska filed Aug. 29, 2018).

114.    Friends' brought a lawsuit challenging the 2018 Exchange Agreement on January 31, 2018. KCC and other road proponents intervened as intervenor-defendants.

115.    Friends' moved for summary judgment on July 11, 2018, requesting the District Court to vacate and void the Exchange Agreement, and prevent any activities from moving forward pursuant to it.

116.    Pursuant to the 2018 Exchange Agreement, the Bureau of Land Management (BLM) conducted a cadastral survey aided by a helicopter of the potential road corridor within the Izembek Wilderness on July 10–11, 2018.

117.    BLM staff conducted approximately 86 helicopter landings in the process of installing 122 survey monuments along the road corridor in Izembek's Wilderness. Though foot traffic was identified as an option to reduce impacts from helicopters landing in Wilderness areas, this option was disregarded as "inconsistent with direction from the Secretary to expedite our process" and for other reasons. Memo to the File from

Case 3:19-cv-00216-JWS   Document 17   Filed 10/07/19   Page 29 of 48

Mitch Ellis, Regional Chief, National Wildlife Refuge System-Alaska Region (July 12, 2018).

118.    A Minimum Requirements Analysis (MRA) for the cadastral survey was not conducted to determine compliance with the Wilderness Act, because, according to FWS, the survey was expressly required by the Secretary under the 2018 Land Exchange Agreement and under the Secretary's authority under ANILCA 1302(h). FWS stated that the survey "does not meet the MRA requirement of necessity for administering the area as wilderness and to accomplish refuge purposes." *Id.* at 2.

119.    FWS did not complete a compatibility determination for the cadastral survey on the grounds that it was a "management action" under the 2018 Exchange Agreement. U.S. Fish and Wildlife Service, Region 7, Statement of Compliance, Izembek Land Exchange Boundary Cadastral Survey, Izembek NWR (undated).

120.    There was no public notice prior to this survey taking place and no permits were issued.

121.    On September 12, 2018, the BLM published a Notice of Filing Plats of Survey for U.S. Survey No. 14495, Alaska, which failed to include location information for the survey. Department of the Interior, Bureau of Land Management, Filing of Plats of Survey: Alaska, 83 Fed. Reg. 46,188 (Sept. 12, 2018). An official correction was published on October 10, 2018, which made it possible for the public to identify U.S. Survey No. 14495 as the survey of lands within Izembek Refuge. Department of the

Interior, Bureau of Land Management, Filing of Plats of Survey: Alaska; correction, 83 Fed. Reg. 50,956 (Oct. 10, 2018).

122.    On November 9, 2018, environmental groups submitted a notice of protest against the plats of survey for U.S. Survey No. 14495, Alaska. The groups submitted a statement of reasons for the protest on December 10, 2018.

123.    The protest questioned the legality of the survey. Groups alleged that BLM's survey and plat filing was prematurely executed due to the ongoing litigation associated with the land exchange, and BLM's use of helicopters in designated Wilderness. The protest also alleged that BLM did not perform the cadastral survey in compliance with legal mandates and the agency's own policies and procedures set forth in the BLM Manual of Survey Instructions (2009), rendering the survey invalid.

124.    BLM dismissed the protest on March 11, 2019 and filed the survey. On information and belief, the survey has not been withdrawn or otherwise revoked.

125.    On March 29, 2019, the U.S. District Court issued its Order on the Motion for Summary Judgment, granting summary judgment to the Plaintiffs.

126.    The District Court found that the 2018 Exchange Agreement violated the APA because Interior failed to justify the change in policy from the prior administration. *Friends of Alaska Nat'l Wildlife Refuges v. Bernhardt*, 381 F. Supp. 3d 1127 (D. Alaska 2019).

127.    The District Court found that the 2018 Exchange Agreement did not contain an acknowledgment of the Secretary's fundamental change in agency policy,

provided no reasoned explanation regarding prior determinations that viable alternatives exist, and ignored findings concerning a road's environmental impact on Izembek Refuge. *Id*. at 1140–41. The Court therefore found that the Secretary's decision to enter into the 2018 Exchange Agreement constituted an unlawful agency action and was arbitrary and capricious under the APA. *Id*. at 1143.

128.    Specifically, the Court determined that "the Secretary's failure to acknowledge the change in agency policy and his failure to provide a reasoned explanation for that change in policy are serious errors." *Id*.

129.    In light of this ruling, the Court did not reach the Plaintiffs' other ANILCA, NEPA, or ESA claims. *Id*. at 1143 n.124.

130.    The Court entered Judgment and set aside and vacated the 2018 Exchange Agreement. *Friends of Alaska Nat'l Wildlife Refuges v. Bernhardt*, Case No. 3:18-cv-00029-SLG, Judgement in a Civil Case (Mar. 29, 2019).

131.    On May 21, 2019, KCC wrote to Secretary Bernhardt asking him to consider another land exchange that allows for a "transportation system between the City of King Cove and the Cold Bay airport." Letter from Dean Gould, KCC President, to Hon. David Bernhardt, Secretary (May 21, 2019). The letter included a draft exchange agreement.

132.    On May 24, 2019, Defendants in the *Friends* case appealed the decision to the U.S. Court of Appeals for the Ninth Circuit.

133.    On July 3, 2019, Secretary Bernhardt signed the new Exchange Agreement.

_____

*Friends of Alaska National Wildlife Refuges, et al., v. Bernhardt, et al.*
Case No. 3:19-cv-00216-JWS                                                    Page 32 of 48

134.    On July 12, 2019, a representative from KCC signed the new Exchange

Agreement.

135.    The executed Exchange Agreement is substantively identical to the draft

agreement proposed by KCC with its May 21 letter.

136.    On July 16, 2019, the Secretary moved to dismiss the appeal of the 2018

Exchange Agreement. The Ninth Circuit Court of Appeals granted the motion on July 22,

2019.

137.    On July 23, 2019, a news outlet reported that a new exchange agreement

had been executed. Liz Ruskin, *It's Back: Interior Signs New Land Swap for King Cove

Road*, Alaska Public Media, July 23, 2019, available at:

https://www.alaskapublic.org/2019/07/23/its-back-interior-signs-new-land-swap-for-

king-cove-road/.

138.    The Exchange Agreement is a final agency action that binds the United

States to exchange lands with KCC.

139.    The Exchange Agreement states that the United States "intends to convey

to KCC the surface and subsurface estate of the lands delineated in U.S. Survey No.

14495, Alaska, that have been previously identified by KCC as being needed for the

construction, operation, and maintenance of a road linking King Cove with the Cold Bay

airport (U.S. Exchange Lands)." Exchange Agreement at 1.

140.     The remaining actions that the Department of the Interior will take under

the Exchange Agreement are to conduct a contaminants survey, to appraise both the U.S.

Exchange Lands and the KCC Exchange Lands Pool and notify KCC of the exact number of acres of land from the KCC Exchange Lands Pool that will equal the value of the U.S. Exchange Lands, and to conduct a National Historical Preservation Act survey.

141.    The Secretary states in the Exchange Agreement "that this land exchange with KCC that allows for construction of a road" strikes "the proper and appropriate balance between protecting the national interest in the scenic, natural, cultural and environmental values of the public lands in Alaska and providing an adequate opportunity for satisfaction of the economic and social needs of the State of Alaska." *Id.* at 2.

142.    The Exchange Agreement includes some limitations and restrictions on road construction and design. These standards and prohibitions must be included in any patent issued by the Secretary to ensure that the Izembek lands remain subject to the laws and regulations governing use and development in the Izembek Refuge. 43 U.S.C. § 1621(g).

143.    The Exchange Agreement does not include a provision limiting use of the road for health and safety purposes nor impose any restrictions on commercial use of the road.

144.    The Exchange Agreement states that the land exchange does not count against KCC's ANCSA entitlement.

145.    Under the Exchange Agreement, the conveyances of land may occur sequentially, with conveyance of the previously surveyed U.S. Exchange Lands to KCC occurring first in time.

146.    Pursuant to the Exchange Agreement, the United States will select lands from the KCC Exchange Lands Pool within 12 months.

147.    The Exchange Agreement states that the conveyance of the U.S. Exchange Lands will be by patent issued by the Bureau of Land Management, "preceded by Interim Conveyance if necessary." Exchange Agreement at 5.

148.    Under the Exchange Agreement, KCC would relinquish its selection rights under ANCSA to 5,430 acres located within Izembek. KCC will be entitled to the conveyance of 5,430 acres previously selected, but not yet conveyed, under ANCSA outside of Izembek.

149.    The Exchange Agreement was accompanied by a memorandum from the Secretary. Findings and Conclusions Concerning a Proposed Land Exchange Between the Secretary of the Interior and King Cove Corporation for Lands Within Izembek National Wildlife Refuge, Alaska (July 3, 2019) (Bernhardt Memo).

150.    The Bernhardt Memo purports to explain the Secretary's decision. In the Bernhardt Memo, the Secretary provides a summary of the factual background for the Exchange Agreement. The Secretary partially describes and summarizes the 2013 ROD, the use of medevacs and Coast Guard vessels for emergency transportation from King Cove, and a 2015 report prepared by the U.S. Army Corps of Engineers evaluating non-

road transportation alternatives to connect King Cove and Cold Bay. Bernhardt Memo at 3–12.

151.    The Secretary states that Secretary Zinke considered the following factors in entering the 2018 Exchange Agreement: (1) King Cove's need for emergency transport (2) Secretary Jewell's decision relying on alternative transportation methods was misplaced based on new evidence (3) Izembek would benefit from the acreage acquired via exchange and (4) marine transportation would harm endangered sea otters. The Secretary does not identify any decision document or findings by Secretary Zinke in support of these statements. Bernhardt Memo at 11.

152.    The Secretary purports to describe the legal background for the exchange, including ANILCA, ANCSA, NEPA, and the ESA. Bernhardt Memo at 12–16.

153.    The Secretary states the Exchange Agreement formalizes a decision "whether to authorize land exchange pursuant to ANILCA that will afford KCC the ability to use its land selections in the pursuit of a better range of health and safety options for their community." Bernhardt Memo at 16.

154.    The Secretary asserts that the exchange serves the purposes of ANILCA and ANCSA by balancing "the national interest in the scenic, natural, cultural, and environmental values of the public lands in Alaska and providing an adequate opportunity for satisfaction of the economic and social needs of the Alaska Native people of King Cove." Bernhardt Memo at 19.

Case 3:19-cv-00216-JWS   Document 17   Filed 10/07/19   Page 36 of 48

155.    The Secretary states that "[t]he balancing of needs would be enhanced through the adoption of restrictions on the nature of any road to a single-land gravel construction on which non-medical uses and access would be severely limited." Berhnardt Memo at 19.

156.    The Exchange Agreement does not restrict use of the road against non-medical use, commercial use, or otherwise limit access.

157.    The exchange is not a land selection under ANCSA and will not result in any charge against KCC's ANCSA entitlement. Exchange Agreement at 3, ¶ C.

158.    The Bernhardt memo does not provide detailed findings on the 1960 and ANILCA purposes for Izembek, or the Wilderness Act or National Wildlife Refuge System Act purposes.

159.    The Secretary did not ensure that the Exchange Agreement met the requirements for an exchange under ANILCA Section 1302(h), 16 U.S.C. § 3192(h).

160.    The Secretary did not comply with the procedures of ANILCA Title XI prior to executing the Exchange Agreement.

161.    The Secretary did not comply with the procedures mandated by NEPA prior to executing the Exchange Agreement.

162.    The Secretary did not complete consultation under ESA Section 7 prior to executing the Exchange Agreement.

163.    Pursuant to 16 U.S.C. § 1540(g)(2), on August 7, 2019, Friends provided written notice of violation of the ESA to the Secretary, and informed the Secretary of Friends' intent to sue if consultation was not commenced within sixty days of transmittal.

164.    Based on information and belief, the Secretary did not consult with FWS or NMFS on the potential impacts of the land exchange on listed species and critical habitat under Section 7 of the ESA.

## FIRST CLAIM FOR RELIEF
### (Violation of Alaska National Interest Lands Conservation Act, 16 U.S.C. § 3192 and APA, 5 U.S.C. §§ 704–706)

165.    Friends re-alleges and incorporates by reference the allegations made in all preceding paragraphs.

166.    The Exchange Agreement is a final agency action for which there is no other adequate remedy in a court. 5 U.S.C. § 704.

167.    ANILCA mandates that acquiring lands be for the purposes of the Act. 16 U.S.C. § 3192(h).

168.    Prior Secretaries and FWS have declined to exchange lands in Izembek, finding that doing so would not further the purposes of ANILCA, Izembek, the Wilderness Act, or the National Wildlife Refuge System Administration Act, and would cause serious harm to Refuge resources, among other reasons.

169.    Secretary Bernhardt determined that the Exchange Agreement would meet the purposes of ANILCA.

_____
*Friends of Alaska National Wildlife Refuges, et al., v. Bernhardt, et al.*
Case No. 3:19-cv-00216-JWS                                        Page 38 of 48

Case 3:19-cv-00216-JWS   Document 17   Filed 10/07/19   Page 38 of 48

170.     When an agency changes policy or course, it must "supply a reasoned analysis for the change." *Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 42. More specifically, it must acknowledge the change in course, show that the new rule is permissible under the statute, express that it is a better policy, and provide good reasons for the change in policy. *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. at 515–16; *Organized Village of Kake v. U.S. Dep't of Agric.*, 795 F.3d at 966. When reversing a policy, "an agency may not simply discard prior factual findings without reasoned explanation." 795 F.3d at 968. Instead, when a policy change rests on new factual findings that contradict prior findings and circumstances, the agency must "provide a more detailed justification than what would suffice for a new policy created on a blank slate." *F.C.C. v. Fox*, 556 U.S. at 515–16; *see also Organized Village of Kake v. U.S. Dep't of Agric.*, 795 F.3d at 966.

171.     The Secretary failed to show that a land exchange is permissible under the statute because the exchange does not further the purposes of ANILCA.

172.     In executing the Exchange Agreement and issuing the Bernhardt Memo, the Secretary failed to adequately explain the change in Interior's and FWS's long-held position to reject a land exchange in Izembek and confront multiple prior decisions finding that a land exchange would not meet ANILCA's purposes for multiple reasons, which may include, but are not limited to:

   a.   Failure to address the fact that the Exchange Agreement does not impose restrictions on the road to limit use to health, safety, medical, or generally

noncommercial uses and consider or explain his conclusions in light of this fact;

b. Failure to address the prior findings regarding the specific purposes of Izembek that would not be met by an exchange;

c. Failure to acknowledge or consider the finding in the 1998 Land Protection Plan that a road is "the greatest known potential threat to wildlife and wilderness values within the Izembek complex;"

d. Failure to acknowledge prior findings regarding the impacts of a land exchange and road on the purposes of the Wilderness Act and National Wildlife Refuge System Administration Act with respect to Izembek;

e. Failure to address the fact that this Exchange Agreement results in more than twice the acreage being included in the road corridor than the 2013 proposed exchange and also includes gravel sites and failure to consider or explain his conclusions in light of this fact;

f. Failure to address the fact that no additional lands other than those necessary to achieve an equal value exchange will be acquired by the United States, in contrast to the exchange considered in 2013 where over 13,000 acres of KCC lands and over 43,000 of State of Alaska lands would also be exchanged with the United States;

g. Failure to address the agency's prior finding that acquisition of KCC-selected lands did not support an exchange because those lands were unlikely

Case 3:19-cv-00216-JWS   Document 17   Filed 10/07/19   Page 40 of 48

to be developed in a manner that would have a similar impact to Izembek as a land exchange for a road;

h. Failure to consider the prior findings that a land exchange and road would lead to increased impacts on wildlife and habitat from human access and activity;

i. Mischaracterization of the 2013 ROD's failure to consider impacts from ferry travel through sea otter critical habitat, where such impacts were discussed and considered in the Final EIS;

j. Failure to justify his determination regarding viability of non-road transportation alternatives in light of prior statements by the Aleutians East Borough to federal agencies regarding its intent to construct a marine link, and findings regarding viability of non-road transportation options, including cost, travel time, and reliability;

k. Failure to acknowledge or consider the finding in the 2013 ROD that increased activity from a road would put a strain on Refuge management at a time of decreasing Refuge budget and capacity;

l. Failure to consider Izembek's designation under the Ramsar Convention and management obligations under that designation;

m. Failure to explain or justify his conclusion that the costs of Coast Guard medical evacuations were underestimated in 2013; and

Case 3:19-cv-00216-JWS   Document 17   Filed 10/07/19   Page 41 of 48

n.  Failure to explain or justify his conclusion that the acute necessity for a road was underestimated in 2013.

173.   Secretary Bernhardt's failure to demonstrate that the Exchange Agreement is permissible under ANILCA and to provide the required justification for the change in policy to support the Exchange Agreement renders the Exchange Agreement and Bernhardt Memo arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, or without observance of the procedure required by law. 5 U.S.C. § 706.

## SECOND CLAIM FOR RELIEF
(Violation of Alaska National Interest Lands Conservation Act, 16 U.S.C. § 3192)

174.   Friends re-alleges and incorporates by reference the allegations made in all preceding paragraphs.

175.   ANILCA Section 1302(h) mandates that acquiring lands be for the purposes of the Act. 16 U.S.C. § 3192(h).

176.   The exchange does not further the purposes of ANILCA.

177.   Secretary Bernhardt's decision to exchange Izembek lands for KCC lands does not further the purposes of ANILCA and is arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, or without observance of procedure required by law. 5 U.S.C. § 706.

## THIRD CLAIM FOR RELIEF
(Violation of Alaska National Interest Lands Conservation Act, 16 U.S.C. §§ 3161–3173)

178.   Friends re-alleges and incorporates by reference the allegations made in all preceding paragraphs.

179.    Title XI of ANILCA requires that transportation systems through conservation system units in Alaska be approved or disapproved through its "single comprehensive statutory authority." 16 U.S.C. § 3161(c).

180.    Title XI of ANILCA mandates the use of specific forms, preparation of an EIS, compliance with specific timelines and public involvement, and that each agency make eight detailed findings. 16 U.S.C. § 3164.

181.    Title XI of ANILCA prohibits the construction of transportation systems through designated Wilderness without recommendation by the President and approval by Congress. 16 U.S.C. § 3166.

182.    KCC specifically sought the land exchange to allow for a "transportation system" between the City of King Cove and the Cold Bay airport.

183.    The Exchange Agreement specifically states that it is for the purpose of allowing the construction of a road.

184.    The Exchange Agreement was not adopted pursuant to Title XI's procedures.

185.    The President has not recommended to Congress that a road be constructed through Izembek pursuant to Title XI's procedures.

186.    Congress has not approved a road through Izembek pursuant to Title XI's procedures.

187.    ANILCA Section 1302(h), 16 U.S.C. § 3192(h), does not exempt the Exchange Agreement from Title XI's requirements.

188.    Secretary Bernhardt's decision to exchange Izembek lands for KCC lands for the purpose of allowing the construction of a road through the Refuge without complying with Title XI of ANILCA is arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, or without observance of procedure required by law. 5 U.S.C. § 706.

189.    Because Title XI mandates that any action "by any Federal agency under applicable law with respect to the approval or disapproval of the authorization, in whole or in part, of any transportation or utility system shall not have any force or effect unless the provisions of this section are complied with," the Exchange Agreement is null and void. 16 U.S.C. § 3164(a).

### FOURTH CLAIM FOR RELIEF
(Violation of the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321–4370h)

190.    Friends re-alleges and incorporates by reference the allegations made in all preceding paragraphs.

191.    NEPA requires the preparation of an EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.4.

192.    The Exchange Agreement for the purpose of allowing the construction of a road through Izembek is a major federal action significantly affecting the quality of the human environment.

193.    The Exchange Agreement states that "the Parties [] agree the land exchange under this Agreement will not result in any charge against KCC's ANCSA entitlement."

_____

*Friends of Alaska National Wildlife Refuges, et al., v. Bernhardt, et al.*
Case No. 3:19-cv-00216-JWS                                        Page 44 of 48

194.     ANILCA Section 910, 43 U.S.C. § 1638, does not apply to the Exchange

Agreement and does not exempt the Secretary from compliance with NEPA.

195.     Secretary Bernhardt's decision to exchange Izembek lands for KCC lands

for the purpose of allowing the construction of a road through the Refuge without

complying with NEPA is arbitrary, capricious, an abuse of discretion, otherwise not in

accordance with law, or without observance of procedure required by law. 5 U.S.C. §

706.

## FIFTH CLAIM FOR RELIEF

(Violation of the Endangered Species Act (ESA), 16 U.S.C. §§ 1531–1544)

196.     Friends re-alleges and incorporates by reference the allegations made in all

preceding paragraphs.

197.     Pursuant to Section 7(c) of the ESA, federal agencies have an affirmative

duty to ensure that their activities do not jeopardize the survival of listed species or do not

destroy or adversely modify their critical habitat. 16 U.S.C. § 1536(a)(2).

198.     Under the ESA, agency actions that "may affect" a listed species or critical

habitat may not proceed unless and until the federal agency first ensures, through

completion of the consultation process, that the action is not likely to cause jeopardy or

adverse modification of critical habitat. 16 U.S.C. § 1536(a), (d); 50 C.F.R. §§ 402.14,

402.13.

199.     Consultation under section 7 of the ESA is required whenever an agency

action "may affect" any listed species or its critical habitat. The threshold for a "may

_____
*Friends of Alaska National Wildlife Refuges, et al., v. Bernhardt, et al.*
Case No. 3:19-cv-00216-JWS                                     Page 45 of 48

Case 3:19-cv-00216-JWS   Document 17   Filed 10/07/19   Page 45 of 48

affect" determination is low, and the "effects" of an agency action are broadly defined to include both direct and indirect effects. "An indirect effect — as envisioned by 50 C.F.R. § 402.02 — is one that the action makes possible (or indeed, more probable), but does not directly cause." *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 1009 (9th Cir. 2014).

200.    Secretary Bernhardt's decision to exchange lands within the Izembek Refuge are for the express purpose of enabling construction of a road through the Refuge. Exchange Agreement at 1–2.

201.    Species listed as either threatened or endangered and designated critical habitat under the ESA are present in the Izembek National Wildlife Refuge.

202.    Secretary Bernhardt did not consult with FWS or NMFS for each listed species and designated critical habitat in the area, in violation of his Section 7 duty to consult under the ESA.

203.    Secretary Bernhardt acted arbitrarily, capriciously, in abuse of discretion and violated the ESA and its implementing regulations by failing to complete consultation on the effects of the Exchange Agreement for the Steller's eider, southwest Alaska distinct population segment of the northern sea otter, and Steller sea lion, and associated critical habitat for each species. 16 U.S.C. § 1536(a)(2); 50 CFR § 402.12.

## REQUEST FOR RELIEF

The Plaintiffs request that the Court grant the following relief:

Case 3:19-cv-00216-JWS   Document 17   Filed 10/07/19   Page 46 of 48

A. Declare that Secretary Bernhardt's decision to exchange Izembek lands for KCC lands is arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, or without observance of procedure required by law, in violation of ANILCA, NEPA, ESA, and the APA;

B. Invalidate, vacate, and set aside the Exchange Agreement;

C. Invalidate, vacate, and set aside the Bernhardt Memo;

D. Invalidate, vacate, and set aside any agency actions or decisions relying on the vacated 2018 and/or unlawful 2019 Exchange Agreements, including but not limited to: U.S. Survey 14495, Alaska, the contaminants survey referenced in paragraph L of the Exchange Agreement, and the appraisal referenced in paragraph D.3 of the Exchange Agreement;

E. Enter appropriate injunctive relief;

F. Award Friends all reasonable costs and fees as authorized by law; and

G. Award Friends such other and further relief as this Court deems just and proper.

Respectfully submitted this 7th day of October, 2019,

s/ Bridget Psarianos
Bridget Psarianos (AK Bar No. 1705025)
Brook Brisson (AK Bar No. 0905013)
Valerie Brown (AK Bar No. 9712099)
TRUSTEES FOR ALASKA

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that on October 7, 2019, I caused a copy of the FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF to be electronically filed with the Clerk of the Court for the U.S. District Court of Alaska using the CM/ECF system.

For the parties who have not yet registered an appearance, a copy was served via USPS Certified Mail:

David Bernhardt
Secretary of the Interior
Department of the Interior
1849 C Street, N.W.
Washington DC 20240

Department of the Interior
1849 C Street, N.W.
Washington DC 20240

U.S. Fish and Wildlife Service
1849 C Street, N.W.
Washington DC 20240

Civil Process Clerk
Office of the U.S. Attorney
Civil Division, District of Alaska, Anchorage Office
222 West 7th Ave., Room 253 #9
Anchorage, AK 99501

U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Ave., NW
Washington, DC 20530

I further certify that on October 7, 2019 a courtesy copy was transmitted to Steve Silver, on behalf of King Cove Corporation et al., via electronic mail.

s/Bridget Psarianos
Bridget Psarianos

_____

*Friends of Alaska National Wildlife Refuges, et al., v. Bernhardt, et al.*
Case No. 3:19-cv-00216-JWS