Bridget Psarianos (AK Bar No. 1705025)
Brook Brisson (AK Bar No. 0905013)
Valerie Brown (AK Bar No. 9712099)
TRUSTEES FOR ALASKA
1026 W. Fourth Avenue, Suite 201
Anchorage, AK 99501
Phone: (907) 276-4244
Fax: (907) 276-7110
bpsarianos@trustees.org
bbrisson@trustees.org
vbrown@trustees.org

*Attorneys for Plaintiffs*

## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| FRIENDS OF ALASKA NATIONAL WILDLIFE REFUGES, *et al*., | Case No. 3:19-cv-00216-JWS |
| Plaintiffs, | |
| v. | |
| DAVID BERNHARDT, *et al*., | |
| Defendants, | |
| and | |
| KING COVE CORPORATION, *et al*., | |
| Intervenor-Defendants. | |

## PLAINTIFFS' OPENING BRIEF FOR SUMMARY JUDGMENT
(Civil Rule 56(a), Local Civil Rule 16.3)

<u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES……………………………………………………………..iv

LIST OF SHORT NAMES AND ACRONYMS ............................................................viii

INTRODUCTION ................................................................................................... 1

BACKGROUND ..................................................................................................... 2

I.   IZEMBEK HAS BEEN PROTECTED FOR DECADES. ...................................... 2

II.  THE SERVICE REPEATEDLY FOUND A ROAD WOULD SIGNIFICANTLY DAMAGE THE REFUGE'S WILDLIFE AND WILDERNESS. ................................ 4

III. THE SECRETARY ENTERED AN ILLEGAL EXCHANGE AGREEMENT VACATED BY THIS COURT. ............................................................................... 7

IV.  THE SECRETARY ENTERED A SECOND EXCHANGE AGREEMENT IN VIOLATION OF MULTIPLE STATUTES. ................................................................ 8

STANDARDS OF REVIEW ................................................................................... 9

PLAINTIFFS' INTERESTS .................................................................................. 10

ARGUMENT......................................................................................................... 11

I.   THE LAND EXCHANGE IS AN IMPERMISSIBLE CHANGE IN AGENCY POLICY. .......... 12

    A.  The Exchange Agreement is Impermissible under Applicable Statutes.............. 13

    B.  The Secretary Failed to Provide "Good Reasons" for the Reversal. ................... 14

II.  THE LAND EXCHANGE DOES NOT FURTHER ANILCA'S PURPOSES....................... 19

    A.  Land Exchanges Under 1302(h) Must Advance ANILCA's Purposes. .............. 20

    B.  The Land Exchange Does Not Further ANILCA's Purposes.............................. 21

III. THE SECRETARY DID NOT FOLLOW TITLE XI'S EXCLUSIVE PROCEDURES.........25

    A.  Title XI Contains the Sole Procedures for Allowing Transportation System Units in Conservation System Units.................................................................... 25

    B.  The Secretary Must Comply with Title XI. ....................................................... 27

IV.  THE SECRETARY VIOLATED NEPA....................................................................... 30

V.   INTERIOR VIOLATED THE ESA BY FAILING TO CONSULT....................................... 34

    A.  The ESA's Requirements Protect Threatened and Endangered Species and Critical Habitat. ..................................................................................... 35

    B.  The Secretary Did Not Consult on the Exchange Agreement Despite Listed Species and Critical Habitat in Izembek. ............................................ 36

VI.  THE COURT SHOULD VACATE THE EXCHANGE AGREEMENT AND ENJOIN
FURTHER ACTION. ................................................................................................ 39

CONCLUSION ................................................................................................................ 40

<u>TABLE OF AUTHORITIES</u>

**Cases**

*Agdaagux Tribe of King Cove v. Jewell*,
  128 F. Supp. 3d 1176 (D. Alaska 2015) ............................................. passim

*Alliance For the Wild Rockies v. U.S. Forest Serv.*,
  907 F.3d 1105 (9th Cir. 2018) ............................................................ 39

*Alyeska Pipeline Serv. Co. v. Kluti Kaah Native Vill. of Copper Ctr.*,
  101 F.3d 610 (9th Cir. 1996) .............................................................. 10

*AquAlliance v. U.S. Bureau of Reclamation*,
  312 F. Supp. 3d 878 (E.D. Cal. 2018) ............................................... 39

*Cal. Cmtys. Against Toxics v. U.S. EPA*,
  688 F.3d 989 (9th Cir. 2012) .............................................................. 39

*Cal. Wilderness Coal. v. U.S. Dep't of Energy*,
  631 F.3d 1072 (9th Cir. 2011) ............................................................ 39

*Chevron U.S.A. v. Natural Resources Defense Council, Inc.*,
  467 U.S. 837 (1984) ............................................................... 10, 20, 33

*Citizens for Better Forestry v. U.S. Dep't of Agric.*,
  481 F. Supp. 2d 1059 (N.D. Cal. 2007) ............................................. 37

*City & Cty. of San Francisco v. United States*,
  130 F.3d 873 (9th Cir. 1997) ................................................................ 9

*Conner v. Burford*,
  848 F.2d 1441 (9th Cir. 1988) ............................................................ 38

*Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*,
  789 F.3d 1075 (9th Cir. 2015) ............................................................ 40

*Ctr. for Biological Diversity v. U.S. Forest Serv.*,
  349 F.3d 1157 (9th Cir. 2003) .............................................................. 9

*Defenders of Wildlife v. Babbitt*,
  130 F. Supp. 2d 121 (D.C. Cir. 2001) ................................................ 38

*Defenders of Wildlife v. Browner*,
  191 F.3d 1159 (9th Cir. 1999) ............................................................ 10

*Digital Realty Trust, Inc. v. Somers*,
  138 S. Ct. 767 (2018) ......................................................................... 33

*Dolan v. U.S. Postal Serv.*,
  546 U.S. 481 (2006) ........................................................................... 32

*Ecological Rights Found. v. Fed. Emergency Mgmt. Agency*,
  384 F. Supp. 3d 1111 (N.D. Cal. 2019) ....................................... 36, 38

*F.C.C. v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) ..................................................................... passim

---

*Friends of Alaska National Wildlife Refuges, et al., v. Bernhardt, et al.*
Case No. 3:19-cv-00216-JWS                                  Page iv

*Fed. Power Comm'n v. Transcon. Gas Pipe Line Corp.*,
   423 U.S. 326 (1976) ............................................................................................... 39
*Friends of Alaska Nat'l Wildlife Refuges v. Bernhardt*,
   381 F. Supp. 3d 1127 (D. Alaska 2019) ............................................................ passim
*Greater Boston Television Corp. v. Fed. Commc'ns Comm'n*,
   444 F.2d 841 (D.C. Cir. 1970) ............................................................................... 12
*Humane Soc'y of the U.S. v. Locke*,
   626 F.3d 1040 (9th Cir. 2010) ............................................................................... 39
*Morales v. Trans World Airlines*,
   504 U.S. 374 (1992) .......................................................................................... 29, 30
*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   (*State Farm*), 463 U.S. 29 (1983) .................................................................... passim
*Nat'l Audubon Soc'y v. Hodel*,
   606 F. Supp. 825 (D. Alaska 1984) ........................................................... 20, 22, 24
*Nat'l Forest Pres. Grp. v. Butz*,
   485 F.2d 408 (9th Cir. 1973) ................................................................................. 30
*Nat'l Labor Relations Bd. v. SW Gen., Inc.*,
   137 S. Ct. 929 (2017) ............................................................................................ 31
*Nat'l Wildlife Fed'n v. Coleman*,
   529 F.2d 359 (5th Cir. 1976) ................................................................................. 38
*Neighbors of Cuddy Mountain v. Alexander*,
   303 F.3d 1059 (9th Cir. 2002) .......................................................................... 34, 35
*Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*,
   477 F.3d 668 (9th Cir. 2007) ................................................................................. 12
*Organized Vill. of Kake v. U.S. Dep't of Agric.*,
   795 F.3d 956 (9th Cir. 2015) ............................................................................ passim
*Pac. Rivers Council v. Thomas*,
   30 F.3d 1050 (9th Cir. 1994) ................................................................................. 35
*Pollinator Stewardship Council v. EPA*,
   806 F.3d 520 (9th Cir. 2015) ................................................................................. 39
*Robertson v. Methow Valley Citizens Council*,
   490 U.S. 332 (1989) .............................................................................................. 34
*Robinson v. Shell Oil Co.*,
   519 U.S. 337 (1997) .............................................................................................. 32
*Rocky Mountain Wild v. Dallas*
   No. 15-CV-01342-RPM, 2017 WL 6350384…………………………………………36
*Shasta Res. Council v. U.S. Dep't of Interior*,
   629 F. Supp. 2d 1045 (E.D. Cal. 2009) ................................................................. 36
*Tenn. Valley Auth. v. Hill*,
   437 U.S. 153 (1978) .............................................................................................. 35

---

*Thomas v. Peterson*,
  753 F.2d 754 (9th Cir. 1985) ........................................................................ 35
*Town of Superior v. U.S. Fish & Wildlife Serv.*,
  913 F. Supp. 2d 1087 (D. Colo. 2012) .......................................................... 36
*United States v. Novak*,
  476 F.3d 1041 (9th Cir. 2007) ...................................................................... 28
*United States v. Raddatz*,
  447 U.S. 667 (1980) ...................................................................................... 28
*United States v. United Cont'l Tuna Corp.*,
  425 U.S. 164 (1976) ...................................................................................... 33
*Util. Air Regulatory Grp. v. EPA*,
  573 U.S. 302 (2014) ...................................................................................... 32

**Statutes**

5 U.S.C. § 706(2) ....................................................................... 9, 30, 34, 39, 40
16 U.S.C. § 668dd(b)(3) ........................................................................... 28
16 U.S.C. § 1132(e) ................................................................................... 27
16 U.S.C. § 1536(a)(2) ....................................................................... 34, 35
16 U.S.C. § 1540(g)(1)(A) ....................................................................... 40
16 U.S.C. § 3101 ....................................................................................... 21
16 U.S.C. § 3161 ............................................................................. 25, 26, 28
16 U.S.C. § 3162 ............................................................................... 25, 29
16 U.S.C. § 3164 ............................................................... 25, 26, 27, 30, 40
16 U.S.C. § 3192 ....................................................................... 14, 20, 28
42 U.S.C. § 4332(C) ................................................................................. 30
43 U.S.C. § 1621(g) ................................................................................. 22
43 U.S.C. § 1638 ....................................................................................... 31
43 U.S.C. § 1641 ....................................................................................... 33
43 U.S.C. § 1716(b) ................................................................................. 28
Alaska Native Claims Settlement Act, Pub. L. No. 94-204, 89 Stat. 1145 (1976) .......... 28
Alaska Nat'l Interest Lands Conservation Act, Pub. L. No. 96-487, 94 Stat. 2371
(1980)….3, 21, 24, 32
Omnibus Pub. Land Mgmt. Act, Pub. L. No. 111-11, 123 Stat. 991 (2009)……….5, 6, 23

**Rules**

FED. R. CIV. P. 56(a) .................................................................................. 9
Local Civ. R. 16.3………...………………………………………………………9

**Regulations**

---

50 C.F.R. § 402.14.................................................................................................... 35, 38
50 C.F.R. § 402.02.......................................................................................................... 38

**Other Authorities**

House Comm. on Interior and Insular Affairs, H.R. REP. NO. 94-729............................. 28
House Comm. on Interior and Insular Affairs, H.R. REP. NO. 95-1045 .............. 20, 28, 33
House Comm. on Interior and Insular Affairs, H.R. REP. NO. 96-97 ....................... passim
Senate Energy & Nat. Res. Comm, S. REP. NO. 96-413 ................................ 20, 24, 26, 33

_____
*Friends of Alaska National Wildlife Refuges, et al., v. Bernhardt, et al.*
Case No. 3:19-cv-00216-JWS                                          Page vii


Case 3:19-cv-00216-JWS   Document 32   Filed 01/23/20   Page 7 of 51

## LIST OF SHORT NAMES AND ACRONYMS

| | |
|---|---|
| ANCSA | Alaska Native Claims Settlement Act |
| ANILCA | Alaska National Interest Lands Conservation Act |
| APA | Administrative Procedure Act |
| Borough | Aleutians East Borough |
| Corps | U.S. Army Corps of Engineers |
| Interior | Department of the Interior |
| EIS | Environmental Impact Statement |
| ESA | Endangered Species Act |
| Izembek or the Refuge | Izembek National Wildlife Refuge |
| NEPA | National Environmental Policy Act |
| OPLMA | Omnibus Public Land Management Act of 2009 |
| The Secretary | Secretary of the U.S. Department of Interior |
| The Service | U.S. Fish and Wildlife Service |

## INTRODUCTION

This case continues Plaintiffs' Friends of Alaska National Wildlife Refuges, et. al. (collectively "Friends") efforts to protect the Izembek National Wildlife Refuge (Izembek or the Refuge). This is the second time the Secretary of the Interior (the Secretary) has unlawfully reversed earlier decisions of the Department of Interior (Interior) and executed a land exchange for a road. In 2013, Interior concluded, consistent with decades of earlier decisions, that a road through Izembek would have significant detrimental impacts and declined to exchange lands. In 2017, Interior tried to exchange lands with King Cove Corporation for a road through Izembek. This Court found that agreement violated the law because the Secretary failed to justify the change in policy from the prior administration.[1]

The Secretary entered into another Exchange Agreement, again attempting to trade lands in Izembek for a road. This decision commits the same procedural and substantive statutory violations as the previous attempt: violations of the Alaska National Interest Lands Conservation Act (ANILCA), the Administrative Procedure Act (APA), the National Environmental Policy Act (NEPA), and the Endangered Species Act (ESA). The main difference now is that the Secretary attempts to justify the decision in a memorandum. This memorandum is insufficient because it relies on erroneous factual and legal conclusions, and ignores prior factual findings. Because the Secretary violated

---

[1] *Friends of Alaska Nat'l Wildlife Refuges v. Bernhardt*, 381 F. Supp. 3d 1127 (D. Alaska 2019).

multiple laws and failed to explain the policy reversal, the Court should vacate the Exchange Agreement, enjoin all activities, and invalidate, vacate, and set aside any agency actions or decisions relying on the Exchange Agreement.

BACKGROUND

## I. IZEMBEK HAS BEEN PROTECTED FOR DECADES.[2]

Izembek has "some of the most striking wildlife diversity and wilderness values of the northern hemisphere."[3] Izembek's heart is a narrow isthmus of rolling tundra, separating the Izembek Lagoon and Bering Sea from the Kinzarof Lagoon and Gulf of Alaska.[4] The lagoons are invaluable to wildlife because conditions do not mirror one another, alternately providing more favorable conditions for food and shelter.[5]

As one of the world's most important migratory bird staging and wintering habitats, Izembek supports millions of migratory waterfowl and shorebirds.[6] Izembek Lagoon ecompasses one of the world's largest eelgrass beds, creating a feeding and nesting area for nearly the entire world's population of Pacific Black Brant before their

---

[2] For additional background, see Plaintiffs' Brief in Support of Mot. for Summ. J. at 10–14, *Friends*, 381 F. Supp. 3d 1127 (ECF No. 51) ("Friends Br.").

[3] AR 9041, 2925, 8992. Citations to AR refer to the administrative record filed in 2014, *Agdaagux Tribe of King Cove v. Jewell*, 128 F. Supp. 3d 1176 (D. Alaska 2015); citations to AR INT refer to the administrative record filed at ECF Nos. 25–26.

[4] AR 2925, 8992–93, 180579; AR INT–001238.

[5] AR 180794, 180804, 180865.

[6] AR 8993.

---

*Friends of Alaska National Wildlife Refuges, et al., v. Bernhardt, et al.*
Case No. 3:19-cv-00216-JWS                                    Page 2

over 3,000-mile migration.[7] Brant are highly vulnerable to degradation of these eelgrass beds,[8] which also act as nurseries for fish, marine species, and waterfowl.[9]

Izembek is home to the only non-migratory population of Tundra Swans in the world, and rare and vulnerable Emperor Geese.[10] As much as 40 percent of the entire world's population of Steller's eiders, a "threatened" species under the ESA, over-winter in Izembek.[11] Izembek and its adjacent wetlands and marine environment also provide habitat for other federally-protected species, including the Northern sea otter and Steller sea lion.[12] In addition, Izembek provides high quality brown bear and caribou habitat.[13]

The Izembek National Wildlife Range (Range) was established in 1960 "as a refuge, breeding ground, and management area for all forms of wildlife," including waterfowl, bears, and caribou.[14] In 1980, with the passage of ANILCA, Congress re-designated the Range as the Refuge because of its ecologically unique habitat and wilderness characteristics.[15] Izembek is the smallest of Alaska's National Wildlife Refuges, but one of the most ecologically unique.[16] Nearly all of it is designated

---

[7] AR 8992, 180730, 180804; AR INT-001238, 001242.

[8] AR 20415, 180804.

[9] AR 20415.

[10] AR INT-001242–43.

[11] *Id*.; AR 180865.

[12] AR 180861.

[13] AR 19634–36, 20404; AR INT–001243.

[14] AR 561, 563–65.

[15] Alaska Nat'l Interest Lands Conservation Act, Pub. L., Title III, § 303(3)(A), 94 Stat. § 2371, 2390–91 (1980).

[16] AR 4472, 8992; AR INT-001240.

---

Wilderness[17] to "protect this critically important habitat."[18] Congress also identified four additional purposes for Izembek, to: (1) "conserve fish and wildlife populations and habitats in their natural diversity, including . . . waterfowl, shorebirds and other migratory birds, brown bears and salmonids;" (2) fulfill international treaty obligations; (3) provide for subsistence use; and (4) protect water quality and quantity.[19] Izembek was also recognized by the Ramsar Convention on Wetlands of International Importance due to its global importance to birds.[20]

## II. THE SERVICE REPEATEDLY FOUND A ROAD WOULD SIGNIFICANTLY DAMAGE THE REFUGE'S WILDLIFE AND WILDERNESS.

The Service has evaluated the effects of a road through Izembek numerous times, beginning in the 1980s.[21] Each time, the Service found that the impacts of a road on wildlife resources, habitats, and Wilderness would irreversibly damage Izembek and declined to exchange Refuge lands for a road.[22]

The Service considered the issue in 1996 and found that a road through Izembek would have unacceptable environmental impacts.[23] In 1997, the Service declined an offer from the King Cove Corporation (KCC) to exchange lands in Izembek because of the

---

[17] ANILCA §§ 303(3)(A), 702(6); AR 4472.
[18] Attach. 1 at 2, H.R. REP. NO. 96-97, pt. II, at 136 (1979).
[19] ANILCA § 303(3)(B).
[20] AR 5344, 6057, 180730; AR INT-001240.
[21] AR INT-001241–42; AR 9038, 4587–90 (1980s regional planning effort); AR 180575 (listing findings in the 1985 management plan of impacts of a road).
[22] AR INT-001237, 001241–42; *see also* Friends Br. at 15–21.
[23] AR 9036–43.

---

*Friends of Alaska National Wildlife Refuges, et al., v. Bernhardt, et al.*
Case No. 3:19-cv-00216-JWS                                                    Page 4

adverse impacts of a road on wildlife.[24] The Service again studied the potential impacts

of a road in 1998.[25] That same year, in its Land Protection Plan for Izembek National

Wildlife Refuge Complex (Land Protection Plan), the Service deemed a road "the

greatest known potential threat to wildlife and wilderness values within the Izembek

Complex."[26] The Service declined to exchange lands because "the proposed road would

have an adverse impact on the significant wildlife and wilderness resources in the area."[27]

In 1999, Congress sought to resolve King Cove's transportation concerns while

protecting the Refuge by funding a hovercraft that operated from 2007 to 2010,

performing all requested medical evacuations.[28] Nevertheless, the Aleutians East

Borough (Borough) suspended hovercraft services.[29] During the operation of the

hovercraft, Congress authorized the Secretary to exchange of Izembek lands if found to

be in the public interest as part of the Omnibus Public Land Management Act of 2009

(OPLMA).[30] Under OPLMA, KCC offered 13,300 acres of its land and the State of

Alaska offered 43,093 acres of its land in exchange for roughly 200 acres within

---

[24] AR 9039.

[25] AR 10380.

[26] AR INT-000058.

[27] *Id.*

[28] AR 220142, 174410, 197559; AR INT-001240; *see also Friends*, 381 F. Supp. 3d at 1131.

[29] AR INT-001241.

[30] Omnibus Pub. Land Mgmt. Act of 2009, Pub. L. No. 111-11, Subtitle E, § 6402(a), 123 Stat. 991, 1178 (2009).

---

Izembek.[31] Road use would be restricted "primarily for health and safety purposes . . . and only for noncommercial purposes."[32]

After the OPLMA NEPA process, the Secretary declined the land exchange in a record of decision (2013 ROD).[33] The Secretary concluded that Izembek "would be irretrievably damaged by construction and operation of the proposed road" and that this degradation "would not be offset by the protection of other lands to be received under an exchange."[34] The Secretary explained that the decision "protects the unique resources the Department administers for the entire Nation," protects Izembek's "unique and internationally recognized habitats," maintains the integrity of designated Wilderness, and ensures that the Refuge continues to meet the purposes for the Range and in ANILCA.[35]

A group of plaintiffs challenged the Secretary's decision.[36] This Court upheld the decision: "[t]he Secretary's determination that the No Action Alternative would "best

---

[31] AR INT-001237–38; AR 180521.

[32] OPLMA § 6403(a)(1).

[33] AR INT-001237–38, 001255.

[34] AR INT-001237; *see also* AR 180521 (explaining that the lands to be received do not provide the same "internationally recognized wetland habitat" and "will not compensate" for the impacts to Izembek).

[35] AR INT-001255, 001239; *see also* AR 180521 (stating that no-action "is believed to best meet refuge purposes and the Service mission").

[36] *Agdaagux Tribe of King Cove*, 128 F. Supp. 3d 1176.

---

achieve the Refuge's purpose, the agency's statutory mission, and Congress' intent under ANILCA was based on substantial evidence in the record."[37]

### III. THE SECRETARY ENTERED AN ILLEGAL EXCHANGE AGREEMENT VACATED BY THIS COURT.

The Secretary signed an "Agreement for the Exchange of Lands" (2018 Exchange Agreement) with KCC in early 2018.[38] That agreement bound the United States to exchange up to 500 acres within Izembek for a road.[39] The 2018 Exchange Agreement imposed some use prohibitions, including a requirement that the road be used primarily for health and safety purposes.[40] Friends brought a lawsuit challenging the 2018 Exchange Agreement.[41]

During that lawsuit, the Bureau of Land Management (BLM) conducted a cadastral survey of the road corridor within the Wilderness using a helicopter and installing survey monuments.[42] This survey delineates the lands being exchanged under the present Exchange Agreement.[43]

---

[37] *Id.* at 1194, 1200–01.
[38] AR INT-002122–37; *see also Friends*, 381 F. Supp. 3d at 1133.
[39] AR INT-002123–24.
[40] AR INT-002124.
[41] *Friends*, 381 F. Supp. 3d at 1133.
[42] Fed. Def. Answer to Am. Compl. at ¶ 116; AR INT-002141-2208; Plaintiffs' Motion for Judicial Notice at Ex. 1 (ECF 33-1).
[43] AR INT-002865.

---

Last March, this Court granted summary judgment to Friends.[44] The Court found that the 2018 Exchange Agreement violated the law because the Secretary did not acknowledge the agency's change in policy, provided no reasoned explanation regarding prior determinations, and ignored findings concerning a road's environmental impact on Izembek, and vacated the agreement.[45] Defendants appealed the decision.

## IV. THE SECRETARY ENTERED A SECOND EXCHANGE AGREEMENT IN VIOLATION OF MULTIPLE STATUTES.

While the appeal was pending, the Secretary signed this Exchange Agreement.[46] Once again, the Exchange Agreement commits the United States to exchange lands with KCC for construction of a road.[47] Unlike the prior proposed exchanges, this Exchange Agreement does not include a provision limiting use of the road for health and safety purposes nor does it impose restrictions on commercial use.[48]

The Exchange Agreement was accompanied by a memorandum from the Secretary (Secretary's Memo) that purports to explain the decision.[49] Instead, the Secretary makes erroneous legal arguments and ignores important factual findings to justify this second unlawful land exchange.

---

[44] *Friends*, 381 F. Supp. 3d at 1144.
[45] *Id.* at 1140–41, 1143–44.
[46] Fed. Defs. Answer to Am. Compl. at ¶¶ 133, 136.
[47] AR INT-002865.
[48] *See infra* note 123.
[49] *See* AR INT-002813–33.

---

*Friends of Alaska National Wildlife Refuges, et al., v. Bernhardt, et al.*
Case No. 3:19-cv-00216-JWS                                                  Page 8

<u>STANDARDS OF REVIEW</u>

As an APA case, resolution on motions for summary judgment is appropriate.[50] Under the APA, courts "hold unlawful and set aside agency action, findings, and conclusions" if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or if adopted "without observance of procedure required by law."[51] Agency action violates this standard when the agency "relie[s] on factors which Congress has not intended it to consider, entirely fail[s] to consider an important aspect of the problem, offer[s] an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."[52] Courts look particularly closely at reversals in policy; policy changes violate the APA if the agency "ignores or countermands its earlier factual findings without reasoned explanation for doing so."[53]

---

[50] FED. R. CIV. P. 56(a); LOCAL CIV. R. 16.3(a)(1); *City & Cty. of San Francisco v. United States*, 130 F.3d 873, 877 (9th Cir. 1997).

[51] 5 U.S.C. § 706(2)(A), (D); *Friends*, 381 F. Supp. 3d at 1133–34; *see also Ctr. for Biological Diversity v. U.S. Forest Serv.*, 349 F.3d 1157, 1165 (9th Cir. 2003) (for review of NEPA compliance).

[52] *Friends*, 381 F. Supp. 3d at 1134 (quoting *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.* (*State Farm*), 463 U.S. 29, 43 (1983).

[53] *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 966 (9th Cir. 2015) (en banc) (quoting *F.C.C. v. Fox Television Stations*, Inc., 556 U.S. 502, 537 (2009)).

---

*Friends of Alaska National Wildlife Refuges, et al., v. Bernhardt, et al.*
Case No. 3:19-cv-00216-JWS                                    Page 9

Interpretation of a statute is a question of law.[54] When reviewing an agency's interpretation of a statute, courts follow *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*[55] The first step is to consider the statute to determine "whether Congress has directly spoken to the precise question at issue."[56] Courts employ "traditional tools of statutory construction" to determine Congressional intent.[57] "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."[58] If Congress has not spoken to the issue, or if Congress' intent is unclear, courts then consider the agency's interpretation, and give it effect if it is permissible.[59]

<u>PLAINTIFFS' INTERESTS</u>

Friends have standing to bring this action because they and their members will suffer injuries in fact, those injuries are traceable to Interior's actions, and are redressable by a favorable decision of this Court.[60] Each plaintiff has as its mission to protect public

---

[54] *Alyeska Pipeline Serv. Co. v. Kluti Kaah Native Vill. of Copper Ctr.*, 101 F.3d 610, 612 (9th Cir. 1996).

[55] 467 U.S. 837 (1984).

[56] *Id.* at 842.

[57] *Defenders of Wildlife v. Browner*, 191 F.3d 1159, 1162 (9th Cir. 1999) (internal quotations and citations omitted).

[58] *Chevron*, 467 U.S. at 842–43.

[59] *Id.* at 843.

[60] *See Friends*, 381 F. Supp. 3d at 1134–35 (finding standing).

---

Case 3:19-cv-00216-JWS   Document 32   Filed 01/23/20   Page 18 of 51

lands and wildlife, including Izembek.[61] Their members use and enjoy Izembek.[62] These

members are injured by Interior's decision to exchange and privatize Refuge lands

without public process or environmental review.[63] This harm is exacerbated because the

exchange is for a road through Izembek, which will harm habitat, wildlife, and wilderness

values.[64] A favorable decision from the Court would redress these injuries.[65]

## ARGUMENT

The Secretary violated multiple laws in entering the Exchange Agreement. The

decision to enter the exchange represents a reversal in longstanding agency policy and the

Secretary failed to provide a reasoned explanation for the reversal, in violation of

ANILCA and the APA. The Secretary relies on Section 1302(h) of ANILCA which

allows exchanges if they meet the purposes of ANILCA. This exchange does not achieve

---

[61] Decl. of David Raskin, Ex. 1 at ¶¶ 3, 10; Decl. of Susan Culliney, Ex. 2 at ¶¶ 7–10; Decl. of Kevin Proescholdt, Ex. 3 at ¶¶ 10–13; Decl. of Randi Spivak, Ex. 4 at ¶¶ 4, 6, 8–15; Decl. of Nicole Whittington-Evans, Ex. 5 at ¶¶ 5, 10–13; Decl. of Adam Kolton, Ex. 6 at ¶¶ 4–6; Decl. of Daniel Ritzman, Ex. 7 at ¶¶ 6–11; Decl. of Karlin Itchoak, Ex. 8 at ¶¶ 3, 24; Decl. of Caroline Brouwer, Ex. 9 at ¶¶ 3, 6, 8–11.

[62] Ex. 1 at ¶¶ 16–20; Ex. 3 at ¶ 14; Ex. 4 at ¶¶ 22–26, 29, 36; Ex. 5 at ¶¶ 23, 25–34; Ex. 6 at ¶ 8; Ex. 9 at ¶ 19; Decl. of Jeff Wasley, Ex. 10 at ¶ 3, 7–11; Decl. of Victoria Hoover, Ex. 11 at ¶¶ 3–15; Decl. of Patrick Brian Rogers, Ex. 12 at ¶¶ 3–4, 7–12; Decl. of Brianne Rogers, Ex. 13 at ¶¶ 4–5, 12–14, 17–20.

[63] Ex. 1 at ¶ 15; Ex. 2 at ¶¶ 18; Ex. 4 at ¶ 21; Ex. 5 at ¶ 37; Ex. 7 at ¶¶ 7, 17; Ex. 10 at ¶¶ 4, 12–13, 15–22; Ex. 11 at ¶¶ 17, 20–21; Ex. 12 at ¶¶ 13–17, 22; Ex. 13 at ¶ 25.

[64] Ex. 2 at ¶¶ 16–17; Ex. 4 at ¶¶ 27–37; Ex. 5 at ¶¶ 5, 38–40; Ex. 6 at ¶¶ 11–12; Ex. 7 at ¶¶ 18–19; Ex. 8 at ¶¶ 12–14; Ex. 9 at ¶¶ 19–24; Ex. 10 at ¶ 10, 19–20; Ex. 11 at ¶¶ 16–20, 25; Ex. 12 at ¶¶ 18–21; Ex. 13 at ¶¶ 17–24.

[65] Ex. 1 at ¶¶ 26–28; Ex. 3 at ¶ 26; Ex. 4 at ¶¶ 36–37; Ex. 5 at ¶ 41; Ex. 6 at ¶¶ 15–16; Ex. 8 at ¶¶ 26–27; Ex. 10 at ¶¶ 22–24; Ex. 11 at ¶¶ 23–25; Ex. 12 at ¶¶ 22–23; Ex. 13 at ¶ 25; Ex. 9 at ¶¶ 26–28.

---

the purposes of ANILCA; it is counter to them. The Secretary violated Title XI of ANILCA by proceeding with this land exchange without following mandatory statutory procedures to allow a road through a refuge. The Secretary also failed to conduct an environmental analysis under NEPA prior to entering into the Exchange Agreement. Finally, the Secretary did not consult regarding the possible effects to threatened and endangered species, as required by the ESA. As a result, the Secretary's decision to enter into the Exchange Agreement is arbitrary and unlawful.

## I. THE LAND EXCHANGE IS AN IMPERMISSIBLE CHANGE IN AGENCY POLICY.

In executing the Exchange Agreement, the Secretary failed to adequately explain his reversal of decades of agency findings and decisions rejecting a land exchange for a road. It is an established principle of administrative law that when an agency changes course, it "is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance."[66]

Though an agency can change course, an agency "must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed . . . ."[67] In *FCC v. Fox Television Stations* (*Fox*), the Supreme Court established a four-factor test to determine if an agency's change in course complies with the APA.[68] The agency must:

---

[66] *State Farm*, 463 U.S. at 42.

[67] *Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 687–88 (9th Cir. 2007) (quoting *Greater Boston Television Corp. v. Fed. Commc'ns Comm'n*, 444 F.2d 841, 852 (D.C. Cir. 1970)).

[68] 556 U.S. 502 (2009).

---

*Friends of Alaska National Wildlife Refuges, et al., v. Bernhardt, et al.*
Case No. 3:19-cv-00216-JWS                                                      Page 12

(1) display "awareness that it *is* changing position;" (2) show that "the new policy is permissible under the statute;" (3) believe the new policy is better; and (4) provide "good reasons" for the new policy, which, if the "new policy rests upon factual findings that contradict those which underlay its prior policy," must include "a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy."[69] This requires "a more detailed justification than what would suffice for a new policy created on a blank slate."[70]

The Secretary's decision fails the *Fox* test. The Secretary's Memo acknowledges that the exchange represents a policy change and offers various explanations in an attempt to support the decision.[71] However, the Secretary has not shown that the land exchange is permissible under applicable laws nor provided "good reasons" for the new policy. As a result, the Secretary has failed the second and fourth *Fox* requirements.

A.    **The Exchange Agreement is Impermissible under Applicable Statutes.**

The Secretary failed to demonstrate that the Exchange Agreement is permissible under law. The Secretary asserts that the exchange serves the purposes of ANILCA.[72]

---

[69] *Id.* at 515–16.

[70] *Id.* at 515.

[71] AR INT-002815.

[72] AR INT-002832. The Secretary also asserts — without foundation — that the Exchange Agreement meets ANCSA's purposes. The Exchange Agreement expressly states that it does not count against KCC's ANCSA entitlements. AR INT-002867. As a result, ANCSA provisions do not apply, and the Secretary cannot rely on KCC's land selections to justify the Exchange Agreement.

ANILCA requires that land exchanges achieve its purposes.[73] Importantly, the 2013 ROD found that a land exchange permitting a road through Izembek would diminish the ability of the Service to meet ANILCA and Izembek's purposes, among other laws.[74] As described below in Section II, this Exchange Agreement does not achieve those purposes and the Secretary's Memo does not demonstrate otherwise. Thus, the Secretary failed to show the new policy is permissible under the statute.

**B.    The Secretary Failed to Provide "Good Reasons" for the Reversal.**

The Secretary also failed to provide a reasoned explanation for disregarding facts and circumstances that underlay the Service's longstanding refusal to exchange lands. In *Organized Village of Kake v. United States Department of Agriculture*, the Ninth Circuit considered *Fox*'s requirement for explaining contrary factual findings.[75] The 2003 Forest Service decision at issue in that case concluded that "the social and economic hardships to Southeast Alaska outweigh the potential long-term ecological benefits" of a "Roadless Rule;" in contrast, the earlier decision concluded that "the long-term ecological benefits to the nation of conserving these inventoried roadless areas outweigh the potential economic loss to [southeast Alaska] communities."[76] The Court held that the 2003

---

[73] 16 U.S.C. § 3192(h), ANILCA 1302(h).

[74] AR INT-001242, 001255.

[75] 795 F.3d at 966 (en banc) (citing *Fox*, 556 U.S. at 538 (Kennedy, J., concurring)).

[76] *Id*. at 967.

decision did not comply with *Fox* because the agency did not give "good reasons" for adopting the new policy in light of unexplained contrary facts.[77]

*Kake* requires that because the Secretary's decision "rests on factual findings contradicting those in the [2013] ROD, [it] thus must contain the 'more substantial justification' or reasoned explanation mandated by *Fox*."[78] However, the Secretary's Memo made contradictory findings that are not explained or supported by the record. Specifically, he failed to explain contrary findings regarding harm to Izembek's resources, the value of the private lands received, and alternative transportation options. As result, the Secretary does not provide "good reasons" for the policy reversal, in violation of *Fox*'s fourth requirement.

First, the Secretary failed to adequately address findings regarding harm to the Refuge's irreplaceable resources. The 2013 ROD (like prior decisions) found that the exchange would not protect Izembek's resources while the Secretary now states that it will.[79] But the Secretary's Memo does not confront the prior findings, only offering conclusory statements instead of reasoned explanation supported by the record.[80] For instance, the 2013 ROD determined that the road proposal, despite limitations on use, would result in increased human access and activity that would have "profound adverse

---

[77] *Id*. at 967–68.
[78] *Id.* at 967.
[79] AR INT-001237–39, 002831–32.
[80] *See Friends*, 381 F. Supp. 3d at 1142 (conclusory statements are insufficient to support agency reversals).

effects on wildlife use and habitats of the isthmus" and Wilderness.[81] It found there

would be negative impacts to multiple species including Pacific Black Brant, Tundra

Swans, brown bear, caribou, and wolves.[82] The 2013 ROD also found that damage and

impacts from off-road use could not be prevented through regulation, enforcement, or

roadside barriers.[83] The Secretary's Memo "contains '[n]ot one sentence'"[84] explaining

these previous findings in the context of this reversal.[85] Instead, the Secretary's Memo

summarily states that restrictions and limitations on the construction and use of a road

would balance conservation with social and economic needs, but failed to explain this

conclusion in light of the fact that the present exchange contains no such restrictions.[86]

The Secretary likewise ignores the environmental harm from gravel mines on the

isthmus, which are authorized under the Exchange Agreement but were not considered

---

[81] AR INT-001239, 001244.

[82] AR INT-001242–43.

[83] AR INT-001244. The 2013 ROD also found that increased activity from road construction and use would "place a strain on Refuge management." AR INT-001239. The Secretary's Memo acknowledges this, but does not explain the agency's change in position in light of this finding. AR INT-002820.

[84] *Friends*, 381 F. Supp. 3d at 1141 (quoting *State Farm*, 463 U.S. at 48).

[85] *See id.* at 1139–42 (describing Secretary's failure to address prior findings regarding environmental impacts of a road).

[86] AR INT-002832; *see also State Farm*, 463 U.S. at 43 (stating that an agency must articulate a "rational connection between the facts found and the choice made").

---

previously.[87] Such "unexplained conflicting findings about the environmental impacts of a proposed agency action violate the APA."[88]

Second, the Secretary failed to adequately explain his conclusion regarding the value of lands to be received via the exchange. In 2013, the Secretary considered an exchange of 206 acres within Izembek, but found that the over-56,000 acres of lands proposed to come into federal ownership were not valuable enough to offset the resultant harm to Izembek.[89] The present exchange would trade away nearly 500 acres of Izembek for some of these same lands.[90] The Secretary failed to adequately address the Service's 2013 findings that the value of those lands would not compensate for or offset the negative impacts of road construction to the Refuge.[91] Instead, the Secretary simply states that the 2013 decision "discounted the value of" lands that would be received.[92] The Secretary relies on the Land Protection Plan to support this, but as explained below, that document is contrary to the Secretary's finding.[93] Under *Fox* and *Kake*, an agency is

---

[87] AR INT-002161 (describing that survey for the exchange includes material sites); AR 179342–43, 179351 (considering material sites outside the isthmus).

[88] *Organized Vill. of Kake*, 795 F.3d at 969.

[89] AR INT-001237–38, 001248–49; *see also* AR 180521 ("[The exchange] would not compensate for the adverse effects of removing a corridor of land and constructing a road within the narrow Izembek isthmus."); AR 182943 (the "lands lost and lands gained have little in common with regard to cover types, wildlife potential, or ecological process/function").

[90] *Compare* AR INT-002874 (Exhibit A of Exchange Agreement depicting KCC Exchange Lands) *with* AR 180987 (KCC Exchange Lands offered in 2013).

[91] AR INT-002831.

[92] *Id*.

[93] AR INT-002831–32; *see infra* Argument Part II at 22.

---

obligated to explain its reason to disregard facts and circumstances underlying its prior decision.[94] The Secretary failed to do so.

Third, the Secretary failed to adequately address prior factual findings regarding alternative transportation options and his contrary findings are not supported by the record. The 2013 ROD found that at least three viable alternatives exist to a road: hovercraft, landing craft, and ferry.[95] Though the Borough chose to suspend the hovercraft and did not pursue a landing craft,[96] there is no evidence supporting the Secretary's claims of non-viability. Regarding reliability, a 2015 Corps study considered marine and air alternatives and found that a marine link dependable over 99% of the time — slightly more than a road's 98% dependability.[97] Similarly, there is also no evidence that a ferry is cost-prohibitive, nor any discussion of how financial feasibility was measured. The ferry has an estimated 75-year life-cycle cost of $56.7 million; the road a 35-year life cycle cost of $34.2 million plus annual maintenance costs of $670,000, or $61 million for 75 years of operation.[98] Relatedly, the Secretary incorrectly asserts that the cost of transport by the Coast Guard was not considered in 2013; it was.[99] The Secretary points to no new information regarding non-road alternatives to support his

---

[94] *Fox*, 556 U.S. at 516; *Organized Vill. of Kake*, 795 F.3d at 969.
[95] AR INT-001255.
[96] AR INT-002817, 002822.
[97] AR INT-001246, 001304.
[98] *See* AR INT-001265 (ferry cost); AR 00180633 (road costs).
[99] *See* AR INT-001247.

assertions that these options are less reliable than previously known or cost-prohibitive.[100] Even if the Secretary's statements were supported by the record, it would not obviate the Secretary's obligation to explain his conclusions in light of conflicting facts.[101]

In sum, the Secretary has not demonstrated that the Exchange Agreement is permissible under applicable statutes and failed to address factual findings underlying the Service's longstanding refusal to exchange lands or explain or support contrary factual findings. As a result, the Secretary's decision to enter the Exchange Agreement is arbitrary and capricious.

## II. THE LAND EXCHANGE DOES NOT FURTHER ANILCA'S PURPOSES.

The Exchange Agreement violates ANILCA because it does not further its purposes. ANILCA is clear: acquiring lands under its exchange provision — 1302(h) — must further its purposes. ANILCA's overarching purposes and Izembek's specific purposes are for conservation and protection of ecologically important habitats, wildlife and wilderness values, and subsistence. The exchange is directly contrary to these purposes and the Secretary's justifications are inadequate.

---

[100] *Friends*, 381 F. Supp. 3d at 1134 (explaining that agency action is arbitrary and capricious where its conclusions run counter to the evidence before it)
[101] *See supra* Standards of Review at 9–10.

---

*Friends of Alaska National Wildlife Refuges, et al., v. Bernhardt, et al.*
Case No. 3:19-cv-00216-JWS                                        Page 19

## A. Land Exchanges Under 1302(h) Must Advance ANILCA's Purposes.

Section 1302(a) of ANILCA authorizes the Secretary to acquire lands within conservation system units "in order to carry out the purposes of this Act."[102] Subsection (h) — the specific authority for the Exchange Agreement[103] — reaffirms that when the Secretary exchanges lands, he must do so for the purposes of ANILCA.[104] Taken together, the plain language of these provisions mandates that any land exchange must meet the broad conservation purposes of ANILCA and the specific purposes of the unit.[105]

Congress included Section 1302(h) principally to give the Secretary the ability to acquire inholdings within conservation system units without having to resort to condemnation.[106] In giving the Secretary exchange authority, Congress was clear that the exchange authority not be used to undercut the protections it was enacting.[107] That is why Section 1302 land exchanges must "carry out the purposes of" ANILCA.

---

[102] 16 U.S.C. § 3192(a).

[103] AR INT-002865.

[104] 16 U.S.C. § 3192(h).

[105] *Chevron*, 467 U.S. at 842–43; *Nat'l Audubon Soc'y v. Hodel*, 606 F. Supp. 825, at 842–43, 845 (D. Alaska, 1984).

[106] Attach. 2 at 10, S. REP. NO. 96-413 at 304 (1979) ("It is the intent of the Committee that exchange authority be used as the major tool of acquisition authority and that condemnation be used only as a last resort."); Attach. 3 at 6, H.R. REP. NO. 96-97 pt. I, at 246 (1979) (noting that Congress "expects the Secretary to utilize his exchange authority and his authority to acquire easements where possible rather than resort to fee condemnation.").

[107] Attach. 4 at 10–11, H.R. REP. NO. 95-1045, pt. I, at 211–12 (1978).

---

Congress enacted ANILCA to protect and preserve "nationally significant natural, scenic, historic, archeological, geological, scientific, wilderness, cultural, recreational, and wildlife values."[108] ANILCA's purposes include the preservation of nationally significant lands, unaltered ecosystems, wildlife habitat, and to provide opportunities for recreation and scientific research.[109] The purposes of Izembek include the conservation of "fish and wildlife populations and habitats in their natural diversity," fulfillment of international treaty obligations, continued subsistence use, and protection of water quality and quantity, as well as the original Range purposes and Wilderness preservation.[110] To exchange lands under Section 1302, the Secretary had to ensure that the exchange furthered these purposes.

## B. The Land Exchange Does Not Further ANILCA's Purposes.

The Exchange Agreement and Secretary's Memo state that the land exchange serves ANILCA's purposes by striking a balance between conservation and the economic and social needs of the State of Alaska.[111] But such justifications are flawed. Contrary to Congressional intent, the exchange undermines the Wilderness protection and conservation purposes of ANILCA and Izembek.

---

[108] 16 U.S.C. § 3101(a).
[109] *Id.* § 3101(b).
[110] ANILCA, Pub. L., Title III, §§ 303(3)(B), 702(6), 94 Stat. 2371, 2391, 2418 (1980); AR 561.
[111] AR INT-002831–33, 002866.

---

The Secretary states that the purposes of ANILCA will be achieved because the land exchange will acquire and provide "more permanent conservation status" of lands prioritized for acquisition in the Land Protection Plan.[112] But this is contrary to the Plan's finding that a road through Izembek's isthmus is "the greatest known potential threat to wildlife and wilderness values within the Izembek Complex,"[113] and its conclusion that "[l]and protection strategies should strive to preserve the ecological integrity of the refuge."[114] The Secretary also ignores the fact that other protections would apply to those lands,[115] and does not explain what development threats those lands face if not exchanged.[116]

The Secretary also states that the exchange is justified by the increase in acreage that would be added to Izembek and an adjacent refuge.[117] This does not explain how merely adding acreage achieves ANILCA's purposes, irrespective of conservation values impacted. Indeed, the Secretary rejected the 2013 exchange that would have resulted in

---

[112] AR INT-002831; *see also* AR INT-002832.

[113] AR INT-000058.

[114] AR INT-000063.

[115] AR INT-000046; 43 U.S.C. § 1621(g) (ANCSA section 22(g) allowing for a right of first refusal and mandating that corporation lands within pre-ANCSA refuges — like Izembek — are subject to the laws governing refuges); *Agdaagux Tribe of King Cove*, 128 F. Supp. 3d at 1197–98 (explaining how the Land Protection Plan did not support an exchange).

[116] *See Nat'l Audubon Soc.*, 606 F. Supp. at 837–840, 845 (rejecting explanation that exchange protects lands already subject to protections and unlikely to be developed); *see also Agdaagux Tribe of King Cove*, 128 F. Supp. 3d at 1196–97 (discussing unlikelihood of development of KCC lands to support not exchanging lands).

[117] AR INT-002831–32.

---

more acreage being added to refuges than this exchange because the values of the lands to be added were not sufficient to account for the harm of removing land from Izembek.[118] The Secretary does not address this finding.[119]

The Secretary summarily states that the purposes of ANILCA and Izembek would be achieved "through the adoption of restrictions on [the road]. . .on which non-medical uses and access would be severely limited."[120] This justification is not supported by the Exchange Agreement. Unlike prior agreements or statutes authorizing an exchange, the Exchange Agreement no longer contains use restrictions.[121] The Secretary does not otherwise explain what restrictions will apply or how they will protect Izembek's conservation values. The Secretary cannot rely on nonexistent or unexplained restrictions to satisfy the requirement that the exchange further ANILCA's purposes.

More broadly, the Secretary states that the Exchange Agreement achieves the proper balance between conservation and the economic and social needs of King Cove.[122] Izembek's isthmus is its ecological heart, and Interior has repeatedly found the Refuge would be irreversibly damaged by the construction of a road.[123] When designating this

---

[118] *See supra* Background Part II at 5–6.
[119] *See supra* Argument Part I at 12–13.
[120] AR INT-002832.
[121] *Compare* AR INT-002124 (restricting use to "health, safety, and quality of life" and generally for noncommercial use, with exception) *and* OPLMA § 6403(a)(1) (restricting the road "primarily for health and safety purposes . . . and only for noncommercial purposes") *with* AR INT-002867 (no longer containing use restrictions)
[122] AR INT-002815, 002832–33, 002866.
[123] *See supra* Background Part II at 4–7, Argument Part I at 15-17.

area as Wilderness, Congress stressed that "[a] wilderness designation will protect this critically important habitat by restricting access to the Lagoon."[124] Congress specifically sought to limit access to the isthmus to protect Izembek lagoon and the "millions of waterfowl" that rely on its eel grass beds.[125] Further, one of Izembek's purposes is to fulfill "international treaty obligations" for wildlife and habitat[126] such as the Ramsar Convention, which recognizes Izembek's "unique ecology," eelgrass beds, and importance to migratory birds.[127] Under 1302(h), the Secretary is mandated to ensure that these values will be maintained. As explained above, he failed to explain or counter myriad contrary findings that these values — and relatedly Izembek's purposes — will be harmed by a land exchange.[128] Without confronting these contrary findings, the Secretary's summary assertion that the exchange achieves Izembek's and ANILCA's purposes should be rejected.

In sum, the Exchange Agreement is for the specific purpose of taking land out of Izembek and designated Wilderness for a road. The protection of human life and safety

---

[124] Attach. 1 at 2, H. R. REP. NO. 96-97, pt. II, at 136 (1979); *see also* Attach. 2 at 2, S. REP. NO. 96-413, at 15 (1979) ("Izembek Lagoon is a special feature of the refuge.").

[125] Attach. 1 at 2, H.R. REP. NO. 96-97, pt. II, at 136 (1979); Attach. 3 at 4, H.R. REP. NO. 96-97, pt. I, at 209 (1979).

[126] ANILCA, § 303(3)(B).

[127] AR 005344, 006057, 180730.

[128] *See supra* Argument Part I at 12–13; *see also Nat'l Audubon Soc.*, 606 F. Supp. at 842–45 (considering impacts to the specific purposes of the refuge for a land exchange under Section 1302).

---

*Friends of Alaska National Wildlife Refuges, et al., v. Bernhardt, et al.*
Case No. 3:19-cv-00216-JWS                                                    Page 24

cannot be at the expense of ANILCA's and Izembek's purposes. The Secretary's justification for how these purposes would be met is unsupported by or contrary to the record and is arbitrary and capricious.[129] The exchange is not in furtherance of the purposes of ANILCA and Izembek; it violates them.

## III. THE SECRETARY DID NOT FOLLOW TITLE XI'S EXCLUSIVE PROCEDURES.

To authorize a road within a conservation system unit, the Secretary was required to follow the procedures in Title XI of ANILCA. Title XI provides the sole authority for the approval and authorization of transportation systems within conservation system units like Izembek.[130] The Secretary cannot circumvent Congress' clear directives via a land exchange. The Secretary violated Title XI because Interior failed to follow its procedures to allow for a road through Izembek.[131]

### A. Title XI Contains the Sole Procedures for Allowing Transportation System Units in Conservation System Units.

Congress enacted Title XI "to minimize the adverse impacts of siting transportation and utility systems within units established or expanded by this Act and to

---

[129] *State Farm*, 463 U.S. at 43 (affirming agency action is arbitrary and capricious where the agency has "relied on factors which Congress has not intended it to consider" or "offered an explanation for its decision that runs counter to the evidence before the agency.").

[130] 16 U.S.C. § 3161.

[131] 16 U.S.C. §§ 3164, 3162(4); AR INT-002209 (KCC requesting a "year-round transportation system" to Cold Bay).

---

insure the effectiveness of the decisionmaking process."[132] To achieve this goal, Congress established "a single comprehensive statutory authority for the approval or disapproval of applications for such systems,"[133] and adopted a detailed procedure which "supersedes rather than supplements" existing law.[134]

Section 1104 governs the approval of all transportation systems and requires a very specific agency and public process.[135] Congress also mandated that each federal agency make eight findings to approve a transportation system unit within a conservation system unit, including: alternative routes to minimize impacts; whether impacts would affect the purposes of the conservation system unit; and "short- and long-term social, economic, and environmental impacts of national, State, or local significance, including impacts on fish and wildlife and their habitat."[136] For transportation systems proposed through Wilderness, Title XI expressly limits the Executive Branch's ability to act unilaterally. Under Section 1106, a transportation system is not allowed in Wilderness unless it is recommended by the President and approved by Congress.[137] These

---

[132] 16 U.S.C. § 3161(c).
[133] *Id.*
[134] Attach. 2 at 8, S. REP. NO. 96-413, at 246 (1979).
[135] 16 U.S.C. § 3164(b)–(f).
[136] *Id.* § 3164(g)(2)(B), (D), (F).
[137] *Id.* § 3166(b); *see also* 16 U.S.C. § 1132(e) (explaining similar process for modifying Wilderness boundary).

---

procedures reflect Congress' intent that "wilderness lands deserve a greater degree of protection."[138]

### B. The Secretary Must Comply with Title XI.

The road would be built in the Refuge, which is also Wilderness, making it subject to both Sections 1104 and 1106.[139] The Secretary asserts that because the exchange removes land from federal ownership prior to road construction, Title XI is not applicable, as the lands would no longer be federal lands.[140] This is incorrect as a matter of law. It is undisputed that the purpose of the land exchange is to allow a road: KCC requested the exchange to allow for a "year-round transportation system" and the Secretary expressly relies on road construction to justify the exchange.[141] Thus, the Secretary was required to comply with Title XI.

The Secretary's interpretation is inconsistent with Congress' express intent and is not due deference because the statute is not ambiguous.[142] Congress was clear: Title XI is the "single comprehensive statutory authority for the approval or disapproval of applications" for "transportation . . . systems within [conservation system] units."[143]

---

[138] Attach. 1 at 4, H.R. Rep. No. 96-97, pt. II, at 157.
[139] 16 U.S.C. §§ 3164, 3166.
[140] AR INT-002827 n.47.
[141] AR INT-002209, 002865.
[142] *See supra* Standards of Review at 9–10.
[143] 16 U.S.C. § 3161(c).

---

*Friends of Alaska National Wildlife Refuges, et al., v. Bernhardt, et al.*
Case No. 3:19-cv-00216-JWS                                                    Page 27

Moreover, ANILCA's exchange provision cannot be used to circumvent Title XI, particularly because the two provisions are part of the same statute.[144] While Section 1302(h) allows the Secretary to exchange lands "[n]otwithstanding any other provision of law," this clause should not be read to obviate Title XI.[145] Courts should "determine[] the reach of each such 'notwithstanding' clause by taking into account the whole of the statutory context in which it appears."[146] Other statutes in place when ANILCA was enacted required equal value or complex public interest exchanges.[147] Congress intended Section 1302(h)'s "notwithstanding" provision to exempt land exchanges under its authority from such requirements.[148] There is no indication that it was meant to invalidate or supersede the application of Title XI when the Secretary acts to allow a road through a conservation system unit.

---

[144] *Id.*; *see also United States v. Raddatz*, 447 U.S. 667, 676 n.3 (1980) (stating that courts "cannot impute to Congress a purpose to paralyze with one hand what it sought to promote with the other") (internal quotations omitted).

[145] 16 U.S.C. § 3192(h)(1); *cf.* AR INT-002827 n.47.

[146] *United States v. Novak*, 476 F.3d 1041, 1046 (9th Cir. 2007).

[147] *See*, *e.g.*, Fed. Land Policy and Mgmt. Act, 43 U.S.C. § 1716(b) (lands exchanged by the Secretary must be of equal value, or the values shall be equalized through monetary payments, but those payments may be waived for public interest exchanges); Nat'l Wildlife Refuge Admin. Act, 16 U.S.C. § 668dd(b)(3) (authorizes the Secretary to enter equal value exchanges or equalize value through cash).

[148] Congress amended ANCSA Section 22(f), the model for Section 1302(h), to remove similar restrictions that had troubled exchanges under that provision. Attach. 4, H.R. REP. NO. 95-1045, pt. I, at 211–212 (1978); ANCSA, Pub. L. No. 94-204, §17, 89 Stat. 1145, 1156 (1976) (modeling 1302(h) on ANCSA 22(f)).

Further, statutory interpretation tools instruct that the general authorization to exchange lands in Section 1302 should not overcome the focused, specific procedures for authorizing transportation systems in Title XI.[149] Title XI controls, as it specifically applies when the Secretary acts to allow a road through a conservation system unit. To interpret Section 1302(h) to eliminate Title XI's requirements would create a loophole that would nullify the protections Congress carefully put in place when it adopted Title XI. Such an interpretation must be rejected.

The Secretary also argues that the Exchange Agreement is not an "authorization" to construct a road, and thus, Title XI is not applicable.[150] This elevates form over substance — it is undisputed that the Exchange Agreement is for a road. The Exchange Agreement should not circumvent Congress' clear intent — it should be deemed an "authorization [] without which a transportation or utility system cannot, in whole or in part, be established or operated."[151]

In sum, the Secretary did not follow Title XI's requirements. To ensure compliance with Title XI, Congress declared that any action that purports to approve a transportation system unit but fails to adhere to Title XI's procedures is invalid.[152] The

---

[149] *Morales v. Trans World Airlines*, 504 U.S. 374, 384–85 (1992).
[150] AR INT-002827 n.47.
[151] 16 U.S.C. § 3162(1).
[152] 16 U.S.C. § 3164(a).

Secretary's action in entering the Exchange Agreement to allow a road failed to comply with the procedures required by law, and is, therefore, without "any force or effect."[153]

## IV. THE SECRETARY VIOLATED NEPA.

The Secretary did not conduct an environmental analysis before executing the Exchange Agreement, in violation of NEPA. NEPA requires federal agencies to prepare an Environmental Impact Statement (EIS) for any "major Federal actions significantly affecting the quality of the human environment."[154] The Exchange Agreement falls squarely within this requirement.[155] The fact that the NEPA analyses were completed for prior decisions does not relieve the Secretary of having to comply with NEPA for this action.[156]

The Exchange Agreement erroneously relies on ANILCA Section 910 to exempt the exchange from NEPA.[157] The Secretary reads the targeted exemption in Section 910 too broadly. Regardless, his interpretation is not entitled to deference because Congress' intent is clear: the plain language, structure, and legislative history demonstrate that Section 910 only waives NEPA for conveyances undertaken to fulfill land entitlements

---

[153] *Id*.; 5 U.S.C. § 706(2)(D).
[154] 42 U.S.C. § 4332(C).
[155] *See, e.g.*, *Nat'l Forest Pres. Grp. v. Butz*, 485 F.2d 408, 411–12 (9th Cir. 1973) (noting that NEPA applied to a land exchange and that the impacts of the later use must be evaluated).
[156] *Cf.* AR INT-002832 (Secretary's Memorandum noting prior NEPA reviews).
[157] AR INT-002828, 002832 n.57, 002867.

under ANCSA or its amendments.[158] The land exchange does not fulfill KCC's ANCSA

entitlement.[159] Accordingly, the Secretary violated NEPA.

Section 910 states in relevant part:

> [NEPA] shall not be construed, in whole or in part, as requiring the preparation or submission of an [EIS] for withdrawals, conveyances, regulations, orders, easement determinations, or other actions which lead to the issuance of conveyances to Natives or Native Corporations, pursuant to the Alaska Native Claims Settlement Act, or this Act.[160]

The plain language of this provision makes the exemption dependent on the

conveyance being made under ANCSA, or the ANILCA amendments to ANCSA, to

fulfill land entitlements. Additionally, while the list included in Section 910 is inclusive,

it does not include land exchanges.[161] This makes sense because the conveyances of lands

under ANCSA, which Congress sought to expedite in ANILCA, were not occurring by

land exchange.

The overall structure of ANILCA reinforces this interpretation. ANILCA refers to

conveyances with Alaska Natives almost solely in the context of fulfilling ANCSA

entitlements. For example, the term "conveyance" is used almost exclusively in Titles IX

---

[158] *See supra* Standards of Review at 10.

[159] AR INT-002124; *see also* AR 86428 (noting that KCC's existing selections would complete their ANCSA entitlement).

[160] 43 U.S.C. § 1638.

[161] *See Nat'l Labor Relations Bd. v. SW Gen., Inc*., 137 S. Ct. 929, 940 (2017) (stating that the interpretive canon, *expressio unius est exclusio alterius*, "expressing one item of an associated group or series excludes another left unmentioned" applies "only when circumstances support a sensible inference that the term left out must have been meant to be excluded" (internal quotations omitted)).

and XIV, "Amendments to [ANCSA] and Related Provisions," and is not used widely otherwise. Other provisions of ANILCA that discuss "conveyances" with Alaska Natives also focus almost exclusively on fulfilling ANCSA entitlements.[162] Thus, the term "conveyance" in Section 910 refers to those conveyances to meet ANCSA entitlements.[163]

The context of this provision also demonstrates Congress' intent to exempt only those conveyances necessary to meet ANCSA entitlements.[164] Section 910 is part of ANILCA Title IX, entitled "Implementation of Alaska Native Claims Settlement Act and Alaska Statehood Act." Title IX deals largely with amendments to ANCSA aimed at fulfilling land entitlements. Given the title's focus on fulfilling ANCSA entitlements, Section 910 should be read to only apply to conveyances related to fulfilling land entitlements under ANCSA and its amendments.

---

[162] *See*, *e.g.*, ANILCA §§ 201(8)(b)(3) (used in context of ANCSA conveyances), 508(a) (re: instrument of conveyance to Kootznoowoo on Admiralty Island), 810(c) ("Nothing herein shall be construed to prohibit or impair the ability of the State or any Native Corporation to make land selections and receive land conveyances pursuant to the Alaska Statehood Act or [ANCSA].").

[163] *See Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006).

[164] *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 321 (2014) (stating the cannon of statutory construction that "reasonable statutory interpretation must account for both 'the specific context in which . . . language is used' and 'the broader context of the statute as a whole'" (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997))).

---

*Friends of Alaska National Wildlife Refuges, et al., v. Bernhardt, et al.*
Case No. 3:19-cv-00216-JWS                                                    Page 32

The legislative history of Section 910 reinforces Congress' intent to exempt only conveyances to meet ANCSA entitlements.[165] Again, Congress was concerned that Alaska Natives obtain their entitlements quickly, which was not happening following ANCSA's passage.[166] Section 910 was drafted to ensure that land conveyances to satisfy entitlements happen expeditiously; there is no indication that Congress intended to exempt future exchanges outside of ANCSA entitlements.[167]

The text, context, and legislative history instruct that Congress intended Section 910 only apply to those conveyances that fulfill ANCSA entitlements. The fundamental policies embodied in NEPA should not be discarded absent some clear indication that Congress so intended.[168] Deciding whether to exchange Wilderness and refuge lands to

---

[165] *See Digital Realty Trust, Inc. v. Somers*, 138 S. Ct. 767, 780 (2018) (relying on legislative history at *Chevron* step 1); *id.* at 782–83 (Sotomayor, J., concurring) (explaining that reliance on legislative history to inform statutory interpretation and discern Congressional intent is proper).

[166] Attach. 2 at 9, S. REP. NO. 96-413, at 292 (stating "[t]ime is of the essence," that "[i]t is imperative that the Natives receive their land as quickly as possible," and an EIS "is unnecessary and not warranted where implementation of the ANCSA or of this Title is involved"). While broad language is used in this report to describe the exemption (that it "cover every possible action . . . for the Secretary to take in the process of conveying land title to the Alaska Natives"), the report states that application of the exemption is limited to ANSCA or that particular title of ANILCA (the expedited conveyance procedures). *Id.*

[167] Attach. 4 at 7, H.R. REP. NO. 95-1045, pt. I, at 42; Attach. 3 at 3–4, H.R. REP. NO. 96-97, pt. I at 100–101; Attach. 2 at 4–5, S. REP. NO. 96-413, at 73–74; 43 U.S.C. § 1641.

[168] *United States v. United Cont'l Tuna Corp.*, 425 U.S. 164, 168–69 (1976) (When Congress abandons previously articulated policies, one "would normally expect some expression by Congress that such results are intended").

---

allow for a road is the quintessential government decision requiring NEPA to ensure informed decision making about environmental impacts and to allow public participation.[169]

In sum, the land exchange is not the type of land transaction exempted by Section 910. Congress intended Section 910 to apply to conveyances to complete ANCSA entitlements. This land exchange does not fulfill KCC's ANCSA entitlements; it states that it "will not result in any charge against KCC's ANCSA entitlement."[170] The Izembek exchange is not, therefore, the type of land transaction that Congress intended Section 910 to cover. Because Section 910 does not apply to the Exchange Agreement, the Secretary was obligated to follow NEPA's analysis and review procedures. The failure to do so is arbitrary and capricious and without the procedure required by law.[171]

## V. INTERIOR VIOLATED THE ESA BY FAILING TO CONSULT.

The Secretary did not complete ESA Section 7 consultation before executing the Exchange Agreement. The ESA requires federal agencies to ensure that an action taken is not likely to jeopardize the continued existence of any threatened or endangered species, or result in the destruction or adverse modification of critical habitat.[172] Executing the

---

[169] *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989); *Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059, 1063 (9th Cir. 2002).

[170] AR INT-002867. Though KCC will relinquish selection rights to lands within Izembek, the Exchange Agreement does not fulfill KCC's ANCSA entitlements because KCC retains other ANCSA selections to complete its entitlement. *See* AR INT-002874.

[171] 5 U.S.C. § 706(2)(A).

[172] 16 U.S.C. § 1536(a)(2).

Exchange Agreement for the purpose of constructing a road where threatened species and critical habitat are present required the Secretary to consult on the potential impacts on Steller's eiders, Northern sea otters, Steller sea lions, and critical habitats. The Secretary did not consult, in violation of the ESA.

A. **The ESA's Requirements Protect Threatened and Endangered Species and Critical Habitat.**

Congress enacted the ESA to conserve endangered and threatened species and the ecosystems they rely on.[173] To achieve these policies, Congress mandated specific requirements in Section 7(a)(2), which commands all federal agencies, through consultation, to ensure that their actions do not jeopardize the continued existence of threatened or endangered species.[174] When an agency considers taking an action that "may affect" a listed species or its habitat, the ESA requires the agency to consult with the National Marine Fisheries Service (NMFS) and the Fish and Wildlife Service (collectively, "the Services").[175] The "may affect" determination is a "'relatively low threshold' and '[a]ny possible effect, whether beneficial, benign, adverse or of

---

[173] *Id.*; *Tenn. Valley Auth. v. Hill,* 437 U.S. 153, 185 (1978).
[174] 16 U.S.C. § 1536(a)(2); *Thomas v. Peterson*, 753 F.2d 754, 764 (9th Cir. 1985); *see also Pac. Rivers Council v. Thomas*, 30 F.3d 1050, 1056–57 (9th Cir. 1994) ("Only after the [agency] complies with § 7(a)(2) can any activity that may affect the protected [species] go forward.").
[175] 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a).

undetermined character' triggers the requirement.'"[176] Land exchanges are federal actions that trigger consultation.[177]

## B. The Secretary Did Not Consult on the Exchange Agreement Despite Listed Species and Critical Habitat in Izembek.

The Alaska breeding population of Steller's eider is listed as threatened and its designated critical habitat includes areas within Izembek, adjacent to exchange lands.[178] Northern sea otters are threatened and appear year-round in marine waters adjacent to Izembek, and Izembek Lagoon is part of its critical habitat.[179] The western distinct population segment of Steller sea lion is endangered and these animals are present near Cold Bay year-round.[180] Despite the presence of listed species and protected habitat, the Secretary did not consult before signing the Exchange Agreement.[181] This failure violated the ESA.

---

[176] *Ecological Rights Found. v. Fed. Emergency Mgmt. Agency*, 384 F. Supp. 3d 1111, 1121–22 (N.D. Cal. 2019) (internal citations and emphasis omitted).

[177] *See, e.g.*, *Town of Superior v. U.S. Fish & Wildlife Serv.*, 913 F. Supp. 2d 1087, 1136–37 (D. Colo. 2012), *aff'd sub nom. WildEarth Guardians v. U.S. Fish & Wildlife Serv.*, 784 F.3d 677 (10th Cir. 2015) (Agencies consulted on proposed land exchange); *Shasta Res. Council v. U.S. Dep't of Interior*, 629 F. Supp. 2d 1045, 1064 (E.D. Cal. 2009) (same) *Rocky Mountain Wild v. Dallas*, No. 15-CV-01342-RPM, 2017 WL 6350384, at *6 (D. Colo. May 19, 2017).

[178] AR 180861–65.

[179] AR 180868–71.

[180] AR 180873–74.

[181] AR INT-002828–29.

During the 2013 EIS process, the Service expressly recognized its obligation to consult.[182] The Service consulted on the No Action Alternative, i.e., no land exchange and no road.[183] The Service determined there would be "no effect" to listed species from the No Action Alternative because the agency would not exchange lands.[184] The Service did not consult on any action alternatives.[185] The Secretary's Memo mischaracterizes the 2013 EIS as having found that an exchange will have "no effect" on listed species or critical habitat.[186] To the contrary, in 2013, the Service determined that exchanging lands to authorize a road would affect listed species and critical habitat and explicitly stated that consultation would be required.[187] The Secretary's current stance that consultation is not required is contrary to the ESA and the Service's prior position. To comply with the ESA, the Secretary had to consult on the impacts of this land exchange on listed species and their critical habitat.[188]

Further, Interior is required to consult on the impacts from the proposed road, regardless of whether another entity may eventually build it. ESA regulations require that

_____

[182] AR 191910 (northern sea otter and Steller's eider); AR 191953 (Steller sea lion).
[183] AR 191901.
[184] AR 191920.
[185] AR 191901.
[186] AR INT-002828–29.
[187] AR 181304–12, AR 181432–181437.
[188] *See Citizens for Better Forestry v. U.S. Dep't of Agric.*, 481 F. Supp. 2d 1059, 1095–96 (N.D. Cal. 2007) (finding no Ninth Circuit cases affirming an agency's "no effect" finding without formal or informal consultation under the ESA).

_____

*Friends of Alaska National Wildlife Refuges, et al., v. Bernhardt, et al.*
Case No. 3:19-cv-00216-JWS                                             Page 37

the consultation process consider the effects of the federal action and its cumulative effects.[189] Construction, operation, and maintenance of a road corridor through Izembek are effects of the Exchange Agreement. The Secretary is incorrect that Section 7 does not require Interior to consider the consequences of road construction.[190] Agencies must consider all related impacts from agency actions that may affect listed species,[191] even "attenuated consequences" of the agency action.[192] To comply with its consultation requirements, Interior must consult on the land exchange and the impacts of road construction, operation, and maintenance.

In conclusion, the ESA requires federal agencies to consult for actions that may affect protected species and critical habitat. It is undisputed that the Secretary did not consult prior to entering into the Exchange Agreement despite the presence of threatened species and critical habitat. This failure violates the ESA.

---

[189] 50 C.F.R. §§ 402.02, 402.14(g)(3).

[190] *See* AR INT-002828–29.

[191] *See, e.g., Conner v. Burford*, 848 F.2d 1441, 1453–54 (9th Cir. 1988) (requiring consultation on oil and gas leases and impacts from future exploration and development); *Nat'l Wildlife Fed'n v. Coleman*, 529 F.2d 359, 373 (5th Cir. 1976) (requiring analysis of future residential and commercial development from construction of a highway) (internal quotations omitted); *Defenders of Wildlife v. Babbitt,* 130 F. Supp. 2d 121, 128–30 (D.C. Cir. 2001) (requiring consultation to include impacts of all activities within the action area).

[192] *Ecological Rights Found.*, 384 F. Supp. 3d at 1122.

---

## VI. THE COURT SHOULD VACATE THE EXCHANGE AGREEMENT AND ENJOIN FURTHER ACTION.

The APA mandates that when an agency action violates the law, "[t]he reviewing court shall . . . hold unlawful and set aside [the] agency action."[193] Vacatur is the presumptive remedy under the APA.[194] The Court should apply the presumptive remedy and vacate the Exchange Agreement.

The Secretary and King Cove may argue that vacatur is not warranted based on equitable considerations.[195] As an equitable defense, the burden is on the party seeking remand without vacatur to show that deviation from the presumptive remedy is warranted.[196] This case is not one of the "rare circumstances" where remand without vacatur may be warranted.[197] The Secretary violated multiple laws and failed to explain the reversal of decades-old agency policy — serious and harmful errors.[198] Accordingly,

---

[193] 5 U.S.C. § 706(2).

[194] *Fed. Power Comm'n v. Transcon. Gas Pipe Line Corp.*, 423 U.S. 326, 331 (1976); *Alliance For the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1121 (9th Cir. 2018); *Cal. Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072, 1095 (9th Cir. 2011).

[195] *See Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532–33 (9th Cir. 2015) (stating test for remand without vacatur in limited circumstances where there would be serious environmental harm from vacating) (citing *Cal. Cmtys. Against Toxics v. U.S. EPA*, 688 F.3d 989, 992 (9th Cir. 2012)).

[196] *Alliance for the Wild Rockies*, 907 F.3d at 1121–22; *AquAlliance v. U.S. Bureau of Reclamation*, 312 F. Supp. 3d 878, 883 (E.D. Cal. 2018).

[197] *Humane Soc'y of the U.S. v. Locke*, 626 F.3d 1040, 1053, n.7 (9th Cir. 2010); *see also Pollinator Stewardship Council*, 806 F.3d at 533 (noting "limited circumstances" of remand without vactaur).

[198] *See Friends*, 381 F. Supp. 3d at 1143 (finding serious error and vacating the 2018 Exchange Agreement).

---

the Exchange Agreement must be declared void and vacated, and any activity carried out under its terms — including survey and appraisal work for the road and the installation of monuments — should be invalidated as well.[199]

If Defendants seek to take additional on-the-ground action before this case is resolved, the ESA provides Friends an additional remedy: enjoining any activities taken pursuant to the Exchange Agreement until Interior completes consultation.[200] The Exchange Agreement allows activities in Izembek.[201] Ground-disturbing activities and human presence have the potential to disrupt wildlife and may affect threatened species.[202] Activities undertaken to implement the Exchange Agreement will likely irreparably harm Friends' interests in viewing and enjoying threatened species.[203] Until Interior completes consultation, injunctive relief is the necessary and appropriate remedy for the Secretary's ongoing ESA violation.

## CONCLUSION

For the foregoing reasons, the Court should grant Friends' Motion for Summary Judgment, vacate and void the Exchange Agreement, including any actions taken

---

[199] 5 U.S.C. § 706(2); 16 U.S.C. § 3164(a) (Title XI voiding any actions taken without compliance).
[200] 16 U.S.C. § 1540(g)(1)(A); *Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1089 (9th Cir. 2015).
[201] AR INT-002124–26.
[202] *See supra* Argument Part V at 37–38.
[203] *See supra* Plaintiffs' Interests at 10–11.

---

*Friends of Alaska National Wildlife Refuges, et al., v. Bernhardt, et al.*
Case No. 3:19-cv-00216-JWS                                             Page 40

pursuant to the agreement, and enjoin any activities related to the Exchange Agreement under the ESA until statutory consultation requirements are fulfilled.

Respectfully submitted this 23rd day of January, 2020.

 s/ Bridget Psarianos
Bridget Psarianos (AK Bar No. 1705025)
Brook Brisson (AK Bar No. 0905013)
Valerie Brown (AK Bar No. 9712099)
TRUSTEES FOR ALASKA

*Attorneys for Plaintiffs*

**CERTIFICATE OF COMPLIANCE**

      Pursuant to Local Civil Rule 7.4(a)(3), I certify that this brief complies with the type-volume limitation of Local Civil Rule 7.4(a)(1) because it contains 10,000 words, excluding the parts of the brief exempted by Local Civil Rule. 7.4(a)(4).


                               s/Bridget Psarianos
                               Bridget Psarianos

**CERTIFICATE OF SERVICE**

I certify that on January 23, 2020, I caused a copy of the PLAINTIFFS' OPENING BRIEF FOR SUMMARY JUDGMENT to be electronically filed with the Clerk of the Court for the U.S. District Court of Alaska using the CM/ECF system.


 s/Bridget Psarianos
Bridget Psarianos