DAVENÉ D. WALKER
U.S. Department of Justice
Environment and Natural Resources Division
Natural Resources Section
P.O. Box 7611
Washington, DC 20044–7611
Telephone: (202) 353-9213
Facsimile: (202) 305–0506
davene.walker@usdoj.gov

RICKEY D. TURNER, JR.
U.S. Department of Justice
Environment and Natural Resources Division
Wildlife and Marine Resources Section
999 18th Street, South Terrace, Suite 370
Denver, CO 80202
Telephone: (303) 844-1373
Facsimile: (303) 844-1350
rickey.turner@usdoj.gov

*Attorneys for Federal Defendants*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ALASKA**

| | | |
|---|---|---|
| FRIENDS OF ALASKA NATIONAL WILDLIFE REFUGES, *et al*., | ) | CASE NO. 3:19-cv-00216-JWS |
| Plaintiffs, | ) | |
| v. | ) | |
| DAVID BERNHARDT, *et al*., | ) | **FEDERAL DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |
| Federal Defendants, | ) | |
| and | ) | |
| KING COVE CORPORATION, *et al*., | ) | |
| Intervenor-Defendants. | ) | |

## TABLE OF CONTENTS

I. INTRODUCTION ... 1

II. FACTUAL BACKGROUND ... 5

III. STATUTORY BACKGROUND ... 11

A. Alaska National Interest Lands Conservation Act ... 11

B. National Environmental Policy Act ... 12

C. Endangered Species Act ... 13

IV. STANDARD OF REVIEW ... 14

A. Summary Judgment ... 14

B. Administrative Procedure Act ... 14

V. ARGUMENT ... 16

A. The Secretary's Decision To Enter Into The 2019 Agreement Was The Result Of A Legally Permissible Change In Policy Supported By A Reasoned Explanation ... 16

B. The Agreement Is Consistent With The Purposes of ANILCA ... 22

C. Title XI of ANILCA Does Not Apply ... 27

D. The Exchange Is Not Subject To NEPA ... 30

E. Plaintiffs' ESA Arguments Lack Merit ... 32

1. The Service Made a Proper "No Effect" Determination ... 33

2. Plaintiffs Fail to Show the Service's "No Effect" Determination is Unreasonable ... 35

a. Land exchange agreements do not automatically trigger consultation obligations ... 35

b. The Service was not required to analyze road construction impacts ... 36

i. Direct Effects ... 36

ii. Indirect Effects ... 36

Fed. Defs.' Resp. to Pls.' Mot. for Summ. J.
*Friends of Alaska National Wildlife Refuges v. Bernhardt*, Case No. 3:19-cv-00216-JWS i

iii. Cumulative Effects ........................................................ 37

F. Additional Briefing Would Be Necessary To Address The Remedy for Any Legal Error Found by the Court ........................................................ 38

VI. CONCLUSION ........................................................ 39

Fed. Defs.' Resp. to Pls.' Mot. for Summ. J.
*Friends of Alaska National Wildlife Refuges v. Bernhardt*, Case No. 3:19-cv-00216-JWS ii

## TABLE OF AUTHORITIES

**Cases**

*Abbott Labs. v. Gardner*,
387 U.S. 136 (1967) ... 35

*Agdaagux Tribe of King Cove et al. v. Jewell, et al.*,
128 F. Supp. 3d 1176 (D. Alaska 2015) ... 8

*Agdaagux Tribe of King Cove, et al. v. Zinke, et al.*,
No. 15-35875, 2017 WL 5198384 (9th Cir. Aug. 11, 2017) ... 9

*Babbitt v. United Farm Workers Nat'l Union*,
442 U.S. 289 (1979) ... 35

*Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*,
419 U.S. 281 (1974) ... 15

*Cal. Cmtys. Against Toxics v. EPA*,
688 F.3d 989 (9th Cir. 2012) ... 38

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
467 U.S. 837 (1984) ... 30

*Citizens to Pres. Overton Park v. Volpe*,
401 U.S. 402 (1971) ... 15

*City of Angoon v. Marsh*,
749 F.2d 1413 (9th Cir. 1984) ... 23, 24

*Def. of Wildlife v. Flowers*,
414 F.3d 1066 (9th Cir. 2005) ... 33

*Douglas Cty. v. Babbitt*,
48 F.3d 1495 (9th Cir. 1995) ... 12

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) ... 16, 21

*FDIC v. Meyer*,
510 U.S. 471 (1994) ... 31

*Friends of Alaska Nat'l Wildlife Refuges v. Bernhardt*,
381 F. Supp. 3d 1127 (D. Alaska 2019) ... 2, 10, 16

*Friends of the Earth v. Hintz*,
800 F.2d 822 (9th Cir. 1986) ... 15

*Fund for Animals, Inc. v. Rice*,
85 F.3d 535 (11th Cir. 1996) ... 15

Fed. Defs.' Resp. to Pls.' Mot. for Summ. J.
*Friends of Alaska National Wildlife Refuges v. Bernhardt*, Case No. 3:19-cv-00216-JWS iii

*John v. United States*,
720 F.3d 1214 (9th Cir. 2013) .................................................. 11

*Lands Council v. McNair*,
537 F.3d 981 (9th Cir. 2008) .................................................. 15

*League of Wilderness Defs. Blue Mountains Biodiversity Project v. U.S. Forest Serv.*,
549 F.3d 1211 (9th Cir. 2008) .................................................. 15

*Lincoln v. Vigil*,
508 U.S. 182 (1993).................................................. 26

*Marsh v. Or. Nat. Res. Council*,
490 U.S. 360 (1989).................................................. 15

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983).................................................. 14

*Nat. Res. Def. Council v. Houston*,
146 F.3d 1118 (9th Cir. 1998) .................................................. 33

*Nat'l Ass'n of Home Builders v. EPA*,
682 F.3d 1032 (D.C. Cir. 2012).................................................. 19

*Nat'l Audubon Soc'y v. Hodel*,
606 F. Supp. 825 (D. Alaska 1984) .................................................. 12, 26

*Nat'l Wildlife Fed'n v. Burford*,
871 F.2d 849 (9th Cir. 1989) .................................................. 15

*Native Ecosystems Council v. Dombeck*,
304 F.3d 886 (9th Cir. 2002) .................................................. 14

*Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*,
18 F.3d 1468 (9th Cir. 1994) .................................................. 14

*Occidental Eng'g Co. v. Immigration & Naturalization Serv.*,
753 F.2d 766 (9th Cir. 1985) .................................................. 14

*Ohio Forestry Ass'n v. Sierra Club*,
523 U.S. 726 (1998).................................................. 35

*Organized Vill. of Kake v. U.S. Dep't of Agric.*,
795 F.3d 956 (9th Cir. 2015) .................................................. 18

*Pac. Rivers Council v. Thomas*,
30 F.3d 1050 (9th Cir. 1994) .................................................. 13, 33

*Rio Grande Silvery Minnow v. Bureau of Reclamation*,
601 F.3d 1096 (10th Cir. 2010) .................................................. 38

Fed. Defs.' Resp. to Pls.' Mot. for Summ. J.
*Friends of Alaska National Wildlife Refuges v. Bernhardt*, Case No. 3:19-cv-00216-JWS iv

*Robertson v. Methow Valley Citizens Council*,
490 U.S. 332 (1989) ........ 12

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
747 F.3d 581 (9th Cir. 2014) ........ 30

*Sierra Forest Legacy v. U.S. Forest Serv*.,
598 F. Supp. 2d 1058 (N.D. Cal. 2009) ........ 33

*Sturgeon v. Frost*,
136 S. Ct. 1061 (2016) ........ 24

*Sw. Ctr. for Biological Diversity v. U.S. Forest Serv*.,
100 F.3d 1443 (9th Cir. 1996) ........ 33

*United States v. L.A. & Salt Lake R.R.*,
273 U.S. 299 (1927) ........ 35

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*,
435 U.S. 519 (1978) ........ 15

*W. Oil and Gas Ass'n v. EPA*,
633 F.2d 803 (9th Cir. 1980) ........ 38

*W. Watersheds Project v. Kraayenbrink*,
632 F.3d 472 (9th Cir. 2011) ........ 33

*Weinberger v. Romero-Barcelo*,
456 U.S. 305 (1982) ........ 38

*Winter v. Nat. Res. Def. Council, Inc*.,
555 U.S. 7 (2008) ........ 15

*Yamaguchi v. State Farm Mut. Auto. Ins. Co.*,
706 F.2d 940 (9th Cir. 1983) ........ 31

**Statutes**

5 U.S.C. § 701(a)(2) ........ 26

5 U.S.C. § 706(2)(A) ........ 14

15 U.S.C. § 793(c)(1) ........ 30

16 U.S.C. § 1536 ........ 13

16 U.S.C. § 1536(a)(2) ........ 13

16 U.S.C. § 3101(d) ........ 23, 24

16 U.S.C. § 3102 ........ 31

16 U.S.C. § 3102(3) ........ 28

Fed. Defs.' Resp. to Pls.' Mot. for Summ. J.
*Friends of Alaska National Wildlife Refuges v. Bernhardt*, Case No. 3:19-cv-00216-JWS v

16 U.S.C. § 3103(c) .... 29
16 U.S.C. § 3162(1) .... 28
16 U.S.C. § 3164(a) .... 29
16 U.S.C. § 3192(h) .... 11, 22
16 U.S.C. § 3192(h)(1) .... 29
16 U.S.C. § 668dd .... 25
16 U.S.C. §§ 3161-3173 .... 27
16 U.S.C. §§ 3164-3167 .... 28
42 U.S.C. § 4321 .... 12
42 U.S.C. § 4332(2)(C) .... 12
42 U.S.C. §§ 4321-4370m-12 .... 12
43 U.S.C. § 1602 .... 31
43 U.S.C. § 1613(a) .... 2
43 U.S.C. § 1621(g) .... 24, 27
43 U.S.C. § 1638 .... 12, 30, 31
43 U.S.C. §§ 1601-1629(h) .... 12
Pub. L. No. 105-277, 112 Stat. 2681 (1999) .... 6
Pub. L. No. 111-11, 123 Stat. 991 (2009) .... 7
Pub. L. No. 96-487, 94 Stat. 2371 (1980) .... 5

**Regulations**

40 C.F.R. § 1501.1 .... 12
40 C.F.R. § 1502.1 .... 12
43 C.F.R. pt. 36 .... 28
50 C.F.R. § 402.02 .... 36, 37
50 C.F.R. § 402.14(a) .... 13
50 C.F.R. § 402.14(c) .... 37
50 C.F.R. § 402.14(g)(4) .... 37
51 Fed. Reg. 19,926 (June 3, 1986) .... 33

Fed. Defs.' Resp. to Pls.' Mot. for Summ. J.
*Friends of Alaska National Wildlife Refuges v. Bernhardt*, Case No. 3:19-cv-00216-JWS vi

**Rules**

L.Civ.R. 16.3(c)(2).......... 5

**Other Authorities**

H.R. REP. NO. 96-97 (1979).......... 5

## I. INTRODUCTION

This dispute stems from the Department of the Interior's renewed effort to enter into a land exchange agreement with King Cove Corporation ("KCC"), an Alaska Native village corporation, pursuant to the authority set forth in section 1302(h) of the Alaska National Interest Lands Conservation Act ("ANILCA"). Two Secretaries of the Interior have properly concluded that such an agreement serves both the best interests of the people of Alaska and the purposes of ANILCA, while at the same time complying with relevant federal laws, including ANILCA, the National Environmental Policy Act ("NEPA"), and the Endangered Species Act ("ESA").

Then-Secretary of the Interior Ryan Zinke entered into the first land exchange agreement with KCC on January 22, 2018 (referred to herein as the "2018 Agreement"). AR INT-002122-37.[1] In so doing, Secretary Zinke agreed to convey to KCC up to 500 acres out of the 315,000 total acres of land in the Izembek National Wildlife Refuge in exchange for a to-be-determined number of acres from lands owned by KCC that are adjacent to the refuge. AR INT-002123-4. The number of acres to be received from KCC and incorporated into the refuge would have been that amount of land necessary to ensure that both parcels were of equal value, but the specific land had not yet been identified. AR INT-002125. Additionally, KCC would have agreed to relinquish its selection rights under the Alaska Native Claims Settlement Act ("ANCSA") to 5,430 acres on the east side of Cold Bay, including acreage that the U.S. Fish and Wildlife Service (the "Service") had previously identified as being highly desirable for preservation as

[1] References to "AR ########" (documents compiled in 2014) and AR INT-###### (documents compiled in 2019) in this brief refer to the bates-stamp numbering on the bottom of each page in the administrative record. For convenience, copies of any pages cited from the 2014 and 2018 administrative records will be attached hereto.

Fed. Defs.' Resp. to Pls.' Mot. for Summ. J.
*Friends of Alaska National Wildlife Refuges v. Bernhardt,* Case No. 3:19-cv-00216-JWS 1

habitat and inclusion in the refuge. *See id*.[2] This Court vacated the 2018 Agreement finding that Secretary Zinke failed to provide a reasoned explanation for his change in policy from that of prior administrations. *Friends of Alaska Nat'l Wildlife Refuges v. Bernhardt*, 381 F. Supp. 3d 1127, 1143 (D. Alaska 2019).

In May of 2019, KCC asked newly-appointed Secretary Bernhardt to enter into a renewed land exchange agreement on substantially the same terms as the 2018 Agreement. AR INT-002209-15. After considering the record here, Secretary Bernhardt reached the same conclusion as had Secretary Zinke. He determined that a land exchange allowing for the potential construction of a gravel road and increasing the total acreage in Izembek and Alaska Peninsula National Wildlife Refuges would improve public safety and serve the purposes of ANILCA by striking a proper balance between protecting the national interest in the scenic, natural, cultural and environmental values of the public lands in Alaska and providing an opportunity for satisfaction of the economic and social needs of the State of Alaska. AR INT-002866.

Taking this Court's guidance regarding the need for a more thorough, reasoned explanation to heart, Secretary Bernhardt set forth his findings and rationale in the renewed land exchange agreement, AR INT-02867-74 ("2019 Agreement"), and a twenty-page document, entitled "Findings and Conclusions Concerning a Proposed Land Exchange Between the Secretary of the Interior and King Cove Corporation for Lands within Izembek National Wildlife Refuge, Alaska." AR INT-002814-33 ("2019 Findings").

---

[2] KCC, as the Village Corporation for the village of King Cove, was entitled under ANCSA to select and receive a patent for the surface estate of 161,280 acres of land as set forth at 43 U.S.C. § 1613(a).

Fed. Defs.' Resp. to Pls.' Mot. for Summ. J.
*Friends of Alaska National Wildlife Refuges v. Bernhardt*, Case No. 3:19-cv-00216-JWS 2

As detailed in these documents, Secretary Bernhardt decided to exercise his land exchange authority because he found an exchange in the public interest and serving the purposes of ANILCA. *E.g.,* AR INT-02815. Not only will the land exchange increase the total acreage managed by the Service for refuge purposes, it is expected to facilitate the opportunity for the future construction of a single lane, gravel road to connect the communities of King Cove and Cold Bay, which would improve access to medical care and, thus, the health, safety, and quality of life for the residents of King Cove. AR INT-02865-66.

The Secretary's rationale for agreeing to the land exchange is initially set forth in the introductory "whereas" clauses to the 2019 Agreement. AR INT-02865-66. There, it describes the difficulty residents of King Cove have experienced attempting to reach the Cold Bay Airport for medical evacuations during inclement weather conditions, as well as the need to rely on the United States Coast Guard in many instances. AR INT-02866. The Agreement also states that King Cove residents have died either attempting to travel between King Cove and Cold Bay or because they were unable to get to the Cold Bay airport for transport to the hospital in Anchorage. *Id.*

In the 2019 Findings, Secretary Bernhardt expounds on the "whereas" clauses and provides a detailed and reasoned explanation for Interior's change in policy from prior years. AR INT-02814-33. The Secretary considered by the following factors in concluding that a land exchange is in the public's best interests include:

> 1. The acute necessity, underestimated in the 2013 EIS [Environmental Impact Statement] and ROD [Record of Decision], for a road connecting King Cove and Cold Bay to serve the future emergency medical and other social needs of the Alaska Native residents of King Cove and the Alaskan people;
> 2. Changed information concerning the viability and availability of alternative means of transportation that have since proven to be neither viable nor available;

Fed. Defs.' Resp. to Pls.' Mot. for Summ. J.
*Friends of Alaska National Wildlife Refuges v. Bernhardt,* Case No. 3:19-cv-00216-JWS 3

3. A previous failure to take into consideration the high ongoing and future costs to the taxpayers of continuing emergency medical evacuations from King Cove by the U.S. Coast Guard;
4. The substantial benefits to the citizens of the United States and residents of Alaska in increasing the total amount of acreage in the Izembek National Wildlife Refuge and adjacent Alaska Peninsula National Wildlife Refuge for the protection of scenic, natural, cultural, and environmental values by way of a land exchange with King Cove Corporation; and
5. [The Secretary's] determination that, even if the facts are as stated in the 2013 ROD; that is, that a road is a viable alternative but (a) there are "viable, and at times preferable" transportation alternatives for medical services and (b) resources would be degraded by the road's construction -- human life and safety must be the paramount concern in this instance. Nothing about construction of a road prevents the use of other alternatives (such as emergency Coast Guard evacuations) should the road be impassable or its use be otherwise inexpedient.

AR INT-002831-32. In short, after weighing competing public interest considerations, Secretary Bernhardt, as had Secretary Zinke before him, concluded that preservation of human life must be given the greatest weight. AR INT-002832. Additionally, the Secretary concluded that an equal value exchange is consistent with the purposes of ANCSA and ANILCA, as well as with Interior's responsibility to the Alaska Native peoples. *Id.*

Plaintiffs have challenged the lawfulness of the 2019 Agreement under ANILCA, NEPA, and the ESA. Yet, many of the issues that Plaintiffs allege in their motion for summary judgment and accompanying memorandum are separate and distinct from the land exchange. Plaintiffs' claims largely relate to the use of the land for a prospective road that may or may not be built. Any such road will have to comply with all applicable federal and state laws and regulations before it could be built, and Plaintiffs' concerns about the existence of a road should be addressed at that time.

Secretary Bernhardt was entitled to enter the 2019 Agreement under ANILCA. No public notice or process was required for the Secretary to take this action. After sufficiently

Fed. Defs.' Resp. to Pls.' Mot. for Summ. J.
*Friends of Alaska National Wildlife Refuges v. Bernhardt,* Case No. 3:19-cv-00216-JWS 4

apprising himself of relevant factors and prior decisions by the Department of the Interior and having the benefit of updated information regarding transportation alternatives, Secretary Bernhardt reached a different conclusion regarding the wisdom of a land exchange than had his predecessors. Secretary Bernhardt's decision to execute the 2019 Agreement furthers the purposes of ANILCA and does not violate Title XI of ANILCA. The Secretary was not required to prepare an environmental impact statement pursuant to section 910 of ANILCA. There also was no requirement to consult regarding the possible effects of the Agreement on the threatened and endangered species under the ESA. For these reasons, Plaintiffs' motion for summary judgment should be denied, and summary judgment should be granted for Federal Defendants.[3]

## II. FACTUAL BACKGROUND

Congress established the 315,000 acre Izembek National Wildlife Refuge in 1980 when it passed ANILCA. *See* Pub. L. 96-487, 94 Stat. 2371 (HR 39), Title III § 303(3) (Dec. 2, 1980).[4] At the time, legislators highlighted this region's "outstanding scenery, key populations of brown bear, caribou and other wilderness-related wildlife and critical watersheds for Izembek Lagoon." H. Rep. 96-97, pt. II, at 136 (1979). The Department of the Interior, through the Service, manages the refuge so as to "conserve fish and wildlife populations and habitats in their natural diversity," "ensure … water quality," as well as to "provide … opportunity for continued subsistence uses by local residents." Pub. L. No. 96-487, § 303(3)(B), 94 Stat. 2371, 2390-91. Part of the refuge spans the isthmus separating the Izembek Lagoon and the Bering Sea, to the north, and from Cold Bay and the Pacific Ocean, to the south. AR INT-002816.

[3] Pursuant to L.Civ.R. 16.3(c)(2), this brief in opposition to Plaintiffs' motion for summary judgment is deemed a cross-motion for summary judgment.

[4] The area had formerly been designated as the "Izembek National Wildlife Range," which was established two decades earlier under Public Land Order 2216 (Dec. 6, 1960).

Fed. Defs.' Resp. to Pls.' Mot. for Summ. J.
*Friends of Alaska National Wildlife Refuges v. Bernhardt,* Case No. 3:19-cv-00216-JWS 5

The Native Village of King Cove and the City of Cold Bay in southwestern Alaska lie 18 miles apart. *Id.* Both are in close proximity to the Izembek Refuge. *Id.* King Cove has a population of approximately 800 people year-round, but the population expands to approximately 1,300 people during the summer. *Id*. While King Cove has the larger population, Cold Bay has the larger airport—an instrument-capable airport with a paved runway more than 10,000 feet long (one of the longest in the state) and a crosswind runway. *Id.* It is a former military airport kept in service primarily as an emergency landing location on the long-haul great circle route between North American and Asian airport hubs. Both communities are accessible only by sea or by air. *Id.*

King Cove and Cold Bay are separated not only by miles, but also by:

- the water body of Cold Bay, which is known for severe winds and waves, and infrequently for ice;
- mountainous terrain, particularly near the City of King Cove and its small airport;
- an isthmus 3 miles wide separating the head of Cold Bay, which opens to the Pacific Ocean, from the Bering Sea; and,
- the Izembek Refuge and Izembek Wilderness on the isthmus and by the Alaska Peninsula National Wildlife Refuge along the shoreline.

*Id.*

The residents of the remote King Cove community have long sought reliable access to Cold Bay's all-weather airport to allow for emergency medical evacuations and other purposes. AR INT-002209-15; AR INT-002816-17. Congress has repeatedly shown itself to be sympathetic to that need. In 1999, Congress passed the King Cove Health and Safety Act of the Consolidated and Emergency Supplemental Appropriations Act of 1999. Pub. L. No. 105-277, § 353, 112 Stat. 2681 (1999). Under this act, $20 million was provided to construct a road-hovercraft link between King Cove and Cold Bay, $15 million was for improvements to the King Cove airstrip, and $2.5 million was for a major renovation of the King Cove health clinic. *Id.*

Fed. Defs.' Resp. to Pls.' Mot. for Summ. J.
*Friends of Alaska National Wildlife Refuges v. Bernhardt*, Case No. 3:19-cv-00216-JWS 6

These funds allowed for the purchase of a $9 million hovercraft and the construction of a landing along the northeastern shore of Cold Bay. AR INT-001275.

Due to the poor reliability of the hovercraft in severe weather and uncertainty about future funding for the high operational costs, King Cove residents continued to seek a road linking their community with Cold Bay. AR INT-001649-50. And, in fact, the hovercraft service was discontinued in 2011 due to exorbitantly high operating costs and reliability concerns. AR INT-001275. During its years of operation from 2007-2011, the hovercraft was used to complete 30 medical evacuations, but was inoperable 30 percent of the time. *Id.*

Ten years after passing the King Cove Health and Safety Act, Congress again took action to assist the residents of King Cove. In the Omnibus Public Land Management Act of 2009 ("OPLMA"), Congress directed the Secretary of the Interior to develop an environmental impact statement to determine whether a land exchange and road construction within the boundaries of the Izembek Refuge would be in the public interest. Pub. L. No. 111-11, Title VI, Subtitle E, 123 Stat. 991 (Mar. 30, 2009); AR INT-002435-40. The proposed exchange would have transferred to the State of Alaska all right, title and interest to a corridor of land "for the purpose of constructing a single-lane gravel road between the communities of King Cove and Cold Bay, Alaska." OPLMA § 6402(a). Subject to limited exceptions, the use of any portions of the road built on the conveyed federal lands would be "primarily for health and safety purposes (including access to and from the Cold Bay Airport) and only for noncommercial purposes." *Id.* § 6403(a)(1). If the public interest determination was in the affirmative, then road construction was authorized. *Id.* § 6402(d)(1). However, if no construction permits for the road were issued within seven years, then the authorization expired. *Id.* § 6406(a).

Fed. Defs.' Resp. to Pls.' Mot. for Summ. J.
*Friends of Alaska National Wildlife Refuges v. Bernhardt,* Case No. 3:19-cv-00216-JWS 7

On December 23, 2013, then-Secretary Jewell signed a ROD in which she concluded that such a road would not be in the overall public interest because it "would lead to significant degradation of irreplaceable ecological resources that would not be offset by the protection of other land to be received under an exchange . . . [and] . . . because reasonable and viable transportation alternatives exist to meet the important health and safety needs of the people of King Cove." AR INT-001238. KCC asked for reconsideration. However, after further consultation and visiting the site, then-Secretary Jewell signed a letter dated August 13, 2014, affirming her conclusion and rejecting the community's assertion that a road would best suit their needs. AR INT-001258-59.

In the meantime, KCC filed a complaint in the District Court for the District of Alaska, alleging that the Secretary's decision violated, among others, the OPLMA, NEPA, ANILCA, the Administrative Procedure Act ("APA"), and the government's trust responsibility to tribes. *Agdaagux Tribe of King Cove et al. v. Jewell, et al.*, 128 F. Supp. 3d 1176 (D. Alaska 2015). The State of Alaska intervened on behalf of the plaintiffs, while a number of environmental groups intervened on behalf of the government. *Id*. The Court granted the government's motion for summary judgment and KCC appealed. *Id*. During the pendency of the appeal, Congressional authorization for the road construction expired on March 30, 2016. OPLMA § 6406(a).

From December 2013, when then-Secretary Jewell signed the ROD, until May of 2019, there were a total of 101 emergency medical evacuations from King Cove. AR INT-002211. Of those 101, 21 evacuations had to be handled by the U.S. Coast Guard. *Id.; see also* AR INT-002230-56. Evacuations by the U.S. Coast Guard add significant cost at $200,000 to $250,000

Fed. Defs.' Resp. to Pls.' Mot. for Summ. J.
*Friends of Alaska National Wildlife Refuges v. Bernhardt*, Case No. 3:19-cv-00216-JWS 8

per rescue mission and risk the lives of Coast Guard personnel as well as those of the King Cove residents being rescued. AR INT-002211; AR INT-002268; AR INT-002354.

Early in 2017, the Department of the Interior decided to re-consider the issue of a land exchange with KCC. AR INT-001500-01 (transcript of Secretary Zinke's confirmation hearing where he committed to work on this issue). In May 2017, KCC formally requested that Interior agree to an exchange, explaining:

> Although King Cove is only 12 miles from Alaska's fourth longest paved civilian runway, at Cold Bay, the residents of King Cove cannot regularly reach the airport. The weather in our area is some of the worst in Alaska and will often prevent us from accessing the Cold Bay airport by small aircraft. This weather is subject to radical change even during the same day. So, it is only possible to schedule air travel from our small airstrip about 50% of the time with any certainty of safety. Twelve persons have died in the past years trying to get to and from the King Cove unpaved, gravel landing strip.
>
> In addition, we have had many 'near miss' events. For example, Etta, Kuzakin, President of the Agdagux [sic] Tribal Council was medevaced from King Cove while 34 weeks pregnant to give birth by cesarean section in Anchorage. She was flown to Cold Bay on a Coast Guard helicopter from a Coast Guard ship, which fortuitously was in the area. There were 60 knot winds that forced her to fly a circuitous route to Cold Bay that took 40 minutes. Had the Coast Guard not been there or able to flyer her to Cold Bay she could not have given birth because the King Cove clinic lacks the ability to perform a cesarean section.

AR INT-001645. Following discussions with KCC representatives, the parties agreed to explore the concept of an equal value land exchange that would give KCC a narrow corridor through the refuge on which a road could potentially be constructed in exchange for lands belonging to or selected by KCC, the end result of which would likely be a substantial increase in the total amount of public land comprising the refuge. AR INT-001645-47. In light of these discussions, King Cove moved to dismiss its appeal, which the Court granted in August 2017. *Agdaagux Tribe of King Cove, et al. v. Zinke, et al.*, No. 15-35875, 2017 WL 5198384 (9th Cir. Aug. 11, 2017).

Fed. Defs.' Resp. to Pls.' Mot. for Summ. J.
*Friends of Alaska National Wildlife Refuges v. Bernhardt*, Case No. 3:19-cv-00216-JWS 9

On January 22, 2018, Secretary Zinke entered into the 2018 Agreement with KCC pursuant to section 1302(h) of ANILCA. AR INT-002122-37. In that agreement, the parties agreed to an equal value exchange whereby KCC agreed to convey to the United States the surface estate of certain lands within the Izembek and Alaska Peninsula National Wildlife Refuges and relinquish its selection rights to an additional 5,430 acres within the Izembek Refuge. AR INT-002123-25. In return, the Secretary agreed to convey to KCC the surface and subsurface estates of not more than 500 acres in the form of a narrow corridor through the Izembek Refuge. AR INT-002124. The precise number of acres to be conveyed by KCC to the United States would have been adjusted to ensure an equal value exchange. *Id.*

The U.S. District Court for the District of Alaska vacated the 2018 Agreement after concluding that Secretary Zinke had failed to provide reasoned explanations for the changes of course with respect to the existence of viable alternatives to a road or the agency's prior determinations concerning a road's environmental impacts. *Friends of Alaska*, 381 F. Supp. 3d at 1143. The Court did not reach the merits of Plaintiff's arguments concerning NEPA, ANILCA, or the ESA. *Id*.

As previously discussed, KCC then asked Secretary Bernhardt to enter into a new land exchange agreement. AR INT-002209-15. Following a review of the history of King Cove's access concerns, the previous efforts of Congress and Interior, the 2013 Environmental Impact Statement and corresponding ROD, and the 2018 Agreement, Secretary Bernhardt concluded that such a land exchange "comports with the purposes of ANCSA and ANILCA because it strikes the proper balance between protection of scenic, natural, cultural and environmental values and provides opportunities for the long-term social and physical well-being of Alaska Native people." AR INT-02814-15. Consequently, he detailed his rationale and conclusions in

Fed. Defs.' Resp. to Pls.' Mot. for Summ. J.
*Friends of Alaska National Wildlife Refuges v. Bernhardt*, Case No. 3:19-cv-00216-JWS 10

the 2019 Findings and entered into the 2019 Agreement. AR INT-002814-33; AR INT-2865-74. The fundamental terms of the 2019 Agreement with respect to the lands to be exchanged are substantially similar to those of the 2018 Agreement, although there are some minor modifications.[5]

## III. STATUTORY BACKGROUND

### A. Alaska National Interest Lands Conservation Act

Congress enacted ANILCA to preserve and protect "nationally significant natural, scenic, historic, archeological, geological, scientific, wilderness, cultural, recreational, and wildlife values" and landscapes by creating "conservation system units," such as national parks, preserves, refuges, and other federal reservations. *John v. United States*, 720 F.3d 1214, 1218 (9th Cir. 2013). Congress also sought to protect the "subsistence way of life for rural residents" and the resources upon which they depend, as well as to obviate the need for future legislation regarding environmental conservation and subsistence uses. *Id.*

In ANILCA, Congress included a provision, section 1302(h), that authorized the Secretary, when acquiring lands for the purposes of ANILCA, to exchange lands in refuges and other conservation system units with corporations organized by the Native groups, Village Corporations, Regional Corporations, the State, and others. 16 U.S.C. § 3192(h). Such exchanges are to be of equal value unless the Secretary determines that an unequal value

[5] The modifications in the 2019 Land Exchange include: (1) the lands that the United States intends to convey are delineated in U.S. Survey No. 14495; (2) the number of medical evacuations since December 23, 2013, were updated from 68 to 101; (3) an additional whereas clause that states the Secretary's conclusion that this land exchange would improve public safety and serve the purposes of ANILCA; (4) removed the agreement that the potential road would be "used primarily for health, safety, and quality of life purposes . . . and generally for noncommercial purposes"; and (5) various clauses concerning potential contamination and remediation procedures.

Fed. Defs.' Resp. to Pls.' Mot. for Summ. J.
*Friends of Alaska National Wildlife Refuges v. Bernhardt,* Case No. 3:19-cv-00216-JWS 11

exchange is in the public interest. *Id*. Significantly, Congress also included language clarifying that the National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321-4370m-12, should not be construed as requiring the preparation an environmental impact statement for "withdrawals, conveyances, regulations, orders, easement determinations, or other actions" that lead to the issuance of conveyances to Native Corporations under the ANCSA[6] or ANILCA. 43 U.S.C. § 1638.

**B. National Environmental Policy Act**

Under NEPA, whenever an agency proposes a "major Federal action[] significantly affecting the quality of the human environment," it must prepare an environmental impact statement. 42 U.S.C. § 4332(2)(C). When required, the environmental impact statement must "provide [a] full and fair discussion of significant environmental impacts" so as to "inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1. NEPA is a procedural statute; it does not require that agencies reach a particular result. 42 U.S.C. § 4321; 40 C.F.R. § 1501.1; *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). Furthermore, courts have found that some agency actions are not subject to NEPA requirements. *Douglas Cty. v. Babbitt*, 48 F.3d 1495, 1502 (9th Cir. 1995). Similarly, Congress has declined to apply NEPA to certain statutory schemes. *Id*.

[6] 43 U.S.C. §§ 1601-1629(h). *See also Nat'l Audubon Soc'y v. Hodel*, 606 F. Supp. 825, 828 (D. Alaska 1984) ("Congress enacted ANCSA in 1971 to effectuate a comprehensive settlement of all Native claims based on subsistence use and occupancy of land in Alaska." (footnote omitted)).

Fed. Defs.' Resp. to Pls.' Mot. for Summ. J.
*Friends of Alaska National Wildlife Refuges v. Bernhardt*, Case No. 3:19-cv-00216-JWS 12

### C. Endangered Species Act

Section 7(a)(2) of the ESA requires each federal agency to ensure that any action authorized, funded, or carried out by that agency "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of designated critical habitat. 16 U.S.C. § 1536(a)(2). To assist these federal agencies in complying with Section 7(a)(2), the agency undertaking the action (the "action agency") is required to consult with the appropriate consulting agency (either the U.S. Fish and Wildlife Service or the National Marine Fisheries Service) whenever a federal action "may affect" a threatened or endangered species or critical habitat. 16 U.S.C. § 1536; 50 C.F.R. § 402.14(a). If a proposed action "may affect" a listed species or designated critical habitat, the action agency must conduct "informal consultation" or "formal consultation." *Id*. But "if the action agency determines that a particular action will have no effect on an endangered or threatened species, the consultation requirements are not triggered." *Pac. Rivers Council v. Thomas*, 30 F.3d 1050, 1054 n.8 (9th Cir. 1994). No concurrence by the consulting agency regarding the action agency's "no effect" determination is required. 50 C.F.R. § 402.14(a).

On occasion, as in the case at hand, the Service is both the action agency and consulting agency. When warranted, Service units will conduct an intra-Service Section 7 consultation with the appropriate Service Ecological field office on actions they authorize, fund, or carry out that "may affect" listed species or designated or proposed critical habitat. *See* ESA § 7 Consultation Handbook at 1-5 (March 1998), available at http://www.fws.gov. These actions may include activities like national "refuge operations, public use programs, private lands and federal aid activities, as well as promulgating regulations and issuing permits." *Id*. at 1-6. A Service office

Fed. Defs.' Resp. to Pls.' Mot. for Summ. J.
*Friends of Alaska National Wildlife Refuges v. Bernhardt*, Case No. 3:19-cv-00216-JWS 13

seeking intra-Service consultation, after first making a "may affect" decision for its proposed action, provides any required data and is treated as any other action agency. *Id*.

## IV. STANDARD OF REVIEW

### A. Summary Judgment

The Ninth Circuit has endorsed the use of summary judgment motions under Rule 56 of the Federal Rules of Civil Procedure for review of agency actions under the APA. *See, e.g.*, *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471-72 (9th Cir. 1994). The court's role in cases involving decisions of an administrative agency is not to resolve facts, but to "determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Occidental Eng'g Co. v. Immigration & Naturalization Serv.*, 753 F.2d 766, 769 (9th Cir. 1985). The administrative agency itself is the fact-finder; summary judgment is appropriate for determining the legal question of "whether the agency could reasonably have found the facts as it did." *Id*. at 770.

### B. Administrative Procedure Act

Judicial review of agency decisions such as this one is governed by the APA, "which specifies that an agency action may be overturned only where it is found to be 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 891 (9th Cir. 2002) (quoting 5 U.S.C. § 706(2)(A)). "The scope of review under the [APA] standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). A court may reverse a decision as arbitrary and capricious only if an agency "relied on factors Congress did not intend it to consider, 'entirely failed to consider an important aspect of the problem,' or offered an explanation 'that runs counter to the evidence before the

Fed. Defs.' Resp. to Pls.' Mot. for Summ. J.
*Friends of Alaska National Wildlife Refuges v. Bernhardt*, Case No. 3:19-cv-00216-JWS 14

agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *League of Wilderness Defenders Blue Mountains Biodiversity Project v. U.S. Forest Serv.*, 549 F.3d 1211, 1215 (9th Cir. 2008) (internal quotations and citation omitted). "In other words, there must be 'a clear error of judgment.'" *Id.* (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989)). The court's role is solely to determine whether "the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 416 (1971).

This standard is "exceedingly deferential." *Fund for Animals, Inc. v. Rice*, 85 F.3d 535, 541 (11th Cir. 1996); *see also The Lands Council v. McNair*, 537 F.3d 981, 992-94 (9th Cir. 2008) (en banc), *overruled on other grounds by Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008). "While we may not supply a reasoned basis for the agency's action that the agency itself has not given, we will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 285-86 (1974) (internal citation omitted); *see also Friends of the Earth v. Hintz*, 800 F.2d 822, 831 (9th Cir. 1986) ("The court may not set aside agency action as arbitrary and capricious unless there is no rational basis for the action."(footnote and citation omitted)). "The [agency's] action . . . need be only a reasonable, not the best or most reasonable, decision." *Nat'l Wildlife Fed'n v. Burford*, 871 F.2d 849, 855 (9th Cir. 1989). The APA does not require – or even allow – a court to overturn an agency action because it disagrees with the agency's decision or even with its conclusions about the scope, breadth or effect of the environmental impacts of the project at issue. *Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council*, 435 U.S. 519, 521 (1978). The reviewing court's task is simply "to insure a fully informed and well-considered

Fed. Defs.' Resp. to Pls.' Mot. for Summ. J.
*Friends of Alaska National Wildlife Refuges v. Bernhardt*, Case No. 3:19-cv-00216-JWS 15

decision, not necessarily a decision [that the court] would have reached had [it] been [a] member [ ] of the decisionmaking unit of the agency." *Id.* at 558.

## V. ARGUMENT

### A. The Secretary's Decision To Enter Into The 2019 Agreement Was The Result Of A Legally Permissible Change In Policy Supported By A Reasoned Explanation.

The framework for deciding if an agency has engaged in legally defensible analysis and decision making when it changes a previous policy was ascribed by the Supreme Court in *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009). *See also Friends of Alaska*, 381 F. Supp. 3d at 1143. In *Fox*, the Court held that a policy change will comply with the APA if the agency:

> (1) displays awareness that it is changing position;
> (2) shows that the new policy is permissible under the statute;
> (3) believes the new policy is better; and,
> (4) provides good reasons for the new policy, which, if the new policy rests upon factual findings that contradict those which underlay its prior policy must include a reasoned explanation for disregarding facts and circumstances that underlay or were engendered by the prior policy.

*Id.* at 515. Therefore, under *Fox*, an agency must acknowledge and consider existing policy determinations prior to adopting a new position. The next two criteria, articulating why a potential policy change is "better" and providing a "reasoned explanation" regarding the factual basis of the prior policy are inextricably linked. Any potential arguments or rationale supporting a new policy direction would also require an explanation for changing the previous policy decision. Finally, if the Department were to consider and adopt a new policy, that policy must be statutorily permissible.

Plaintiffs contend that Secretary Bernhardt's decision to enter into the land exchange constitutes an impermissible change in agency policy in violation of the *Fox* decision. Pls.' Mem. in Support of Mot. For Summ. J. at 12, ECF No. 32 ("Pls.' Mem."). In making this

Fed. Defs.' Resp. to Pls.' Mot. for Summ. J.
*Friends of Alaska National Wildlife Refuges v. Bernhardt*, Case No. 3:19-cv-00216-JWS 16

argument, Plaintiffs do not allege that the Secretary failed to display awareness of the change in agency position, nor do they dispute that the Secretary believes that the new policy is better. *Id*. at 13. Rather, Plaintiffs allege that: (1) the agreement is impermissible under ANILCA because it does not comport with the purposes of that statute; and, (2) that the Secretary failed to provide good reasons, including a reasoned explanation, for his reversal of the agency's prior policy that rejected a land exchange. *Id.* at 13-19. The issue of compliance with the purposes of ANILCA is addressed below in section B.

With regard to the Secretary's alleged failure to provide good reasons, Plaintiffs misconstrue the Secretary's rationale based on new information as detailed in the 2019 Findings. Moreover, they have misapplied the *Fox* decision in a manner that would effectively prevent an agency from using such new information to rebalance competing interests in a manner that leads to a different conclusion.

Plaintiffs first contend that the Secretary failed to adequately address previous findings regarding harm to refuge resources. *Id.* at 15. Plaintiffs are incorrect. Moreover, this single-minded focus on one element of a broader analysis neglects to account for the Secretary's obligation under ANILCA to balance a variety of considerations relating not only to protection of the national interest in the scenic, natural, cultural and environmental values of the public lands in Alaska, but also to the provision of an adequate opportunity for satisfaction of the economic and social needs of the State of Alaska. AR INT-002866. Such social needs certainly include public health and safety.

The Secretary recognized and acknowledged concerns about a road's possible impacts to refuge resources. AR INT-002820. However, looking at the broader picture, he also found that "Federal ownership and a more permanent conservation status for the lands and land selection

Fed. Defs.' Resp. to Pls.' Mot. for Summ. J.
*Friends of Alaska National Wildlife Refuges v. Bernhardt,* Case No. 3:19-cv-00216-JWS 17

rights to be acquired enhances the purposes of the Refuge." AR INT-002831. Similarly, he recognized the "substantial benefits to the citizens of the United State and residents of Alaska in increasing the total amount of acreage in the [Izembek and Alaska Peninsula Refuges] for the protection of scenic, natural, cultural, and environmental values . . . ." *Id.* These considerations, when coupled with important factors such as the medical and other social needs of the residents of King Cove, new information concerning the lack of viability and availability of alternative means of transportation, the high cost to the taxpayers of medical evacuations by the U.S. Coast Guard, and general concerns over human health and safety, led the Secretary to conclude that the weight of these various considerations favored a land exchange despite the potential resource impacts of a single lane gravel road. AR INT-002831-32.

Plaintiffs next argue that the Secretary failed to adequately explain his conclusion regarding the value of lands to be received in the exchange. Pls.' Mem. 17. They point to a statement in the 2013 ROD that the value of lands received from KCC would not compensate for the negative impacts of a road. *Id.* However, as the Secretary indicated in the 2019 Findings, he found those 2013 findings to be flawed because they failed to give proper weight either to the value of the habitat that the Service would receive or to the enhancement to the purposes of the refuge by way of more permanent conservation status for the lands and land selection rights to be acquired. AR INT-002831.

Moreover, the Secretary concluded, as is his purview and obligation under ANILCA, that he was compelled in 2019 to rebalance the factors used to reach the 2013 conclusions to give greater weight to the value of human life. AR INT 002831-32. *See also Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 966 (9th Cir. 2015) ("We do not question that the Department was entitled in 2003 to give more weight to socioeconomic concerns than it had in

Fed. Defs.' Resp. to Pls.' Mot. for Summ. J.
*Friends of Alaska National Wildlife Refuges v. Bernhardt*, Case No. 3:19-cv-00216-JWS 18

2001, even on precisely the same record."); *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1038 (D.C. Cir. 2012) ("*Fox* makes clear that this kind of reevaluation is well within an agency's discretion."). This rebalancing was not only within the scope of the Secretary's discretion and authority, but also a warranted response to various changed circumstances, such as new information concerning the unfeasibility and lack of availability of alternative means of transportation for use by King Cove residents during medical emergencies.

Plaintiffs' final allegation regarding the Secretary's reasoned explanation for his change in policy touches on this very point – alternative means of transportation. Pls.' Mem. 18. Plaintiffs contend that the Secretary's findings concerning a paucity of viable alternatives is not supported by the record and that hovercraft, landing craft, and ferry all constitute viable alternatives. *Id.* In making this argument, Plaintiffs not only cherry pick certain facts, but they also ignore the practical reality that any viability analysis necessarily includes considerations of economic viability.

Plaintiffs concede that the Aleutians East Borough chose to eliminate hovercraft service in 2011 and did not pursue an option of replacing it with a landing craft. *Id.* However, they argue that this does not constitute evidence of non-viability, thereby implying that the Borough did not have valid reasons for making these decisions. *Id.* To the contrary, the record shows that the Borough suspended hovercraft service in 2011 due to high costs of operation ($3 million per year) and 30 percent down-time due to weather conditions and poor reliability. AR INT-001275. Regarding landing craft, the United States Army Corps of Engineers ("Corps") concluded that such vessels are not ice capable, would not be able to perform shore landings in ice conditions, and would not be suitable for year-round medevac use. AR INT-001305. Regardless, even if these types of vessels had the potential to be more reliable or economically viable, neither the

Fed. Defs.' Resp. to Pls.' Mot. for Summ. J.
*Friends of Alaska National Wildlife Refuges v. Bernhardt*, Case No. 3:19-cv-00216-JWS 19

Secretary nor King Cove has any authority to force the Borough to make different decisions. The bottom line is that there is no hovercraft or landing craft available for use by residents of King Cove and any such availability for the foreseeable future is both highly speculative and less likely than in 2013. *E.g.*, AR INT-002821. In light of these considerations, the Secretary did not consider hovercraft or landing craft to be viable alternatives.

The other marine alternative, a ferry, was analyzed by the Corps in 2015, long after then-Secretary Jewell signed the 2013 ROD.[7] The ferry alternative was rejected by Secretary Bernhardt as prohibitively expensive and laden with risks such as capital funding, operational funding, regulatory permitting, and lack of redundancy. AR INT-002822; AR INT-001303. Compounding the funding concerns, the Corps assigned a separate risk factor of "medium-serious" to each of three ferry route options, with the most important such risks relating to "operations at night and in extreme weather, permitting, and delays in getting the project built with known important wildlife resources both on land and in the ocean." AR INT-001303. And while Plaintiffs tout a Corps table showing a projected dependability of 99 percent for marine alternatives like a ferry, they neglect to mention that the values in that table reflect dependability based solely on wind speed – they do not take into consideration the aforementioned risks, snow or avalanche conditions that could close ferry access roads, downtime for routine maintenance, or unplanned maintenance and repairs. *Compare* Pls.' Mem. 18 *with* AR INT-001303-04.

[7] The Corps issued a report in June 2015 analyzing non-road alternatives for medical evacuation from King Cove to Cold Bay, including an ice-capable marine vessel, a fixed-wing aircraft/new airport, and a helicopter/heliport. AR INT-001262. That report was not intended to produce a final definitive answer about which alternative was best. AR INT-001276-78. While, as Plaintiffs note, the report discussed other options that could be pursued in theory, Pls.' Mem. 18, a road continues to be KCC's preferred choice to enhance the safety of its residents. AR INT-001649; AR INT-002209-15.

Fed. Defs.' Resp. to Pls.' Mot. for Summ. J.
*Friends of Alaska National Wildlife Refuges v. Bernhardt*, Case No. 3:19-cv-00216-JWS 20

Despite Plaintiffs' efforts to identify shortcomings in the finer points of Secretary Bernhardt's decision-making process, the Secretary "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates." *Fox*, 556 U.S. at 515. Under the APA, a court should "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'" *Id.* at 513-14. So even if the Court were to conclude that this case involves "a decision of less than ideal clarity," the Secretary's path may reasonably be discerned. The Secretary understood the previous decision to reject the land exchange proposal due to possible impacts on wildlife, but the Secretary came to a more humane conclusion – regardless of the potential environmental impacts that can be managed and minimized in cooperation with KCC, human life is more important.

Moreover, Secretary Bernhardt clearly shows awareness that he is changing position from previous administrations and demonstrates that he believes the new policy is better. *E.g.,* AR INT-002814-15; AR INT-002829-33. Plaintiffs do not dispute these points. The Secretary provided good reasons for his decision and a reasoned explanation for the change of policy in substantial detail in the 2019 Findings. AR INT-2814-33. Specifically, he made it clear that a rebalancing of the factors involved, weighted by the responsibility to the Alaska Native people, required a different policy result in light of an acute necessity for a road to service the medical and social needs of the residents of King Cove, changed information concerning the viability and availability of alternative means of transportation, the high costs to the taxpayers for evacuations by the Coast Guard, the benefits of increasing acreage in the two refuges, and his determination that human life and safety is a paramount concern in this instance. AR INT-002831-32. Such a

Fed. Defs.' Resp. to Pls.' Mot. for Summ. J.
*Friends of Alaska National Wildlife Refuges v. Bernhardt,* Case No. 3:19-cv-00216-JWS     21

change in policy, based on a weighting of factors that includes humanitarian considerations and supported by a reasoned explanation, is neither arbitrary nor capricious and must be upheld by this Court.

**B. The Agreement Is Consistent With The Purposes of ANILCA.**

Plaintiffs allege that the land exchange agreement is inconsistent with the purposes of ANILCA, which they argue is largely concerned with "conservation and protection of ecologically important habitats, wildlife and wilderness values, and subsistence." Pls.' Mem. 19. In making this argument, Plaintiffs ignore one of the other key purposes of ANILCA – to protect and enhance the economic and social interests of communities engaged in a traditional and subsistence way of life. Yet, Plaintiffs acknowledge that section 1302(h) allows the Secretary to exchange certain lands in Alaska if that exchange furthers the purposes of ANILCA. The plain language of section 1302(h) contemplated such an exchange. It reads:

> **(1)** Notwithstanding any other provision of law, in acquiring lands for the purposes of this Act, the Secretary is authorized to exchange lands (including lands within conservation system units and within the National Forest System) or interests therein (including Native selection rights) with the corporations organized by the Native Groups, Village Corporations, Regional Corporations, and the Urban Corporations, and other municipalities and corporations or individuals, the State (acting free of the restrictions of section 6(i) of the Alaska Statehood Act), or any Federal agency. Exchanges shall be on the basis of equal value, and either party to the exchange may pay or accept cash in order to equalize the value of the property exchanged, except that if the parties agree to an exchange and the Secretary determines it is in the public interest, such exchanges may be made for other than equal value.

16 U.S.C. § 3192(h). This language clearly demonstrates that Congress anticipated that the Secretary might authorize an exchange of lands from within a conservation system unit such as the lands at issue within the Izembek National Wildlife Refuge.

Fed. Defs.' Resp. to Pls.' Mot. for Summ. J.
*Friends of Alaska National Wildlife Refuges v. Bernhardt,* Case No. 3:19-cv-00216-JWS 22

ANILCA's Congressional statement of purpose expresses that in addition to "provid[ing] sufficient protection for the national interest in the scenic, natural, cultural, and environmental values on the public lands in Alaska," the Act "provides adequate opportunity for satisfaction of the economic and social needs of the State of Alaska and its people . . . ." 16 U.S.C. § 3101(d). The Ninth Circuit has opined that ANILCA's function can be distilled into the "dual purpose" of furnishing "guidelines for the protection for the national interest in the scenic, natural, cultural and environmental values of the public lands in Alaska and to provide an adequate opportunity for satisfaction of the economic and social needs of the people of Alaska." *City of Angoon v. Marsh*, 749 F.2d 1413, 1415–16 (9th Cir. 1984). Congress structured ANILCA in this fashion after becoming "aware of the need for a legislative means of maintaining the proper balance between the designation of national conservation areas and the necessary disposition of public lands for more intensive private use." *Id*. at 1415.

Here, there is no question that this land exchange is intended to serve the national interest in the scenic, natural, cultural and environmental values as well as the economic and social needs of Alaska and its people. The 2019 Agreement notes that there is a 12-mile road gap between King Cove and the Cold Bay airport. AR INT-02866. This gap prevents residents of King Cove from reaching the Cold Bay airport during periods of inclement weather. *Id*. "King Cove residents and others have died attempting to travel to and from King Cove or Cold Bay and from being unable to get from King Cove to the Cold Bay airport for medevac transport to Anchorage." *Id.* In agreeing to the land exchange, the Department is establishing a "proper balance" between the interests of the people of Alaska and the conservation of Alaska's natural resources, as intended by ANILCA. To not consider the land exchange would deny the Aleut Natives of King Cove the opportunity to pursue the building of a light-use road to access a

Fed. Defs.' Resp. to Pls.' Mot. for Summ. J.
*Friends of Alaska National Wildlife Refuges v. Bernhardt,* Case No. 3:19-cv-00216-JWS 23

medical evacuation facility and would fail to "provide[] adequate opportunity for satisfaction of the economic and social needs" of the Aleut Natives, contrary to the expressed intent when Congress passed ANILCA. *See* 16 U.S.C. § 3101(d).

Contrary to Plaintiffs' argument that there is no conservation value to the land currently owned by KCC becoming part of the refuge, Pls.' Mem. 22-23, this Court should find that the acquisition of the KCC-owned lands by exchange furthers the purpose of ANILCA. With respect to the lands to be acquired, the 2019 Agreement states that "KCC owns lands . . . within the exterior boundaries of Izembek NWR [and Alaska Peninsula National Wildlife Refuge]" which have been "identified by the U.S. Fish and Wildlife Service for future acquisition if such lands become available." AR INT-002866.[8] Under section 1302(a), the Secretary is authorized to acquire any lands within the boundaries of any conservation system unit. While the land that the federal government would receive from KCC is already subject to certain laws and regulations governing use and development as set forth in ANCSA section 22(g), there would be additional protections in place once the land becomes public. 43 U.S.C. § 1621(g); *see Sturgeon v. Frost*, 136 S. Ct. 1061, 1071 (2016) (recognizing a distinction between public and non-public lands within the boundaries of a conservation system unit); *see also City of Angoon*, 749 F.2d at 1416-17 (finding that ANILCA did not mandate that private lands conveyed to Native Corporations are to be treated as public lands because they are located within a conservation system). So, taking these lands into federal ownership is consistent with the creation of both

[8] The 1998 Izembek Land Protection Plan, which identified privately-owned lands within the refuge boundaries that contain valuable fish and wildlife habitat, AR INT-000003, shows the land held by KCC as well as prioritizes this land for acquisition. AR INT-000026; AR INT-000055.

Fed. Defs.' Resp. to Pls.' Mot. for Summ. J.
*Friends of Alaska National Wildlife Refuges v. Bernhardt*, Case No. 3:19-cv-00216-JWS 24

refuges and with Congress' intention as set forth in ANILCA – to protect and manage these lands for an array of values for the benefit of future generations of Americans.[9]

The 2019 Findings note that past attempts to address the safety needs of King Cove have been insufficient. AR INT-002821. After these failed past attempts, this exchange will allow the community to pursue one last option – a one-lane gravel road that would allow for safe transport to the Cold Bay airport. This exchange comports with the purposes of ANILCA, which demonstrate Congress' intention to balance wilderness preservation with continued opportunities for Alaska residents to live a subsistence lifestyle in traditional communities. The Secretary's exchange authority under section 1302(d) is one element of Congress' strategy for maintaining proper balance by allowing disposition of federal lands to address "social needs" as "necessary and appropriate." It is well within the Secretary's discretion to determine that a land exchange that results in both a net increase in the amount of land and habitat being preserved in the refuge system and a potential improvement in public safety serves these purposes.

Secretary Bernhardt identified and stated on the face of the 2019 Agreement that the authority for the land exchange was section 1302(h) of ANILCA. AR INT-002865. His rationale is fully detailed in both in the 2019 Agreement and in the accompanying 2019 Findings. AR INT-002864-74; AR INT-002814-33. The agreement identifies the 12-mile gap between the road from King Cove to the road to the Cold Bay airport and the difficulty for King Cove

---

[9] Section 302(1) of ANILCA established the Alaska Peninsula National Wildlife Refuge for various purposes including "conservation of fish and wildlife populations and habitats in their natural diversity," fulfillment of "international treaty obligations ... with respect to fish and wildlife and their habitats," "the opportunity for continued subsistence use by local residents," and to ensure "water quality and necessary water quantity within the refuge." 16 U.S.C. § 668dd note. Section 303(3) of ANILCA designated the then-existing Izembek National Wildlife Range as the Izembek National Wildlife Refuge for the same purposes. *Id.*

Fed. Defs.' Resp. to Pls.' Mot. for Summ. J.
*Friends of Alaska National Wildlife Refuges v. Bernhardt,* Case No. 3:19-cv-00216-JWS       25

residents to reach that airport by air or boat during inclement weather. AR INT-02866. Because of that difficulty, Congress has tried to address this transportation problem twice in the past 20 years with legislation. *Id*. But King Cove residents still do not have a satisfactory solution. *Id*. As a result, the Secretary entered into the 2019 Agreement to allow KCC to pursue constructing a road, with a paramount concern being the preservation of human life and safety. AR INT-002832.

No court has addressed the alleged requirement that a land exchange under section 1302(h) be for "purposes of the Act." In *National Audubon Society v. Hodel*, the Court found that this exchange provision imposes two requirements on the Secretary. 606 F. Supp. 825, 828-29 (D. Alaska 1984). The first requirement, which is the one that is applicable here, is that the exchange will result in acquiring lands for the purposes of ANILCA. The second requirement is that the exchange must further the public interest if the lands to be exchanged are of unequal value. In the current matter, the proposed land exchange is to be an equal value exchange, which means that this second requirement is inapplicable. [10] Additionally, because the precise lands that will be exchanged have not yet been determined, Plaintiffs cannot challenge the exchange on this basis.

---

[10] The APA does not allow judicial review of agency action "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). This provision precludes judicial review where a statute is drawn so broadly that a court has no meaningful standard to apply to review of the challenged action. *See Lincoln v. Vigil*, 508 U.S. 182, 191 (1993). In *National Audubon Society v. Hodel*, the Court addressed the contention that the Secretary's public interest determination was unreviewable as committed to agency discretion. The court held that it was reviewable and, in so doing, noted that the authority of the Secretary under section 1302(h) "is subject to significant constrains: first, he may acquire lands only for purposes of ANILCA; and second, in the exchange he must receive lands of equal value except that an exchange for other than equal value is permissible if it is in the public interest." *National Audubon Soc'y*, 606 F. Supp. at 834. While Section 1302(h) of ANILCA is very broadly drawn, we believe that a court will likely find that it can review an exchange for the narrow purpose of ensuring it furthers the purpose of the Act.

In the exchange at issue in *National Audubon Society*, the Secretary chose to prepare a NEPA analysis and described in the Record of Decision how the land exchange would comport with the purposes of ANILCA:

> (1) the interests obtained in the Kenai and Yukon Delta NWRs would "be consistent with and further the purposes of the refuges to which they are added"; (2) these acquisitions would "consolidate significant recreational lands and wildlife habitat lying within units of the [NWR] System and National Wilderness Preservation System into permanent federal ownership"; (3) wildlife management benefits would result from this consolidation of conservation system units (CSUs); (4) protection of prime waterfowl habitat would be increased; (5) Native selection conveyance expenses would be reduced; and (6) the possibility of inconsistent land use by Natives within CSUs would be reduced.

*Id.* at 829. The Court did not address the sufficiency of these findings because the case was focused on the second requirement of the exchange authority, but the same reasoning applies to the 2019 Agreement. The land given to KCC will serve the public interest by fulfilling the health, safety, and quality of life needs of the King Cove residents.[11] In addition, the land received from KCC will be added to the refuge and further the purposes of conservation. Consequently, this Court should find that the 2019 Agreement complied with section 1302(h) of ANILCA.

### C. Title XI of ANILCA Does Not Apply.

Title XI of ANILCA details the procedure for the federal approval and authorization of a "transportation and utility system" through a "conservation system unit."[12] 16 U.S.C. §§ 3161-

[11] Notably, this land will also be given with a reservation to the United States of the right of first refusal if the land is ever sold by KCC. 43 U.S.C. § 1621(g).

[12] A "conservation system unit" means "any unit in Alaska of the National Park System, * * * [or] National Wild and Scenic Rivers Systems, * * * including existing units, units established, designated, or expanded by or under the provisions of this Act, additions to such units, and any such unit established, designated, or expanded hereafter." ANILCA Section 102, 16 U.S.C. § 3102(4).

Fed. Defs.' Resp. to Pls.' Mot. for Summ. J.
*Friends of Alaska National Wildlife Refuges v. Bernhardt*, Case No. 3:19-cv-00216-JWS 27

3173. While there is no dispute that Izembek is a conservation system unit, Title XI does not apply here because the 2019 Agreement is not a decision to build a transportation system unit.

Plaintiffs argue that the express purpose of the 2019 Agreement is to allow for the construction of a road, so the elaborate procedures set forth in Title XI should apply. Pls.' Mem. 25. Title XI provides a mandatory process for obtaining federal authorizations associated with a "transportation or utility system," which includes roads. It applies when any portion of the proposed route of such a system is located on "public lands" as defined in section 102(3) of ANILCA, 16 U.S.C. § 3102(3), within any conservation system unit, national recreation area, or national conservation area in Alaska. Under ANILCA, lands within the National Wildlife Refuge System or the National Wilderness Preservation System in Alaska are considered to be conservation system units.[13] The mandatory process includes a timeline for the preparation of an Environmental Impact Statement, coordination between federal agencies involved, a deadline for a decision by each agency with jurisdiction, a potential appeal to the President and, in certain circumstances, a recommendation by the President and action by Congress. 16 U.S.C. §§ 3164-3167.

However, Title XI does not apply to the 2019 Agreement. Title XI applies to any federal "authorization (including but not limited to, any right-of-way, permit, license, lease, or certificate) without which a transportation or utility system cannot, in whole or in part, be established or operated." 16 U.S.C. § 3162(1). While the agreement envisions that KCC will pursue the construction of a road, it is not an "authorization" to do so. Furthermore, all of the examples within the scope of "authorization" are for uses of land

[13] The Department of the Interior has promulgated regulations implementing Title XI at 43 C.F.R. Part 36.

Fed. Defs.' Resp. to Pls.' Mot. for Summ. J.
*Friends of Alaska National Wildlife Refuges v. Bernhardt,* Case No. 3:19-cv-00216-JWS 28

that remains in federal ownership. Unlike a right-of-way or lease or permit, the exchange will remove land from federal ownership. ANILCA section 103(c) provides:

> Only those lands within the boundaries of any conservation system unit which are public lands (as such term is defined in this Act) shall be deemed to be included as a portion of such unit. No lands which, before, on, or after the date of enactment of this Act, are conveyed to the State, to any Native Corporation, or to any private party shall be subject to the regulations applicable solely to public lands within such units. If the State, a Native Corporation, or other owner desires to convey any such lands, the Secretary may acquire such lands in accordance with applicable law (including this Act), and any such lands shall become part of the unit, and be administered accordingly.

16 U.S.C. § 3103(c). So, once the land is exchanged, any future road would not be built through a conservation system unit, but through private land, and Title XI would not apply.

Finally, the Secretary's exchange authority under section 1302(h) exists "[n]otwithstanding any other provision of law." 16 U.S.C. § 3192(h)(1). Thus, the Secretary's authority to effectuate land exchanges pursuant to section 1302(h) is independent of other statutory requirements that might otherwise apply, including those set forth in Title XI. While Title XI has a provision stating that it too applies "[n]otwithstanding any provision of applicable law," 16 U.S.C. § 3164(a), that phrase is limited to "applicable law" and should be harmonized with the broader "notwithstanding" provision of section 1302(h) by recognizing that section 1302(h) is not an "applicable law." A contrary reading would effectively repeal in part the "notwithstanding any other provision of law" provision of section 1302(h) by making the exchange authority subject to another provision of law (*i.e.*, Title XI).

Because Title XI does not apply here, this Court need not consider the purposes behind why Congress enacted this part of ANILCA or the specific procedures it describes. Nor is the Secretary required to comply with Title XI.

Fed. Defs.' Resp. to Pls.' Mot. for Summ. J.
*Friends of Alaska National Wildlife Refuges v. Bernhardt*, Case No. 3:19-cv-00216-JWS 29

### D. The Exchange Is Not Subject To NEPA

Plaintiffs also allege that the 2019 Agreement is unlawful because the Secretary violated NEPA by failing to prepare an environmental impact statement analyzing the impacts of the exchange. Pls.' Mem. 30. First, this land exchange does not require an environmental impact statement because of the plain language of section 910 of ANILCA. 43 U.S.C. § 1638. This reasoning is contained in the 2019 Findings, AR INT-002828, and the agency's interpretation of section 910 is entitled to deference. *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 865 (1984). Plus, the plain language of the statute supports the agency's interpretation. Plaintiffs attempt to limit section 910 to land transactions involving ANCSA, Pls.' Mem. 31-32, but that reading is faulty. Similarly, Plaintiffs' assertion that a land exchange is not a conveyance is also misleading. *Id*. at 32.

"Congress has expressly provided that NEPA does not apply to certain statutory schemes." *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 647 (9th Cir. 2014). There, the Ninth Circuit used the Clean Air Act as an example, which stated, "No action taken under the Clean Air Act shall be deemed a major Federal action significantly affecting the quality of the human environment within the meaning of the National Environmental Policy Act of 1969." *Id*. (citing 15 U.S.C. § 793(c)(1)). ANILCA's section 910 is another clear statement by Congress that NEPA does not apply to this land transaction. Section 910 states:

> The National Environmental Policy Act of 1969 (83 Stat. 852) shall not be construed, in whole or in part, as requiring the preparation or submission of an environmental impact statement for withdrawals, conveyances, regulations, orders, easement determinations, or other actions which lead to the issuance of conveyances to Natives or Native Corporations, pursuant to the Alaska Native Claims Settlement Act, or this Act. Nothing in this section shall be construed as affirming or denying the validity of any withdrawals by the Secretary under §14(h)(3) of the Alaska Native Claims Settlement Act.

Fed. Defs.' Resp. to Pls.' Mot. for Summ. J.
*Friends of Alaska National Wildlife Refuges v. Bernhardt,* Case No. 3:19-cv-00216-JWS 30

43 U.S.C. § 1638.

This land exchange is a conveyance to a Native corporation pursuant to "this Act," *i.e.*, ANILCA. King Cove Corporation is a Native corporation organized under the laws of Alaska pursuant to the authority contained in ANCSA. AR INT-002865. Plaintiffs do not dispute this first point, but they attempt to argue that the land exchange is not a conveyance. Pls.' Mem. 32. Neither ANCSA nor ANILCA define a "conveyance." *See* 43 U.S.C. § 1602 and 16 U.S.C. § 3102. When a statute does not define a term, a court should construe it according to its ordinary or natural meaning. *FDIC v. Meyer*, 510 U.S. 471, 476 (1994) (citation omitted). "Conveyance" is defined in Black's Law Dictionary as "the voluntary transfer of a right or of property." (10th ed. 2014). That is exactly what a land exchange is, and the statute does not have to list all of the possible types of conveyances for this Court to find that a land exchange is covered by the plain language in section 910. To the extent that this Court was persuaded by Plaintiffs' argument, there can be no doubt that the land exchange is an "other action[] which [will] lead to . . . [a] conveyance" to a Native Corporation. 43 U.S.C. § 1638. Either way, this section covers this land exchange to KCC.

Plaintiffs argue that this section only applies to conveyances made under ANCSA or its amendments. Pls.' Mem. 30-31. In essence, Plaintiffs' interpretation makes the words "this Act" superfluous, which is contrary to the rules of statutory construction. *Yamaguchi v. State Farm Mut. Auto. Ins. Co.*, 706 F.2d 940, 947 (9th Cir. 1983) (stating "a statute ought to be construed to avoid making any word superfluous" (citation omitted)). ANCSA is already referenced in this clause, so "this Act" does not refer to that statute. As section 910 is part of ANILCA, the phrase "this Act" refers to ANILCA.

Fed. Defs.' Resp. to Pls.' Mot. for Summ. J.
*Friends of Alaska National Wildlife Refuges v. Bernhardt*, Case No. 3:19-cv-00216-JWS 31

Plaintiffs have offered no legal authority to show that section 910 of ANILCA should not be applied as it is plainly written. Instead, they rely on an argument that the structure of Title IX of ANILCA should add restrictions to how section 910 is applied. Pls.' Mem. 32. No such restrictions exist on the face of the statute. The 2019 Agreement will result in a conveyance to a Native corporation under ANILCA and ANCSA, and thus, the Court should find that an environmental impact statement was not required for this land exchange in accordance with section 910.

**E. Plaintiffs' ESA Arguments Lack Merit.**

Plaintiffs argue that the Service was required to conduct intra-Service Section 7 consultation on the potential effects of its proposed land exchange agreement and subsequent road construction on the ESA-listed species and their designated critical habitat. Pls.' Mem. 34-38. Plaintiffs' argument is without merit because the Service was not required to consult under the unique circumstances of this case. The 2019 Agreement simply seeks a legal exchange of lands; it does not authorize the construction of any road. Road construction, if any, would proceed only after King Cove passes numerous significant hurdles like funding, planning, any state approvals and permitting, and any federal approvals and permitting, including any required ESA review and compliance. For these reasons, the Service appropriately determined in 2013 that a land exchange agreement, in and of itself, would have "no effect" on listed species or their designated critical habitats. AR 00181304; AR 00181307; INT-002828-29. The Service's "no effect" determination has not changed from 2013 to the present. As a result of its "no effect" determination, the Service was not required to undertake intra-Service consultation under the ESA.

Fed. Defs.' Resp. to Pls.' Mot. for Summ. J.
*Friends of Alaska National Wildlife Refuges v. Bernhardt,* Case No. 3:19-cv-00216-JWS 32

### 1. The Service Made a Proper "No Effect" Determination

Before taking any action, an action agency (here, the Service) is required to review its proposed action (the land exchange agreement) and determine whether consultation is required. *See* Interagency Cooperation – Endangered Species Act of 1973, As Amended; Final Rule, 51 Fed. Reg. 19,926, 19,945 (June 3, 1986); *see also Natural Res. Defense Council v. Houston*, 146 F.3d 1118, 1126 (9th Cir. 1998); *Def. of Wildlife v. Flowers*, 414 F.3d 1066, 1068 (9th Cir. 2005). If the action agency makes a "no effect" determination, there is no trigger for consultation. *Sierra Forest Legacy v. U.S. Forest Serv*., 598 F. Supp. 2d 1058, 1065 (N.D. Cal. 2009); *see also Pac. Rivers Council*, 30 F.3d at 1054 n.8; *Sw. Ctr. for Biological Diversity v. U.S. Forest Serv*., 100 F.3d 1443, 1447-48 (9th Cir. 1996). A "no effect" determination must be upheld if it is reasonable and supported by the record. *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 496 (9th Cir. 2011).

Here, Congress, in 2009, directed the Service to analyze the potential environmental effects of two separate actions: (1) a proposed land exchange agreement; and (2) possible future road construction and operation. *See* Section 6402 of the *Omnibus Public Land Management Act of 2009* (Public Law 111-11 Title VI Subtitle E, § 6402, 123 Stat. 991, 1178-79 (2009)). With respect to just the land exchange agreement, the Service determined that a land exchange agreement, in and of itself, would have "no effect" on listed species or critical habitat (nor was any critical habitat involved in the land exchange), taking into account the purely legal nature of the agreement and the fact that it does not actually authorize the construction of a road.[14] For

[14] The 2013 "no effect" determination was made within a broader NEPA analysis of the direct and indirect effects of the land exchange (as required by the 2009 Omnibus Public Land Management Act). In that analysis, as required by NEPA, the Service analyzed whether the land exchange would result in any direct or indirect effects in the "reasonably foreseeable future" that

Fed. Defs.' Resp. to Pls.' Mot. for Summ. J.
*Friends of Alaska National Wildlife Refuges v. Bernhardt,* Case No. 3:19-cv-00216-JWS 33

example, the Service explained that "[n]o effects on Steller's Eider . . . have been identified that would result from the proposed land exchange, because no activities in the reasonably foreseeable future have been identified that would affect these species or their habitats within these parcels. These birds and their habitats . . . would remain the same, before and after the proposed land exchange." AR 00181304. The Service also noted that Section 7 consultation would be required in the future, but only when and if measures are actually ever taken to implement road construction. *Id*. The Service also made similar "no effect" determinations for the other listed species with respect to the proposed land exchange agreement. *See* AR 00181307; AR 00181310; AR 00181432.

Nothing has changed since 2013 with respect to the potential effects of a land exchange agreement on listed species and critical habitat. The 2019 Agreement, in and of itself, is still a purely legal transaction and does not authorize any ground disturbing activities. And no activities in the reasonably foreseeable future have been identified that would affect these species. This is because road construction, if any, can proceed only after any proposed road project successfully passes numerous significant hurdles like funding, planning, any state approvals and permitting, and federal approvals and permitting (after the appropriate ESA review). For these reasons, the Service continues to rely on its 2013 "no effect" determination.[15] This determination is reasonable, supported by the record, and should be upheld.

---

would affect species. The ESA effects analysis, on the other hand, requires the Service to analyze whether the land exchange would result in any direct or indirect effects that are "reasonably certain to occur." While the 2013 "no effect" determination was made within the more expansive analysis required by NEPA, it is consistent with the stricter and narrower requirements of Section 7 of the ESA.

[15] For these same reasons, Plaintiffs ESA claims are unripe and not fit for review. The ripeness doctrine serves "to prevent the courts, through avoidance of premature adjudication, from

Fed. Defs.' Resp. to Pls.' Mot. for Summ. J.
*Friends of Alaska National Wildlife Refuges v. Bernhardt,* Case No. 3:19-cv-00216-JWS 34

### 2. Plaintiffs Fail to Show the Service's "No Effect" Determination is Unreasonable

Plaintiffs advance several arguments essentially challenging the Service's "no effect" determination, but none have merit.

#### a. Land exchange agreements do not automatically trigger consultation obligations.

Plaintiffs suggest that the 2019 Agreement automatically triggers Section 7 consultation obligations, but the cases they cite in support do not stand for that proposition. Pls.' Mem. 36 n. 177. Rather, the cases merely demonstrate that, depending on the specific facts and circumstances – *e.g.*, specific terms of a proposed land exchange agreements, type of species involved, location of critical habitat, etc. – it is possible that a land exchange agreement "may affect" listed species and critical habitat, thereby requiring Section 7 consultation. This is not such a case. The 2019 Agreement specific to the Izembek National Wildlife Refuge has "no effect" on listed species or designated critical habitat. *See supra* Argument Section E.1. For this reason, intra-Service consultation under Section 7 of the ESA was not required. *Id*.

entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–49 (1967). To determine whether a case is ripe, the Court considers both "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Labs*., 387 U.S. at 149. In determining whether the issues are fit for judicial decision, a court looks to whether the controversy presented is "definite and concrete" as opposed to "hypothetical or abstract." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979) (citation omitted). In assessing whether delayed review will impose a hardship on a plaintiff, a court looks to the nature of the challenged action. Here, with respect to the 2019 Agreement, there is no hardship where the challenged actions "do not command anyone to do anything or to refrain from doing anything; they do not grant, withhold, or modify any formal legal license, power, or authority; they do not subject anyone to any civil or criminal liability; they create no legal rights or obligations." *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733 (1998) (citing *United States v. Los Angeles & Salt Lake R.R.*, 273 U.S. 299, 309–10 (1927)).

Fed. Defs.' Resp. to Pls.' Mot. for Summ. J.
*Friends of Alaska National Wildlife Refuges v. Bernhardt*, Case No. 3:19-cv-00216-JWS 35

#### b. The Service was not required to analyze road construction impacts.

Plaintiffs also argue mistakenly that the Service must consider "all related impacts," even "attenuated consequences of the agency action" on listed species, thereby suggesting that the Service must consider the direct, indirect, and cumulative effects of future road construction. Pls.' Mem. 38. Plaintiffs are incorrect and each argument is addressed in turn.[16]

##### i. Direct Effects

Direct effects are undefined in the ESA's implementing regulations, but are commonly understood to be the immediate effects on a listed species or on critical habitat that will result from the proposed action. The Agreement only seeks to facilitate a land swap between the Service and King Cove. It does not authorize any road construction or any other ground-disturbing activity. Therefore, road construction is not an immediate or natural consequence of the Agreement and has no direct effects on listed species.

##### ii. Indirect Effects

Not every conceivable indirect effect must be considered. Indirect effects are "those that are caused by the proposed action and are later in time, but are still *reasonably certain to occur*." 50 C.F.R. § 402.02 (emphasis added). Indirect effects may involve subsequent actions by other parties but must ultimately be caused by the proposed action – the land exchange agreement. Here, effects on species from road construction are not "reasonably certain to occur" because the numerous intervening steps before road construction. For example, the road must be funded,

[16] The 2019 Agreement was finalized before the 2019 revision of the ESA's implementing regulation. *See* 84 Fed. Reg. 44,976 (Oct. 28, 2019). Regardless of the regulations applied, the end result is the same. The 2019 Agreement had "no effect" on listed species and designated critical habitat and, as a result, the Service was not required to consult under Section 7.

Fed. Defs.' Resp. to Pls.' Mot. for Summ. J.
*Friends of Alaska National Wildlife Refuges v. Bernhardt,* Case No. 3:19-cv-00216-JWS 36

planned, and other state and federal authorizations are required. Future federal permissions (most notably, a decision by the U.S. Army Corp of Engineers under Section 404 of the Clean Water Act) will require compliance with Section 7 of the ESA. Additionally, there will likely be litigation over all of these intervening steps. While the Agreement makes it possible for King Cove to pursue its road project, due to the numerous required intervening steps, road construction is not "reasonably certain to occur." Therefore, contrary to Plaintiffs' implication, there are no indirect effects of the Service's proposed action of exchanging lands.

**iii. Cumulative Effects**

Cumulative effects are those effects of future State or private activities—not including federal activities—that are reasonably certain to occur within the action area of the federal action subject to consultation. 50 C.F.R. § 402.02. Cumulative effects are taken into account at the formal consultation stage which is triggered as a result of the agency's threshold determination that the direct and indirect effects of its proposed action may have an effect on listed species or critical habitat. 50 C.F.R. § 402.14(c) and (g)(4) . Because the Service first determined that a land exchange agreement would have "no effect" on listed species and critical habitat, it was not required to consult under Section 7 and was, therefore, not required to assess any cumulative effects for future road construction.

In sum, the Agreement did not approve road construction. Road construction, if any, can proceed only after any proposed road project successfully passes numerous significant hurdles to include funding, planning, any state approvals and permitting, and federal approvals and permitting. In particular, it is likely that the project will not be allowed to proceed unless the U.S. Army Corps of Engineers authorizes activities regulated under the Clean Water Act (which requires additional ESA review and compliance). Because road construction is not a direct,

Fed. Defs.' Resp. to Pls.' Mot. for Summ. J.
*Friends of Alaska National Wildlife Refuges v. Bernhardt*, Case No. 3:19-cv-00216-JWS 37

indirect, or cumulative effect of the Agreement, the Service was not required to consider it. Therefore, the Service's overall "no effect" determination with respect to this Agreement is reasonable, supported by the record, and should be upheld.

### F. Additional Briefing Would Be Necessary To Address The Remedy for Any Legal Error Found by the Court.

While Federal Defendants believe that the Agreement complies with the law, should this Court find any legal error, Federal Defendants respectfully request the opportunity to provide additional briefing on the question of remedy. Under the APA, judicial relief—whether in the form of vacatur or injunctive relief—does not issue automatically upon a finding of legal error. Rather, courts are obligated to weigh the extent of the legal error, as well as the equities and the public interest, in crafting relief. *See,* e.g., *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) (holding an injunction is an "extraordinary remedy" that does not issue as a matter of course even "though irreparable injury may otherwise result to the plaintiff"); *Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 992-93 (9th Cir. 2012) (holding that the decision of whether to vacate an agency's action requires consideration of equitable factors); *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1139 (10th Cir. 2010) ("Vacatur is an equitable remedy . . . and the decision whether to grant vacatur is entrusted to the district court's discretion"). Courts may, where the equities warrant, leave an agency decision in place while the agency corrects the legal errors on remand. *Cal. Cmtys. Against Toxics*, 688 F.3d at 994 (remanding without vacating decision); *W. Oil and Gas Ass'n v. EPA*, 633 F.2d 803, 813 (9th Cir. 1980) ("[G]uided by authorities that recognize that a reviewing court has discretion to shape an equitable remedy, we leave the challenged designations in effect."). Federal Defendants

Fed. Defs.' Resp. to Pls.' Mot. for Summ. J.
*Friends of Alaska National Wildlife Refuges v. Bernhardt,* Case No. 3:19-cv-00216-JWS 38

therefore respectfully submit that the Court allow additional briefing on remedy should the Court find any legal deficiency in this decision.

## VI. CONCLUSION

For the reasons stated above, the Court should deny Plaintiffs' motion for summary judgment and grant judgment in favor of Federal Defendants.

Dated this 3rd day of March, 2020.

PRERAK SHAH
Deputy Assistant Attorney General
Environment and Natural Resources Division

*/s/ Davené D. Walker*
DAVENÉ D. WALKER
Trial Attorney
United States Department of Justice
Environment and Natural Resources Division
Natural Resources Section
P.O. Box 7611
Washington, DC 20044-7611
Telephone: (202) 353-9213
Facsimile: (202) 305–0506
davene.walker@usdoj.gov

RICKEY D. TURNER, JR.
Trial Attorney
U.S. Department of Justice
Environment and Natural Resources Division
Wildlife and Marine Resources Section
999 18th Street, South Terrace, Suite 370
Denver, CO 80202
Telephone: (303) 844-1373
Facsimile: (303) 844-1350
rickey.turner@usdoj.gov

Fed. Defs.' Resp. to Pls.' Mot. for Summ. J.
*Friends of Alaska National Wildlife Refuges v. Bernhardt,* Case No. 3:19-cv-00216-JWS 39

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on March 3, 2020, a copy of the foregoing *Federal Defendants' Response to Plaintiffs' Motion for Summary Judgment* was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to all counsel of record by operation of the court's electronic filing system.

*/s/ Davené D. Walker*
Davené D. Walker, Trial Attorney
U.S. Department of Justice

Fed. Defs.' Resp. to Pls.' Mot. for Summ. J.
*Friends of Alaska National Wildlife Refuges v. Bernhardt*, Case No. 3:19-cv-00216-JWS 40