KEVIN G. CLARKSON
ATTORNEY GENERAL

Sean Lynch
Senior Assistant Attorney General
sean.lynch@alaska.gov

Mary Hunter Gramling
Senior Assistant Attorney General
mary.gramling@alaska.gov

State of Alaska Department of Law
P.O. Box 110300
Juneau, Alaska 99811-0300
907.465.3600 main
907.465.2417 fax
*Attorneys for the State of Alaska*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| FRIENDS OF ALASKA NATIONAL WILDLIFE REFUGES, et al., | ) |
| | ) |
| | ) **3:19-CV-00216 (JWS)** |
| Plaintiffs, | ) |
| v. | ) |
| | ) **STATE OF ALASKA'S** |
| DAVID BERNHARDT, et al., | ) **OPPOSITION TO** |
| | ) **PLAINTIFFS' MOTION** |
| Defendants, | ) **FOR SUMMARY** |
| | ) **JUDGMENT** |
| KING COVE CORPORATION, et al., | ) |
| | ) |
| Intervenor-Defendants, | ) |
| | ) |
| STATE OF ALASKA, | ) |
| | ) |
| Intervenor-Defendant. | ) |
| _____ | ) |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... iii

INTRODUCTION ............................................................................................... 1

ALASKA'S BACKGROUND .................................................................................. 2

STANDARD OF REVIEW AND STATUTORY BACKGROUND ................................. 4

ARGUMENTS .................................................................................................... 4

    I.  SECRETARY BERNHARDT'S DECISION ON THE LAND EXCHANGE IS A PERMISSIBLE POLICY CHANGE ................................................................ 4

        A.  Secretary Bernhardt's Decision Discusses the Value of Private Land ...................................................................................................... 6

        B.  Secretary Bernhardt's Decision Discusses Negative Effects on Habitat ................................................................................................. 8

        C.  Secretary Bernhardt's Decision Discusses Alternate Transportation Options ................................................................................................ 14

    II.  THE SECRETARY'S 2019 FINDINGS AND THE 2019 AGREEMENT ARE PERMISSIBLE AND PROMOTE THE BALANCE OF INTERESTS CONGRESS SOUGHT IN ALASKA BY ANILCA ............................................. 14

        A.  The 2019 Agreement comports with ANILCA's purposes ................... 14

        B.  The 2019 Agreement is lawful under Section 1302(h) of ANILCA ..... 14

        C.  The 2019 Agreement meets the purposes the Izembek Refuge ........... 20

    III.     ANILCA TITLE XI ALLOWS INHOLDER ACCESS FOR RURAL VILLAGES ............................................................................................. 22

    IV.    NEPA IS INAPPLICABLE TO THE 2019 AGREEMENT ....................... 24

CONCLUSION ................................................................................................ 29

Case 3:19-cv-00216-JWS   Document 40   Filed 03/09/20   Page 2 of 35

# TABLE OF AUTHORITIES

**Cases**

*Agdaagux Tribe of King Cove v. Jewell*, 128 F.Supp.3d 1176 (D. Alaska 2015) .............. 7

*Consejo De Desarrollo Economico De Mexacali, A.C. v. U.S.*, 482 F.3d 1157 (9th Cir. 2007) ....................................................................................................................... 17

*FCC v. Fox Television Stations, Inc*, 556 U.S. 502 (2009) ................................... 4

*Friends of Alaska Nat'l Wildlife Refuges v. Bernhardt*, 381 F.Supp. 3d 1127 (D. Alaska 2019) ............................................................................................................... 5

*Montana v. Blackfeet Tribe of Indians,* 471 U.S. 759 (1985) ........................... 29

*Nat'l Audubon Society v. Hodel*, 606 F.Supp. 825 (D. Alaska 1984) ............... 20

*Nat'l Forest Pres. Group v. Butz*, 485 F.2d 408 (9th Cir. 1973) ...................... 25

*Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956 (9th Cir. 2015) ................ 5

*Richardson v. Nat'l City Bank of Evansville*, 141 F.3d 1228 (7th Cir. 1998) ................... 21

*Sturgeon v. Frost,* 139 S.Ct. 1066 (2019) ........................................................ 4

*Wisconsin Public Intervenor v. Mortier*, 501 U.S. 597 (1991) ......................... 18

**Statutes**

5 U.S.C. 551, et seq .......................................................................................... 4

16 U.S.C. § 1613a and d .................................................................................. 28

16. U.S.C. § 3101 ............................................................................................. 29

16 U.S.C. 3161 ................................................................................................. 22

16 U.S.C. 3164(e) ............................................................................................ 24

16 U.S.C. 3166 ................................................................................................. 24

16 U.S.C. 3167 ................................................................................................. 22

16 U.S.C. 3170 ................................................................................................. 24

16 U.S.C § 3192(h) ....................................................................................... 16, 17

42 U.S.C. 4332(C) ............................................................................................ 25

43 U.S.C. § 1638 ....................................................................... 25, 26, 27, 28, 29

Alaska Native Claims Settlement Act Pub. L 94-204, 89 Stat.1145(1971) ........................

Alaska National Interest Lands Conservation Act , Pub. Law 96-487, 94 Stat.
371 (1980) ....................................................................................

Omnibus Publ. Land Mgmt. Act of 2009 (Pub. Law 111-11, Title VI, Subtitle E, §
6402(b)(2); 123 Stat.991, 1179) ................................................................. 3, 13

Omnibus Publ. Land Mgmt. Act of 2009 (Pub. Law 111-11, Title VI, Subtitle E, §
6402(f)(3)) ................................................................................................. 10

AS 19.05.125 ..................................................................................................... 3

Alaska Const. art. 7 §§ 4 and 5 .......................................................................... 2

**Rules**

L.Civ.R. 7.4(b)(2) .............................................................................................. 4

**Other Authorities**

2017 State Law of Alaska (SLA) Chapter 1, Section 23, Line 6 ........................ 3

2014 SLA Chapter 18, Section 62, Line 30 ....................................................... 3

2014 SLA Chapter 18, Section 58, Line 12 ....................................................... 3

2013 SLA Chapter 16, Section 148, Line 7 ....................................................... 3

2012 SLA Chapter 17, Section 146, Line 27 ..................................................... 3

2011 SLA First Special Session Chapter 5, Section 35, Line 10 ....................... 3

2010 SLA Chapter 43, Section 48, Line 95 ....................................................... 3

2010 SLA Chapter 43, Section 95, Line 21 ....................................................... 3

2008 SLA Chapter 29, Section 103, Line 5 ....................................................... 3

2005 SLA Chapter 3, Section 136, Line 26 ....................................................... 3

**INTRODUCTION**

Was a land exchange agreement between the federal government and an Alaska Native corporation consistent with ANILCA and ANCSA, when it would transfer a mere 500 acres from within an expansive wildlife refuge in order restore ancestral lands, promote subsistence values, protect wildlife habitat in the refuge, and allow the potential for future construction of a life-saving road with minimal environmental impacts? And did Secretary Bernhardt, in a 21 page decision document, provide good reasons for the change of Department of Interior policy to authorize the land exchange? The answer to both questions is: Yes.

**BACKGROUND**

Eighteen deaths have been attributed to King Cove residents' inability to get timely medical treatment and to plane crashes during medical evacuations from the King Cove airport between 1980 and 2013. AR INT-002138. Since the publication of the U.S. Department of Interior's 2013 Environmental Impact Statement (EIS) and Record of Decision (ROD) examining a land exchange in the Izembek National Wildlife Refuge there have been an additional 101 medical evacuations, including twenty-one by the U.S. Coast Guard. AR INT 866. Many, if not all, of these emergency medical evacuations and fatalities could have been prevented with a single-lane gravel road connecting the community of King Cove to the all-weather airport in the neighboring community of Cold Bay.

The State of Alaska ("Alaska") has a universal interest in the health, welfare and safety of its residents. Alaska Const. art. 7 §§ 4 and 5. In addition to these broad

Friends of Alaska NW Refuges, et. al. v. Bernhardt, et. al. Case No. 3:19-cv-00216-JWS
State of Alaska's Opposition                                                    Page 2 of 32
Case 3:19-cv-00216-JWS   Document 40   Filed 03/09/20   Page 5 of 35

interests, Alaska has a very specific interest in ensuring that its residents have access over the vast expanse of federal lands that often leave communities like King Cove isolated where they are effectively surrounded by federally-owned conservation units. As a result, Alaska has long supported the efforts of the residents of King Cove and Cold Bay, and the local municipal governments and Native Alaskan entities, to obtain a road over the Izembek Isthmus to connect the remaining 12-mile gap between King Cove and Cold Bay. Alaska's dedication to a permanent resolution of this intolerable and unnecessary isolation of a rural residents is evidenced by the appropriation and allocation of $56.7 million to cure the transportation deficiency between these communities.[1]

The Alaska Department of Transportation and Public Facilities (DOT&PF) is authorized under state law to plan, design, and construct transportation infrastructure to connect communities and to improve the economic and general welfare of Alaskans. AS 19.05.125. In the Omnibus Public Land Management Act of 2009 (OPLMA), Congress recognized Alaska's history of designing roads in sensitive environments, and its close working relationship with the local municipal governments and Native Alaskans, when it required that Alaska and the intervenor-defendant Native Alaskan entities be allowed to participate in the siting of specific road corridors evaluated in the 2013 EIS.

---

[1]     See, 2017 State Law of Alaska (SLA) Chapter 1, Section 23, Line 6 ($10,000,000); 2014 SLA Chapter 18, Section 62, Line 30 ($21,000,000); 2014 SLA Chapter 18, Section 58, Line 12 ($100,000); 2013 SLA Chapter 16, Section 148, Line 7 ($1,958,992); 2012 SLA Chapter 17, Section 146, Line 27 ($4,000,000); 2011 SLA First Special Session Chapter 5, Section 35, Line 10 ($300,000); 2010 SLA Chapter 43, Section 48, Line 95 ($15,000,000); 2010 SLA Chapter 43, Section 95, Line 21 ($300,000); 2008 SLA Chapter 29, Section 103, Line 5 ($2,000,000); 2005 SLA Chapter 3, Section 136, Line 26 ($2,000,000).

Friends of Alaska NW Refuges, et. al.  v. Bernhardt, et. al.  Case No. 3:19-cv-00216-JWS
State of Alaska's Opposition                                                                      Page 3 of 32
Case 3:19-cv-00216-JWS   Document 40   Filed 03/09/20   Page 6 of 35

Pub. L. No. 111-11, Title VI, Subtitle E, § 6402(b)(2)(B)(ii); 123 Stat. 991, 1179; AR INT-002436. DOT&PF fulfilled Congress's call and took a lead role in the engineering and environmental analyses that underpinned the 2013 EIS analyses.[2]

Alaska as a sovereign state and state land manager has long sought increased local control and permanency in land determinations in Alaska. See, *Sturgeon v. Frost*, 139 S.Ct. 1066, 1074-77 (2019)(outlining Alaska's efforts and the efforts of Alaska Natives to secure ownership of land in Alaska). The land exchange agreement at issue in this case ("2019 Agreement") effectuates that local control and permanency.[3]

## STANDARD OF REVIEW AND STATUTORY BACKGROUND

Alaska fully agrees with the statutory background narrative and the standard of review description presented in the Federal Defendants' response to the Plaintiffs' motion for summary judgment. Fed. Defs.' Mem.[4] at 19-24. Alaska has no additions or clarifications.

## ARGUMENTS

### I. SECRETARY BERNHARDT'S DECISION ON THE LAND EXCHANGE IS A PERMISSIBLE POLICY CHANGE.

The analytical framework for Secretary Bernhardt's decision to authorize the land exchange follows the criteria described in *FCC v. Fox Television Stations, Inc.*[5] to

---

[2] See generally, administrative record documents compiled in 2014.

[3] The Land Exchange Agreement between King Cove Corporation and the United States executed in 2019 is referred to as the 2019 Agreement. AR INT-002865-74.

[4] The Federal Defendants' Response to Plaintiffs' Motion for Summary Judgment, ECF Number 38, is hereinafter referred to as "Fed. Defs.' Mem." Consistent with L.Civ.R. 7.4(b)(2), page references are to the numbers assigned by the CM/ECF System.

[5] 556 U.S. 502 (2009).

Friends of Alaska NW Refuges, et. al. v. Bernhardt, et. al. Case No. 3:19-cv-00216-JWS
State of Alaska's Opposition                                                    Page 4 of 32
Case 3:19-cv-00216-JWS    Document 40    Filed 03/09/20    Page 7 of 35

determine an agency's compliance with the Administrative Procedure Act (APA)[6] when an agency's decision effects a policy change. AR INT-002825. The Ninth Circuit summarized the *Fox* standard as: "[A] policy change complies with the APA if the agency (1) displays 'awareness that it is changing position,' (2) shows that 'the new policy is permissible under the statute,' (3) 'believes' the new policy is better, and (4) provides 'good reasons' for the new policy." *Organized Vill. of Kake v. U.S. Dep't of Agric.,* 795 F.3d 956, 966 (9th Cir. 2015) (quoting, *Fox*, 556 U.S. at 515). The Plaintiffs do not contest Secretary Berhardt's compliance with the first and third *Fox* factors, but allege that the 2019 Findings[7] did not comply with the second and fourth *Fox* requirements. Pls.' Mem. at 21.[8]

As Judge Gleason noted in her earlier decision on a similar agreement, the second *Fox* requirement—whether the challenged decision is permissible under statute—is distinct from, but quite closely related to, the Plaintiffs' Alaska National Interest Land Conservation Act ("ANILCA") arguments. *Friends of Alaska Nat'l Wildlife Refuges v. Bernhardt*, 381 F.Supp. 3d 1127, 1136 (D. Alaska 2019). Secretary Bernhardt's decision in the 2019 Findings is fully compliant with the requirements of ANILCA, as is

---

6     5 U.S.C. 551, et seq.

7     Secretary Bernhardt's Findings and Conclusions Concerning a Proposed Land Exchange Between the Secretary of the Interior and King Cove Corporation for Lands within Izembek National Wildlife Refuge, Alaska is referred to as "2019 Findings". AR INT-002814-33.

8     The Plaintiffs' Memorandum in Support of Motion for Summary Judgment, ECF Number 32, is hereinafter referred to as "Pls.' Mem."

Friends of Alaska NW Refuges, et. al. v. Bernhardt, et. al. Case No. 3:19-cv-00216-JWS
State of Alaska's Opposition                     Page 5 of 32

Case 3:19-cv-00216-JWS   Document 40   Filed 03/09/20   Page 8 of 35

explained below in Section II of this brief that addresses the Plaintiffs' challenges to ANILCA compliance. *Infra.*, pages 14-21.

With regard to the fourth *Fox* consideration—whether good reasons were given for the new decision—the Plaintiffs find three particular faults in Secretary Bernhardt's decision in the 2019 Findings: "Specifically, he failed to explain contrary findings regarding harm to Izembek's resources, the value of the private lands received, and alternative transportation options." Pls.' Mem. at 23. These allegations are addressed in turn:

### A. Secretary Bernhardt's Decision Discusses the Value of the Private Land.

The Plaintiffs criticize the 2019 Decision for not addressing "the Service's 2013 findings that the value of those [55,000 acres of proposed exchange] lands would not compensate for or offset the negative impacts of road construction to the Refuge." Pls. Mem. at 25. The specific 2013 Decision finding that the Plaintiffs argue went unaddressed is that the 55,000 acres of land intended for exchange would not "compensate for the adverse effects of removing a corridor of land and constructing a road within the narrow, irreplaceable Izembek isthmus." Pls. Mem. at 25, fn. 89 (quoting, AR INT 001243). In making this argument, the Plaintiffs refuse to recognize that if every acre of the Izembek isthmus is "irreplaceable"—as determined by Secretary Jewell—then no amount of exchanged lands could compensate for the effects of a single-lane road connecting King Cove to the all-weather airport at Cold Bay.

Secretary Bernhardt directly addresses the unequal exchange considered in the 2013 Decision: "[T]he 2013 ROD discounted the value of the [55,000 acres of] habitat

Friends of Alaska NW Refuges, et. al. v. Bernhardt, et. al. Case No. 3:19-cv-00216-JWS
State of Alaska's Opposition                                          Page 6 of 32
Case 3:19-cv-00216-JWS   Document 40   Filed 03/09/20   Page 9 of 35

FWS would receive in a potential land exchange." AR INT-002831. *Fox* requires that "a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy." 556 U.S. at 516. Secretary Bernhardt's decision does just that by stating the obvious: Secretary Jewell tremendously undervalued the thousands of acres of land in and adjacent to the Izembek Refuge that were offered for exchange.

As explained by Secretary Bernhardt, former Secretary Jewell had complete discretion under OPLMA without any "criteria that the Secretary must consider in reaching a decision not to proceed." AR INT 002819 (quoting the 2013 Decision at p.6; AR INT 011241). Without criteria to determine the value of land proposed for exchange, Secretary Jewell had the freedom to make policy-based findings that the Izembek isthmus is "invaluable" and "irreplaceable." By deeming the Izembek isthmus priceless, the land could be protected by way of excluding human activities. See, e.g. AR INT 001244 ("The no action alternative protects … pristine areas where natural processes prevail with few signs of human presence."). Secretary Bernhardt, thus, correctly identified the core issue underlying the policy decision at hand: Whether to further the potential human use of the Izembek isthmus, or to protect the national wildlife refuges and wilderness values through the exclusion of humans. AR INT 002832-33; See also, *Agdaagux Tribe of King Cove v. Jewell*, 128 F.Supp.3d 1176, 1200 (D. Alaska 2015)("Secretary [Jewell] evaluated environmental impacts, not public health and safety impacts."). Secretary Bernhardt's decision placed greater weight on protecting the welfare and well-being of

Friends of Alaska NW Refuges, et. al. v. Bernhardt, et. al. Case No. 3:19-cv-00216-JWS
State of Alaska's Opposition                                                    Page 7 of 32
Case 3:19-cv-00216-JWS   Document 40   Filed 03/09/20   Page 10 of 35

the Alaskans who live completely surrounded by the national wildlife refuges. AR INT 002833.

In contrast to the lack of criteria in OPLMA for the 2013 proposed exchange, Secretary Bernhardt describes ANILCA 1302(h) equal value exchange envisioned by the 2019 Agreement:

> "[King Cove Corporation] KCC would convey to the United States the surface estate of certain lands within the Izembek and Alaska Peninsula National Wildlife Refuges and relinquish its selection rights to an additional 5,430 acres within the Izembek Refuge. In return, the Department would convey to KCC the surface and subsurface estates of not more than 500 acres in the form of a narrow corridor through the Izembek Refuge. The land exchange itself would not authorize the construction of a road."

AR INT 002824. Pursuant to the terms of the 2019 Agreement "equal value … may not necessarily result in an acre-for-acre exchange" and the values of the respective lands will be determined by appraisals. AR INT 002867 (2019 Agreement ¶¶ (C) and (D)(3), respectively). Thus, contrary to the Plaintiffs' allegations, Secretary Bernhardt's decision discusses the value of KCC land to be acquired by the United States in the exchange, and recognizes that his decision to proceed with the exchange under ANILCA section 1302(h) is a discretionary policy decision. AR INT 002816.

**B. Secretary Bernhardt's Decision Discusses Negative Effects on Habitat.**

The Plaintiffs argue that "the Secretary failed to adequately address findings of harm to the Refuge's irreparable resources," specifically alleging insufficient statements on the prior finding that "human access and activity [ ] would have 'profound adverse effects on wildlife use and habitats of the narrow isthmus.'" Pls.' Mem. at 23-24 (quoting 2013 ROD at AR INT-001239). First, as explained above, Secretary Bernhardt addressed

Friends of Alaska NW Refuges, et. al.  v. Bernhardt, et. al.  Case No. 3:19-cv-00216-JWS
State of Alaska's Opposition                                                     Page 8 of 32
Case 3:19-cv-00216-JWS   Document 40   Filed 03/09/20   Page 11 of 35

the 2013 Decision's finding of "irreplaceable resources" under OPLMA, by making an "equal value" finding under ANILCA section 1302(h) that:

> "Federal ownership and a more permanent conservation status for the lands and land selection rights to be acquired enhances the purposes of the Refuge. In fact, as noted in the record, the 1998 Izembek Land Protection Plan identified lands owned by King Cove Corporation within the Refuge Boundaries as containing valuable fish and wildlife habitat and prioritized this land for acquisition and protection."

AR INT-002831. Secondly, Secretary Bernhardt also squarely addressed the 2013 Decision's selection of the no action alternative under OPLMA, which would prohibit human access across the Izembek isthmus, and came to a conclusion under ANILCA section 1302(h) that "the habitat that FWS would receive for addition to the Refuge in the proposed land exchange" has equal value to the corridor KCC will receive. AR INT-002831. While Secretary Bernhardt's explanation may not be as "precise, elaborate, or detailed" as the Plaintiffs desire, the Secretary's reasons for his actions were founded in the law that he was implementing and "were the sort of reasons an agency may consider and act upon." *Fox,* 556 U.S. at 538 (Kennedy, J., concurring).

The Plaintiffs also complain that the 2019 Findings does not address "negative impacts to multiple species" from the construction of a road. Pls.' Mem. at 25 (referencing 2013 ROD; AR INT-001242-43). Secretary Bernhardt's decision squarely recognized that "construction and use of a road corridor would be likely to have negative impacts on each of the species referenced." AR INT-002819-20. The 2019 Findings specifically require that "[s]hould KCC decide at a later date to pursue the construction of a road connection between Cold Bay and King Cove, it will need to comply with all

Friends of Alaska NW Refuges, et. al. v. Bernhardt, et. al. Case No. 3:19-cv-00216-JWS
State of Alaska's Opposition                                                    Page 9 of 32
Case 3:19-cv-00216-JWS   Document 40   Filed 03/09/20   Page 12 of 35

permitting actions and environmental review required by both Federal and State law."
AR INT 002829. The extent of impacts to any species in the Izembek Refuge will be
considered in the environmental permitting for future road construction, if any, and will
be avoided, minimized or mitigated to the extent required by State and Federal laws.
This requirement is clearly detailed in Secretary Bernhardt's decision.

The Plaintiffs describe the environmental sensitivities and multiple species found
on the Izembek isthmus, and make generalized statements that road construction and
operation will negatively affect the environment and those species. Pls.' Mem. at 10-11
and 15-16, respectively. The Plaintiffs' descriptions parallel the binary analysis—road
vs. no road—of the 2013 Decision, which never comparatively analyzed the avoidance
and minimization of potential harms of the alternative road alignments through the
Izembek isthmus. See, INT 001241-44. The generalized allegations of harm by the
Plaintiffs fail to recognize the corridor design criteria for the lands selected by KCC,
which will allow for an environmentally sensitive future siting of a gravel road
connecting King Cove to Cold Bay.

The road corridor selected by KCC to receive in exchange, delineated in U.S.
Survey No. 14495, "is nearly identical to the Southern Alignment analyzed in the 2013
EIS." AR INT-002837. To reduce effects upon the environment, the road corridor
incorporates the military roads located on the Izembek isthmus that were constructed

Friends of Alaska NW Refuges, et. al.  v. Bernhardt, et. al.  Case No. 3:19-cv-00216-JWS
State of Alaska's Opposition                                          Page 10 of 32
Case 3:19-cv-00216-JWS   Document 40   Filed 03/09/20   Page 13 of 35

during World War II. AR INT-002873.[9] The road corridor is designed to reduce

potential negative effects to the Black Brandt and Emperor Geese by being located in

excess of one-half mile from the shoreline of Kinzarof Lagoon. AR INT-002873.[10]

Similarly, the road corridor identified by KCC was designed to locate a future road so as

to not "disrupt[ ] caribou migration through the Isthmus." AR INT-002873.[11] Also,

contrary to the Plaintiffs' descriptions, there are no eelgrass beds located within the lands

identified for transfer to KCC in this exchange. Pls.' Mem. at 10-11.[12]

---

[9]     See also, OMPLA § 6402(f)(3) ("In designating the road corridor … the Secretary shall … to the maximum extent practicable, incorporate into the road corridor roads that are in existence as of the date of the enactment of this Act."); AR INT 002437.

[10]     See also, 2013 EIS, Environmental Consequences ("Using a 0.5 mile (2680 foot) radius from the road corridor in the intertidal area, most of the road would be visible from areas used by Black Brant and Emperor Geese in Kinzarof Lagoon, but the noise level from passenger type vehicles would be less than the background noise level. The Alternative 2 road proposes an alignment located 0.5 mile (2680 feet) to 1 mile (5280 feet) north of Kinzarof Lagoon, thereby minimizing road disturbances for staging or wintering birds along this route."). AR 00181272.

[11]     See also, 2013 EIS, Environmental Consequences ("The southern road alignment was selected to minimize road construction, operation, and maintenance effects for migrating caribou. Caribou and human development have a long history of coexistence in northern latitudes. Generally, caribou quickly adapt to physical structures or buildings.") AR 00181281.

[12]     See cf. 2013 EIS, Affected Environment ("[N]o eelgrass beds are within the proposed exchange areas."). AR 00180730.

Friends of Alaska NW Refuges, et. al.  v. Bernhardt, et. al.  Case No. 3:19-cv-00216-JWS
State of Alaska's Opposition                                                      Page 11 of 32

Case 3:19-cv-00216-JWS   Document 40   Filed 03/09/20   Page 14 of 35



AR INT 002134 (Diagram of pool of federal lands road corridor may be sited within).

Friends of Alaska NW Refuges, et. al. v. Bernhardt, et. al. Case No. 3:19-cv-00216-JWS
State of Alaska's Opposition                                                    Page 12 of 32
Case 3:19-cv-00216-JWS   Document 40   Filed 03/09/20   Page 15 of 35

Lastly, the Plaintiffs complain that Secretary Bernhardt "ignores the environmental harm from gravel mines on the isthmus, which are authorized under the Exchange Agreement but not considered previously." Pls.' Mem. 24-25. Neither of the Plaintiffs' statements are accurate. The boundaries of the corridor identified by KCC for exchange were "designed to best achieve a balance of materials cut from high points and filled into low points to eliminate the need for imported rock and gravel and to reduce construction time and costs." AR INT-002837. Cut-and-fill construction is how a gravel road comes into being. KCC's request to "acquire the land necessary to construct a road" is exactly what Secretary Bernhardt considered in the 2019 Decision. AR INT-002814. Similarly, "an analysis of the potential construction and operation of a road" is exactly what examined under the EIS authorized by OPLMA. OPLMA § 6402(b)(2). The 2013 EIS never mentions "gravel mines," as described by the Plaintiffs, but it clearly contemplates that "[o]ne or more material sites" are anticipated for use in road construction in the Alternative 2 alignment. AR 00179343. Just like the current corridor, the road corridor for the 2013 EIS anticipates that "[t]he road would be constructed with both cuts and fills; cuts and fills will be balanced [i.e., without importing materials] to the maximum extent practicable." AR 00179346. Thus, contrary to the Plaintiffs' accusation, Secretary Bernhardt considered KCC's request for sufficient lands to accommodate construction of a single-lane gravel road and effects of construction of that road were considered in the 2013 FEIS.

Friends of Alaska NW Refuges, et. al. v. Bernhardt, et. al. Case No. 3:19-cv-00216-JWS
State of Alaska's Opposition                                          Page 13 of 32
Case 3:19-cv-00216-JWS   Document 40   Filed 03/09/20   Page 16 of 35

### C. Secretary Bernhardt's Decision Discusses Alternate Transportation Options.

The last contradictory finding that the Plaintiffs argue was ignored by Secretary Bernhardt relates to the Secretary's detailed finding on the lack of viable transportation alternatives. *See*, AR INT-002820-24. The Federal Defendants thoroughly address how the longest portion of Secretary Bernhardt's decision addresses the non-viability of other transportation alternatives. Fed. Defs.' Mem. at 27-28. However, there is an additional critical point considered by Secretary Bernhardt that has gone unmentioned: the 2013 Decision did not acknowledge that any potential marine transport alternative would pass through designated critical habitat for the endangered Southwest Alaska Distinct Population Segment of Northern Sea Otters. AR INT-002821 at fn 25. This is quite an important additional fact upon which the prior decision was re-evaluated.

In sum, Secretary Bernhardt's decision satisfies the fourth *Fox* consideration, and provides sounds reasons for reaching a new decision.

### II. THE SECRETARY'S 2019 FINDINGS AND THE 2019 AGREEMENT ARE PERMISSIBLE AND PROMOTE THE BALANCE OF INTERESTS CONGRESS SOUGHT IN ALASKA BY ANILCA.

#### A. The 2019 Agreement comports with ANILCA's purposes.

The Secretary determined in the 2019 Findings that the land exchange authorized is consistent with the purposes of ANILCA. AR INT-002832. ANILCA does not have "overarching" purposes for ecological protection as Plaintiffs argue. Pls.' Mem. at 27. Fundamentally, ANILCA is a congressional directive to the Secretary to balance a variety of purposes and values. The multitude of purposes of ANILCA beyond ecological

Friends of Alaska NW Refuges, et. al.  v. Bernhardt, et. al.  Case No. 3:19-cv-00216-JWS
State of Alaska's Opposition                                                    Page 14 of 32
Case 3:19-cv-00216-JWS   Document 40   Filed 03/09/20   Page 17 of 35

protection is evident in case law interpreting ANILCA, the terms of ANICLA itself, its legislative history, and its broader historical context. *See, Sturgeon,* 139 S.Ct. at 1073 (2019) (describing the historical conflicts of resource conservation vs. economic development and federal management vs. local control that underpinned the passage of ANILCA).

Plaintiffs' focus on ecological protection of the Izembek Refuge reflects a myopic view of the purposes ANILCA. Pls.' Mem. at 27. The opening "purposes" section of ANILCA declares that ANILCA is established "[i]n order to preserve for the benefit [and] use..." of present and future Alaskans certain lands and waters in Alaska.16 U.S.C. § 3101(a). This purposes section goes on to include unique declarations about the protections and balance of interests Congress designed ANILCA to address. Congress decreed that ANILCA provides "sufficient protection" for the "national interest in the scenic, natural, cultural and environmental values" on public lands while "at the same time provid[ing] adequate opportunity for satisfaction of the economic and social needs of the State of Alaska and its people." 16 U.S.C. § 3101(d). Congress concluded this decree of purpose with a legislative finding that "the designation and disposition of public lands in Alaska pursuant to [ANILCA]" represents "a proper balance between the reservation of national conservation system units and those public lands necessary and appropriate for more intensive use and disposition." *Id.*

Thus, ANILCA contemplates use of the land and waters by Alaskans and benefits of the land and waters for Alaskans. In ANILCA, Congress acknowledged that the national interests in environmental and other values of these lands existed while

Friends of Alaska NW Refuges, et. al. v. Bernhardt, et. al. Case No. 3:19-cv-00216-JWS
State of Alaska's Opposition                                                                 Page 15 of 32
Case 3:19-cv-00216-JWS   Document 40   Filed 03/09/20   Page 18 of 35

admonishing that those protections and values should not deprive the "State of Alaska and its people" of economic and social needs. *Id.* ANILCA is about balancing national environmental interests with local needs including *human* needs.

The 2019 Agreement epitomizes ANILCA's balancing of objectives. Plaintiffs' interpretation of ANILCA would have ecological protection always outweigh or "overarch" other ANILCA interests and values resulting in an impermissible tip in the balance Congress created in ANILCA. Pls.' Mem. at 27. The 2019 Agreement recognizes the benefit from and use of the lands for present and future Alaskans in that it provides the reinstatement of immemorial lands to Aleut ownership, the potential for a lifesaving road that would connect rural predominantly native communities surrounded by conservation system units, and permanency in land status of valuable wildlife habitat within two refuges. AR INT-002831.

## B. The 2019 Agreement is lawful under Section 1302(h) of ANILCA.

The Secretary in the 2019 Findings appropriately concluded that the 2019 Agreement would be authorized under the land exchange authority found in Section 1302(h) of ANILCA. AR INT-002813, AR INT-002827-28; 16 U.S.C. § 3192(h). Not only did the Secretary consider that language of Section 1302(h), the Secretary in the 2019 Findings even analyzed the history and purpose behind the exchange authority in Section 1302(h). AR INT-002827-28. Section 1302(h) provides:

> EXCHANGE AUTHORITY. - Notwithstanding any other provision of law, in acquiring lands for the purposes of this Act, the Secretary is authorized to exchange lands (including lands within conservation system units and within the National Forest System) or interests therein (including

Friends of Alaska NW Refuges, et. al. v. Bernhardt, et. al. Case No. 3:19-cv-00216-JWS
State of Alaska's Opposition                                                    Page 16 of 32
Case 3:19-cv-00216-JWS   Document 40   Filed 03/09/20   Page 19 of 35

Native selection rights) with the corporations organized by the Native Groups, Village Corporations, Regional Corporations, and the Urban Corporations, and other municipalities and corporations or individuals, the State (acting free of the restrictions of section 6(i) of the Alaska Statehood Act), or any Federal agency. Exchanges shall be on the basis of equal value, and either party to the exchange may pay or accept cash in order to equalize the value of the property exchanged, except that if the parties agree to an exchange and the Secretary determines it is in the public interest, such exchanges may be made for other than equal value.

16 U.S.C. § 3192(h). Plaintiffs ran with their skewed interpretation of ANILCA's purposes, and then carried their myopic vision into the specific provisions of ANILCA on land exchanges to hamstring Section 1302(h) with limitations entirely absent from the statute's language. Pls.' Mem. at 28.

Section 1302(h) authorizes the Secretary to exchange lands "for the purposes of this Act." 16 U.S.C. § 3192(h). Firstly, nowhere in Section 1302(h) is the Secretary's authorization for land exchanges limited by cross-references to more specific purposes expressed in other titles of ANILCA. The most straight forward reading of "for the purposes of this Act" would relate back to the general purposes in Section 101 of ANILCA, and not the rather tortuous attempts by the Plaintiffs to inject limitations from Title III and Title XI of ANILCA into Section 1302(h). Pls.' Mem. at 28 and 33; 16 U.S.C. § 3101; 16 U.S.C. § 3192(h). Secondly, the introductory clause in Section 1302(h) that the exchange authority is "[n]otwithstanding any other provision of law" is a clause that signals congressional intent that other law is modified to the extent it would interfere with the result that follows a "notwithstanding" clause. 16 U.S.C. § 3192(h); *Consejo De Desarrollo Economico De Mexacali, A.C. v. U. S.*, 482 F.3d 1157, 1169 (9th Cir. 2007).

Friends of Alaska NW Refuges, et. al. v. Bernhardt, et. al. Case No. 3:19-cv-00216-JWS
State of Alaska's Opposition                                                    Page 17 of 32
Case 3:19-cv-00216-JWS   Document 40   Filed 03/09/20   Page 20 of 35

Unsurprisingly, none of the legislative history relied on by the Plaintiffs supports this theory that Congress intended that avoidance of condemnations was to be the *only* use of the land exchange authority in Section 1302(h) of ANILCA. Pls.' Mem. at 28. The legislative history relied on by Plaintiffs supports the opposite conclusion. The legislative history noted that the Secretary has "great flexibility" in making land exchanges even when the land exchange would result in conservation system land moving to private hands. ECF Doc. No. 32-18 at 10-11. The legislative history goes on to say "Of course, the committee does not expect that this flexibility will be used to undermine the essential integrity of any conservation system unit or to frustrate the purposes of any such unit." *Id.* at 11. This "of course" comment simply reflects a committee expectation that the Secretary will not act in an extreme manner that is out of balance with ANILCA. It does not follow from such committee commentary that Congress deemed land exchanges that comply with the broader purposes of ANILCA's Section 101 would somehow defeat the "essential integrity" of a conservation system unit. 16. U.S.C. § 3101; *Wisconsin Public Intervenor v. Mortier*, 501 U.S. 597, 617 (1991)(Scalia, A., concurring)(describing the mistake of the state supreme court as "failing to recognize how unreliable Committee Reports are- not only as a genuine indicator of congressional intent but as a safe predictor of judicial construction. We use them when it is convenient, and ignore them when it is not."). A better reading of the legislative history shows that Congress intended to foster ANILCA's balance by preferring exchanges over condemnations.

Friends of Alaska NW Refuges, et. al. v. Bernhardt, et. al. Case No. 3:19-cv-00216-JWS
State of Alaska's Opposition                                        Page 18 of 32
Case 3:19-cv-00216-JWS   Document 40   Filed 03/09/20   Page 21 of 35

The Secretary in the 2019 Findings recognized the land exchange authority in Section 1302(h) was "an important tool provided to the Secretary by Congress to adjust broad Conservation System Unit designations to reflect the health, safety, and other interests of local people in concert with the national interest in conservation." AR INT-002827. Instead of a consideration of the balance objectives, Plaintiffs argue that there can never be such a balancing at all where the Izembek Refuge is concerned.

The Plaintiffs make the unsupported statement that: "The protection of human life and safety cannot be at the expense of ANILCA's and the Izembek's purposes." Pls.' Mem. at 33. By extension of the Plaintiffs' restrictive interpretation of ANILCA, no matter how many people may be buried for a lack of a road, the Secretary must value wildlife resources over human life and safety. In 2017, Etta Kuzakin, President of the Aadaguux Tribe of King Cove testified on her harrowing experience just to receive medical care for the birth of her child. AR INT-002357. The weather in King Cove nearly prevented her from reaching Cold Bay for medical evacuation necessitated by preterm labor. AR INT-002357. Plaintiffs seem to accept that subsistence is an enumerated purpose of the Izembek Refuge, yet they fail to recognize that the opportunity for subsistence matters little if humans are not allowed to use the land to subsist. A slow displacement of the Aleut people cannot be consistent with the balance sought by Congress in ANILCA and ANCSA. The Secretary in the 2019 Agreement fittingly remarked that "[t]he prior failure to allow KCC to use its ANCSA land selections to provide

Friends of Alaska NW Refuges, et. al. v. Bernhardt, et. al. Case No. 3:19-cv-00216-JWS
State of Alaska's Opposition                                                    Page 19 of 32
Case 3:19-cv-00216-JWS   Document 40   Filed 03/09/20   Page 22 of 35

for the welfare and well-being of the Native people of King Cove frustrates the purposes of ANILCA and ANCSA."  AR INT-002830.

C.  **The 2019 Agreement meets the purposes the Izembek Refuge.**

Secretary considered the purposes of the Izembek Refuge in the 2019 Findings. The Secretary also considered the increased acreage in the Izembek Refuge and Alaska Peninsula National Wildlife Refuge to be "for the protection of scenic, natural, cultural, and environmental values." *Id*.  The Secretary is entitled to deference on whether the 2019 Agreement meets the purposes of the Izembek Refuge in ANILCA.  *Nat'l Audubon Society v. Hodel*, 606 F.Supp. 825, 836 (D. Alaska 1984)(finding the Secretary had broad discretion under Section 1302(h) of ANILCA to determine interests considered at arriving a public interest in a land exchange.).  The Secretary found that "[f]ederal ownership and a more permanent conservation status for the lands and land selection rights to be acquired enhances the purposes of the [Izembek] Refuge."  AR INT-002831.

Section 303(3)(B) of ANILCA provides:

> The purposes for which the Izembek National Wildlife Refuge is established and shall be managed include-
> (i) to converse fish and wildlife populations and habitats in their natural diversity including, but not limited to, waterfowl, shorebirds and other migratory birds, brown bears and salmonids;
> (ii) to fulfill the international treaty obligations of the United States with respect to fish and wildlife and their habitats;
> (iii) to provide in a manner consistent with the purposes set forth in subparagraphs (i) and (ii), the opportunity for continued subsistence uses by local residents; and
> (iv) to ensure, to the maximum extent practicable and in a manner consistent with the purposes set forth in paragraph (i), water quality and necessary water quantity within the refuge..

Friends of Alaska NW Refuges, et. al.  v. Bernhardt, et. al.  Case No. 3:19-cv-00216-JWS
State of Alaska's Opposition                                                     Page 20 of 32
Case 3:19-cv-00216-JWS   Document 40   Filed 03/09/20   Page 23 of 35

The Plaintiffs' arguments incorrectly assume that the specific conservation purposes in Section 303(3)(B) of ANILCA for the Izembek Refuge limit the Secretary from management of the Izembek Refuge consistent with the broader balanced purposes in Section 101 of ANILCA. 16. U.S.C. § 3101; Pls.' Mem. at 21 24-25.

Nothing in Section 303(3)(B) precludes the Secretary from considering additional purposes or management objectives and the Secretary is required to consider the general balance of purposes in Section 101 of ANILCA. 16. U.S.C. § 3101. Even more, an established canon of statutory construction directs that the inclusion of the verb "include" prior to the enumeration of purposes for the Izembek Refuge denotes that Congress did *not* intend for the listing to be exclusive. *Richardson v. Nat'l City Bank of Evansville*, 141 F.3d 1228, 1232 (7th Cir. 1998)(explaining "include is a term of illustration, not limitation"). Congress could have omitted the word "include" from Section 303(3)(B) and maintained the grammatical structure if Congress had intended the listing to exclusive of other purposes in ANILCA. By extension, the Plaintiffs' interpretation of "include" to require an exclusive listing of the purposes of the Izembek Refuge in Section 303(3)(B) would cause the word "include" to be disfavored surplusage. Additionally, the exclusive reading suggested by Plaintiffs would result in an inharmonious reading of ANILCA and insert a limitation on provisions designed to benefit natives where none is expressed. While statutory canons, like proverbs, run in pairs, in Section 303(B) canons interpreting "include" as including the general purposes of ANILCA take the race.[13]

---

[13]     The negative-implication canon, *expression unius est exclusion alterius*, has no place in Section 303(3)(B).

Friends of Alaska NW Refuges, et. al.  v. Bernhardt, et. al.  Case No. 3:19-cv-00216-JWS
State of Alaska's Opposition                                                    Page 21 of 32

Thus, the 2019 Agreement is consistent with the broader balance of purposes of ANILCA and the specific purposes of the Izembek Refuge.

### III. ANILCA Title XI Allows Inholder Access for Rural Villages

ANILCA's Title XI provides the requirements and procedures for authorizing the use of federal land within conservation system units (CSU) for transportation and utility systems. ANILCA § 1101; 16 U.S.C. 3161. The property right authorized under ANILCA Title XI is an easement over the federal land, with specified terms and conditions for the use any authorized right-of-way. ANILCA § 1107; 16 U.S.C. 3167. As clearly articulated by the Federal Defendants, Title XI is inapplicable to an exchange of fee interests between the federal government and a Native Corporation. Fed. Defs.' Mem. at 27-30. Even if ANILCA Title XI was applicable to the challenged land exchange, the onerous Title XI procedural requirements outlined by the Plaintiffs would not be applicable to cure the lack of access to the communities of King Cove and Cold Bay due to their being effectively surrounded by ANILCA CSUs. This enclosure of these communities by Izembek NWR and the Alaska Peninsula NWR is plainly depicted by the "USFWS Refuge Boundary" included in the 2019 Agreement for the Exchange of Lands:

Friends of Alaska NW Refuges, et. al.  v. Bernhardt, et. al.  Case No. 3:19-cv-00216-JWS
State of Alaska's Opposition                                                    Page 22 of 32
Case 3:19-cv-00216-JWS   Document 40   Filed 03/09/20   Page 25 of 35



AR INT 002029.

The Plaintiffs argue that Secretary Bernhardt was required to comply with "both Sections 1104 and 1106 [of ANILCA]" to effectuate the land exchange. Pls.' Mem. at 35. Sections 1104 and 1106 are undoubtedly the most cumbersome procedural requirements of ANILCA Title XI, including requirements for the preparation of an EIS followed by a

Friends of Alaska NW Refuges, et. al.  v. Bernhardt, et. al.  Case No. 3:19-cv-00216-JWS
State of Alaska's Opposition                                                    Page 23 of 32
Case 3:19-cv-00216-JWS   Document 40   Filed 03/09/20   Page 26 of 35

presidential recommendation and congressional approval. 16 U.S.C. 3164(e) and 16 U.S.C. 3166, respectively.  However, these are not the only provisions of Title XI that could be used to authorize a right-of-way across a CSU.

ANILCA's Section 1110 provides the standards and procedures for travel to and from villages effectively surrounded by CSUs. 16 U.S.C. 3170.  In the context of the land exchange proposed under OPLMA, Congress recognized that ANILCA's Section 1110 was the governing provision of Title XI for that proposed exchange. OPLMA § 6403(c); INT-002438.  Pursuant to ANILCA's Section 1110: "[When a] valid occupancy is within or effectively surrounded by one or more conservation system units … the State or private owner or occupier shall be given by the Secretary such rights as may be necessary to assure adequate and feasible access for economic and other purposes." 16 U.S.C. 3170(b).  The Secretary of Interior is solely authorized—and mandated—to transfer necessary rights-of-way under ANILCA's Section 1110 when an inholding is effectively surrounded by a CSU. The transfer of rights-of-way under Section 1110 does not require the preparation of an EIS nor review and approval by either the President or Congress. Thus, if Title XI were applicable to current the land exchange then the burdens for compliance would be far lower than those presented by the Plaintiffs.

## IV.    NEPA IS INAPPLICABLE TO THE 2019 AGREEMENT

The Secretary in the 2019 Findings considered prior environmental studies on the Izembek Refuge.  AR INT-002814-15 fn.6.  The Secretary concluded that an EIS under the National Environmental Policy Act ("NEPA") was not required because the 2019 Agreement is excepted from NEPA in Section 910 of ANILCA.  *Id.*  Plaintiffs assert that

Friends of Alaska NW Refuges, et. al.  v. Bernhardt, et. al.  Case No. 3:19-cv-00216-JWS
State of Alaska's Opposition                                             Page 24 of 32

the Secretary violated NEPA because the Secretary did not prepare an EIS and that the exemption to NEPA in Section 910 is inapplicable to the 2019 Agreement.  Pls.' Mem. at 30.

Plaintiffs rely on *National Forest Preservation Group v. Butz*, 485 F.2d 408 (9th Cir. 1973), for their argument that the 2019 Exchange, as a land exchange, required an EIS under NEPA.  Pls.' Mem. at 30.  The land exchange at issue in *Butz* is easily distinguishable from the 2019 Agreement.  The land exchange in *Butz* was a "massive land exchange" to a private company that planned to use the land for recreational development.  *Id*. at 410-11.  In contrast, the 2019 Agreement is an equal value exchange that would move 500 acres of refuge land to a Native Corporation for the restoration of ancestral land, promotion of subsistence values, and potential for construction of lifesaving road connecting two isolated communities.  Also, the land exchange in *Butz* was authorized under statutes predating NEPA.  *Id*. at 412-13.  When Congress enacted NEPA, it was presumably aware of the existing exchange authority and decided not to exempt those exchanges from NEPA requirements. 42 U.S.C. 4332(C).  ANILCA was enacted after NEPA and Congress specifically exempted conveyances to Native Corporations from NEPA in Section 910 of ANILCA.  43 U.S.C. § 1638.

*Butz* does not even support the relief requested by the Plaintiffs for vacatur of the 2019 Agreement.  In *Butz*, the Regional Forester considered environmental factors in his decision and followed up with a formal EIS after the decision was appealed to the Chief Forester.  *Id.* at 412.  The 9th Circuit in *Butz* declined to order remand on that ground.  *Id.* The 9th Circuit in *Butz* held that there was "no prejudicial failure to comply with NEPA"

Friends of Alaska NW Refuges, et. al.  v. Bernhardt, et. al.  Case No. 3:19-cv-00216-JWS
State of Alaska's Opposition                                                                 Page 25 of 32
Case 3:19-cv-00216-JWS   Document 40   Filed 03/09/20   Page 28 of 35

and commented that "the sterile exercise of having the Regional Forester consider the impact statement on an exchange which has already been approved at all levels of the administrative hierarch would serve no useful purpose." *Id.*

Similar to *Butz*, the Secretary's 2019 Findings evidence his extensive review and awareness of environmental factors, including an EIS considering construction of a road along the same corridor of land subject to the 2019 Agreement. AR INT-002818-24. As a gravel road is the highest development being considered under the 2019 Agreement, *Butz* supports the proposition that if NEPA applies then the most that should be ordered would preparation of a supplemental EIS prior to finalization of the conveyances, not vacatur of the 2019 Agreement. Additionally, given that there has been no development across that corridor since the last EIS and thus no change in the environment, a supplemental EIS at this point would be a "sterile exercise" that would serve "no useful purpose." Thus, *Butz* supports that if NEPA applies that there has not been a prejudicial failure to comply because the Secretary extensively considered a recent EIS and a supplemental EIS would serve no purpose.

The 2019 Agreement states that "the exchange is made pursuant to the Secretary of the Interior's authority under section 1302(h) of ANILCA" and declares that the "exchange of land is a conveyance under ANCSA, which is therefore subject to section 910 of ANILCA, 43 U.S.C. § 1638." AR INT-002867.

Section 910 states:

*The National Environmental Policy Act* of 1969 (83 Stat. 852) *shall not be construed*, in whole or in part, *as requiring the preparation* or submission *of an environmental impact statement for withdrawals, conveyances, regulations,*

Friends of Alaska NW Refuges, et. al. v. Bernhardt, et. al. Case No. 3:19-cv-00216-JWS
State of Alaska's Opposition
Page 26 of 32
Case 3:19-cv-00216-JWS Document 40 Filed 03/09/20 Page 29 of 35

*orders, easement determinations, or other actions which lead to the issuance of conveyances to Natives or Native Corporations, pursuant to the Alaska Native Claims Settlement Act, or this Act.* Nothing in this section shall be construed as affirming or denying the validity of any withdrawals by the Secretary under section 14(h)(3) of the Alaska Native Claims Settlement Act. (emphasis added).

The Plaintiffs argue that Section 910 "only waives NEPA for conveyances undertaken to fulfill land entitlements under ANCSA or its amendments."  Pls.' Mem. at 38-39.  The Plaintiffs have inserted two limitations into Section 910.  43 U.S.C. § 1638. We take each in turn.  First, Section 910 is bereft of any limitations regarding "fulfillment" of entitlements under Alaska Native Claims Settlement Act ("ANCSA"). Section 910 requires the conveyance to Native Corporations to be "pursuant to" ANCSA or ANILCA. 43 U.S.C. § 1638.  The 2019 Agreement requires KCC to "relinquish its selection rights under ANCSA to 5,430 acres located within the Izembek NWR".  AR INT-002668.  The fact that KCC will be able to select 5,430 acres elsewhere for its ANCSA entitlement does not make the 2019 Agreement any less of an agreement pursuant to ANCSA.  Similarly, KCC will quitclaim patent lands to the United States for the exchange.  AR INT-002869.  If it is determined that KCC quitclaimed too many acres for the equal value exchange, "then the number of those excess acres will be added to [KCC's] remaining entitlement under ANCSA." *Id.*  Thus, the 2019 Agreement is pursuant to ANCSA because the conveyances will result in adjustments to ANCSA entitlements and selection rights.

Second, Plaintiffs assert that Section 910 applies only to conveyances under ANCSA or ANILCA "amendments to ANCSA."  Pls.' Mem. at 31.  This argument fails

Friends of Alaska NW Refuges, et. al.  v. Bernhardt, et. al.  Case No. 3:19-cv-00216-JWS
State of Alaska's Opposition                                            Page 27 of 32
Case 3:19-cv-00216-JWS   Document 40   Filed 03/09/20   Page 30 of 35

because Section 910 clearly governs conveyances under "this Act", thereby including any conveyances to Native Corporations under ANILCA. 43 U.S.C. § 1638; *see*, Fed. Def.'s Mem. at 38. The 2019 Agreement was executed under the land exchange authority in Section 1302(h) of ANILCA and thus falls into the exception from NEPA in Section 910 for conveyances under ANILCA.

While the final conveyance documents have not been executed, the 2019 Agreement authorizes a conveyance within the ordinary meaning of the word. *See*, Fed. Def.'s Mem. at 39. The 2019 Agreement is an "agree[ment] to the exchange of real property interests." AR INT-002867. The term "land exchange" clearly denotes that there are two conveyances instead of one conveyance in an agreement. The terminology does not negate that land is conveyed. Plaintiffs argue without any citation to authority that "the conveyances of lands under ANCSA, which Congress sought to expedite in ANILCA, were not occurring by land exchange." Pls. Mem. at 39. Instead, ANILCA contemplates that land exchanges would occur under ANCSA. 16 U.S.C. § 1613a and d.

Even if the 2019 Agreement is not a conveyance for the purposes of Section 910, the 2019 Agreement would easily fall into the catchall phrase in Section 910 for "other actions which lead to the issuance of conveyances to Natives or Native Corporations." 43 U.S.C. § 1638. The thrust of the Plaintiffs' argument is to suggest this Court adopt a convoluted and narrow interpretation of Section 910. *Id*. The language of Section 910 disproves the Plaintiffs' narrow interpretation. *Id*. The introductory language mandates that NEPA "shall not be construed, in whole or in part" to apply to the conveyances. *Id.* s*ee, Butz,* 485 F.2d at 414 ("We are therefore bound to give effect to specific

Friends of Alaska NW Refuges, et. al. v. Bernhardt, et. al. Case No. 3:19-cv-00216-JWS
State of Alaska's Opposition                                                      Page 28 of 32
Case 3:19-cv-00216-JWS   Document 40   Filed 03/09/20   Page 31 of 35

Congressional restrictions"). This specific restriction of NEPA fits in the overall context of the balance objectives of ANILCA. 43 U.S.C. § 1638; 16. U.S.C. § 3101. Congress in enacting ANILCA considered environmental protections as reflected in many other provisions of ANILCA. With those protections in place, Congress by including Section 910 effectively determined that additional environmental policy studies of NEPA were either not needed or were not in furtherance of ANILCA balance purposes, with conveyance to Native Corporations under ANILCA and ANCSA. In addition to these textual rationales, Section 910 is a provision to benefit natives and as such should be construed liberally in their favor. 43 U.S.C. § 1638; *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985). The 2019 Agreement benefits an Alaska Native Corporation and therefore Section 910 should be interpreted to exempt the Agreement from NEPA.

**CONCLUSION**

Secretary Bernhardt was completely within the authority given under ANILCA and ANCSA to authorize a land exchange with an Alaska Native corporation to transfer 500 acres for a road corridor connecting the communities of King Cove and Cold Bay. The Secretary's decision will restore ancestral lands, promote subsistence values, protect wildlife habitat in the refuge, and allow the potential for future construction of a life-saving road with minimal environmental impacts. Secretary Bernhardt also provided sound reasons for the change of Department of Interior policy that authorized the land exchange. The interpretations of ANILCA suggested by the Plaintiffs would undermine the notions of cooperative federalism and balance objectives Congress sought in

Friends of Alaska NW Refuges, et. al. v. Bernhardt, et. al. Case No. 3:19-cv-00216-JWS
State of Alaska's Opposition                                              Page 29 of 32
Case 3:19-cv-00216-JWS   Document 40   Filed 03/09/20   Page 32 of 35

ANILCA.  Alaska respectfully requests the Court to deny the Plaintiffs' motion for

summary judgment, which will allow this beneficial land exchange to proceed.

Respectfully submitted March 9, 2020.

KEVIN G. CLARKSON
ATTORNEY GENERAL

By:     */s/Sean Lynch*
        Sean Lynch
        Senior Assistant Attorney General
        Alaska Bar No. 0710065
        sean.lynch@alaska.gov

        */s/Mary Hunter Gramling*
        Mary Hunter Gramling
        Senior Assistant Attorney General
        Alaska Bar No. 1011078
        mary.gramling@alaska.gov
        *Attorneys for the State of Alaska*

Friends of Alaska NW Refuges, et. al.  v. Bernhardt, et. al.  Case No. 3:19-cv-00216-JWS
State of Alaska's Opposition                                            Page 30 of 32
Case 3:19-cv-00216-JWS   Document 40   Filed 03/09/20   Page 33 of 35

# CERTIFICATE OF COMPLIANCE

Pursuant to Local Civil Rule 7.4(a)(3), I certify that this brief complies with the type-volume limitation of Local Civil Rule 7.4(a)(1) because it contains 10,000 words, excluding the parts of the brief exempted by Local Civil Rule. 7.4(a)(4).

*/s/Sean Lynch*
Senior Assistant Attorney General
Alaska Bar No. 0710065
sean.lynch@alaska.gov
P.O. Box 110300
Juneau, AK 99811-0300
907.465.3600 main

Friends of Alaska NW Refuges, et. al.  v. Bernhardt, et. al.  Case No. 3:19-cv-00216-JWS
State of Alaska's Opposition                                                    Page 31 of 32
Case 3:19-cv-00216-JWS   Document 40   Filed 03/09/20   Page 34 of 35

**CERTIFICATE OF SERVICE**

I hereby certify that on March 9, 2020, a copy of the foregoing Response to the plaintiffs' Motion for Summary Judgment was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to all counsel of record by operation of the court's electronic filing system.

KEVIN G. CLARKSON
ATTORNEY GENERAL

By:   */s/Sean Lynch*
Senior Assistant Attorney General
Alaska Bar No. 0710065
sean.lynch@alaska.gov
P.O. Box 110300
Juneau, AK 99811-0300
907.465.3600 main

Friends of Alaska NW Refuges, et. al.  v. Bernhardt, et. al.  Case No. 3:19-cv-00216-JWS
State of Alaska's Opposition                                                    Page 32 of 32
Case 3:19-cv-00216-JWS   Document 40   Filed 03/09/20   Page 35 of 35