Bridget Psarianos (AK Bar No. 1705025)
Brook Brisson (AK Bar No. 0905013)
Valerie Brown (AK Bar No. 9712099)
TRUSTEES FOR ALASKA
1026 W. Fourth Avenue, Suite 201
Anchorage, AK 99501
Phone: (907) 276-4244
bpsarianos@trustees.org
bbrisson@trustees.org
vbrown@trustees.org

*Attorneys for Plaintiffs*

## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| FRIENDS OF ALASKA NATIONAL WILDLIFE REFUGES, *et al.*, | Case No. 3:19-cv-00216-JWS |
| Plaintiffs, | |
| v. | |
| DAVID BERNHARDT, *et al.*, | |
| Defendants, | |
| KING COVE CORPORATION, *et al.*, and | |
| STATE OF ALASKA, | |
| Intervenor-Defendants. | |

## PLAINTIFFS' [PROPOSED] REPLY BRIEF FOR SUMMARY JUDGMENT
(Civil Rule 56(a), Local Civil Rule 16.3)

# TABLE OF CONTENTS

TABLE OF CONTENTS.............................................................................................. ii

TABLE OF AUTHORITIES ...................................................................................... iii

LIST OF SHORT NAMES AND ACRONYMS......................................................... iv

INTRODUCTION ........................................................................................................ 1

ARGUMENT ............................................................................................................... 1

I.    The Secretary's "Rebalancing" of Facts Does Not Meet the Legal Requirements For an Agency Reversal. ...................................................................................................... 1

    A.  The Secretary's Conclusory Statements Fail to Explain Conflicting Findings and Ignore Prior Findings Regarding Harm to Izembek. ......................................................... 4

    B.  The Secretary's Unsupported, Conclusory Statements Are Insufficient to Explain Conflicting Findings Regarding the Value of Lands to be Received. .................................. 6

    C.  The Secretary's Contradictory Findings Regarding Transportation Alternatives Are Unsupported by the Record. ................................................................................... 7

II.   The Land Exchange Does Not Further ANILCA's Purposes. ............................................ 9

III.  Title XI Controls the Exchange Agreement Because it Enables a Road Through Izembek. ................................................................................................................ 12

IV.   The Secretary Violated NEPA Because He Wrongly Concluded that Section 910 of ANILCA Provided an Exemption.......................................................................... 16

V.    Interior was Required to Consult on the Effects of the Exchange Agreement and Cannot Rely on The Service's Prior No Effect Finding.................................................. 21

VI.   The Court Should Vacate the Exchange Agreement and Enjoin Further Action........... 24

CONCLUSION.......................................................................................................... 26

_____

*Friends of Alaska National Wildlife Refuges, et al., v. Bernhardt, et al.*
Case No. 3:19-cv-00216-JWS                                    Page ii

<u>TABLE OF AUTHORITIES</u>

**CASES**

*Agdaagux Tribe of King Cove v. Jewell*, 128 F. Supp. 3d 1176.........................................7
*Alaska v. Fed. Subsistence Bd.*, 544 F.3d 1089 (9th Cir. 2008).........................................9
*Alaska v. United States Forest Service*, 2019 WL 245174 (June 11, 2019) ...................20
*Ark Initiative v. Tidwell*, 816 F.3d 119 (D.C. Cir. 2016) .....................................................2
*Chandris, Inc. v. Latsis*, 515 U.S. 347 (1995) ....................................................................17
*Christensen v. Comm'r of Internal Revenue*, 523 F.3d 957 (9th Cir. 2008) ....................18
*Cisneros v. Alpine Ridge Grp.*, 508 U.S. 10 (1993) ...........................................................15
*Conner v. Burford,* 848 F.2d 1441 (9th Cir. 1988) ............................................................24
*Consejo de Desarrollo Economico de Mexacali v. United States*, 482 F.3d 1157 (9th Cir. 2007) ...................................................................................................................................20
*Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075 (9th Cir. 2015) ...........21
*Ctr. for Food Safety v. Vilsack*, 734 F. Supp. 2d 948 (N.D. Cal. 2010)............................25
*Davis v. Mich. Dep't of Treasury*, 489 U.S. 803 (1989) ....................................................18
*Dolan v. U.S. Postal Serv.*, 546 U.S. 481 (2006) ...............................................................18
*Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073 (9th Cir. 2014).....................................15
*F.C.C. v. Fox Television Stations, Inc.*, (*Fox*) 556 U.S. 502 (2009) ...........................3, 4, 8
*Food and Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000)...19
*Friends of Alaska Nat'l Wildlife Refuges v. Bernhardt, (Friends*), 381 F. Supp. 3d 1127 (D. Alaska 2019)........................................................................................................passim
*Friends of Se.'s Future v. Morrison*, 153 F.3d 1059 (9th Cir. 1998)...............................24
*Indigenous Envtl. Network v. United States Dep't of State*, 347 F.Supp.3d 561 (D. Mont. 2018) ....................................................................................................................................4
*League of Conservation Voters v. Trump*, 363 F. Supp. 3d 1013 (D. Alaska 2019) ........16
*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co., (State Far*m), 463 U.S. 29 (1983) .............................................................................................5, 11
*Nat'l Audubon Soc'y v. Hodel*, 606 F. Supp. 825 (D. Alaska 1984)................................11
*Nat'l Wildlife Fed'n v. Coleman*, 529 F.2d 359 (5th Cir. 1976) ......................................24
*Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726 (1998).......................................21
*Or. Nat. Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092 (9th Cir. 2010)..............7
*Organized Village of Kake v. U.S. Department of Agriculture*, 795 F.3d 956 (9th Cir. 2015) ...............................................................................................................................2, 3
*Pac. Rivers Council*, 30 F.3d n.8 .......................................................................................22

_____

*Friends of Alaska National Wildlife Refuges, et al., v. Bernhardt, et al.*
Case No. 3:19-cv-00216-JWS                                    Page iii

*Pollinator Stewardship Council v. U.S. Envtl. Prot. Agency*, 806 F.3d 520 (9th Cir. 2015) .................................................................................................................................... 25
*San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971 (9th Cir. 2014) ....... 23, 24
*Sierra Forest Legacy v. U.S. Forest Serv.*, 598 F. Supp. 2d 1058 (N.D. Cal. 2009) ........ 22
*Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443 (9th Cir. 1996) ..... 22
*W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472 (9th Cir. 2011) ........................... 23

## STATUTES

16 U.S.C. § 1613a ............................................................................................................. 19
16 U.S.C. § 3101 ........................................................................................................... 9, 11
16 U.S.C. §§ 3111–12 ...................................................................................................... 11
16 U.S.C. § 3121(b) .......................................................................................................... 15
16 U.S.C. § 3161(c) .......................................................................................................... 13
16 U.S.C. § 3162(1) .......................................................................................................... 14
16 U.S.C. § 3164(a) ..................................................................................................... 15, 16
16 U.S.C. § 3164(b)(1) ...................................................................................................... 14
16 U.S.C. § 3170 .............................................................................................................. 15
43 U.S.C. § 1613a ............................................................................................................. 19

## REGULATIONS

40 C.F.R. § 1502.5 ............................................................................................................ 20
40 C.F.R. § 1508.9 ............................................................................................................ 17
43 C.F.R. § 36.10 .............................................................................................................. 16
50 C.F.R. § 402.02 ............................................................................................................ 23
50 C.F.R. § 402.14(a) ....................................................................................................... 22

## OTHER AUTHORITIES

Black's Law Dictionary ..................................................................................................... 18
Local Civil Rule 16.3 ........................................................................................................ 24

Case 3:19-cv-00216-JWS   Document 43   Filed 03/23/20   Page 4 of 32

## LIST OF SHORT NAMES AND ACRONYMS

| | |
|---|---|
| ANCSA | Alaska Native Claims Settlement Act |
| ANILCA | Alaska National Interest Lands Conservation Act |
| APA | Administrative Procedure Act |
| Borough | Aleutians East Borough |
| Corps | U.S. Army Corps of Engineers |
| Interior | Department of the Interior |
| EIS | Environmental Impact Statement |
| ESA | Endangered Species Act |
| Izembek or the Refuge | Izembek National Wildlife Refuge |
| NEPA | National Environmental Policy Act |
| OPLMA | Omnibus Public Land Management Act of 2009 |
| The Secretary | Secretary of the U.S. Department of Interior |
| The Service | U.S. Fish and Wildlife Service |

## INTRODUCTION

The Exchange Agreement to trade lands within the Izembek National Wildlife Refuge (Izembek or the Refuge) and its Wilderness for a road is unlawful. It is an impermissible reversal of agency policy and violates the Alaska National Interest Lands Conservation Act (ANILCA), the National Environmental Policy Act (NEPA), and the Endangered Species Act (ESA). The Federal Defendants (Secretary),[1] Intervenor-Defendants King Cove Corporation, et al., (King Cove),[2] and the State of Alaska (State)[3] fail to show that the Secretary provided a reasoned explanation for the decision, that ANILCA, NEPA, and the ESA are not applicable to the Exchange Agreement, or that the Secretary otherwise complied with their mandates. The Court should vacate the Exchange Agreement and agency decisions relying on it, and enjoin all activities.

## ARGUMENT

### I. THE SECRETARY'S "REBALANCING" OF FACTS DOES NOT MEET THE LEGAL REQUIREMENTS FOR AN AGENCY REVERSAL.

The Secretary failed to adequately explain the reversal of findings and decisions that a land exchange to allow a road would harm Izembek and not further ANILCA's purposes. The Secretary claims that he rebalanced facts in light of new information

---

[1] Fed. Defs.' Resp. to Pls.' Mot. for Summ. J., Docket 38 (Mar. 3, 2020) ("DOI Br.").
[2] Def.-Intervenors' Opp. Br. to Pls.' Mot. for Summ. J., Docket 39 (Mar. 9, 2020) ("KCC Br.").
[3] State of Alaska's Opp. to Pls.' Mot. for Summ. J., Docket 40 (Mar. 9, 2020) ("SOA Br.").

---

*Friends of Alaska National Wildlife Refuges, et al., v. Bernhardt, et al.*
Case No. 3:19-cv-00216-JWS                                     Page 1

regarding alternative transportation options and gave greater weight to "humanitarian considerations,"[4] agreeing to the exchange "regardless of the potential environmental impacts."[5] This does not satisfy the law.[6]

As an initial matter, King Cove's assertion that the Exchange Agreement does not represent a policy change is contrary to the record,[7] the history of this issue,[8] prior judicial determinations,[9] and the Secretary's position.[10] King Cove's reliance on *Ark Initiative v. Tidwell* is misplaced.[11] There, the agency made no new findings that contradicted prior policies or findings.[12] Here, the Secretary's findings directly contradict earlier findings. King Cove's argument should be rejected.

The Secretary quotes *Organized Village of Kake v. U.S. Department of Agriculture* (*Kake*)[13] for the proposition that agencies may give more weight to different factors when

---

[4] DOI Br. at 30.

[5] DOI Br. at 29; *see id.* at 11–12, 26–27.

[6] *See* Pls.' Opening Brief For Summ. J. at 17, 20–21, Docket 32 (Jan. 23, 2020) ("Friends Br.") (explaining standard for agency reversals).

[7] AR INT-002209–15 (KCC letter requesting exchange for a road).

[8] *See* Friends Br. at 12–14 (summarizing decades of Service refusals to exchange lands to facilitate road construction). King Cove claims that the Exchange Agreement is not a reversal in part because it does not directly authorize road construction. KCC Br. at 22. The 2013 decision similarly did not authorize construction. AR INT-001241, AR 179406.

[9] *Friends of Alaska Nat'l Wildlife Refuges v. Bernhardt* (*Friends*), 381 F. Supp. 3d 1127, 1140–41, 1143–44 (D. Alaska 2019).

[10] DOI Br. at 29.

[11] KCC Br. at 19–20.

[12] 816 F.3d 119, 127–28 (D.C. Cir. 2016).

[13] 795 F.3d 956 (9th Cir. 2015).

---

changing decisions.[14] While correct, it does not stand alone and the Secretary ignores the Ninth Circuit's subsequent analysis that an agency must explain prior findings that conflict with its new policy:

> *State Farm* teaches that even when reversing a policy after an election, an agency may not simply discard prior factual findings without a reasoned explanation.

> That is precisely what happened here. The 2003 ROD did not simply rebalance old facts to arrive at the new policy. Rather, it made factual findings directly contrary to the 2001 ROD and expressly relied on those findings to justify the policy change.[15]

Like *Kake*, the Secretary did not merely rebalance old facts. The Secretary made new findings regarding harm to Refuge resources, the value of lands to be received, alternative transportation options, and ANILCA's purposes that are contrary to the findings of prior Administrations. The Secretary relies on these direct and unexplained contradictions to support his decision.[16] This is not a situation where the Secretary made a decision of "less than ideal clarity."[17] The contrary findings that Friends identify are the foundation for the Secretary's decision. Accordingly, the Secretary "was required to provide a 'reasoned explanation . . . for disregarding' the 'facts and circumstances' that underlay [] previous decision[s]."[18] He did not, in violation of the law.

---

[14] DOI Br. at 26–27.
[15] 795 F.3d at 968.
[16] AR INT-000058, 1237–39; Friends Br. at 14 n.35.
[17] DOI Br. at 29.
[18] *Kake*, 795 F.3d at 968 (citing *F.C.C. v. Fox Television Stations, Inc.*, (*Fox*) 556 U.S. 502, 516 (2009)).

## A. The Secretary's Conclusory Statements Fail to Explain Conflicting Findings and Ignore Prior Findings Regarding Harm to Izembek.

The Secretary's finding regarding harm to Izembek is directly contrary to prior findings. Secretary Jewell's decision to reject a land exchange (the 2013 ROD) found that Izembek's internationally significant resources "would be irretrievably damaged by construction and operation of the proposed road," and that this degradation "would not be offset by the protection of other lands to be received under an exchange."[19] In contrast, the memorandum from Secretary Bernhardt (Secretary's Memo) states that there would be "substantial benefits" to the public from increasing the amount of acreage in the Refuge.[20] This conclusory statement does not address the prior findings that harm to Izembek's unique resources would not be offset by additional acreage.[21]

Further, the 2013 ROD found that restrictions on road use would not sufficiently protect Izembek,[22] while the Secretary's Memo found that they would.[23] There are two

---

[19] AR INT-001237–38; *see also* AR 180521 ("[The exchange] would not compensate for the adverse effects of removing a corridor of land and constructing a road within the narrow Izembek isthmus."); AR 182943 ("[T]he lands lost and lands gained have little in common with regard to cover types, wildlife potential, or ecological process/function.").

[20] AR INT-002831.

[21] *See Friends*, 381 F. Supp. 3d at 1142 (explaining that conclusory statements are insufficient to support agency reversals) (citing *Indigenous Envtl. Network v. United States Dep't of State*, 347 F.Supp.3d 561, 584 (D. Mont. 2018)); *see also Fox*, 556 U.S. at 515–16 (explaining that when an agency's policy change depends on contradictory findings it must provide a "reasoned explanation" and a "more detailed justification").

[22] AR INT-001244.

[23] AR INT-002832.

problems here. First, there are no longer use restrictions on the road, so the record cannot support this contrary finding.[24] Second, the Secretary does not explain how the nonexistent limits would protect resources and uses, he simply states that they would. This conclusory statement is legally insufficient.[25]

In failing to explain his contrary findings, the Secretary also ignored critical issues. Specifically, the Secretary failed to evaluate the environmental impacts of this exchange, which trades away more acreage within the Refuge and Wilderness than previously considered and includes material sites within the Refuge.[26] The Secretary's failure to explain his decision to enter a larger and more environmentally damaging exchange than previously considered and rejected is arbitrary.[27]

Finally, the State incorrectly argues that the 2013 ROD did not consider impacts to Northern Sea Otters from marine transport.[28] The 2013 final environmental impact

---

[24] *See infra* 10–11.

[25] *See supra* note 21.

[26] Friends Br. at 24–25, 31. The State argues that material sites were considered previously. State Br. at 16. However, the Exchange Agreement provides for material sites within Izembek and its Wilderness. Friends Br. at 25, n.87. Previously, material sites were only considered outside Izembek and were not part of the exchange. AR 179343.

[27] *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.* (*State Farm*), 463 U.S. 29, 43 (1983) (When reviewing an agency's decision, the court must ensure that the agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." (internal quotation omitted)).

[28] SOA Br. at 17.

---

Case 3:19-cv-00216-JWS   Document 43   Filed 03/23/20   Page 10 of 32

statement (2013 FEIS) considered these impacts.[29] Regardless, the Secretary did not

explain how impacts to sea otters factored into his decision.[30] In sum, the record does not

demonstrate that the Secretary "balanced" the environmental impacts of road construction

with other considerations — rather, he ignored them.[31]

### B. The Secretary's Unsupported, Conclusory Statements Are Insufficient to Explain Conflicting Findings Regarding the Value of Lands to be Received.

The Secretary did not explain his contrary finding regarding the value of lands to

be received. The Secretary found that lands coming into federal ownership would protect

"scenic, natural, cultural, and environmental values,"[32] while prior decisions found that

the lands to be received would not offset the loss to Izembek.[33] The Secretary asserts that

the 2013 ROD's findings regarding the values of lands to be received were "flawed"

because they improperly weighed the lands' habitat values or conservation status.[34] He

cites nothing in the record to explain how the 2013 findings are flawed, or to support his

---

[29] AR 179500.

[30] The State also argues that because road alignment is "nearly identical" to that considered in 2013, the Secretary considered mitigating measures in siting the corridor. SOA Br. at 13–14. Neither the Secretary's Memo nor the record support this contention, and the State ignores the 2013 ROD's finding any road alignment too damaging to warrant an exchange. AR INT-001255.

[31] Friends Br. at 24–25.

[32] AR INT-002831.

[33] *Supra* note 19.

[34] DOI Br. at 26; *see also* SOA Br. at 11–12 (raising similar arguments).

---

*Friends of Alaska National Wildlife Refuges, et al., v. Bernhardt, et al.*
Case No. 3:19-cv-00216-JWS                                        Page 6

statement that improper weight was given to the value of the lands to be received.[35] Nor does the Secretary identify any new findings or information regarding the value of those lands, or explain his finding in light of the fact that prior proposals had more lands coming into federal ownership than this one.[36] Unsupported, conclusory statements are legally insufficient.[37]

### C. The Secretary's Contradictory Findings Regarding Transportation Alternatives Are Unsupported by the Record.

The Secretary found that non-road options are not viable, directly contrary to prior findings. The Secretary provides no evidence to support his assertion that transportation alternatives are "neither viable nor available."[38] As an initial matter, the Secretary argues that prior administrations failed to consider the high and ongoing costs of Coast Guard evacuations; however, the use of medevacs in the region is not "new" information,[39] nor does the Secretary explain how the number of medevacs factored into his decision. These justifications are contrary to the record and cannot justify the Secretary's reversal.[40]

---

[35] *See Agdaagux Tribe of King Cove v. Jewell*, 128 F. Supp. 3d 1176, 1200–01 (holding that the 2013 decision to not exchange lands was based on substantial evidence in the record).

[36] *See* Friends Br. at 13–14, 25–26.

[37] *See supra* note 21; *see also Or. Nat. Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1121 (9th Cir. 2010) ("We cannot defer to a void.").

[38] DOI Br. at 11.

[39] DOI Br. at 12; *contra* AR INT-001247.

[40] *See also supra* note 27.

---

The Secretary and King Cove point to the U.S. Army Corps of Engineers' 2015 study as providing "new information."[41] This study does not conclude that road alternatives are not viable or available.[42] Nor does the study relieve the Secretary of his obligation to explain his findings in light of conflicting facts, which he does not do. The Secretary's Memo provided no evidence that non-road alternatives are cost prohibitive, and did not discuss how financial feasibility or technical viability was measured.[43] While a road is King Cove's preferred option — a fact well-known to prior administrations[44] — the Secretary is not charged with implementing King Cove's preference. The Secretary is charged with complying with the law.

Finally, and as explained below, the Secretary cannot show that the new policy is permissible under ANILCA.[45] Decades of prior agency decisions found that an exchange to allow a road would not meet ANILCA's purposes.[46] The Secretary does not confront

---

[41] DOI Br. at 27; KCC Br. at 26.

[42] The Secretary asserts that the study concluded that a marine route's risks were medium-serious and costly. DOI Br. at 28. This is incorrect. The study notes that funding and permitting would be necessary — as they would be for any alternative, including a road — not that costs are excessive. AR INT-001303. As Friends pointed out, the estimated marine ferry and road costs are comparable. Friends Br. at 18–19.

[43] Friends Br. at 26–27.

[44] *Id*. at 12–13.

[45] *Fox*, 556 U.S. at 515.

[46] *See* Friends Br. at 12–14, 22.

these specific findings, offering conclusory statements instead of a reasoned explanation supported by the record.[47]

Before entering into the Exchange Agreement, the Secretary was required to confront contrary prior factual findings and conclusions and provide a "detailed justification" supported by the record for why the agency changed position.[48] The Secretary failed to do so, in violation of the APA.

## II.   THE LAND EXCHANGE DOES NOT FURTHER ANILCA'S PURPOSES.

The Secretary argues that the land exchange achieves ANILCA's purposes because it benefits King Cove's economic and social needs.[49] As Friends explained, the Secretary's findings are not supported by, and are inconsistent with, the record.[50]

---

[47] DOI Br. at 25; *see also supra* note 21.

[48] Friends Br. at 21; *supra* note 21.

[49] DOI Br. at 30–35; *see also* KCC Br. at 38–43 (same); SOA Br. at 18–19 (same). While the Secretary asserts that economic and social needs are purposes of ANILCA, DOI Br. at 30–31; *see also* KCC Br. at 39, the language the Secretary relies on is Congress' statement that it achieved the proper balance of conservation and economic and social needs in passing ANILCA. 16 U.S.C. § 3101(d). ANILCA's purposes focus on conservation and subsistence. *Id.* at § 3101(a)–(c); s*ee also Alaska v. Fed. Subsistence Bd.*, 544 F.3d 1089, 1091, 1098 (9th Cir. 2008) (stating that "Congress enacted ANILCA to further two ends:" preservation and subsistence and that ANILCA's purposes are "protecting and preserving the subsistence lifestyle and protecting and preserving wildlife" (citing 16 U.S.C. § 3101(b)–(c))). The Secretary does not justify why further weight should be given to economic and social needs beyond what Congress provided.

[50] Friends Br. at 29–33. The State misunderstands Friends; Friends did not assert that the exchange provision can only be used to avoid condemnation. SOA Br. at 21. Friends explained that Congress' intent in adopting the provision was to provide a land acquisition option preferable to condemnation while requiring ongoing protection of designated lands. Friends Br. at 28. King Cove cites to ANCSA's exchange provision to

---

The Secretary primarily relies on statements in the Land Protection Plan (Plan) to conclude that the exchange furthers ANILCA's purposes because it adds acreage to the refuges and provides additional protections for acquired lands.[51] But the Plan addresses the question of whether lands should be acquired generally, not whether those lands should be acquired in exchange for lands to build a road.[52] Importantly, the Plan states that a road through the isthmus is the biggest threat to Izembek and explains the importance of maintaining Izembek's ecological integrity.[53] The Secretary does not confront these facts. The record also does not support the Secretary's assertion that increased acreage furthers ANILCA's purposes.[54] The Secretary' assertions are unsupported by the record.[55]

As Friends explained and the Secretary concedes, the Exchange Agreement contains no use restrictions for a road.[56] The Secretary does not explain his finding that

---

assert broad authority to enter the exchange. KCC Br. at 41–42. The exchange was not executed under that provision. AR INT-002865.

[51] DOI Br. at 32–33.

[52] AR INT-00003, 10–11.

[53] AR INT-000058, 63.

[54] DOI Br. at 32–33; Friends Br. at 30–31; *see also supra* note 19 (explaining prior findings regarding the values of these lands not compensating for the values of the lands to be lost).

[55] Relatedly, the Secretary overstates Friends' argument concerning the KCC Exchange Lands. DOI Br. at 32. Friends did not assert that there are no conservation values in these lands, but that the record does not support an exchange of those lands for Izembek's isthmus. Friends Br. at 30–31.

[56] Friends Br. at 31; DOI Br. at 19 n.5; KCC Br. at 43 n.13.

---

Case 3:19-cv-00216-JWS   Document 43   Filed 03/23/20   Page 15 of 32

use restrictions would provide the protections necessary to satisfy ANILCA's purposes given that there are no restrictions in the agreement.[57] Without restrictions in place for lands currently designated as the Refuge and Wilderness, the Secretary's conclusion should be rejected.[58] Additionally, while the lands to be acquired are already subject to Alaska Native Claims Settlement Act (ANCSA) 22(g) protections, the Secretary summarily states that additional, unidentified protections will be put into place when those lands are acquired.[59] Without identifying use restrictions and future protections, the Secretary's conclusion that the purposes of ANILCA will be met cannot be supported by this record.[60]

The Secretary indicates that the exchange will benefit subsistence uses and users.[61] The Secretary did not rely on subsistence benefits in his decision; this *post hoc* rationale should be rejected.[62] Regardless, the Secretary fails to acknowledge that subsistence uses and users are protected in Izembek.[63] Additionally, the 2013 FEIS indicates that

---

[57] AR INT-002832.

[58] *See supra* note 37 (noting that courts "cannot defer to a void.").

[59] DOI Br. at 32.

[60] Friends Br. at 30 & nn.115, 116; *see also* AR INT-001244 (prior finding that continued current ownership of lands would be less impactful on Izembek than construction of a road).

[61] DOI Br. at 33; SOA Br. at 5, 32.

[62] AR INT-002829–33, 2865–66; *State Farm*, 463 U.S. at 43, 50 (explaining that "courts may not accept [] counsel's post hoc rationalizations for agency action").

[63] 16 U.S.C. §§ 3101(c), 3111–12; *see also Nat'l Audubon Soc'y v. Hodel*, 606 F. Supp. 825, 839 (D. Alaska 1984) (noting that subsistence users are protected by ANILCA and finding that easement will not provide additional subsistence protections).

Case 3:19-cv-00216-JWS   Document 43   Filed 03/23/20   Page 16 of 32

subsistence effects from an exchange would be neutral,[64] and the Secretary points to no evidence that rebuts this determination.

Finally, the State misconstrues Friends' argument to mean that there could never be an exchange and that the Secretary must prioritize wildlife above all other values.[65] Friends simply asserts that the Secretary must follow the law: when executing an exchange, the Secretary must ensure that it furthers ANILCA's and Izembek's purposes.[66] That is Congress' directive.[67] It was not achieved here.

## III. TITLE XI CONTROLS THE EXCHANGE AGREEMENT BECAUSE IT ENABLES A ROAD THROUGH IZEMBEK.

To authorize a road within Izembek, the Secretary was required to follow the procedures in ANILCA Title XI. It is undisputed that the Exchange Agreement is to allow a road through Izembek, making this the type of transaction Congress intended Title XI to govern. ANILCA Section 1302(h) does not exempt the Exchange Agreement from those requirements.

---

[64] AR INT-001254–55, AR 181365–66, 182866.

[65] SOA Br. at 22. The Secretary raises a similar argument — that Friends argued the agency can never reverse its position. *See* DOI Br. at 25. This is incorrect. Friends Br. at 20–21 (explaining the standard for agency reversal and that it was not met).

[66] The State presents conflicting arguments concerning whether the exchange must meet both ANILCA's general purposes and Izembek's specific purposes, and misreads Friend's brief as asserting that only refuge-specific purposes must be satisfied. SOA Br. at 20, 24–25. As Friends explained, Section 1302(h) requires consistency with ANILCA's broad purposes and the refuge-specific purposes. Friends Br. at 28–29.

[67] Friends Br. at 28 & n.107.

---

Case 3:19-cv-00216-JWS   Document 43   Filed 03/23/20   Page 17 of 32

The Secretary and King Cove argue that because the exchange precedes road construction, Title XI is not applicable because the lands are no longer federal lands.[68] This chicanery is inconsistent with Congress' express intent that Title XI is the "single comprehensive statutory authority" for authorizing transportation systems.[69] The Secretary's interpretation would nullify the protections Congress established when adopting Title XI by enabling land exchanges to circumvent its procedures.[70] Regardless, the Secretary's interpretation of Title XI is not due deference because the statute is not ambiguous.[71]

The Secretary and King Cove further argue that the Exchange Agreement is not an "authorization" such that they did not have to comply with Title XI.[72] It is undisputed that the purpose of the Exchange Agreement is for a road and it is the first step in allowing a road. Indeed, the Secretary justifies the Exchange Agreement due to the "acute necessity . . . for a road connecting King Cove and Cold Bay,"[73] and King Cove specifically requested the exchange for a "transportation system."[74] It is, therefore, an "authorization [] without which a transportation or utility system cannot, in whole or in part, be

---

[68] DOI Br. at 37; KCC Br. at 44.
[69] 16 U.S.C. § 3161(c).
[70] *See* Friends Br. 33–35 (describing legislative intent to minimize adverse impacts from siting of transportation systems by mandating compliance with Title XI).
[71] Friends Br. at 18.
[72] DOI Br. at 36; KCC Br. at 44.
[73] DOI Br. at 11.
[74] AR INT-002209.

---

established or operated."[75] It is irrelevant that additional permits are required; there is no caveat in Title XI that only a single authorization be required nor an exemption for initial decisions.[76]

Further, Title XI is not subordinate to Section 1302. The Secretary and King Cove do not explain why the general exchange authority in Section 1302(h) should overcome the focused, specific procedures in Title XI.[77] Where the two provisions could conflict, Title XI must control. Title XI's provisions generally do not contravene the Secretary's authority to enter land exchanges. Section 1302(h) and Title XI could conflict only where the Secretary enters into a land exchange to enable a transportation or utility system without following Title XI's procedures. In cases like this, Section 1302's general authority must yield.

Similarly, Section 1302(h)'s "notwithstanding" clause does not overcome Title XI. The Secretary does not address these "notwithstanding" provisions in context nor provide support for why Section 1302(h) should prevail over Title XI's notwithstanding clause.[78]

_____

[75] 16 U.S.C. § 3162(1); *see also* Friends Br. at 37.

[76] *See* 16 U.S.C. § 3164(b)(1) (describing the need to consolidate applications for transportation systems that require multiple permits).

[77] Friends Br. at 37 & n.149. King Cove states that Section 1302(h) is the "specific" authority governing the "general" provisions of Title XI. KCC Br. at 45. The statutory provisions themselves demonstrate otherwise.

[78] DOI Br. at 37. Had Congress intended Section 1302 to override provisions within ANILCA, it would have included such language. Elsewhere in ANILCA, Congress expressly exempted specific actions from the application of ANILCA and other

_____

Likewise, King Cove offers no support for its assertion that Congress intended Section 1302(h)'s "notwithstanding" clause to override other provisions of law generally.[79] "Notwithstanding" clauses set aside potentially conflicting laws, not all legal dictates.[80] Congress intended Section 1302(h)'s "notwithstanding" provision to exempt land exchanges from the requirement of an equal value or complex public interest exchange.[81] There is no indication that it should invalidate the application of Title XI when the Secretary undertakes an exchange to allow for a road through a refuge. Construing Section 1302(h)'s "notwithstanding" clause to circumvent Title XI[82] is contrary to Congressional intent in enacting Title XI.

Further, Title XI provides that "[n]otwithstanding any provision of applicable law," no action with respect to authorization of a transportation system "shall have any force or effect *unless* the provisions of this section are complied with."[83] Interpreting the plain language of Title XI and Section 1302 to require the Secretary to comply with Title

---

laws. *See*, *e.g.,* 16 U.S.C. § 3121(b) ("Notwithstanding any other provision of this Act or other law . . . ."); *id*. at § 3170(a) (same). No such language appears in Section 1302(h).

[79] KCC Br. at 45.

[80] *Cisneros v. Alpine Ridge Grp*., 508 U.S. 10, 18 (1993); *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1083 (9th Cir. 2014).

[81] Friends Br. at 36 & n.147.

[82] DOI Br. at 37.

[83] 16 U.S.C. § 3164(a) (emphasis added).

---

Case 3:19-cv-00216-JWS   Document 43   Filed 03/23/20   Page 20 of 32

XI here gives meaning to both provisions[84] and is consistent with Congress' intent that Title XI provides the "single comprehensive authority" for transportation system units.

Finally, the State asserts that the Exchange Agreement is permissible under Section 1110 of ANILCA because the City of King Cove is an inholding.[85] This theory was not a basis for the exchange and must be rejected.[86] Moreover, if King Cove believes that the City is an inholding, it can avail itself of those procedures.[87] It has not done so.

In sum, the Secretary may not use Section 1302(h) to circumvent Title XI's requirements. The Secretary was required to follow Title XI's procedures. He did not. The Secretary violated ANILCA and the Exchange Agreement is, therefore, void.[88]

## IV. THE SECRETARY VIOLATED NEPA BECAUSE HE WRONGLY CONCLUDED THAT SECTION 910 OF ANILCA PROVIDED AN EXEMPTION.

The Secretary does not contest that the Exchange Agreement is a major federal action that would trigger NEPA.[89] Instead, the Secretary asserts that the plain language of

---

[84] *League of Conservation Voters v. Trump*, 363 F. Supp. 3d 1013, 1018 (D. Alaska 2019) ("[A] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." (citations omitted)).

[85] State Br. at 27.

[86] *See supra* note 62 (explaining that the Court should reject *post hoc* rationales).

[87] *See* 43 C.F.R. § 36.10 (regulatory procedures for inholdings under Section 1110(b)).

[88] 16 U.S.C. § 3164(a) (Title XI voids any actions taken without compliance); *see also Friends*, 381 F. Supp. 3d at 1143 ("The APA states that a reviewing court shall 'hold unlawful and set aside agency action . . . not in accordance with law.'" (citations omitted)).

[89] Friends' Br. at 38 & n.155. The State appears to assert that the land exchange is not a major federal action that would require an EIS. SOA Br. at 28. If an agency is

Section 910 exempts the Exchange Agreement from NEPA, claiming deference for his interpretation of that provision.[90] The Secretary is not due deference for his interpretation because Section 910 is not ambiguous.[91]

Section 910 only exempts land transactions from NEPA that are undertaken to fulfill original land entitlements granted by ANCSA.[92] Friends does not argue that Section 910 solely applies to land transactions undertaken pursuant to ANCSA.[93] This exchange does not fulfill King Cove Corporation's ANCSA entitlements.[94] It is, therefore, not exempt from NEPA by Section 910.

---

uncertain if an EIS is required, NEPA requires an agency to complete an environmental assessment first. 40 C.F.R. §§ 1501.4, 1508.9.

[90] DOI Br. at 38.

[91] Friends Br. at 18, 38–42; *see also Chandris, Inc. v. Latsis*, 515 U.S. 347, 369 (1995) (noting that interpretation of a statute is a question of law for the court). King Cove and the State assert that the statute must be interpreted in favor of Alaska Natives. KCC Br. at 30 n. 10, 31; SOA Br. at 32. It does not harm Alaska Natives to require compliance with NEPA to execute an exchange outside of ANCSA entitlements. To the contrary, it ensures transparency as well as broad tribal participation in decision making.

[92] Friends Br. at 39–42.

[93] DOI Br. at 38; *see also* SOA Br. at 30–31. The State asserts that the agreement is also executed pursuant to ANCSA. SOA Br. at 30. This is incorrect. AR INT-002815, 2867.

[94] AR INT-002867. King Cove and the State assert that the land exchange will fulfill ANCSA entitlements. KCC Br. at 37–38; SOA Br. at 30. This is contrary to the Exchange Agreement and the record. AR INT-002867, 2874; AR 86428; AR INT-000018 (explaining that lands in the isthmus generally cannot be selected under ANCSA).

---

*Friends of Alaska National Wildlife Refuges, et al., v. Bernhardt, et al.*
Case No. 3:19-cv-00216-JWS                                                    Page 17

This interpretation is supported by the statutes' text, context (including statutory structure), and legislative history.[95] The Secretary focuses narrowly on the common meaning of the term "conveyance" to assert that the land exchange is exempted by Section 910.[96] While "conveyance" is not defined in ANCSA or ANILCA, and is generally defined as "[t]he voluntary transfer of a right or of property",[97] its meaning must be informed by the context of its usage in the statute.[98] ANILCA uses the term "conveyance" in relation to those actions that would fulfill land entitlements provided by ANCSA and ANILCA's provisions to implement ANCSA.[99] Taking the text and context together, Congress intended "conveyance" in Section 910 to mean transfers of property to

---

[95] Friends Br. at 18; *see also Christensen v. Comm'r of Internal Revenue*, 523 F.3d 957, 960–62 (9th Cir. 2008) (using text, context, and legislative history to reveal Congressional intent).

[96] DOI Br. at 39; SOA Br. at 31 (advancing a similar argument).

[97] Conveyance, Black's Law Dictionary (10th ed. 2014).

[98] *See Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006) (Explaining that words should not be defined in isolation and that interpretation of a word "depends upon reading the whole statutory text, [and] considering the purpose and context of the statute . . . ."); *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989) (stating that it is a "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme").

[99] Friends Br. at 39–40.

fulfill land entitlements provided by ANSCA and ANILCA.[100] This provision's legislative history reinforces this conclusion.[101]

This interpretation would give full effect to Congress' intent in passing Section 910: to speed the transfer of lands necessary to complete ANSCA entitlements,[102] and would not render the term "'this Act' superfluous."[103] The Secretary's argument that the Exchange Agreement is an "other action" similarly fails: whether it is a conveyance or an "other action," Section 910 applies only to transactions to fulfill ANCSA entitlements, which the Exchange Agreement does not.[104]

King Cove also argues that the "notwithstanding any other provision of law" language of Section 1302(h) wholly exempts land exchanges from NEPA.[105] This is a

---

[100] Both King Cove and the State cite to 43 U.S.C. § 1613a to argue that exchanges are conveyances. KCC Br. at 36–37; SOA Br. at 31 (both incorrectly cite 16 U.S.C. § 1613a and the State additionally cites 16 U.S.C. § 1613d, which does not appear in the U.S. Code). This 2006 amendment to ANCSA addresses circumstances where a Native Corporation reconveys its lands to another Native Corporation. 43 U.S.C. § 1613a. It is factually inapplicable. Regardless, it does not alter the conclusion that Section 910 was intended to cover only those transactions to fulfill ANCSA entitlements.

[101] Friends Br. at 41. King Cove points to the seemingly broad Committee Report language, KCC Br. at 33–34, 37, but when read in context, that Report reinforces that the NEPA exemption was intended to expedite ANCSA entitlements. Friends Br. at 41 & n.166, 167.

[102] *See Food and Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132–33 (2000) (stating that the Court must give effect to Congress' intent).

[103] DOI Br. at 39.

[104] DOI Br. at 39; SOA Br. at 31.

[105] KCC Br. at 32–35.

---

Case 3:19-cv-00216-JWS   Document 43   Filed 03/23/20   Page 24 of 32

*post hoc* argument and contrary to the record.[106] The Exchange Agreement and

Secretary's Memo rely solely on Section 910.[107] Further, Section 1302(h)'s

"notwithstanding" provision would not exempt exchanges from NEPA, because NEPA is

not in conflict with the exchange provision.[108]

The State also confuses the application of NEPA with the proper remedy of

vacatur, arguing that a supplemental environmental impact statement would be useless.[109]

As explained below, vacatur is the proper remedy. Additionally, the State's argument

negates NEPA's purpose of informed decision-making prior to agency action.[110]

Section 910 of ANILCA does not apply to the Exchange Agreement because the

Exchange Agreement does not satisfy King Cove Corporation's ANCSA entitlements.

The Exchange Agreement is not, therefore, exempt from NEPA. The Secretary violated

NEPA by failing to follow its procedural mandates before executing the Exchange

Agreement.[111]

---

[106] *See infra* note 62.

[107] AR INT-002815, 2867.

[108] S*ee supra* 14–15. King Cove's reliance on *Alaska v. United States Forest Service*, 2019 WL 245174, *2 (June 11, 2019) is misplaced. KCC Br. at 32. The statute at issue in that case immediately enacted easements into law, creating potential conflict between the statutes by requiring a NEPA process for Congressionally approved easements. Similarly, the statute in *Consejo de Desarrollo Economico de Mexacali v. United States*, 482 F.3d 1157, 1169 (9th Cir. 2007) directed immediate implementation. KCC Br. at 33–34. Section 1302(h), in contrast, would be used in the future to exchange lands.

[109] SOA Br. at 29.

[110] 40 C.F.R. § 1502.5; *see also* Friends Br. at 41–42 & n.169.

[111] *See also Friends*, 381 F. Supp. 3d at 1143; *supra* note 88.

---

**V.     INTERIOR WAS REQUIRED TO CONSULT ON THE EFFECTS OF THE EXCHANGE AGREEMENT AND CANNOT RELY ON THE SERVICE'S PRIOR NO EFFECT FINDING.**

It is undisputed that the Secretary did not complete ESA consultation before executing the Exchange Agreement. The Secretary argues that there is a procedural and substantive bar to Friend's challenge of this failure. Both are incorrect.

First, the Exchange Agreement is ripe for review because it is a final and binding decision that establishes legal rights. There is no need for further administrative action or factual development to decide the issues raised. When a party suffers a procedural injury such as the failure to consult, it "may complain of that failure at the time the failure takes place, for the claim can never get riper."[112] Friends need not wait until King Cove implements road construction to challenge this failure: "[t]he imminence of project-specific implementation is irrelevant to the ripeness of an action raising a procedural injury."[113] The Secretary's failure to consult on the direct, indirect and cumulative effects of the Exchange Agreement on protected species is a final agency action ripe for judicial review.

On the substance of Friends' claim, the Secretary incorrectly asserts that the Service properly reviewed and relied on its earlier analysis in the 2013 FEIS to satisfy its

---

[112] *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 737 (1998).
[113] *Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1084 (9th Cir. 2015) (internal citations omitted).

ESA obligations.[114] The Secretary implies that no documentation is needed for a "no effect" determination; however, the cases and regulation he relies upon do not support that contention.[115] Rather, "no effect" determinations must be supported by the record.[116] There is nothing in the record documenting ESA review by the Service or demonstrating that the Service actually made a "no effect" determination here.[117] The Secretary's argument lacks legal basis and is not supported by the record.

The Secretary also alleges that the Exchange Agreement will have "no effect" on listed species or critical habitat because it is a "purely legal transaction."[118] To support this argument, he mischaracterizes the 2013 FEIS as documenting the Service's finding of "no effect" for a land exchange.[119] The Secretary further mischaracterizes the Service's findings in stating that consultation is required "only when and if measures are actually ever taken to implement road construction."[120] This is contrary to the record and legally

---

[114] DOI Br. at 41–42.

[115] 50 C.F.R. § 402.14(a) (describing consultation generally, but not addressing "no effect" determinations); *Sierra Forest Legacy v. U.S. Forest Serv.*, 598 F. Supp. 2d 1058, 1069 (N.D. Cal. 2009) (upholding "no effect" determination after preparation of a biological assessment); *Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1447–48 (9th Cir. 1996) (same); *Pac. Rivers Council*, 30 F.3d at 1054 n.8 (describing consultation process generally; a "no effect" determination was not at issue in the case).

[116] Friends Br. at 45 n. 188.

[117] *See supra* note 37 (noting that Courts "cannot defer to a void").

[118] DOI Br. at 42.

[119] *Id.*

[120] *Id.*

Case 3:19-cv-00216-JWS   Document 43   Filed 03/23/20   Page 27 of 32

incorrect. In 2013, the Service determined that a land exchange to authorize a road would affect listed species and critical habitat, and that consultation would be required if the Secretary approved such a land exchange.[121]  Regardless, "purely legal" or administrative transactions are not exempt from ESA requirements.[122] Road construction is not necessary — the Exchange Agreement itself triggers ESA requirements.

Finally, the Secretary was required to consult on impacts to listed species from road construction, operation, and maintenance. The Secretary argues that Interior is not required to consult on impacts from road construction.[123] Under the ESA, the "effect" of a proposed action includes direct, indirect, and cumulative effects.[124] To show that something is an indirect effect, it must be caused by the action, come later in time, and be "reasonably likely to occur."[125] "[A]n indirect effect . . .  is one that the action makes possible (or indeed, more probable), but does not directly cause."[126] The fact that subsequent funding, planning, and permitting would occur for a road does not shield the

_____

[121] Friends Br. at 45 & n.187; AR 181304–81308.

[122] *See, e.g.*, *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 498 (9th Cir. 2011) (rejecting BLM's argument that amending its grazing regulations was "purely administrative" and would have no effect on species).

[123] DOI Br. at 44–45.

[124] 50 C.F.R. § 402.02.

[125] *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 1009 (9th Cir. 2014).

[126] *Id.*; *see also* 50 C.F.R. § 402.02.

_____

Secretary from having to consider its impacts now.[127] The Secretary does not distinguish precedent on this point. He instead provides an unsupported assertion that because the Service determined there would be "no effect," the agency need not consider cumulative effects.[128] This circular argument is contrary to the plain language of the ESA regulations and controlling Ninth Circuit precedent.[129]

## VI. THE COURT SHOULD VACATE THE EXCHANGE AGREEMENT AND ENJOIN FURTHER ACTION.

The Secretary argues that vacatur under the Administrative Procedure Act (APA) is not automatic when the Court finds a legal error, asserting that courts must weigh the legal error, equities, and public interest.[130] This misstates the law. Vacatur is the presumptive remedy under the APA.[131] While courts have recognized a very narrow

---

[127] *See, e.g., Nat'l Wildlife Fed'n v. Coleman*, 529 F.2d 359, 373 (5th Cir. 1976) (requiring consultation on residential and commercial development expected to result from highway construction as an indirect effect); *see also San Luis & Delta-Mendota Water Auth.*, 776 F.3d at 1009; *Conner v. Burford,* 848 F.2d 1441, 1453–54 (9th Cir. 1988) (requiring consideration not only oil and gas leases, but  impacts from future exploration and development).

[128] DOI Br. at 45.

[129] Friends Br. at 45–46; *see also Friends of Se.'s Future v. Morrison*, 153 F.3d 1059, 1069 (9th Cir. 1998) ("[A]n agency's interpretation does not control, where, as here, it is plainly inconsistent with the regulation at issue.").

[130] DOI Br. at 46. The Secretary and KCC request additional briefing on remedy if the Court grants summary judgement for Friends. DOI Br. at 46–47; KCC Br. at 46. Neither party sought separate remedy briefing when the parties modified the summary judgment schedule, which does not provide for a separate remedy briefing. Local Rule 16.3; Joint Stipulation of Extension of Time to File Mot. for Summ. J. Briefing (ECF No. 30). This request should be rejected.

[131] Friends Br. at 47 & n.194.

---

exception in circumstances where there could be serious environmental harm from vacating, the burden is on the party seeking remand without vacatur to show that deviation from the standard is warranted.[132] Neither the Secretary nor King Cove offered any arguments to meet their burden of demonstrating that this case is one of the "rare circumstances" where departure from the presumptive remedy of vacatur is warranted.[133] Friends' raise fundamental flaws that go to the heart of the legality of the Exchange Agreement. As the District Court previously recognized, these are serious errors and there is no indication that there will be disruptive consequences from vacatur.[134] The Court should vacate and void the Exchange Agreement and all authorizations issued pursuant to it, including survey work.

Friends also explained that an injunction preventing any further on-the-ground activities taken pursuant to the Exchange Agreement is necessary under the ESA until

---

[132] Friends Br. at 47 & n.196; *see also Pollinator Stewardship Council v. U.S. Envtl. Prot. Agency*, 806 F.3d 520, 532 (9th Cir. 2015) (vacating a rule that could harm bee populations because leaving it in place "risks more potential environmental harm than vacating it"); *Ctr. for Food Safety v. Vilsack*, 734 F. Supp. 2d 948, 951 (N.D. Cal. 2010) ("[T]he Ninth Circuit has only found remand without vacatur warranted by equity concerns in limited circumstances, namely [when] serious irreparable environmental injury [will occur if the decision is vacated].").

[133] Though this case is not about a regulation or a permit, King Cove fails to cite any authority to indicate that the presumptive remedy of vacatur is inapplicable. KCC Br. at 45–46. King Cove also asserts that ambiguities should be resolved in favor of Alaska Native organizations. KCC Br. at 45–46. As the District Court recognized, the legal faults with the Exchange Agreement are not based on ambiguous terms in the agreement. *Friends*, 381 F. Supp. 3d at 1143.

[134] *Friends*, 381 F. Supp. 3d at 1143.

---

consultation is completed.[135] Neither the Secretary nor King Cove has offered any argument to refute this statutory remedy. An injunction should be entered.

<u>CONCLUSION</u>

The Court should grant Friends' Motion for Summary Judgment, vacate and void the Exchange Agreement, including all authorizations issued pursuant to it, and enjoin any activities until ESA consultation requirements are fulfilled.

Respectfully submitted this 23rd day of March, 2020.

 s/ Bridget Psarianos
Bridget Psarianos (AK Bar No. 1705025)
Brook Brisson (AK Bar No. 0905013)
Valerie Brown (AK Bar No. 9712099)
TRUSTEES FOR ALASKA

*Attorneys for Plaintiffs*

---

[135] Friends Br. at 48.

---

*Friends of Alaska National Wildlife Refuges, et al., v. Bernhardt, et al.*
Case No. 3:19-cv-00216-JWS                                            Page 26

**CERTIFICATE OF SERVICE**

I certify that on March 23, 2020, I caused a copy of the PLAINTIFFS'
[PROPOSED] REPLY BRIEF FOR SUMMARY JUDGMENT to be electronically filed
with the Clerk of the Court for the U.S. District Court of Alaska using the CM/ECF
system.

<u>s/Bridget Psarianos</u>
Bridget Psarianos