# Tab 42



Mr. Dean Gould
President, King Cove Corporation
P.O. Box 38
King Cove, Alaska 99612

Dear Mr. Gould:

Thank you for your letter of May 21, 2019, and the accompanying submissions related to your request for a land exchange. I have fully reviewed your current request and supporting material, as well as past consideration of this matter by both Secretary Jewell and Secretary Zinke. After careful evaluation, I find that executing the equal value exchange you propose is consistent with the public interest, the purposes of Alaska Native Claims Settlement Act and the Alaska National Interest Lands Conservation Act, and the Department of the Interior's responsibility to both King Cove Corporation and the people of King Cove.

I have enclosed with this letter my "Findings and Conclusions" in this matter and an executed copy of the land exchange agreement.

Sincerely,

Secretary of the Interior

**FINDINGS AND CONCLUSIONS CONCERNING A PROPOSED LAND EXCHANGE BETWEEN THE SECRETARY OF THE INTERIOR AND KING COVE CORPORATION FOR LANDS WITHIN IZEMBEK NATIONAL WILDLIFE REFUGE, ALASKA**

## I.    INTRODUCTION

On March 29, 2019, the Alaska District Court in *Friends of Alaska National Wildlife Refuge v. David Bernhardt & King Cove Corp*[1] set aside and vacated a land exchange agreement between the King Cove Corporation (KCC), an Alaskan Native village corporation created to participate in the Alaska Native Claims Settlement Act (ANCSA), and the Department of the Interior (DOI or Department) pertaining to lands within Izembek National Wildlife Refuge. In a May 21, 2019 letter, attached as Addendum A, KCC requested that DOI reconsider the land exchange vacated by the District Court. Specifically, KCC provided that:

> The people of King Cove, Alaska request that DOI consider a land exchange that could allow the citizens of King Cove a long term, safe, reliable, and affordable year round transportation system between the city of King Cove and the Cold Bay airport by executing a land exchange under the Alaska Native Claims Settlement Act (ANCSA) and the Alaska National Interest Lands Act (ANILCA). King Cove Corporation would make this a mutually beneficial exchange by offering very important and valuable land it owns that is located within the physical boundaries of the Izembek Refuge and Wilderness Area.

This issue is neither new nor novel. Archaeological evidence suggests that Aleut (Unanga and Alutiiq) peoples have occupied the Alaska Peninsula for approximately 9,000 years. Excavation of a village site near the middle of King Cove suggests that Aleut people have been utilizing this site for at least 4,000 years. The establishment of the Izembek National Wildlife Refuge and the designation of Wilderness in 1980 significantly altered the lives and options for Native people in this remote village. The Alaska Native village represented by KCC has endeavored for over 40 years to acquire the land necessary to construct a road connecting it with the community of Cold Bay, or, more importantly, construct a safe and reliable path to the dependable medical services afforded through use of the Cold Bay airport.[2] Two previous Secretaries of the Interior considered whether or not to proceed with such a land exchange, with Secretary Jewell and Secretary Zinke each coming to a different conclusion. The recent District Court decision has resulted in returning this decades-old question to the Department, which, in turn, has afforded me an opportunity to conduct a comprehensive review of the history of the village of King Cove's access concerns; the previous efforts of Congress and DOI, including the 2013 Environmental Impact Statement (EIS) and corresponding Record of

---

[1] *Friends of Alaska National Wildlife Refuges et al. v. Bernhardt and King Cove Corporation*, Case No. 3:18-cv-00029-SLG, Order Re Motion for Summary Judgment dated March 29, 2019.

[2] The Cold Bay Airport was built during World War II and contains the fifth longest runway in Alaska, exceeding over 10,000 feet and is one of the main airports serving the Alaska Peninsula.

Decision (ROD); and the 2018 Land Exchange Agreement.[3] KCC's request, following years of patience and repeated efforts, warrants a thoughtful review and informed decision.

Just as Secretary Jewell noted in her review years ago, a decision addressing the KCC request and evaluating the new proposed land exchange agreement must "weigh[s] on the one hand the concern for more reliable methods of medical transport from King Cove to Cold Bay and, on the other hand, a globally significant landscape that supports an abundance and diversity of wildlife unique to the Refuge . . ."[4]. Whether to proceed under the Congressional grant of authority in the Omnibus Public Land Management Act of 2009 (OPLMA) is a discretionary policy decision,[5] as is whether to make an exchange under section 1302(h) of ANILCA.

In reviewing the legal and policy options presented by the well-studied and established circumstances at issue, I am cognizant of the Department's responsibility to the Alaska Native people, particularly in fulfilling the promises made to adequately address their economic, social, and cultural needs as provided for in ANCSA and ANILCA. As set forth in more detail below, my balancing of the relevant factors has led me to the conclusion that the Department will enter into a land exchange with KCC as authorized by ANILCA at 16 U.S.C. § 3192(h), which is exempt from the requirements of the National Environmental Policy Act as provided for in 43 U.S.C. § 1638.[6] I find that a land exchange between the United States and KCC as described above comports with the purposes of ANCSA and ANILCA because it strikes the proper balance between protection of scenic, natural, cultural, and environmental values and provides opportunities for the long-term social and physical well-being of the Alaska Native people. To be clear, the exchange of lands does not itself authorize the construction of a road. It does allow KCC to use its ANCSA land selections to have the full range of options available for meeting the health and safety needs of its community. Although I make this determination under ANILCA – not OPLMA – I further find that to the extent an authorization under ANILCA constitutes a policy change from that described by Secretary Jewell in the 2013 ROD rejecting a similar, but not identical, land exchange under OPLMA, such change is warranted, necessary, and appropriate.

---

[3] DOI's efforts also take into account past promises, particularly the 2013 ROD's assertion that DOI "will continue to work with the State and local governments to develop viable alternatives to a road to ensure continued transportation improvements for the residents of King Cove." DOI Record of Decision for Izembek National Wildlife Refuge Land Exchange/Road Corridor (ROD), Dec. 23, 2013, at 2.

[4] ROD, at 2.

[5] "Thus, Congress has required the Department to identify and consider fully the impacts of such an exchange, but has left the final decision as a policy choice on whether to proceed." ROD at 6.

[6] Although this land exchange is exempt under ANILCA section 910, I have reviewed each of the extensive environmental analysis documents related to the Izembek Refuge and past road development scenarios, including the 2013 EIS and 2015 USACE Transportation Alternatives study.

2

INT-002815

## II.   BACKGROUND

### A. Factual Background

The Native Village of King Cove and the City of Cold Bay lie 18 miles apart in southwestern Alaska. King Cove has a population of approximately 800 people year-round, but the population expands to approximately 1,300 people during the summer. While King Cove has the larger population, Cold Bay has the larger airport—an instrument-capable airport with a paved runway more than 10,000 feet long (one of the longest in the State) and a crosswind runway. Both communities are accessible only by sea or by air. The residents of the remote King Cove community have long sought reliable access to Cold Bay's all-weather airport to allow for emergency medical evacuations and other purposes. Unfortunately, King Cove and the City of Cold Bay are separated not only by miles, but also by mountainous terrain; Cold Bay, which is known for severe winds and waves, and infrequently for ice; an isthmus 3 miles wide separating the head of Cold Bay; the Izembek National Wildlife Refuge and Wilderness on the isthmus; and the Alaska Peninsula National Wildlife Refuge along the shoreline.

King Cove is an ocean-oriented community but lacks a dependable public marine connection between it and Cold Bay. Historically, a State-operated Alaska Marine Highway System ferry made two stops a month during the summer months. The only other option available to the citizens of King Cove is to charter fishing vessels for travel to Cold Bay. Although the fishing vessels in question are capable of operating in most weather conditions, they are ill-equipped for the safe transport of medical evacuees. The route from King Cove to Cold Bay is approximately 27 nautical miles, with roughly half that distance occurring in open seas. Marine transportation of medical evacuation (medevac) passengers is further complicated by the fact that individuals must travel up a twenty-foot ladder to disembark at the Cold Bay Dock. Kevin Washburn, former Assistant Secretary for Indian Affairs, described the experience of marine transportation between King Cove and Cold Bay:

> We personally experienced travel by sea. . . the 53-foot boat that had been
> chartered for us was determined not to be large enough for comfortable travel in
> such conditions (wind and high seas) so, after a couple of hours of waiting
> around, our hosts obtained a larger, 73-foot vessel to ferry us to the airport at Cold
> Bay. Though windy, rainy, and cold, the trip was uneventful until we reached
> Cold Bay roughly two-and-a-half hours later. When we reached Cold Bay, it was
> necessary to step from the boat to a wet metal ladder made of rebar like material
> and to climb 10 to 15 feet to the deck of the dock. And, of course, we were
> traveling under the relatively tame conditions of late June.[7]

_____

[7] Memorandum, Report requested from Secretary Salazar on March 21, 2013, on medical evacuation benefits of proposed road from King Cove to Cold Bay, Alaska. Kevin K. Washburn, Assistant Secretary Indian Affairs, October 28, 2013.

INT-002816

Air transportation shares a perilous history in King Cove, whose airport has a 3,500-foot-long runway in a mountainous area. The existing terrain limits the available approaches and the local meteorology (high winds coupled with low visibility) often serves to cause unsafe flying conditions. In 1994, the Alaska Department of Transportation and Public Facilities published the *Alaska Intermodal Transportation Plan*, which noted: "(1) A significant portion of the scheduled flights in and out of King Cove were canceled due to unsafe flying conditions; (2) in addition to documented air crashes in King Cove, numerous incidents and near-misses occurred during operations around the airport, associated principally with weather; and (3) canceled flights due to unsafe flying conditions caused medical complications and fatalities for patients awaiting evacuation from King Cove."

Although the history of King Cove's efforts to pursue a more reliable transportation corridor spans many decades, it is important to note that in 1976, King Cove passed its first formal resolution in support of a road connection to the Cold Bay Airport. In the years that followed, the residents of King Cove experienced a number of airplane crashes, including one with multiple fatalities. Between 1980 and 1998, the majority of King Cove's efforts were aimed at working with the State of Alaska in its pursuit of a safer transportation method, but those efforts proved unfruitful.

However, in 1998, Congress passed the King Cove Health and Safety Act of 1998, which directed the Secretary of the Interior to accept the land offered in trade and modify the Izembek Refuge's boundary in order to grant a sixty foot right-of-way for a road. That bill included provisions to ensure that construction and location of the road would be accomplished to minimize the effect on wildlife and migratory birds. It also included specific provisions that would prohibit use of the road corridor during times with high concentrations of birds. Ultimately, the King Cove Health and Safety Act of 1998 neither served as a meaningful vehicle in accomplishing a land exchange for the purposes of subsequent road construction nor provided any viable alternative that improved public safety for the residents of King Cove.

In 2007, the Aleutians East Borough (AEB or "Borough") received a $37.5 million Federal appropriation to improve both transportation between King Cove and Cold Bay and medical care in King Cove. With those funds, AEB purchased a $9 million hovercraft and constructed a landing for the hovercraft along the northeastern shore of Cold Bay. The hovercraft would serve as the primary marine connection between King Cove and Cold Bay from 2007-2010. However, due to the excessive operating costs (approximately $3 million per year), the hovercraft proved to be an unsustainable option.

In OPLMA, Congress directed the Secretary of the Interior to develop an environmental impact statement to determine whether or not a land exchange and road construction within the boundaries of the Izembek National Wildlife Refuge to connect these two communities would be in the public interest.[8] If the public interest determination was in the affirmative, then road

---

[8] Pub. L. No. 111-11, Title VI, Subtitle E, 123 Stat. 991 (Mar. 30, 2009). In this instance, the land exchange would have been with the State of Alaska.

INT-002817

construction would be authorized.[9]  However, if no construction permits for the road were issued within 7 years, then the authorization expired.[10]

### B. The 2013 EIS and Record of Decision

The U.S. Fish and Wildlife Service prepared an EIS in accordance with OPLMA.  The "basic project purpose," as described by the EIS, was to provide a long-term, safe, and reliable year-round transportation system between the City of King Cove and the Cold Bay Airport.[11] The EIS continued by indicating that the "need for the proposed action is broader than the focused purpose," noting that the transportation system was vital to "health and safety,"[12] "quality of life,"[13] and "affordable transportation."[14]

The EIS evaluated five alternatives, guided by the purpose and need as well as criteria set forth in OPLMA and NEPA.  Those alternatives were as follows: (1) No Action Alternative; (2) Land Exchange and Southern Road Alignment; (3) Land Exchange and Central Road Alignment; (4) Hovercraft Operations from the Northeast Terminal to Cross Wind Cove; and (5) Lenard Harbor Ferry with Cold Bay Dock Improvements.[15]

On December 23, 2013, then-Secretary Jewell signed a Record of Decision in which she

---

[9] *Id.* § 6402(d)(1).

[10] *Id.* § 6406(a).

[11] U.S. Fish and Wildlife Service, Izembek National Refuge Land Exchange/Road Corridor Final Environmental Impact Statement 1-5 (2013) ("EIS").

[12] "Historically, for cases requiring emergency care exceeding that available at King Cove Clinic, medical evacuations from the King Cove community arrive first at the Cold Bay Airport via aircraft and marine vessels, depending upon weather conditions and availability of transport modes." EIS at 1-7.

[13] "Road access would provide peace of mind, particularly during extended periods of inclement weather that prevent marine and air travel. In addition, access to the Cold Bay Airport would provide the students, school board, borough assembly members, and medical service providers residing in the City of King Cove with enhanced opportunities to travel out of their community. Residents would be able to receive mail more frequently, attend sporting events and fundraisers, participate in school field trips, schedule doctor's appointments, meet with government officials in Anchorage and Juneau more reliably, and to visit extended families living in other communities." EIS at 1-8.

[14] "The transportation system must be affordable by local families and be constructed, operated, and maintained at a cost that can be borne by local or state government. The transportation must be practical in the context of the Cold Bay and King Cove area, so that it can be operated and maintained without undue requirements for specially trained personnel or specialized equipment, and can provide safe, reliable, affordable transportation with the least amount of interruption by weather conditions." EIS at 1-9.

[15] As relevant here, the Department has the benefit of not only considering the analysis and facts associated with the respective alternatives as discussed in the 2013 EIS, but also the benefit of considering what has (or has not) transpired since the 2013 ROD.  There are multiple instances where the latter can provide important context to the former.

INT-002818

concluded that balance weighed in favor of the no action alternative and that the road would not be in the public interest because it "would lead to significant degradation of irreplaceable ecological resources that would not be offset by the protection of other lands to be received under an exchange . . . [and] . . . because reasonable and viable transportation alternatives exist to meet the important health and safety needs of the people of King Cove."[16] Secretary Jewell noted that "[w]hile Section 6402(a) of OPLMA provides the Secretary with the discretionary authority to undertake an exchange, it does not mandate an exchange nor does it set forth criteria that the Secretary must consider in reaching a decision not to proceed."[17] Ultimately, the Department need only "identify and consider fully the impacts of such an exchange", but the decision on whether to proceed is purely a "policy choice."[18] The 2013 ROD provided its findings and reasons for the decision that served to inform the balancing that Secretary Jewell engaged in prior to coming to a conclusion. The ROD articulated the following considerations: Wildlife and Habitat; Wilderness; Refuge Management; and Viable Transportation Alternatives.

1. Wildlife and Habitat Considerations[19]

The 2013 ROD concluded that "[b]y keeping the isthmus roadless, a no road alternative best protects the habitat and wildlife of the Izembek Refuge." It noted that the Izembek Refuge provides invaluable and potentially irreplaceable nesting and feeding areas for waterfowl and shorebirds. As part of this analysis, the ROD focused on several different species, including the Pacific Black Brant, Tundra Swan, Emperor Geese, Steller's Eiders, Brown Bear, Caribou and Wolves. 98% of the approximately 130,000 Pacific Black Brant feed in the Izembek Refuge. Izembek Refuge possesses the only non-migratory population of Tundra Swans in the world, which number in the low hundreds, compared to the global population of over 190,000. The Izembek Refuge also represents an important staging, wintering, and migratory corridor for Emperor Geese, whose global population is approximately 100,000. A significant portion of the Steller's Eiders winter in the Izembek Refuge. Finally, Brown Bear, Caribou, and Wolves pass through the Izembek Refuge as part of their range.

Secretary Jewell acknowledged that the "lands offered for exchange contain important wildlife habitat, but that those lands would not compensate for the adverse effects associated with the construction of a road.[20] The 2013 ROD concluded that the construction and use of a road

---

[16]ROD at 3.

[17] *Id.* at 6.

[18] *Id.*

[19] *Id.* at 7-9.

[20] However, it is important to note that the FWS had previously indicated that KCC owned lands within the Izembek Refuge are an area that FWS is interested in protecting "because of [its] important fish and wildlife values." Izembek National Refuge Final Comprehensive Conservation Plan/Environmental Impact Statement/Wilderness

Case 3:19-cv-00216-JWS Document 26-9 Filed 04/06/20 Page 8 of 64

INT-002819

corridor would be likely to have negative effects on each of the species referenced.

### 2. Wilderness Considerations[21]

The 2013 ROD briefly considered the impacts to wilderness of a potential road corridor, noting that the "no action alternative protects nearly 300,000 acres of Wilderness". It further noted that the proposed road corridors would jeopardize between 131 and 152 acres (or approximately 1/20[th] of one percent) in a manner entirely inconsistent with Wilderness purposes.

### 3. Refuge Management Considerations[22]

The 2013 ROD discussed concerns that "[i]n addition to the direct impacts of construction and vehicle traffic associated with the proposed road, there is high potential for increased off-road access with the proposed construction of a maintained, all-season gravel-surface road." These concerns were articulated as follows:

> Cutting a road through the middle of the Refuge would mean significant additional resources would be necessary to manage the resulting direct and indirect effects of a road to minimize habitat damage and wildlife disturbance. These resources would have to come at a time of decreasing Refuge System budgets and would be at the expense of accomplishing work directed at the Service's core mission of wildlife and habitat management.

### 4. Viable Transportation Alternatives[23]

In considering the need for viable transportation alternatives, the 2013 ROD recognized that the nearest location to King Cove that can provide Level II trauma care services is in Anchorage, which is over 600 miles away. The ROD also acknowledged that the local King Cove clinic has been unable to attract full-time doctors with sufficient experience and, instead, physician's assistants, nurse practitioners, and health aides provide the majority of medical care. The ROD noted that the medical care transportation alternatives available in 2013 were flights from King Cove to Cold Bay (35 minutes), boat transportation (2 hours), and hovercraft (over an hour). The ROD estimated that, even if a road corridor was constructed, it would be unavailable approximately 2% of the time. A key "transportation alternative" considered by Secretary Jewell leading to her decision was an indication that the AEB would "consider" developing a marine transportation link in the form of an aluminum landing craft if a road connection was

---

Review, June, 1985 at page 102. Furthermore, in the 1998 Land Protection Plan, the FWS identified the KCC land contemplated in this land exchange as "high priority" for addition to the Izembek Refuge.

[21] *Id.* at 9

[22] *Id.*

[23] *Id.* at 10-11.

7

Case 3:19-cv-00216-JWS Document 26-9 Filed 04/06/20 Page 9 of 64

INT-002820

not available.[24] The availability of this alternative was highly speculative at the time of the 2013 ROD.[25] That uncertainty was highlighted in the EIS itself, where the service noted that it lacked "complete data regarding the reasonably predictable actions of the Aleutians East Borough to develop this mode of transportation if the land exchange does not occur."[26] Other alternatives to a road connection relied upon by Secretary Jewell included evacuation by air, fishing vessel shuttles, the Alaska Marine Highway ferry, and the now out-of-service hovercraft.[27] Decades of experience have consistently found by the King Cove Native people to be infeasible or inadequate to provide for their health and safety.[28] Finally, the 2013 ROD indicated that the life-cycle costs associated with the construction and maintenance of the road were $34.2 million.

Secretary Jewell concluded the 2013 ROD by noting that the Izembek Refuge "is internationally recognized for its unique and ecologically significant wetlands and wildlife" and that denying a land exchange would "maintain[s] the integrity of designated wilderness." Secretary Jewell reiterated her belief that viable transportation alternatives were available to the community of King Cove. Finally, Secretary Jewell offered the following assurance:

> The Department will continue to work with the State of Alaska, the Aleutians East Borough, and the local communities to develop viable alternatives to a road to ensure continued transportation improvements for the health and safety of the residents of King Cove.

C. Factual Developments Since the Execution of the 2013 ROD

From the time Secretary Jewell signed the ROD in late 2013 until the present, there have been over 70 medevacs from King Cove to hospital facilities in Cold Bay, Anchorage, or Seattle.[29] Because of the aforementioned distance and obstacles separating the communities, 21 of those 68 evacuations had to be handled by the U.S. Coast Guard at a cost of approximately $50,000 per rescue mission.[30]

---

[24] Id. at 11.

[25] Nor did the 2013 ROD acknowledge that any potential marine transport alternative would pass through designated critical habitat for the endangered Southwest Alaska Distinct Population Segment of Northern Sea Otters.

[26] EIS at 4-12. Furthermore, the landing craft was not discussed in the socio-economic section of the EIS.

[27] Id. at 11-12, 20.

[28] In 2015, a detailed report analyzed several non-road transportation alternatives and is discussed in greater detail below.

[29] United States, Senate Subcommittee on Oceans, Atmosphere, Fisheries and Coast Guard, Hearing to review the readiness and operational performance of the U.S. Coast Guard, November 16, 2017. 115th Congress. (statement of Dan Sullivan, U.S. Senator)

[30] Id.

Case 3:19-cv-00216-JWS   Document 26-4   Filed 04/26/19   Page 10 of 64
INT-002821

In response to a request for reconsideration, Secretary Jewell signed a letter dated August 13, 2014, indicating that the Department would stand by its decision articulated in the 2013 ROD, but also reiterated a commitment to continue to work "to evaluate and develop other transportation improvements for the residents of King Cove and Cold Bay." Based on that commitment, a report was prepared for the U.S. Army Corps of Engineers that assessed the viability of non-road alternatives and was submitted on June 18, 2015.[31] That report considered variations related to three primary options: (1) Marine Alternative; (2) Airport Alternative; and (3) Helicopter Alternative. For those three alternatives, the report considered capital costs, operation costs, maintenance costs, medevac time, risk, and dependability.

The Marine Alternative was a concept that included a vessel capable of transporting people and vehicles in virtually all weather conditions and the necessary terminal facilities on both ends of its route. The report identified three alternative ferry routes, with each contemplating a dedicated terminal built onto the existing Cold Bay Dock, and a new ferry terminal built near King Cove. The differences in the alternatives related to different combinations of ferry travel time versus driving time to reach the ferry. Therefore, although the routes would differ slightly, each ferry alternative would require the same type of vessel, a ferry terminal in Cold Bay, and a ferry terminal in King Cove. Ultimately, the report concluded that the capital costs associated with the Marine Alternative would range between approximately $30 and $42 million, with an annual operations and maintenance cost of approximately $1 million. The 75-year life-cycle costs ranged from approximately $57 to $72 million.[32]

The analysis also included quantifying the potential reliability and risks associated with the Marine Alternative. As to the former, the report considered a number of factors, including wind speed, snow conditions, and maintenance. With slight variations from month to month, the report concluded that the Marine Alternative's dependability exceeded 99%. As to the latter, the report determined the principle risks to the Marine alternative were capital funding, operational funding, regulatory permitting, and lack of redundancy. The report concluded that the Marine Alternative risks were "medium-serious," particularly due to the excessive costs associated with capital and operational funding. Since the completion of this report, the AEB has also indicated that it no longer has any intention to develop an aluminum landing craft. Furthermore, the State of Alaska has also announced substantial cuts to funding for the marine ferry system, which means that the ferry is currently planning to be out of operation at least from October 1, 2019 until June 30, 2020.[33]

---

[31] *King Cove-Cold Bay: Assessment of Non-Road Alternatives*, prepared for U.S. Army Corps of Engineers, Alaska District. https://www.energy.senate.gov/public/index.cfm/files/serve?File_id=D8EA08E9-75F1-4D79-A833-87EE91616819

[32] All costs referenced in 2015 dollars.

[33] https://www.ktuu.com/content/news/Alaska-Marine-Highway-System-not-scheduling-services-past-Oct-1--506118511.html

Case 3:19-cv-00216-JWS   Document 30-4   Filed 04/26/19   Page 11 of 64

INT-002822

The Airport Alternative concept considered constructing a new airport for the city of King Cove that would function better in poor weather conditions, including instrument capability. Analysis indicated that the one technically feasible site for a new airport that would effectively avoid mountain hazards and wind-channeling terrain without physically encroaching into the Izembek National Wildlife Refuge is located northwest of Mount Dutton. The Airport Alternative considered two options: a 5,000-foot paved runway and a 3,500-foot gravel runway.[34] The alternative contemplated designs that would effectively accommodate the typical aircraft used in the Aleutian Region for medevac operations. Both airport designs included a runway, apron, and a connecting taxiway. Travel time between the proposed King Cove airports and Anchorage would range between 144 and 180 minutes. The report concluded that the capital costs associated with the Airport Alternative would range between $47 and $84 million, with an annual operations and maintenance cost of between $225,000 and $675,000. The 75-year life-cycle costs ranged from $50 million to $97 million.

Again, the report quantified the potential dependability and risks associated with the Airport Alternative. As with the Marine Alternative, the most telling factor in determining dependability relates to local meteorology. As a result, the report concluded that wind speeds in excess of forty knots would be considered too dangerous for airport utilization, and that such wind speeds are expected approximately 0.13 percent of the time on an annual basis. Therefore, the report concluded that, with slight variations from month-to-month, the Airport Alternative's dependability ranged between 94% and 95%. In quantifying risks, the report considered sources describing the Aleutian Islands as the windiest and rainiest region in the United States and noted that the mountainous terrain causes dangerous turbulence and visibility issues. Ultimately, the report assessed the risks associated with the Airport Alternative as "medium-serious", also recognizing that the costs associated with the alternative were likely prohibitive.

Finally, the report considered the Helicopter Alternative, a concept that featured the following elements: a leased helicopter and crew; a lighted helicopter facility with a pad of 100 feet by 100 feet; a hanger of 40 feet by 80 feet; and road access to King Cove. The report also considered four possible locations for the heliport, ranging from in King Cove to up to over 22 miles away. Each of the proposed heliport locations has various benefits and concerns. The report concluded that the capital costs associated with the Helicopter Alternative would range between approximately $3 and $28 million, with an annual operations and maintenance cost of approximately $2.25 million. The 75-year life-cycle costs ranged from approximately $73 to $99 million.

In assessing the dependability of the Helicopter Alternative, the report again identified local meteorology as the most volatile factor. Poor visibility and wind speeds serve to limit the dependability of helicopter utilization, and the report's conclusions indicated that in some months the dependability would be as low as 60% and the best case scenario never exceeded

---

[34] Both airport alternatives had design specifications that would accommodate aircrafts customarily used in the region: the Cessna 208 and Beechcraft King Air. However, a 5,000-foot paved runway could also serve to accommodate and support the more demanding needs of a Learjet 35.

10

85%. Coupling dependability concerns with the high costs associated with the Helicopter Alternative led the report to assess risk as "medium-serious."

While the report was tasked with only considering non-road alternatives, for comparison purposes, the 2013 EIS concluded that the "lifecycle cost" of the road alternatives ranged between $34 and $37 million. Furthermore, the weather conditions that complicate air and sea transportation corridors are less relevant to road transportation, and thus the dependability of a road corridor exceeds that of the alternatives discussed in the 2015 report. Currently, neither King Cove nor AEB has found any of the alternatives considered in the 2015 report to be viable.

In May of 2017, KCC petitioned then-Secretary Zinke for a land exchange that would allow the corporation the opportunity to pursue the financing, engineering, and permits potentially leading to the construction of a safer means of transport to Cold Bay's airport in the form of a single lane gravel road that, even though owned by KCC, would traverse the Izembek Refuge.[35] Pursuant to follow-up discussions between the Secretary and KCC, it was agreed that KCC would seek an equal value exchange whereby KCC would convey to the United States the surface estate of certain lands within the Izembek and Alaska Peninsula National Wildlife Refuges and relinquish its selection rights to an additional 5,430 acres within the Izembek Refuge. In return, the Department would convey to KCC the surface and subsurface estates of not more than 500 acres in the form of a narrow corridor through the Izembek Refuge. The land exchange itself would not authorize the construction of a road, however, if KCC chose to pursue this option and was successful in obtaining the necessary financing, engineering, and proper permits and authorizations, which could include Federal permits requiring compliance with other Federal laws including NEPA, such an exchange would eventually allow KCC to construct a road along that corridor, which would, by the terms of the agreement, be utilized primarily for health, safety, and quality-of-life purposes and generally not for commercial purposes.

### D. The 2018 Decision and Subsequent Litigation

In consideration of: (1) King Cove's continuing and persistent need for safe and reliable options for emergency medical evacuation; (2) the emerging evidence that Secretary Jewell's reliance on various transportation alternatives was misplaced; (3) the benefits that would accrue to the United States in the form of increased total acreage and protected habitat in the Izembek and Alaska Peninsula refuges; and, (4) the failure of Secretary Jewell to consider in the 2013 ROD that any marine transport alternative would necessarily impinge on designated sea otter critical habitat while a road would not traverse any critical habitat of threatened or endangered species at all, Secretary Zinke signed a land exchange agreement with KCC on January 22, 2018.

---

[35] KCC, as the Native Corporation for the village of King Cove, was entitled under the Alaska Native Claims Settlement Act (ANCSA) to select and receive a patent for the surface estate of 161,280 acres of land as set forth at 43 U.S.C. § 1613(a).

After a consortium of plaintiffs brought a legal challenge to the land exchange agreement in Alaska Federal District Court, the court ruled that Secretary Zinke had not provided an adequate explanation in the administrative record for his change in policy from that described in the 2013 ROD.[36]

### E. The KCC Request for Reconsideration

On May 21, 2019, the KCC asked the department to reconsider the land exchange previously vacated by the District Court. (Addendum A) The request highlighted the reasons why the land exchange was vital to the community and provided extensive appendices documenting the importance of the opportunities presented by a land exchange to the people of King Cove. Noting that the land exchange would afford King Cove with the opportunity to "pursue the permitting of a safe one-lane gravel road between [King Cove] and the Cold Bay airport." KCC reiterated that "such a road will save the lives of our residents when they experience medical emergencies and need immediate transport by medevac from Cold Bay airport to Anchorage." In its letter, KCC provided a through recitation of the history of its efforts, the factual basis for the proposed exchange, as well as a detailed rationale explaining the risks its citizens endure due to the lack of reliable transportation.

## III.   ANALYTICAL FRAMEWORK

### A. *FCC v. Fox Television Stations, Inc.*

In undertaking the analysis set forth below, the Department takes into account the Alaska Federal District Court decision and the principles set forth therein. In that decision, the court relied extensively upon *FCC v. Fox Television Stations, Inc.*(*Fox*), to provide the analytical framework underlying the Court's ultimate conclusions.[37] Therefore, *Fox* serves to provide the Department with a suitable roadmap that governs its review of prior departmental policy decisions. In *Fox*, the Court held that a policy change will comply with the Administrative Procedure Act (APA) if the agency:

- displays awareness that it is changing position;
- believes the new policy is better;
- provides good reasons for the new policy, which, if the new policy rests upon factual findings that contradict those which underlay its prior policy must include a reasoned explanation for disregarding facts and circumstances that underlay or were engendered by the prior policy; and,

---

[36] *Friends of Alaska National Wildlife Refuges et al. v. Bernhardt and King Cove Corporation*, Case No. 3:18-cv-00029-SLG, Order Re Motion for Summary Judgment dated March 29, 2019.

[37] 556 U.S. 502 (2009). The Court also discussed *Motor Vehicle Manufacturers of the United States, Inc. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29 (1983) and *Organized Village of Kake v. U.S. Department of Agriculture*, 795 F.3d 956 (9th Cir. 2015), both of which also considered policy changes under the APA.

INT-002825

- shows that the new policy is permissible under the statute.[38]

Therefore, under *Fox*, the Department must acknowledge and consider existing policy determinations prior to adopting a new position. The next two criteria, articulating why a potential policy change is "better" and providing a "reasoned explanation" regarding the factual basis of the prior policy are inextricably linked. Invariably, any potential arguments or rationale supporting a new policy direction would also require an explanation for changing the previous policy decision. Finally, under *Fox*, if the Department were to consider and adopt a new policy, that policy must be statutorily permissible.

## B. Governing Law

*Purposes of the Izembek National Wildlife Refuge and ANILCA*

The 315,000 acre Izembek National Wildlife Refuge, which lies between King Cove and Cold Bay in southwest Alaska, was established by Congress in 1980 when it passed the Alaska National Interest Lands Conservation Act (ANILCA).[39] Part of the refuge spans the isthmus separating the Izembek Lagoon and the Bering Sea, to the north, from Cold Bay and the Pacific Ocean, to the south. At the time, legislators highlighted this region's "outstanding scenery, key populations of brown bear, caribou and other wilderness-related wildlife and critical watersheds for Izembek Lagoon."[40] The Department of the Interior manages the Refuge so as to "conserve fish and wildlife populations and habitats in their natural diversity," "ensure … water quality," as well as to "provide … opportunity for continued subsistence uses by local residents."[41]

Congress enacted ANILCA "to preserve and protect 'nationally significant natural, scenic, historic, archeological, geological, scientific, wilderness, cultural, recreational, and wildlife values' and landscapes by creating 'conservation system units,' such as national parks, preserves, refuges, and other Federal reservations."[42] Congress also protected the "subsistence way of life for rural residents" with this act as well as the resources upon which they depend, in order to remove the need for future legislation regarding environmental conservation and subsistence uses.[43] The Ninth Circuit has opined that these purposes of ANILCA can be distilled into the "dual purpose" of furnishing "guidelines for the protection for the national interest in the scenic,

---

[38] *Id.* at 515-16.

[39] See Pub. L. 96-487 (HR 39), Title III § 303(3) (Dec. 2, 1980). The area had formerly been designated as the "Izembek National Wildlife Range," which was established two decades earlier under Public Land Order 2216 (Dec. 6, 1960).

[40] H. Rep. 96-97, pt. II, at 136 (1979).

[41] 16 U.S.C. § 668dd note.

[42] *John v. United States*, 720 F.3d 1214, 1218 (9th Cir. 2013) (footnote omitted). See also 16 U.S.C. § 3101.

[43] *Id.*

13

INT-002826

natural, cultural and environmental values of the public lands in Alaska and to provide an adequate opportunity for satisfaction of the economic and social needs of the people of Alaska."[44] Congress structured ANILCA in this fashion after becoming "aware of the need for a legislative means of maintaining the proper balance between the designation of national conservation areas and the necessary disposition of public lands for more intensive private use."[45]

C. ANILCA Land Exchange Authority, NEPA Exemption, and Endangered Species Act (ESA) Implications

When it passed ANILCA, Congress included a provision, section 1302(h), that authorized the Secretary, when acquiring lands for the purposes of ANILCA, to exchange lands in refuges and other conservation system units with corporations organized by the Native groups, Village Corporations, Regional Corporations, the State, and others.[46] Such exchanges are to be of equal value unless the Secretary determines that an unequal value exchange is in the public interest. This authority is an important tool provided to the Secretary by Congress to adjust broad Conservation System Unit designations to reflect the health, safety, and other interests of local people in concert with the national interest in conservation. In setting aside over 100 million acres of Federal lands (nearly one-third of the State of Alaska) as Parks, Wildlife Refuges, Wilderness, Monuments, and Wild and Scenic Rivers, a promise was made to the affected local populations, and particularly the resource dependent Alaska Native villages, that the Secretary of the Interior would have a tool box available to ensure national conservation goals were not achieved unfairly at the expense of the dependent local people.[47]

---

[44] *City of Angoon v. Marsh*, 749 F.2d 1413, 1415–16 (9th Cir. 1984).

[45] *Id.*

[46] 16 U.S.C. § 3192(h). EXCHANGE AUTHORITY-- Notwithstanding any other provision of law, in acquiring lands for the purposes of this Act, the Secretary is authorized to exchange lands (including lands within conservation system units and within the National Forest System) or interests therein (including Native selection rights) with the corporations organized by the Native Groups, Village Corporations, Regional Corporations, and the Urban Corporations, and other municipalities and corporations or individuals, the State (acting free of the restrictions of §6(i) of the Alaska Statehood Act), or any Federal agency. Exchanges shall be on the basis of equal value, and either party to the exchange may pay or accept cash in order to equalize the value of the property exchanged, except that if the parties agree to an exchange and the Secretary determines it is in the public interest, such exchanges may be made for other than equal value.

[47] On a separate note, I have also concluded that Title XI of ANILCA is not relevant to the land exchange envisioned by the Department. Title XI applies to any Federal "authorization (including but not limited to, any right-of-way, permit, license, lease, or certificate) without which a transportation or utility system cannot, in whole or in part, be established or operated." While a King Cove land exchange agreement envisions that the KCC may construct a road, it is not an "authorization" to do so. Furthermore, all of the examples within the scope of "authorization" are for uses of land that remains in Federal ownership. Unlike a right-of-way or lease or permit, the exchange will remove land from Federal ownership, and should KCC never construct a road, the land would not revert to Federal ownership. Moreover, the provisions of Title XI do not apply to actions taken by the Secretary

14

INT-002827

ANCSA and ANILCA are both unique to Alaska and serve to provide very broad authority to undertake land exchanges on more flexible terms than the major land exchange legislation generally applicable elsewhere in the United States. Section 22(f) of ANCSA provides authority for the Secretary to exchange lands or interest in lands with Native Corporations, the State of Alaska, municipalities, other corporations, individuals, and any Federal agency "for the purpose of effecting land consolidations or to facilitate the management or development of the land or for other public purposes."[48] Section 22(f) also allows the Secretary to complete exchanges for other than equal value "when the parties agree to an exchange" and the "Secretary determines it is in the public interest".[49] Although distinct from section 22(f) of ANCSA, section 1302(h) of ANILCA provides similar land exchange authority that was modeled after that provision.[50] Together, the two statutes provide a very broad scope of administrative authority to conduct land exchanges in Alaska. Significantly, ANILCA also provides that the National Environmental Policy Act of 1969 (NEPA) should not be construed as requiring the preparation of an environmental impact statement for "withdrawals, conveyances, regulations, orders, easement determinations, or other actions" that lead to the issuance of conveyances to Native Corporations under either ANCSA or ANILCA.[51]

Before taking any action, the Department is required to review its proposed action, which, in this matter, is the land exchange, and determine whether ESA consultation is required.[52] In 2009, Congress directed the Department to analyze the potential environmental effects of the proposed land exchange agreement. In 2013, the Department determined that the land exchange, in and of itself, would have "no effect" on the relevant ESA listed species, the

---

under the unique exchange authority provided to him under 1302(h) of ANILCA, and that authority exists "notwithstanding any other provision of law." 16 U.S.C. § 3192(h).

[48] The exceedingly broad "for other public purposes" language was added by a 1976 amendment to ANCSA.

[49] H.R. Rep. No. 94-729, 94th Cong., 1st Sess. 34-35, 1975 U.S. Code Cong. & Adm. News at 2401, providing that 22(f) "will permit exchanges under the subsection to be on a basis other than equal value if the parties agree to the exchange and the Secretary deems it to be in the public interest".

[50] As the House Committee on Interior and Insular Affairs reported regarding an earlier version of the ANILCA exchange language:

> Section 11101(f) [an earlier version of 1302(h)] is the exchange portion of the general acquisition provisions. Modeled on section 22(f) of the Alaska Native Claims Settlement Act, it is intended to provide the Secretary with great flexibility in acquiring lands by permitting him to enter into exchanges. This flexibility extends to making exchanges within conservation system units.

H.R. Rep. No. 96-97, 96th Cong., Sess. 101 (April 18, 1979).

[51] 43 U.S.C. § 1638.

[52] See Interagency Cooperation-Endangers Species Act of 1973, as Amended; Final Rule, 51 Fed. Reg. 19,926, 19,945 (June 3, 1986).

Case 3:19-cv-00216-JWS    Document 30-4    Filed 04/08/20    Page 17 of 64

INT-002828

Steller's Eider and the northern sea otter, nor any designated critical habitat.[53] Given the action agency made a "no effect" determination, there was no trigger for consultation.[54] It is important to acknowledge that nothing has changed since 2013 regarding the potential effects of a land exchange agreement on listed species and critical habitat. Again, the land exchange agreement remains a purely legal transaction and does not authorize any ground disturbing activities. No activities in the reasonably foreseeable future have been identified that would affect the species in question, because road construction, if any, cannot proceed in earnest until a proposed project navigates a variety of hurdles, including funding, planning, Federal and State approvals, and permitting approvals. In other words, potential road construction is not a direct, indirect, or cumulative effect of the land exchange agreement. Moreover, my action does not limit any future federal agency from appropriately considering the effect of their action on listed species if they are asked to authorize, fund, or carry out a discretionary action.

## IV. Conclusions and Findings Concerning the Public Interest and the Purposes of ANILCA

The question before me is whether to authorize a land exchange pursuant to ANILCA that will afford KCC the ability to use its land selections in the pursuit of a better range of health and safety options for their community. A land exchange, like the one contemplated here, will allow KCC to obtain land holdings that align with the needs of the King Cove community to potentially pursue the construction of a road at some point in time. Should KCC decide at a later date to pursue the construction of a road connection between Cold Bay and King Cove, it will need to comply with all permitting actions and environmental reviews required by both Federal and State law. Nevertheless, as noted above, any decision by KCC to pursue a road connection is separate and distinct from the land exchange authorized here.

The Alaska Native Aleut people have lived at the King Cove village site for thousands of years before ANILCA designated their backyard Wilderness. Since the passage of ANILCA, these Native people have petitioned their government in many ways on many occasions for a correction in the broad sweeping lands designations that have impacted their health and safety. Having fully considered the events, arguments, and documents described above, including the extensive record provided by KCC in support of its request for reconsideration, the 2013 ROD, and Secretary Zinke's decision, I find it appropriate to consider whether or not to now enter into a new land exchange agreement with KCC so that they may use their land selections to provide for the health and safety of its members. There are many factors that inform my decision.

---

[53] EIS at 4-184 ("No effects on Steller's Eider, Yellow-billed Loon and Kittlitz's Murrelet have been identified that would result from the proposed land exchange, because no activities in the reasonably foreseeable future have been identified that would affect these species or their habitats."); EIS at 4-188 ("No effects on northern sea otters have been identified that would result from the proposed land exchange, because no activities in the reasonable foreseeable future have been identified that would affect northern sea otters or their habitats.").

[54] *Sierra Forest Legacy v. U.S. Forest Serv.*, 598 F. Supp. 2d 1058, 1065 (N.D. Cal. 2009).

Although Secretary Jewell in the 2013 ROD suggested that "reasonable and viable transportation alternatives exist,"[55] I remain concerned regarding the persistent and substantial number of emergency medevacs and periodic deaths that continue to occur. Since Secretary Jewell's decision, there have been over 70 emergency medevacs from King Cove, a number that demonstrates there will unquestionably be many more in the years to come. Even if a road proves impassable at times as mentioned in the ROD, all indicators are that there will likely still be numerous other occasions when the access it gives to the airport at Cold Bay will make the difference between life and death for many residents. Secretary Jewell's promise that the Department would continue work with the King Cove community to "ensure continued transportation improvements" weighs heavily given the fact that the citizens of King Cove are still in search of greater security and peace of mind.

Almost six years later, the transportation alternatives imagined in the 2013 ROD have proven to be anything but viable and it is clear that the residents of King Cove continue to lack both adequate transportation options and adequate access to local emergency medical care. Most notably, the 2015 report referenced above indicates that alternative transportation routes have been subsequently considered and proven to be prohibitively costly and/or insufficiently dependable. These issues have been recently compounded as the State of Alaska has proposed severe funding cuts to the marine ferry system such that it is highly doubtful that the residents of King Cove will continue to be able to rely on periodic ferry service. The lack of viable transportation alternatives results in maintaining a categorically unsatisfactory status quo for the region, as reliance on fishing vessels and commercial aircraft flying into the King Cove airport has proven, time and again, to be inadequate to meet the public safety needs of the community. It is my view that the health and safety access for the Alaska Native people of King Cove only worsens with time and that promises of help, accommodation, and transportation alternatives have been hollow statements to these Native people. The prior failure to allow KCC to use its ANCSA land selections to provide for the welfare and well-being of the Native people of King Cove frustrates the purposes of ANILCA and ANCSA.

I also note that while the 2013 EIS and ROD discussed the cost to the FWS related to refuge management if a road is constructed, it ignored the countervailing high cost to the taxpayers of U.S. Coast Guard rescues from King Cove, of which there have been 21 since January 2014, at an average cost of approximately $50,000 per mission. Furthermore, the 2013 ROD failed to take into proper account that the marine transport alternatives relied upon therein would all pass through designated critical habitat for the endangered Southwest Alaska Distinct Population Segment of Northern Sea Otters, while a road, if constructed, would not pass through any designated critical habitat.

While the 2013 ROD declined to enter into the land exchange "because of the unique and exceptional resources in the Izembek Refuge, the consequent degradation of resources that would result from construction and operation of a road, and the availability of other viable modes of transportation from King Cove to Cold Bay," Secretary Jewell also explicitly

---

[55] 2013 ROD, at 3.

Case 3:19-cv-00216-JWS   Document 26-24   Filed 04/26/19   Page 19 of 64

INT-002830

acknowledged that there have been at least four fatalities from air transport from King Cove to Cold Bay. Moreover, although the 2013 ROD rejected the idea that a road is the *only* safe, reliable, and affordable means of year-round medical services and that there are other viable, and at times preferable methods of transport (conclusions that have been proved to be incorrect with the passage of time) it notably did not conclude that a road is not a *viable* option for safe transport or even that it may sometimes be preferable.

Furthermore, I find that the habitat the FWS would receive for addition to the refuge in the proposed land exchange is consistent with and will be acquired for the purposes of ANILCA. While the 2013 ROD discounted the value of the habitat FWS would receive in a potential land exchange, I find that Federal ownership and a more permanent conservation status for the lands and land selection rights to be acquired enhances the purposes of the Refuge. In fact, as noted in the record, the 1998 Izembek Land Protection Plan identified lands owned by King Cove Corporation within the Refuge boundaries as containing valuable fish and wildlife habitat and prioritized this land for acquisition and protection.

In consideration of the foregoing, I conclude that the decision to authorize a land exchange between FWS and KCC represents a change in policy position to the extent that such an agreement would provide the opportunity for KCC to possibly pursue the design, permitting and potentially the construction of a road connection and the 2013 ROD declined to approve the transfer of a road corridor to the State of Alaska for the construction, operation, and maintenance of a road between the communities of King Cove and Cold Bay.

I also find that a rebalancing of the factors involved, weighted by the responsibility to the Alaska Native people in the implementation of ANCSA and ANILCA, requires a different policy result for the ANILCA land exchange considered here than the policy conclusion drawn in the 2013 ROD pursued under the authority of OPLMA in light of:

(1) The acute necessity, underestimated in the 2013 EIS and ROD, for a road connecting King Cove and Cold Bay to serve the future emergency medical and other social needs of the Alaska Native residents of King Cove and the Alaskan people;

(2) Changed information concerning the viability and availability of alternative means of transportation that have since proven to be neither viable nor available;

(3) A previous failure to take into consideration the high ongoing and future costs to the taxpayers of continuing emergency medical evacuations from King Cove by the U.S. Coast Guard;

(4) The substantial benefits to the citizens of the United States and residents of Alaska in increasing the total amount of acreage in the Izembek National Wildlife Refuge and adjacent Alaska Peninsula National Wildlife Refuge for the protection of scenic, natural, cultural, and environmental values by way of a land exchange with King Cove Corporation; and

(5) My determination that, even if the facts are as stated in the 2013 ROD; that is, that a road is a viable alternative but (a) there are "viable, and at times preferable" transportation alternatives

18

INT-002831

for medical services and (b) resources would be degraded by the road's construction -- human life and safety must be the paramount concern in this instance. Nothing about construction of a road prevents the use of other alternatives (such as emergency Coast Guard evacuations) should the road be impassable or its use be otherwise inexpedient.

In my judgment, when weighing the competing considerations here, preservation of human life must be given great weight. Accordingly, even assuming all the facts as stated in the 2013 ROD, in the exercise of policy discretion, I find that executing the equal value exchange in a form substantially consistent with the "Draft Form of Agreement for Exchange of Lands" attached as Addendum B is consistent with the public interest, the purposes of ANCSA and ANILCA and our responsibility to the Alaska Native people.

When Congress enacted section 1302(h) of ANILCA, it delegated the authority for and the discretion over whether or not to enter into a land exchange agreement with King Cove Corporation to the Secretary of the Interior.[56] Congress also made it clear in section 910 of ANILCA that any such ANILCA land exchange with King Cove Corporation, because it is an Alaska Native Corporation, is not subject to the requirements of NEPA.[57] Nevertheless, it is important to note that a considerable amount of environmental analysis and assessment that has occurred over the past few decades was reviewed as a part of these Findings and Conclusions, including the 2013 EIS and 2015 Road-Alternatives analysis discussed extensively above. The proposed land exchange between the FWS and King Cove, which includes terms similar to those in the now-vacated January 2018 agreement, serves the purposes of ANILCA by striking the proper and appropriate balance between protecting the national interest in the scenic, natural, cultural, and environmental values of the public lands in Alaska and providing an adequate opportunity for satisfaction of the economic and social needs of the Alaska Native people of King Cove. It would accomplish this by adding substantial acreage to the Izembek and Alaska Peninsula refuges that has been previously identified by the FWS as being important habitat while offering KCC the opportunity to explore improved public safety through a safer and more reliable means of emergency access to the Cold Bay airport for the residents of and visitors to King Cove. This balancing of needs would be enhanced through the adoption of restrictions on the nature of any road to single-lane gravel construction on which non-medical uses and access would be severely limited.

The village of King Cove has strived for decades to find a more reliable and dependable path for health and human safety. During that time, the Department has conducted studies and taken testimony, but offered very little in the way of hope or tangible progress. While I appreciate that

---

[56] 16 U.S.C. § 3192(h).

[57] 43 U.S.C. §1638. "The National Environmental Policy Act of 1969 (83 Stat. 852) shall not be construed, in whole or in part, as requiring the preparation or submission of an environmental impact statement for withdrawals, conveyances, regulations, orders, easement determinations, or other actions which lead to the issuance of conveyances to Natives or Native Corporations, pursuant to the Alaska Native Claims Settlement Act, or this Act. . . ."

Case 3:19-cv-00216-JWS   Document 30-4   Filed 04/06/20   Page 21 of 64

INT-002832

Secretary Jewell placed greater weight on protecting "the unique resources the Department administers for the entire Nation," I choose to place greater weight on the welfare and well-being of the Alaska Native people who call King Cove home. I value the well-being of an entire community over the impacts derived from the change in ownership of these various parcels of property which are an incredibly small percentage of Alaska's Wilderness. Although it is not a decision I take lightly, it is one that I believe best serves the public interest, my responsibilities, and humanity.

Secretary of the Interior

Date: 7/3/19

Case 3:19-cv-00216-JWS   Document 26-4   Filed 04/26/19   Page 22 of 64

INT-002833



# KING COVE CORPORATION
### P.O. Box 38
### King Cove, AK. 99612
907, 497-2312

Fax: 907, 497-2444
e-mail: kcc@arctic.net

Hon. David Bernhardt
Secretary of Interior
1849 C. St.
Washington, DC 20240

**Subject:** Request for Land Exchange Agreement

May 21, 2019

Dear Mr. Secretary:

Congratulations on your recent and well-deserved confirmation as Secretary of Interior. The King Cove Corporation (KCC) and the entire King Cove Cold Bay Group (KCCBG) look forward to working with you and the Department of Interior (DOI) on the issue and request outlined below.

This letter is written on behalf of the people of King Cove and all members of KCCBG including KCC, the Agdaagux Tribe, the Native Village of Belkofski, the Aleutians East Borough (AEB), the City of King Cove, and the City of Cold Bay. Each of these groups strongly supports the efforts of DOI to support the needs of the Aleut people and other residents of King Cove for relief from our life-threatening transportation problem.

The people of King Cove, Alaska request that DOI consider a land exchange that could allow the citizens of King Cove a long term, safe, reliable, and affordable year-round transportation system between the City of King Cove and the Cold Bay airport by executing a land exchange under the Alaska Native Claims Settlement Act (ANCSA) and Alaska National Interest Conservation Lands Act (ANILCA). King Cove Corporation would make this a mutually beneficial exchange by offering very important and valuable land it owns that is located within the physical boundaries of the Izembek Refuge and Wilderness Area.

The exchange would allow King Cove to pursue the permitting of a safe one lane gravel road between their community and the Cold Bay airport, essentially by extending the King Cove road system to the historic military jeep road system in the Izembek National Wildlife Refuge and Wilderness area that has existed throughout the Izembek isthmus since the 1940s. The Cold Bay airport is the fourth longest in Alaska and is capable of handling jets in all kinds of weather. Constructing such a road will save the lives of our residents when they experience medical emergencies and **need immediate transport by medevac from Cold Bay airport** to Anchorage.

Given the endemic wind and wave conditions of Cold Bay during bad weather, transportation by water in small boats is dangerous and often not possible - especially for medical evacuees. The King Cove gravel airport can only handle small aircraft that often cannot fly because of bad

1

INT-002834

weather. This lack of access from King Cove to the neighboring Cold Bay airport results in a situation where medical evacuations too often require U.S. Coast Guard assistance to provide helicopter transport across Cold Bay so that King Cove patients may be transported to Anchorage from the all-weather, year-round Cold Bay airport. In short, the land exchange would provide the quality of life (i.e. predictable and dependable transportation access) that our people deserve as Americans.

**The Land Exchange Proposed Would:**

1. Be of equal value as required by federal law;

2. Utilize land owned in fee by KCC conveyed and selected under ANCSA in exchange for utilizing federal land located within the Izembek National Wildlife Refuge, also conveyed under ANCSA.

3. Further the purposes of ANILCA and ANCSA by enhancing cooperation between the U.S. Fish and Wildlife Service(USFWS) and Alaska Natives, including enhancing subsistence uses for rural residents in King Cove as required by ANILCA Section 101(c)

4. Retain in Wilderness the 5430 acres of ANCSA land selected by KCC. In 1998 USF&WS proclaimed that with respect to the KCC owned exchange lands "...there is the potential for negative impacts on refuge wildlife populations if increasing number of recreational cabins and commercial lodges are constructed on private lands and public use continues to rise." Accordingly, USFWS designated the KCC exchange lands as high priority for protection by the Service. (See *Land Protection Plan, Izembek National Wildlife Refuge Complex,* Appendix 4).

**KCC Reports The Following As The Factual Basis For This Exchange:**

1. King Cove is located near the western end of the Alaska Peninsula and the start of the Aleutian chain. There are two DOI recognized tribes in King Cove, the Agdaagux and the Native Village of Belkofski. Our ancestors have occupied this area for over 4,000 years and, as descendants, we are proud of our heritage and are good stewards of all the resources in our region.

2. Although King Cove is only 17 miles from Alaska's fourth longest paved civilian runway at Cold Bay, the residents of King Cove cannot regularly reach the airport because there is no road access. The weather in our area is some of the worst in Alaska and will often prevent us from accessing the Cold Bay airport by small aircraft. We have an average of about 100 days a year when the weather and flying conditions surrounding the King Cove airstrip prohibits any flights in or out. Further compounding our situation is the precarious

2

INT-002835

location of our airport in a narrow valley surrounded by mountains where high winds and turbulence are usually present. Also, our airport can only be used in daylight hours and under VFR (visual flight rule) regulations.

The severity of our transportation access situations are well documented with 18 fatalities occurring over the past few decades. The majority of these fatalities have been from medevac flights and residents dying either in King Cove (or the way to Cold Bay in a treacherous boat trip) because we couldn't get them to the Cold Bay airport for transport to Anchorage. A number of fatalities have occurred in small planes trying to access the King Cove airstrip in bad weather and crashed into the mountains surrounding the King Cove air corridor.

Since 2014 to the present, King Cove residents have endured 101 emergency medical evacuations including 21 conducted by the US Coast Guard. The Coast Guard provided these evacuations in extreme circumstances because private medevac carriers declined to fly into King Cove under conditions considered too unsafe. (See Appendix 1). For this reason, on November 16, 2017, US Coast Guard Commandant Paul Zukunft testified to the U. S. Senate Commerce Committee that the danger to US Coast Guard personnel performing these medical evacuations from King Cove is not tenable. The Commandant further testified that he believes the best solution for this problem is road transportation to the year-round, all-weather airport at Cold Bay. (See Appendix 2).

There is also a published hearing record from the Senate Energy Committee dated April 14, 2016 at which numerous witnesses testified of the needs for a land exchange and surface transportation solution. See p. 58 of the record for a picture of a recent crash at the King Cove airport caused by sudden winds as the plane approached landing on a clear day. Thankfully, the passengers and pilot were not injured in the crash (See Appendix 6).

3. In addition, we have had many "near miss" events. For example, Etta Kuzakin, President of the Agdaagux Tribal Council, was medevaced from King Cove while 34 weeks pregnant to give birth by cesarean section in Anchorage. She was flown to Cold Bay on a Coast Guard helicopter from a Coast Guard ship, which fortuitously was in the area. There were 60 knot winds that forced her to fly a circuitous route to Cold Bay that took 40 minutes. Had the Coast Guard not been there or able to fly her to Cold Bay she could not have given birth because the King Cove clinic lacks the ability to perform a cesarean section. (See her testimony before the Senate Commerce Committee in Appendix 3).

3

A landing craft travelling 14 miles over open Pacific Ocean between King Cove and Cold Bay in the wind, wave, and storm conditions of Cold Bay is simply not a substitute for a road during such medical emergencies. (See wind and wave conditions described in the 2003 King Cove Access Project FEIS and the DEIS and FEIS for the OPLMA land exchange.

4. Although historically used trails have long existed in the Izembek Isthmus, the idea of a road connecting King Cove and Cold Bay has been discussed since at least the 1940s. As detailed in the earlier EISs, a network of roads were constructed well into the Izembek isthmus by the military during World War II. The land requested by KCC for exchange aligns with these historic roads as much as possible, and would reduce effects upon the environment from any future road construction. (See Appendix 5). Residents of the King Cove community have long desired and advocated for a road as the only safe, reliable and affordable means of year-round access to Cold Bay and its all-weather airport. Further, the King Cove City Council passed a Resolution in 1976 requesting the State of Alaska consider building a road between the two communities.

Nevertheless, in 1980, without any consultation with our people, or consideration of our unique need for a road, Congress designated the existing Izembek National Wildlife Refuge (which had been established in 1960) as wilderness under the Wilderness Act including about 95% of the Izembek Refuge, except for land in and adjacent to the City of Cold Bay and the numerous existing roads connecting to the Izembek Lagoon and leading directly into the Wilderness. This non-wilderness section contains a road system allowing sport hunters tourists, and other recreationists to Izembek Lagoon and other areas not so designated.

5. The KCC proposed road alignment (See Appendix 5) is nearly identical to the Southern Alignment analyzed in the 2013 FEIS. The KCC road alignment would be located approximately ½ mile to one mile north of Kinzarof Lagoon. The KCC alignment generally follows topographical ridge lines to reduce maintenance costs by maximizing the use of crosswinds to clear snow from the road; whereas the EIS alignment had a greater road distance located at lower elevations that could collect snow in wind eddies. The KCC alignment was designed to best achieve a balance of materials cut from high points and filled into low points to eliminate the need for imported rock and gravel and to reduce construction time and costs; the difference in the road footprint for each alignment (EIS alignment = 97 acres and KCC alignment = 155 acres) is primarily due to the use of on-site materials for cut-and-fill construction. Elevating the road through low points to reduce wind eddies also results in a wider road footprint for the KCC alignment. The KCC alignment strikes a compromise between minimizing disturbance to Black Brant (through distance from Kinzarof Lagoon) and disrupting caribou migration through the Isthmus. The route was designed to avoid or minimize impacts to wetlands, minimize stream crossings,

4

and to accommodate terrain considerations. The KCC alignment will likely reduce impacts to wetlands, as compared to the Southern Alignment analyzed in the EIS, since the KCC alignment is generally located at higher elevations. (See Appendix 5)

7. KCC owns land in fee title, under selection rights it received as a Native Village under ANCSA, to land that is located within the physical boundaries of both the Izembek and Alaska Peninsula Refuges. KCC also holds pending ANCSA selection rights under an unsatisfied ANCSA village land selection to additional lands within the Izembek Refuge and Wilderness Area. It also owns fee title to land physically located within the Izembek Refuge and Wilderness Area. In the Land Protection Plan Options for the Protection of Fish and Wildlife Habitats in the Izembek National Wildlife Refuge Complex (1998), the US Fish and Wildlife Service (USFWS) identified the 2,604 acres of KCC land between Kinzarof Lagoon and Cold Bay as "High Priority" for addition to the Izembek and Alaska Peninsula National Wildlife Refuges. (See Appendix 4). In the 1998 Land Protection Plan, USFWS states that there was an "urgency" in acquiring the lands because of potential future development. KCC intends that this land be offered to DOI for consideration as part of the exchange.

8. Former Secretary Jewell did not consider the consequences of KCC's potential future development plans on the 1,917 acres of internationally recognized Ramsar wetlands within the 5,430 acres of Izembek Wilderness selected by KCC.

See https://www.fws.gov/international/pdf/factsheet-ramsar.pdf such as:

   a. access to a thermal spring on the land 5,430 acres of land if removed from the existing Izembek Wilderness by KCC's selection;

   b. I access to and from the east and west sides of existing KCC land ownership in/on the Kinzarof parcel that would be protected from development if added to the Izembek Wilderness;

   c. providing recreation experiences on the unique narrow peninsula with a combination of access by boat on Kinzarof Lagoon and Cold Bay and overland from the Northeast Terminal and from Cold Bay to its land on the west side of Kinzarof Lagoon (*see* KCG comment to the Preliminary FEIS, p. 4-47).

For the foregoing reasons, KCC respectfully requests that DOI enter into an Agreement to exchange parcels of equal value to allow KCC to become an owner of fee simple lands within the Izembek Refuge and Wilderness. In particular, KCC requests that the lands which have been previously surveyed by the Bureau of Land Management (BLM) in United State Survey # 14495 be part of the exchange. This equal value exchange is authorized by sections 1302(h) and 910 of

5

the Alaska National Interest Lands Conservation Act (ANILCA) 16 USC 3192(h) and 43 USC 1638, Public Law 96-487.

Again, such an exchange would result in KCC owning sufficient land to construct a road connecting existing roads. This includes a route previously authorized by Congress in the Omnibus Public Land and Management Act of 2009 under section 6001 et. seq. known as the King Cove Access Project road and the existing, extensive road system on the Cold Bay side which is now used and managed as part of the two refuges, Izembek and Alaska Peninsula. The existing road system is and has been available for years for use by sport hunters, tourists, and other users.

9. A 2012 Transportation Survey was conducted by the King Cove Group found that 78% of King Cove households have a member of their household who is significantly afraid of flying or suffers high levels of stress when flying from King Cove due to weather concerns. This survey was conducted using a statistically valid methodology and provides much more detailed information on travel concerns, issues, and fears by King Cove residents. (See Appendix 8)

10. KCC is aware that at least three similar land exchanges have been executed between the USFWS and three different ANCSA village corporations located within the Yukon Delta Wildlife Refuge. Each of these three land exchanges was accomplished under Section 1302 (h). No objection was raised by any groups professing to protect the purposes of wildlife refuges. (See Appendix 9).

11. Aleutians East Borough Assembly Minutes, dated April 12, 2018, document the sale of the Hovercraft which the Borough and City determined was not reliable or affordable. Also included is a Borough website document outlining on paragraph 10 that the Borough could not afford to operate this expensive hovercraft, particularly since it proved unreliable. Also attached are a Bill of Sale and pictures of the hovercraft on a barge leaving the Borough for Kazakhstan. (See Appendix 11).

12. A National Wildlife Road Refuge Analysis that shows the wide range of roads throughout the National Wildlife Refuge System in Alaska and nationally. This analysis is very detailed and demonstrates that road construction and sound wildlife management go hand in hand and are recognized and support by conservation and other user groups throughout the nation.(Appendix 12).

13. Finally, as former Secretary Salazar recognized in his letter of March 21, 2013 (See pp. 7-8, Appendix 7), DOI has a trust responsibility regarding the Agdaagux Tribe and Native Village of Belkofski and their tribal members. Secretary Jewell ignored this trust responsibility in her Record of Decision denying the OPLMA exchange. The report by Assistant Secretary Kevin Washburn failed to carry out the instructions from Secretary Salazar by failing to address whether a "road is

6

INT-002839

needed to meet the medical emergency requirements of King Cove." (See Washburn Report, Appendix 11).

Thank you for your consideration of this request. Please let me know if you have any questions. KCC looks forward to your reply and beginning these proposed negotiations.

Respectfully

Dean Gould
President

INT-002840

## APPENDICES

1. **101 Emergency Medevacs since December 23, 2013:** Since 2014 to the present, King Cove residents have endured 101 emergency medical evacuations including 21 conducted by the US Coast Guard(USCG). The USCG provided these evacuations in extreme circumstances because private medevac carriers declined to conduct these considered too unsafe. In each case, the USCG personnel were forced to conduct these very dangerous rescue operations risking their lives for our residents. For these efforts the residents of King Cove are forever indebted to the men and women of the US Coast Guard. But the USCG has other missions that make it unlikely it will always be available to provide these evacuations.

   Source: These numbers are derived from the Eastern Aleutians Tribal (EAT) regional health organization which coordinated these medevacs. Federal law (Health Insurance Portability and Accountability Act) prohibits disclosure of private, specific details of these 101 medevacs. However, the Aleutian East Borough (AEB) has been keeping a running count of the total number by regularly seeking this information on the number of medevacs from EAT, which it is not prohibited to provide under HIPAA.

2. **U.S. Coast Guard States Need For A Viable Solution:** The US Coast Guard strongly supports a solution that will solve the current problem and save both King Cove residents and Coast Guard personnel from the current risk for these valiant individuals whenever private medevacs cannot be safely performed. U. S. Coast Guard Commandant Paul Zukunft testified before the U.S. Senate Commerce, Science, and Transportation Committee on November 16, 2017 that the danger to US Coast Guard personnel performing these medevacs is not tenable. The Commandant further testified that he believes the best solution for this problem is road transportation. The Commandant stated that he fully supports that a road solution be finalized for saving lives and saving money. See attached transcript and link to the hearing:

   https://www.commerce.senate.gov/public/index.cfm/hearings?ID=CEB39F45-2CF1-4F94-9946-9B6F63EDCA27 including Testimony by Etta Kuzakin.

3. **Wind and Wave Data:** Specific, significant marine transport information including wind, tidal and wave data and for the water depths at the two existing hovercraft terminals were presented to USFWS by the Corps of Engineers in its 2003 ROD and by KCG on three occasions: 1) In KCG's May 18, 2012 comments on the DEIS (See Appendix G); 2) In KCG's October 24, 2012 comments on the Preliminary FEIS (See Appendix J); and 3) as

8

INT-002841

an Attachment to KCG's March 13, 2013 letter commenting on the FEIS to then Secretary of Interior Ken Salazar.

   a. May 18, 2012 comments on the DEIS (See Appendix G);

   b. In its October 24 2012 comments on the Preliminary Final EIS (PEIS) (See Appendix J); the King Cove Group explicitly told the U. S. Fish and Wildlife Service that to select a landing craft it would be necessary to prepare a Supplemental EIS (SEIS) developing it as a separate alternative.[1]

   c. In its May 13, 2013 comments on the FEIS, which are similar to those made in Appendix G, KCG pointed out that the FEIS failed to:

> **use available information about operability of the conceptual landing craft developed by the EIS consultant for the Service to provide: 6 day a week; for year-round ability to meet scheduled air service at the Cold Bay Airport; and for 24/7 ability to provide transportation for urgent medical care and for emergency medical evacuation. The 2003 King Cove Access Project provided these data that were incorporated by the Service in the DEIS and FEIS include known wind and wave conditions in Cold Bay and at the Northeast and Cross Wind Cove Terminal as well as the physical and biological factors associated with the two terminals. Although used in the DEIS and FEIS for reliability conclusions for the road, hovercraft and ferry alternatives, the Service chose not to validate the key FEIS assumption that no in-water modifications are required for the conceptual landing craft to provide safe and reliable loading and unloading of an ambulance, passengers, and other vehicles.[2]** (Emphasis added).

Each response made it clear that the landing craft had not been sufficiently analyzed and that the assumptions made by Secretary Jewell about the safety, reliability, and affordability of the conceptual landing craft were not sufficiently verified, to be considered a reasonable alternative – i.e., one that met the Congressionally specified Purpose and Need of the EIS.[3]

The following data was available to USFWS in the 2003 King Cove Access Project DEIS (which was tiered to the 2013 FEIS)[4] about the wind direction and velocities at the Cold Bay Airport that should have been used in defendants' 2013 FEIS and ROD to determine the effects of these winds

---

[1] AR 00129555 (Plaintiffs' Comment 55).
[2] Attachment to the King Cove Group March 13, 2013 "Comments on the Izembek land Exchange Final Environmental Impact Statement (FEIS)" at pages 3-4. See also pages 32-33. AR ____
[3] Administrative Record at p. 00132192 (KCG'S Comment 57)
[4]    ROD at pages 14-15.

INT-002842

on the conceptual landing craft during loading and unloading passengers and wheeled vehicles at the Cross Wind Cove Terminal:

- Figure 3-3  (Hourly Wind Speed at Cold Bay Airport for 1991. p-185)
- Table 3-3  (Annual Wind Speed and Direction for Cold Bay, Alaska. p. 186)
- Figure 3-4  (Annual Wind Rose for Cold Bay, Alaska, p. 186)
- Figure 3-5  (Wind Imagery Example - February 28, 2002, p. 187)
- Table 3-4  (Wind Speed less than 3 Knots by Month, p. 188)

The following factual information and data were available to the USFWS in the 2003 King Cove Access Project DEIS about the wave heights which should have been used to estimate/verify the ability of the conceptual landing craft to safely load and unload passengers at the Northeast and Cross Wind Cove hovercraft ramps without the construction of additional in-water facilities:

- Figure 3-11  (Wave Hindcast Locations, p. 3-11)
- Table 3-8  (Annual Wave Height and Direction for Points A, B, and C, Cold Bay, p.195 and 196)
- Appendix C (Characteristics of the Wind Speed Distribution over Cold Bay and Lenard Harbor, Alaska. April 2001 by Johns Hopkins University/Applied Physics Laboratory, SRO-01-09).

4. **2013 FEIS Statement of Purpose and Need for Safe, Reliable and Affordable Year Round Transportation System Between the City of King Cove and Cold Bay Airport:**
   The FEIS describes the Project's Purpose as follows:

   > The basic project purpose is to provide a transportation system between the City of King Cove and the Cold Bay Airport. The overall, project purpose is to construct a long term, safe, and reliable year round transportation system between the cities of King Cove and Cold Bay.[5]

   The FEIS describes the Project's Need as follows:

   > The need for the proposed action is broader than the focused purpose specified in the Act. The project need arises from the underlying issues related to transportation to and from the community of King Cove. Three needs are identified:

   > 1. Health and Safety[6]

---

[5]    FEIS at page 1-5. Ex. 4.
[6]    "Historically, for cases requiring emergency care exceeding that available at King Cove Clinic, medical evacuations from the King Cove community arrive first at the Cold Bay Airport via aircraft and marine vessels, depending upon weather conditions and availability of transport modes." FEIS at page 1-7. Ex. 4.

10

INT-002843

2. Quality of Life[7]
3. Affordable Transportation[8]

The USFWS concluded at page 2-21 of the FEIS that the "no action" alternative would *not* meet the project's Purpose and *may not* meet its Need set out in the FEIS:

> If the no action Alternative is selected "the project purpose (Section 1.3) would not be met because a land exchange would not be executed for the purpose of constructing a road as specified by the Act. The project needs (Section 1.4) of health and safety, quality of life, and affordable transportation would not be met if a new mode of transportation is not implemented, but might be met by the landing craft/passenger ferry depending on **levels** of service.

5. **Hovercraft Service Abandoned/Hovercraft Sold:** The AEB was forced to abandon hovercraft service between King Cove and Cold Bay because such service was unreliable and too expensive to operate. The Borough then attempted to use the hovercraft to provide service between another community airport, Akun, and another Borough community, Akutan. While this attempt would not have solved the King Cove transportation problem, that service also proved unreliable and too expensive for the Borough to operate. As a result, the Borough then sold the hovercraft to a company for use in Kazakhstan. The hovercraft is now in Kazakhstan. (See Appendix 11).

   Page 2-21 of the FEIS shows that annual operating costs of the hovercraft exceeded revenues by more than one million dollars and thus did not meet the affordability criterion of the Purpose and Need Statement. Additionally, the Executive Summary of the FEIS identifies the costs of operating a hovercraft as a $2.2 million subsidy and a ferry as a $2.5 million subsidy. FEIS ES-38.

---

[7]  "Road access would provide peace of mind, particularly during extended periods of inclement weather that prevent marine and air travel. In addition, access to the Cold Bay Airport would provide the students, school board, borough assembly members, and medical service providers residing in the City of King Cove with enhanced opportunities to travel out of their community. Residents would be able to receive mail more frequently, attend sporting events and fundraisers, participate in school field trips, schedule doctor's appointments, meet with government officials in Anchorage and Juneau more reliably, and to visit extended families living in other communities." FEIS at page 1-8, Ex. 4.
[8]  "The transportation system must be affordable by local families and be constructed, operated, and maintained at a cost that can be borne by local or state government. The transportation must be practical in the context of the Cold Bay and King Cove area, so that it can be operated and maintained without undue requirements for specially trained personnel or specialized equipment, and can provide safe, reliable, affordable transportation with the least amount of interruption by weather conditions." FEIS at page 1-9.

11

Page 20 of the FEIS Executive Summary describes the operating cost of the hovercraft as $2.6 million annually in the operating costs of the Lenard Harbor Ferry is $2.4 million annually. FEIS Executive Summary at page ES-20. See KCG Comment 39 (Preliminary FEIS. p. 29550) that the hovercraft is neither economic nor reliable. The discussion of *Cost* for Alternative 4 (FEIS p. 2-49) describes the proposed hovercraft operations in 2003, not current reliability, cost, and passenger volumes or considers the fact that the hovercraft is no longer stationed in Cold Bay. (FEIS pp. 4-450 through 4-.409).

6. **No Landing Craft Developed Or In Service:** Despite representations to the contrary by former Secretary Jewell and by a study for DOI by the Corps of Engineers. the AEB has not developed a landing craft because the Borough found landing craft operations to be impractical and too expensive to develop or operate. Consequently, any reliance on the idea that a landing craft might provide a solution to this long-term transportation problem for King Cove residents is incorrect and erroneous.

7. **Land Exchange will further the purposes and policy of ANILCA and ANCSA:** KCC recognizes that under ANCSA one of its duties is to provide for the welfare and well-being of its shareholders. (See 43 USC 1607 and 43 USC 1621(f)). This exchange would further the purposes of consolidating land and facilitating the management of the land in the Izembek National Wildlife Refuge. While a land exchange will not completely solve this problem, it will provide recognition of this problem, and allow KCC to further the needs of its people and shareholders just as ANCSA and ANILCA intend.

   As a Native corporation landowner. KCC land will be located within the physical boundaries of the Izembek Refuge and Wilderness Area, and provide for better use of the Refuge for subsistence needs (a primary purpose of ANILCA Section 101(c) and provide DOI with greater attention to ANILCA and ANCSA purposes by allowing fee title ownership from King Cove to the Cold Bay airport road. KCC also believes that as a fee title owner of this proposed land, this will improve the communication with the U.S. Fish and Wildlife Service and promote a better understanding by King Cove residents and the Service which will lead to more cooperation between both parties to this proposed exchange and better management thereby enhancing the purposes of the refuge.

8. **KCC Citizens Transportation Survey:** In 2012, the City of King Cove conducted a statistically valid survey regarding transportation issues regarding King Cove residents. The survey demonstrates many aspects of the fear and stress experienced by King Cove residents including:

   1. Long travel delays of more than a few hours—58%
   2. Too often residents choose to travel by boat to Cold Bay for 2.5 hour and climb a steep, slippery ladder at Cold Bay dock –88%
   3. Travel necessitated for health- related reasons—61%

12

INT-002845

(See Appendix 8).

9. **Sections 1302(h) And 910 Have Been Used Successfully Before:** KCC is aware that at least three similar exchanges have been executed between the US Fish and Wildlife Service and three different village corporations within the Yuko Delta Wildlife Refuge. Each of these three land exchanges was accomplished under Section 1302 (h). No NEPA Analysis is reflected in the exchange documents and no objection was raised by any groups professing to protect the purposes of wildlife refuges. (See Appendix 9)

10. **A USFWS document from the 2013 EIS process:** Dated May 2012 the document describes military installations as still visible and military roads/trails and barracks are also still visible (Appendix 10)

11. **Aleutians East Borough Assembly Minutes document the sale of the Hovercraft** On April 12, 2018, the Borough Assembly minutes report that Hovercraft had been sold. Also attached is a Borough website document outlining on paragraph 10 that the Borough could not afford to operate this expensive hovercraft, particularly since it proved unreliable. ( See Appendix 11).

12. **A National Wildlife Road Refuge Analysis:** This analysis shows the wide range of roads throughout the National Wildlife Refuge System in Alaska and nationally. This analysis is very detailed and demonstrates that road construction and sound wildlife management go hand in hand and are recognized and supported by conservation and other user groups throughout the nation.(Appendix 12)

12. **Former Secretary Ken Salazar recognized DOI trust responsibility** In a March 21, 2013 letter then Secretary of Interior Ken Salazar Letter directed then Assistant Secretary for Indian Affairs Kevin Washburn Report to travel to King Cove and to determine the need for a road to Cold Bay under the Department's trust responsibility. Attached is the Washburn Report from the 2013 EIS process. On pages 7-8 of the Report is the letter from then Secretary Ken Salazar which specifically outlines the trust responsibility to the Aleut residents of King Cove. (See Appendix 7)

# DRAFT FORM OF AGREEMENT FOR EXCHANGE OF LANDS

## UNITED STATES DEPARTMENT OF THE INTERIOR
## U.S. FISH AND WILDLIFE SERVICE

## AGREEMENT FOR THE EXCHANGE OF LANDS

**THIS AGREEMENT,** made and entered into this 28th day of June 2019, by and between King Cove Corporation (KCC), a corporation organized under the laws of the State of Alaska, pursuant to the authority contained in the Alaska Native Claims Settlement Act, 43 U.S.C. § 1601, *et seq.*, (ANCSA), for itself and its successors, and the UNITED STATES OF AMERICA (United States) acting by and through the Secretary of the Interior, or his authorized representative (Both KCC and the United States are collectively referred to as "the Parties"). The authority for the exchange is section 1302(h) of the Alaska National Interest Lands Conservation Act, Pub. L. 96-487, as amended by Pub. L. 100-395, § 201, 102 Stat. 979, 981 (1988) (ANILCA).

### RECITALS

**WHEREAS**, KCC owns the surface estate of lands physically located within the external boundaries of the Izembek National Wildlife Refuge (Izembek NWR).

**WHEREAS**, the United States owns the surface and subsurface estate to certain lands located within the boundaries of the Izembek NWR.

**WHEREAS**, under the terms and procedures set forth in this Agreement, the United States intends to convey to KCC the surface and subsurface estate of the lands delineated in U.S. Survey No. 14495, Alaska, that have been previously identified by KCC as being needed for the construction, operation, and maintenance of a road linking King Cove with the Cold Bay airport (the U.S. Exchange Lands).

**WHEREAS**, the intent of this exchange is for lands of equivalent value, to make the values equivalent, the federal lands are to be appraised to determine the per acre value of the federal lands and the acreage range within which that per acre value would apply; subsequently, the King Cove lands will be similarly appraised, and the exchange will occur based on the proportionate value of the lands from each party.

**WHEREAS**, King Cove, Alaska is an isolated Aleut Native village, recognized as a village under ANCSA and located at the end of the Alaska Peninsula at the beginning of the Aleutian Island chain in southwest Alaska.

**WHEREAS**, there are two Tribes recognized by the United States in King Cove: the Agdaagux Tribe of King Cove and the Native Village of Belkofski.

**WHEREAS**, there is an approximate 12-mile gap between the road leading out of King Cove and the road to the Cold Bay airport, which is Alaska's fourth-longest paved civilian runway and suitable for use by air evacuation jet aircraft.

**WHEREAS**, the residents of King Cove cannot regularly reach the Cold Bay airport because inclement weather prevents small aircraft from flying between King Cove and Cold Bay and leaves the residents without access to emergency medical treatment by way of Cold Bay.

Case 3:19-cv-00216-JWS Document 20-34 Filed 04/26/19 Page 352 of 644

**WHEREAS**, there have been 101 medical evacuations (medevac) from King Cove since December 23, 2013, including 21 by the U.S. Coast Guard, because commercial medevac carriers determined that it was too dangerous to fly into King Cove.

**WHEREAS**, King Cove residents and others have died attempting to travel to and from King Cove or Cold Bay and from being unable to get from King Cove to the Cold Bay airport for medevac transport to Anchorage.

**WHEREAS**, Congress has passed legislation twice in the past 20 years to address the transportation problem, which has not produced a solution satisfactory to the needs of King Cove residents.

**WHEREAS**, KCC owns lands (the KCC Exchange Lands Pool) within the exterior boundaries of Izembek NWR, which are identified on the attached map (Exhibit A) as "Village Patent – King Cove."

**WHEREAS**, the lands in the KCC Exchange Lands Pool have been identified by the U.S. Fish and Wildlife Service for future acquisition if such lands became available.

**WHEREAS**, KCC represents to the United States that none of the KCC Exchange Lands Pool lands are subject to conveyance pursuant to section 14(c) of ANCSA, or subject to any known legal third-party possessory rights.

**WHEREAS**, the United States represents to KCC that none of the U.S. Exchange Lands to be conveyed to KCC are subject to any Native Allotments, Federal mining claims, nor any known legal third-party possessory rights.

**WHEREAS,** the Secretary of the Interior concluded that this land exchange with KCC that allows for construction of a road between King Cove and Cold Bay would improve public safety, and serve the purposes of ANILCA by striking the proper and appropriate balance between protecting the national interest in the scenic, natural, cultural and environmental values of the public lands in Alaska and providing an adequate opportunity for satisfaction of the economic and social needs of the State of Alaska.

**NOW, THEREFORE**, in consideration of their mutual promises and other good and valuable consideration, the Parties hereto covenant and agree as follows:

## AGREEMENT

A.  The Parties agree to the exchange of real property interests set forth in the following paragraphs and agree to be bound thereby. The Parties agree that the exchange is made pursuant to the Secretary of the Interior's authority under section 1302(h) of ANILCA, as amended, 16 U.S.C. § 3192(h), and that pursuant to 43 U.S.C. § 1613(a) this exchange of land is a conveyance under ANCSA, which is therefore subject to section 910 of ANILCA, 43 U.S.C. § 1638.

B.  In consideration of conveyance by the United States to KCC of the surface and subsurface estate of the U.S. Exchange Lands as delineated in U.S. Survey 14495, subject to boundary adjustments as described Paragraph L and any valid existing rights, KCC agrees to convey to the United States the surface estate of certain lands it owns in Izembek NWR. The KCC

Exchange Lands will be selected as set forth in paragraph D from the KCC Exchange Lands Pool, subject to any valid existing rights, which are equal in value to the U.S. Exchange Lands.

C. The Parties agree the KCC Exchange Lands and the U.S. Exchange Lands will be of equal value which may not necessarily result in an acre-for-acre exchange. The Parties also agree the land exchange under this Agreement will not result in any charge against KCC's ANCSA entitlement.

D. Because the number of acres and value of the acreage comprising the U.S. Exchange Lands may be determined following any necessary boundary adjustments described in Paragraph L, the number of acres making up the KCC Exchange Lands will be adjusted to equalize the value of the exchange. To accomplish this:

    1. The contemplated conveyances of land may occur sequentially, with conveyance of the U.S. Exchange Lands to KCC to occur first. Within 12 months, and subject to a contaminant survey pursuant to Paragraph L, the United States will select lands of equal value for receipt from the KCC Exchange Lands Pool.

    2. The Parties agree that:

        a. The road, if any, constructed on the land conveyed to KCC pursuant to this Agreement (Road) shall be constructed to the standards for a two-way, single-lane road as set forth in the American Association of State Highway and Transportation Officials Guidelines for Geometric Design of Very Low-Volume Local Roads (ADT≤400) (2001). The Road shall be a gravel road (i.e., not surfaced with asphalt or concrete).

        b. The United States will have a right of ingress and egress to the road corridor to access Izembek NWR lands.

        c. KCC may also bear the cost relating to the remediation of any contaminants or hazardous materials found on KCC Exchange Lands unless such contaminants or hazardous materials were already present on the date that the land was conveyed to KCC or the United States agrees to accept an alternate parcel of equal value that is not contaminated.

        d. The United States will bear all costs relating to contaminants surveys, National Historic Preservation Act surveys, appraisals, and remediation, if any, of the U.S. Exchange lands.

        e. Each party is to bear its own attorney's fees and expenses.

    3. Upon receipt from KCC of the detailed legal property description of the U.S. Exchange Lands satisfying the requirements of paragraphs D.1 and D.2. above, the United States and KCC will work together to have appraisals prepared of the U.S. Exchange Lands and of the KCC Exchange Lands Pool; if the parties agree to use the Non-Federal Party process, rather than federal contracting, then all parties agree to that process consistent with AVSO guidance on the process. Copies of the completed appraisals will be provided to KCC and its counsel within thirty (30) days after

approval of the appraisals by the United States. The appraisal will be revisited, and supplemented as needed, if any boundary adjustment of the U.S. Exchange Lands is necessary pursuant to paragraph L.1.a. of this agreement or as a result of the Section 106 evaluation provided for by paragraph M. Both the US. Exchange Lands and the KCC Lands will be valued as if in private ownership and on the open market. Wilderness restrictions are not to be considered a factor on the U.S. Exchange Lands and the KCC Lands. Both the U.S Exchange Lands and the KCC Lands are to be appraised as though they are free from contaminants and hazardous materials and assuming there are no Section 106 conditions requiring protection. The U.S. Exchange Lands are appraised under the provision that abutting lands, outside the lands delineated in U.S. Survey No. 14495, Alaska may be considered in determination of the highest and best use for the valuation.

4. Following the completion of all contaminant surveys, appraisals, surveys as required by the National Historic Preservation Act, and possible conveyance of the U.S. Exchange Lands as described in subparagraph (1), the United States will select KCC Exchange Lands to be conveyed from the KCC Exchange Lands Pool that are of equal value to the United States Exchange Lands based on the appraisals completed pursuant to paragraph D.3.

E. Notwithstanding the foregoing paragraphs A – D, KCC, in addition to conveying the KCC Exchange Lands, will relinquish its selection rights under ANCSA to 5,430 acres located within Izembek NWR on the east side of Cold Bay, which are identified as "Village Selection – King Cove" and outlined in black on the map attached as Exhibit A. The Parties agree the relinquishment has no monetary value because KCC will be entitled to conveyance of 5,430 acres previously selected, but not yet conveyed under ANCSA, from outside the Izembek NWR.

F. The Parties agree that an abstract of title, title insurance, or other evidence of title to the KCC Exchange Lands, satisfactory to both the Department of the Interior's Solicitor's Office and KCC's counsel, will be obtained by the United States at its expense.

G. The Parties agree that once the legal descriptions are available they will utilize their best efforts and negotiate in good faith the final legal descriptions of the lands to be conveyed.

H. The Parties agree not to do, nor cause others to do, any act by which the value or title to lands owned by them (and referenced in this Agreement) may be diminished or encumbered, during the term of this Agreement. It is further agreed that any loss or damage occurring prior to the exchange by reason of the unauthorized cutting or removal of products therefrom, or because of fire, shall be borne by the owner in title of the loss or damaged land at the time of loss or damage.

I. During the period covered by the Agreement the officers, employees, and accredited agents of the Parties, including the State of Alaska on behalf of either Party, shall, subject to any restrictions required by law and permitting requirements of the land owner, have the right and privilege to enter upon the subject lands described herein in order to conduct physical examination of the U.S. Exchange Lands and the KCC Exchange Lands Pool. The Parties and the State of Alaska shall provide written notice in accordance with paragraph O.10 sufficiently in advance to process a permit application if required, or if not needed at least five (5) days in advance of any site visit.

J.  Conveyance by the United States of the U.S. Exchange Lands shall be by patent (preceded by Interim Conveyance if necessary) issued by the Bureau of Land Management. Conveyance of the surface estate by KCC to the United States of the KCC Exchange Lands shall be by Quitclaim Deed and by relinquishment of selection rights, as the case may be, in a form acceptable to the Parties. The Parties agree that if after patent is issued it is found that KCC has previously quitclaimed too few acres, then it will convey by quitclaim additional acres to the United States to equalize the exchange. If at the time of patent it is found KCC has quitclaimed too many acres, then the number of those excess acres will be added to its remaining entitlement under ANCSA.

K.  It is mutually understood and agreed by the Parties that this Agreement may not be assigned or transferred in whole or in part by either of the Parties, and any assignment or transfer in violation hereof shall be null and void and of no force or effect.

L.  The Parties acknowledge that the proposed exchange includes lands within an area classified as a Formerly Used Defense Site and that the United States is obligated to comply with section 120(h) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. § 9620. The United States will conduct, at its sole expense, a contaminants survey of all lands to be exchanged between the Parties. In the event potential contamination is found on any of the lands to be exchanged, the following remedies and procedures will apply:

   1.  If potential contamination is identified on the lands described in U.S. Survey No. 14495, Alaska:
       a.  The Parties agree that in the absence of extenuating circumstances such as an extensive area of contamination, the proper remedy will be to make a minor boundary adjustment to the road corridor that avoids the potential contamination and minimizes any increase in acreage to be conveyed by the United States. The United States will endeavor to survey the new description as quickly as possible to provide an adequate legal description for the appraisal of the new lands.
       b.  In the event that a boundary adjustment is not possible or practicable, the United States will seek a deferral from the Governor of Alaska in accordance with the requirements of 42 U.S.C § 9620(h)(3)(C) in order to convey the lands in their present state.
   2.  If the possible contamination is found with KCC Pool Lands:
       a.  If the United States determines the possible contamination occurred prior to the conveyance to the patent to KCC for said lands and KCC has not added to the contamination of the lands since it owned the land, the United States will accept the lands in an as-is condition.
       b.  If the United States determines the possible contamination has occurred after KCC received the lands, the United States will request substitute lands.

M.  The Parties acknowledge that the United States must complete a Section 106 review under the National Historic Preservation Act of the U.S. Exchange Lands. If a review finds the conveyance could adversely affect historic properties, the Parties agree that KCC can request a minor boundary adjustment to avoid the historic property or that the United States may require conditions on the conveyance to mitigate the adverse effects of the transfer.

N.  This Agreement shall become effective only upon its execution by both Parties, and the effective date of the Agreement shall be the date upon which the last of the above-described Parties

Case 3:19-cv-00216-JWS   Document 30-25   Filed 04/20/2009   Page 40 of 64

signs the Agreement.

O. Unless extended by written agreement of the Parties or otherwise terminated pursuant to the terms of this Agreement, this Agreement shall expire on December 31, 2027. If KCC has already received the U.S. Exchange Lands on or before December 31, 2027, but has not conveyed the KCC exchange Lands, the Agreement will stay in effect until KCC has completed the conveyance.

P. General Provisions:

    1.    The Parties mutually covenant and agree that this Agreement and any exhibits thereto embody the whole agreement of the Parties regarding the land exchange, and there are no promises, terms, conditions, or obligations other than those contained or referred to in this Agreement.

    2.    This Agreement may be amended, modified, or supplemented only by a written amendment signed by the Parties hereto with the effective date of any amendment being the date upon which the last of the subscribed Parties signs the amendment.

    3.    The Parties agree that clerical and typographical errors contained herein may be corrected upon written notice to the other Party, unless such errors are deemed substantive or otherwise objected to by any Party by written notice within sixty (60) days of the original notice.

    4.    Nothing in the Agreement shall be interpreted to require the obligation or payment of funds by the U.S. Fish and Wildlife Service or other Federal agency in violation of the Anti-Deficiency Act, 31 U.S.C. § 1341.

    5.    No Member of, Delegate to, or Resident Commissioner in, Congress shall be admitted to any share or part of this Agreement or to any benefit to arise therefrom unless the share or part or benefit is for the general benefit of a corporation or company.

    6.    This Agreement contains the entire agreement between the Parties and supersedes any and all prior written and/or oral agreements. The Parties agree that any oral or written representations made by any Party hereto during the negotiation of this Agreement which are not incorporated by writing into this Agreement are not binding.

    7.    The recital clauses set out in this Agreement are intended for convenience only rather than substantive import. The recital clauses shall not be used in the construction or interpretation of this Agreement.

    8.    The commitments, obligations, promises, representations, and warranties contained in this Agreement shall survive the closing and delivery of the deeds.

    9.    This Agreement may be executed in counterparts, including by facsimile signature, and all such counterparts taken together shall be one and the same instrument.

10. All notices, requests, orders, and other communications under this Agreement shall be in writing unless expressly provided otherwise and shall be deemed to have been duly given if delivered personally to the addressee, upon receipt if mailed by certified or registered mail, return receipt request, with postage prepaid, or upon confirmation of facsimile by the transmitting machine if faxed, as follows:

   To: U.S. Fish and Wildlife Service
       Attn: Chief, Division of Realty
       1011 E Tudor Rd., MS 211
       Anchorage, Alaska 99503
       Fax: 907-786-3901

   With a copy to (which shall not be deemed to be requisite notice):

       Refuge Manager
       Izembek National Wildlife Refuge
       P.O. Box 127
       Cold Bay, Alaska 99627
       Fax: 907-524-3251

   To: King Cove Corporation
       Attn: President Dean Gould
       P.O. Box 38
       King Cove, Alaska 99612
       Fax: 907-497-2444
       kcc@arctic.net

   With a copy to (which shall not be deemed requisite notice):

       King Cove Corporation
       Attn: Della Trumble
       P.O. Box 38
       King Cove, Alaska 99612
       dellat@arctic.net

   or to such other addresses as any Party may from time to time designate in a written notice to the others in the manner provided above.

11. Should litigation be brought by either party or by a third party which results in a delay of the times for action set out in this Agreement, the deadline for such action shall be extended for ninety (90) days beyond the date after which the delay caused by such litigation terminates.

12. Time is of the essence of this Agreement. The Parties jointly agree to use their best efforts to expedite all aspects and tasks of this Agreement, including but not limited to appraisals, permits, determination, and any other decision needed to fully implement this Agreement.

13. Should circumstances or events occur that are not covered by this Agreement,

the Parties agree to use their best efforts to resolve any problems arising out of such circumstances in a spirit of good faith and fair dealing.

14. If a Clause in this Agreement is determined by final judgment of any court of competent jurisdiction to be unlawful and/or unenforceable, the other Clauses of this Agreement will continue in effect and remain binding on the Parties; provided, however, that either Party may terminate this Agreement within ninety (90) days of such final judgment declaring a Clause unlawful or unenforceable if the Party determines in its sole judgment that the Clause was a fundamental term or condition of this Agreement.

The persons signing below represent that they have legal authority to execute this Agreement on behalf of their respective Federal agency and corporation.

**King Cove Corporation**

Date:_____       _____

**U.S. Department of the Interior**

Date:_____       _____
                                    Secretary of the Interior

**UNITED STATES DEPARTMENT OF THE INTERIOR**
**U.S. FISH AND WILDLIFE SERVICE**

## AGREEMENT FOR THE EXCHANGE OF LANDS

**THIS AGREEMENT,** made and entered into this 28th day of June 2019, by and between King Cove Corporation (KCC), a corporation organized under the laws of the State of Alaska, pursuant to the authority contained in the Alaska Native Claims Settlement Act, 43 U.S.C. § 1601, *et seq.*, (ANCSA), for itself and its successors, and the UNITED STATES OF AMERICA (United States) acting by and through the Secretary of the Interior, or his authorized representative (Both KCC and the United States are collectively referred to as "the Parties"). The authority for the exchange is section 1302(h) of the Alaska National Interest Lands Conservation Act, Pub. L. 96-487, as amended by Pub. L. 100-395, § 201, 102 Stat. 979, 981 (1988) (ANILCA).

### RECITALS

**WHEREAS**, KCC owns the surface estate of lands physically located within the external boundaries of the Izembek National Wildlife Refuge (Izembek NWR).

**WHEREAS**, the United States owns the surface and subsurface estate to certain lands located within the boundaries of the Izembek NWR.

**WHEREAS**, under the terms and procedures set forth in this Agreement, the United States intends to convey to KCC the surface and subsurface estate of the lands delineated in U.S. Survey No. 14495, Alaska, that have been previously identified by KCC as being needed for the construction, operation, and maintenance of a road linking King Cove with the Cold Bay airport (the U.S. Exchange Lands).

**WHEREAS**, the intent of this exchange is for lands of equivalent value, to make the values equivalent, the Federal lands are to be appraised to determine the per acre value of the Federal lands and the acreage range within which that per acre value would apply; subsequently, the King Cove lands will be similarly appraised, and the exchange will occur based on the proportionate value of the lands from each party.

**WHEREAS**, King Cove, Alaska is an isolated Aleut Native village, recognized as a village under ANCSA and located at the end of the Alaska Peninsula at the beginning of the Aleutian Island chain in southwest Alaska.

**WHEREAS**, there are two Tribes recognized by the United States in King Cove: the Agdaagux Tribe of King Cove and the Native Village of Belkofski.

**WHEREAS**, there is an approximate 12-mile gap between the road leading out of King Cove and the road to the Cold Bay airport, which is Alaska's fourth-longest paved civilian runway and suitable for use by air evacuation jet aircraft.

**WHEREAS**, the residents of King Cove cannot regularly reach the Cold Bay airport because inclement weather prevents small aircraft from flying between King Cove and Cold Bay and hinders seagoing vessels transiting miles of open ocean between King Cove and Cold Bay.

**WHEREAS**, there have been 101 medical evacuations (medevac) from King Cove since December 23, 2013, including 21 by the U.S. Coast Guard, because commercial medevac carriers determined that it was too dangerous to fly into King Cove.

**WHEREAS**, King Cove residents and others have died attempting to travel to and from King Cove or Cold Bay and from being unable to get from King Cove to the Cold Bay airport for medevac transport to Anchorage.

**WHEREAS**, Congress has passed legislation twice in the past 20 years to address the transportation problem, which has not produced a solution satisfactory to the needs of King Cove residents.

**WHEREAS**, KCC owns lands (the KCC Exchange Lands Pool) within the exterior boundaries of Izembek NWR, which are identified on the attached map (Exhibit A) as "Village Patent – King Cove."

**WHEREAS**, the lands in the KCC Exchange Lands Pool have been identified by the U.S. Fish and Wildlife Service for future acquisition if such lands became available.

**WHEREAS**, KCC represents to the United States that none of the KCC Exchange Lands Pool lands are subject to conveyance pursuant to section 14(c) of ANCSA, or subject to any known legal third-party possessory rights.

**WHEREAS**, the United States represents to KCC that none of the U.S. Exchange Lands to be conveyed to KCC are subject to any Native Allotments, Federal mining claims, nor any known legal third-party possessory rights.

**WHEREAS,** the Secretary of the Interior concluded that this land exchange with KCC that allows for construction of a road between King Cove and Cold Bay would improve public safety, and serve the purposes of ANILCA by striking the proper and appropriate balance between protecting the national interest in the scenic, natural, cultural and environmental values of the public lands in Alaska and providing an adequate opportunity for satisfaction of the economic and social needs of the State of Alaska.

INT-002856

NOW, **THEREFORE**, in consideration of their mutual promises and other good and valuable consideration, the Parties hereto covenant and agree as follows:

## AGREEMENT

A. The Parties agree to the exchange of real property interests set forth in the following paragraphs and agree to be bound thereby. The Parties agree that the exchange is made pursuant to the Secretary of the Interior's authority under section 1302(h) of ANILCA, as amended, 16 U.S.C. § 3192(h), and that pursuant to 43 U.S.C. § 1613(a) this exchange of land is a conveyance under ANCSA, which is therefore subject to section 910 of ANILCA, 43 U.S.C. § 1638.

B. In consideration of conveyance by the United States to KCC of the surface and subsurface estate of the U.S. Exchange Lands as delineated in U.S. Survey 14495, subject to boundary adjustments as described Paragraph L and any valid existing rights, KCC agrees to convey to the United States the surface estate of certain lands it owns in Izembek NWR. The KCC Exchange Lands will be selected as set forth in paragraph D from the KCC Exchange Lands Pool, subject to any valid existing rights, which are equal in value to the U.S. Exchange Lands.

C. The Parties agree the KCC Exchange Lands and the U.S. Exchange Lands will be of equal value which may not necessarily result in an acre-for-acre exchange. The Parties also agree the land exchange under this Agreement will not result in any charge against KCC's ANCSA entitlement.

D. Because the number of acres and value of the acreage comprising the U.S. Exchange Lands may be determined following any necessary boundary adjustments described in paragraph L, the number of acres making up the KCC Exchange Lands will be adjusted to equalize the value of the exchange. To accomplish this:

    1. The contemplated conveyances of land may occur sequentially, with conveyance of the U.S. Exchange Lands to KCC to occur first. Within 12 months, and subject to a contaminant survey pursuant to paragraph L, the United States will select lands of equal value for receipt from the KCC Exchange Lands Pool.

    2. The Parties agree that:

        a. The road, if any, constructed on the land conveyed to KCC pursuant to this Agreement (Road) shall be constructed to the standards for a two-way, single- lane road as set forth in the American Association of State Highway and Transportation Officials Guidelines for Geometric Design of Very Low- Volume Local Roads (ADT≤400) (2001). The Road shall be a gravel road (i.e., not surfaced with asphalt or concrete).

b. The United States will have a right of ingress and egress to the road corridor to access Izembek NWR lands.

c. KCC may also bear the cost relating to the remediation of any contaminants or hazardous materials found on KCC Exchange Lands unless such contaminants or hazardous materials were already present on the date that the land was conveyed to KCC or the United States agrees to accept an alternate parcel of equal value that is not contaminated.

d. The United States will bear all costs relating to contaminants surveys, National Historic Preservation Act surveys, appraisals, and remediation, if any, of the U.S. Exchange lands.

e. Each Party is to bear its own attorney's fees and expenses.

3. Upon receipt from KCC of the detailed legal property description of the U.S. Exchange Lands satisfying the requirements of paragraphs D.1 and D.2. above, the United States and KCC will work together to have appraisals prepared of the U.S. Exchange Lands and of the KCC Exchange Lands Pool; if the Parties agree to use the Non-Federal Party process, rather than Federal contracting, then all Parties agree to that process consistent with AVSO guidance on the process. Copies of the completed appraisals will be provided to KCC and its counsel within thirty (30) days after approval of the appraisals by the United States. The appraisal will be revisited, and supplemented as needed, if any boundary adjustment of the U.S. Exchange Lands is necessary pursuant to paragraph L.1.a. of this agreement or as a result of the Section 106 evaluation provided for by paragraph M. Both the US. Exchange Lands and the KCC Lands will be valued as if in private ownership and on the open market. Wilderness restrictions are not to be considered a factor on the U.S. Exchange Lands and the KCC Lands. Both the U.S Exchange Lands and the KCC Lands are to be appraised as though they are free from contaminants and hazardous materials and assuming there are no Section 106 conditions requiring protection. The U.S. Exchange Lands are appraised under the provision that abutting lands, outside the lands delineated in U.S. Survey No. 14495, Alaska may be considered in determination of the highest and best use for the valuation.

4. Following the completion of all contaminant surveys, appraisals, surveys as required by the National Historic Preservation Act, and possible conveyance of the U.S. Exchange Lands as described in subparagraph (1), the United States will select KCC Exchange Lands to be conveyed from the KCC Exchange Lands Pool that are of equal value to the United States Exchange Lands based on the appraisals completed pursuant to paragraph D.3.

E. Notwithstanding the foregoing paragraphs A – D, KCC, in addition to conveying the KCC Exchange Lands, will relinquish its selection rights under ANCSA to 5,430 acres located within Izembek NWR on the east side of Cold Bay, which are identified as "Village Selection – King Cove" and outlined in black on the map attached as exhibit A. The

Parties agree the relinquishment has no monetary value because KCC will be entitled to conveyance of 5,430 acres previously selected, but not yet conveyed under ANCSA, from outside the Izembek NWR.

F.  The Parties agree that an abstract of title, title insurance, or other evidence of title to the KCC Exchange Lands, satisfactory to both the Department of the Interior's Solicitor's Office and KCC's counsel, will be obtained by the United States at its expense.

G.  The Parties agree that once the legal descriptions are available they will utilize their best efforts and negotiate in good faith the final legal descriptions of the lands to be conveyed.

H.  The Parties agree not to do, nor cause others to do, any act by which the value or title to lands owned by them (and referenced in this Agreement) may be diminished or encumbered, during the term of this Agreement. It is further agreed that any loss or damage occurring prior to the exchange by reason of the unauthorized cutting or removal of products therefrom, or because of fire, shall be borne by the owner in title of the loss or damaged land at the time of loss or damage.

I.  During the period covered by the Agreement the officers, employees, and accredited agents of the Parties, including the State of Alaska on behalf of either Party, shall, subject to any restrictions required by law and permitting requirements of the land owner, have the right and privilege to enter upon the subject lands described herein in order to conduct physical examination of the U.S. Exchange Lands and the KCC Exchange Lands Pool. The Parties and the State of Alaska shall provide written notice in accordance with paragraph O.10 sufficiently in advance to process a permit application if required, or if not needed at least five (5) days in advance of any site visit.

J.  Conveyance by the United States of the U.S. Exchange Lands shall be by patent (preceded by Interim Conveyance if necessary) issued by the Bureau of Land Management. Conveyance of the surface estate by KCC to the United States of the KCC Exchange Lands shall be by Quitclaim Deed and by relinquishment of selection rights, as the case may be, in a form acceptable to the Parties. The Parties agree that if after patent is issued it is found that KCC has previously quitclaimed too few acres, then it will convey by quitclaim additional acres to the United States to equalize the exchange. If at the time of patent it is found KCC has quitclaimed too many acres, then the number of those excess acres will be added to its remaining entitlement under ANCSA.

K.  It is mutually understood and agreed by the Parties that this Agreement may not be assigned or transferred in whole or in part by either of the Parties, and any assignment or transfer in violation hereof shall be null and void and of no force or effect.

L.  The Parties acknowledge that the proposed exchange includes lands within an area classified as a Formerly Used Defense Site and that the United States is obligated to comply with section 120(h) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. § 9620. The United States will

INT-002859

conduct, at its sole expense, a contaminants survey of all lands to be exchanged between the Parties. In the event potential contamination is found on any of the lands to be exchanged, the following remedies and procedures will apply:

1. If potential contamination is identified on the lands described in U.S. Survey No. 14495, Alaska:
    a. The Parties agree that in the absence of extenuating circumstances such as an extensive area of contamination, the proper remedy will be to make a minor boundary adjustment to the road corridor that avoids the potential contamination and minimizes any increase in acreage to be conveyed by the United States. The United States will endeavor to survey the new description as quickly as possible to provide an adequate legal description for the appraisal of the new lands.
    b. In the event that a boundary adjustment is not possible or practicable, the United States will seek a deferral from the Governor of Alaska in accordance with the requirements of 42 U.S.C § 9620(h)(3)(C) in order to convey the lands in their present state.
2. If the possible contamination is found with KCC Pool Lands:
    a. If the United States determines the possible contamination occurred prior to the conveyance to the patent to KCC for said lands and KCC has not added to the contamination of the lands since it owned the land, the United States will accept the lands in an as-is condition.
    b. If the United States determines the possible contamination has occurred after KCC received the lands, the United States will request substitute lands.

M. The Parties acknowledge that the United States must complete a Section 106 review under the National Historic Preservation Act of the U.S. Exchange Lands. If a review finds the conveyance could adversely affect historic properties, the Parties agree that KCC can request a minor boundary adjustment to avoid the historic property or that the United States may require conditions on the conveyance to mitigate the adverse effects of the transfer.

N. This Agreement shall become effective only upon its execution by both Parties, and the effective date of the Agreement shall be the date upon which the last of the subscribed Parties signs the Agreement.

O. Unless extended by written agreement of the Parties or otherwise terminated pursuant to the terms of this Agreement, this Agreement shall expire on December 31, 2027. If KCC has already received the U.S. Exchange Lands on or before December 31, 2027, but has not conveyed the KCC exchange Lands, the Agreement will stay in effect until KCC has completed the conveyance.

P. General Provisions:

1. The Parties mutually covenant and agree that this Agreement and any exhibits thereto embody the whole agreement of the Parties regarding the land exchange, and there are no promises, terms, conditions, or obligations other than those contained or referred to in this Agreement.

2. This Agreement may be amended, modified, or supplemented only by a written amendment signed by the Parties hereto with the effective date of any amendment being the date upon which the last of the subscribed Parties signs the amendment.

3. The Parties agree that clerical and typographical errors contained herein may be corrected upon written notice to the other Party, unless such errors are deemed substantive or otherwise objected to by any Party by written notice within sixty (60) days of the original notice.

4. Nothing in the Agreement shall be interpreted to require the obligation or payment of funds by the U.S. Fish and Wildlife Service or other Federal agency in violation of the Anti-Deficiency Act, 31 U.S.C. § 1341.

5. No Member of, Delegate to, or Resident Commissioner in, Congress shall be admitted to any share or part of this Agreement or to any benefit to arise therefrom unless the share or part or benefit is for the general benefit of a corporation or company.

6. This Agreement contains the entire agreement between the Parties and supersedes any and all prior written and/or oral agreements. The Parties agree that any oral or written representations made by any Party hereto during the negotiation of this Agreement which are not incorporated by writing into this Agreement are not binding.

7. The recital clauses set out in this Agreement are intended for convenience only rather than substantive import. The recital clauses shall not be used in the construction or interpretation of this Agreement.

8. The commitments, obligations, promises, representations, and warranties contained in this Agreement shall survive the closing and delivery of the deeds.

9. This Agreement may be executed in counterparts, including by facsimile signature, and all such counterparts taken together shall be one and the same instrument.

INT-002861

10. All notices, requests, orders, and other communications under this Agreement shall be in writing unless expressly provided otherwise and shall be deemed to have been duly given if delivered personally to the addressee, upon receipt if mailed by certified or registered mail, return receipt request, with postage prepaid, or upon confirmation of facsimile by the transmitting machine if faxed, as follows:

To: U.S. Fish and Wildlife Service Attn: Chief, Division of Realty 1011 E Tudor Rd., MS 211 Anchorage, Alaska 99503 Fax: 907-786-3901

With a copy to (which shall not be deemed to be requisite

notice): Refuge Manager Izembek National Wildlife Refuge P.O. Box 127 Cold Bay, Alaska 99627 Fax: 907-524-3251

To: King Cove Corporation Attn: President Dean Gould P.O. Box 38 King Cove, Alaska 99612 Fax: 907-497-2444 kcc@arctic.net

With a copy to (which shall not be deemed requisite notice):

King Cove Corporation Attn: Della Trumble P.O. Box 38 King Cove, Alaska 99612 dellat@arctic.net

or to such other addresses as any Party may from time to time designate in a written notice to the others in the manner provided above.

INT-002862

11. Should litigation be brought by either party or by a third party which results in a delay of the times for action set out in this Agreement, the deadline for such action shall be extended for ninety (90) days beyond the date after which the delay caused by such litigation terminates.

12. Time is of the essence of this Agreement. The Parties jointly agree to use their best efforts to expedite all aspects and tasks of this Agreement, including but not limited to appraisals, permits, determination, and any other decision needed to fully implement this Agreement.

13. Should circumstances or events occur that are not covered by this Agreement, the Parties agree to use their best efforts to resolve any problems arising out of such circumstances in a spirit of good faith and fair dealing.

14. If a Clause in this Agreement is determined by final judgment of any court of competent jurisdiction to be unlawful and/or unenforceable, the other Clauses of this Agreement will continue in effect and remain binding on the Parties; provided, however, that either Party may terminate this Agreement within ninety (90) days of such final judgment declaring a Clause unlawful or unenforceable if the Party determines in its sole judgment that the Clause was a fundamental term or condition of this Agreement.

The persons signing below represent that they have legal authority to execute this Agreement on behalf of their respective Federal agency and corporation.

**King Cove Corporation**

Date:_____

_____
Chief Executive Officer

**U.S. Department of the Interior**

Date: 07/03/19

_____
Secretary of the Interior

INT-002863

# Tab 43



# KING COVE CORPORATION
P.O. Box 38
King Cove, AK. 99612

907, 497-2312

Fax: 907, 497-2444
e-mail: kcc@arctic.net

July 12, 2019

Honorable David Bernhardt
Secretary of Interior
1849 C Street, Room 6612
Washington, DC 20240

Dear Secretary Bernhardt:

Thank you for your response to our May 21, 2019 letter regarding a potential Land Exchange Agreement between the U.S. Department of the Interior (DOI) and the King Cove Corporation.

The King Cove Corporation has carefully reviewed the proposed Agreement from DOI and is now prepared to sign it.

Attached to this transmittal letter is a signed/executed copy of the Agreement. I have signed the Agreement as the Chief Executive Officer of the King Cove Corporation.

Thank you, Secretary Bernhardt, for supporting the Aleut people of King Cove, including the King Cove (ANCSA) Corporation and the Agdaagux Tribe of King Cove and the Native Village of Belkofski.

We look forward to working with you and your Department to implement this Agreement.

Sincerely,

Della Trumble
Chief Executive Officer
King Cove Corporation

RECEIVED
2019 JUL 19 PM 12:48
OFFICE OF THE
EXECUTIVE SECRETARY

**UNITED STATES DEPARTMENT OF THE INTERIOR**
**U.S. FISH AND WILDLIFE SERVICE**

# AGREEMENT FOR THE EXCHANGE OF LANDS

**THIS AGREEMENT,** made and entered into this 28th day of June 2019, by and between King Cove Corporation (KCC), a corporation organized under the laws of the State of Alaska, pursuant to the authority contained in the Alaska Native Claims Settlement Act, 43 U.S.C. § 1601, *et seq.*, (ANCSA), for itself and its successors, and the UNITED STATES OF AMERICA (United States) acting by and through the Secretary of the Interior, or his authorized representative (Both KCC and the United States are collectively referred to as "the Parties"). The authority for the exchange is section 1302(h) of the Alaska National Interest Lands Conservation Act, Pub. L. 96-487, as amended by Pub. L. 100-395, § 201, 102 Stat. 979, 981 (1988) (ANILCA).

## RECITALS

**WHEREAS**, KCC owns the surface estate of lands physically located within the external boundaries of the Izembek National Wildlife Refuge (Izembek NWR).

**WHEREAS**, the United States owns the surface and subsurface estate to certain lands located within the boundaries of the Izembek NWR.

**WHEREAS**, under the terms and procedures set forth in this Agreement, the United States intends to convey to KCC the surface and subsurface estate of the lands delineated in U.S. Survey No. 14495, Alaska, that have been previously identified by KCC as being needed for the construction, operation, and maintenance of a road linking King Cove with the Cold Bay airport (the U.S. Exchange Lands).

**WHEREAS**, the intent of this exchange is for lands of equivalent value, to make the values equivalent, the Federal lands are to be appraised to determine the per acre value of the Federal lands and the acreage range within which that per acre value would apply; subsequently, the King Cove lands will be similarly appraised, and the exchange will occur based on the proportionate value of the lands from each party.

**WHEREAS**, King Cove, Alaska is an isolated Aleut Native village, recognized as a village under ANCSA and located at the end of the Alaska Peninsula at the beginning of the Aleutian Island chain in southwest Alaska.

**WHEREAS**, there are two Tribes recognized by the United States in King Cove: the Agdaagux Tribe of King Cove and the Native Village of Belkofski.

INT-002865

**WHEREAS**, there is an approximate 12-mile gap between the road leading out of King Cove and the road to the Cold Bay airport, which is Alaska's fourth-longest paved civilian runway and suitable for use by air evacuation jet aircraft.

**WHEREAS**, the residents of King Cove cannot regularly reach the Cold Bay airport because inclement weather prevents small aircraft from flying between King Cove and Cold Bay and hinders seagoing vessels transiting miles of open ocean between King Cove and Cold Bay.

**WHEREAS**, there have been 101 medical evacuations (medevac) from King Cove since December 23, 2013, including 21 by the U.S. Coast Guard, because commercial medevac carriers determined that it was too dangerous to fly into King Cove.

**WHEREAS**, King Cove residents and others have died attempting to travel to and from King Cove or Cold Bay and from being unable to get from King Cove to the Cold Bay airport for medevac transport to Anchorage.

**WHEREAS**, Congress has passed legislation twice in the past 20 years to address the transportation problem, which has not produced a solution satisfactory to the needs of King Cove residents.

**WHEREAS**, KCC owns lands (the KCC Exchange Lands Pool) within the exterior boundaries of Izembek NWR, which are identified on the attached map (Exhibit A) as "Village Patent – King Cove."

**WHEREAS**, the lands in the KCC Exchange Lands Pool have been identified by the U.S. Fish and Wildlife Service for future acquisition if such lands became available.

**WHEREAS**, KCC represents to the United States that none of the KCC Exchange Lands Pool lands are subject to conveyance pursuant to section 14(c) of ANCSA, or subject to any known legal third-party possessory rights.

**WHEREAS**, the United States represents to KCC that none of the U.S. Exchange Lands to be conveyed to KCC are subject to any Native Allotments, Federal mining claims, nor any known legal third-party possessory rights.

**WHEREAS,** the Secretary of the Interior concluded that this land exchange with KCC that allows for construction of a road between King Cove and Cold Bay would improve public safety, and serve the purposes of ANILCA by striking the proper and appropriate balance between protecting the national interest in the scenic, natural, cultural and environmental values of the public lands in Alaska and providing an adequate opportunity for satisfaction of the economic and social needs of the State of Alaska.

**NOW, THEREFORE**, in consideration of their mutual promises and other good and valuable consideration, the Parties hereto covenant and agree as follows:

## AGREEMENT

A. The Parties agree to the exchange of real property interests set forth in the following paragraphs and agree to be bound thereby. The Parties agree that the exchange is made pursuant to the Secretary of the Interior's authority under section 1302(h) of ANILCA, as amended, 16 U.S.C. § 3192(h), and that pursuant to 43 U.S.C. § 1613(a) this exchange of land is a conveyance under ANCSA, which is therefore subject to section 910 of ANILCA, 43 U.S.C. § 1638.

B. In consideration of conveyance by the United States to KCC of the surface and subsurface estate of the U.S. Exchange Lands as delineated in U.S. Survey 14495, subject to boundary adjustments as described Paragraph L and any valid existing rights, KCC agrees to convey to the United States the surface estate of certain lands it owns in Izembek NWR. The KCC Exchange Lands will be selected as set forth in paragraph D from the KCC Exchange Lands Pool, subject to any valid existing rights, which are equal in value to the U.S. Exchange Lands.

C. The Parties agree the KCC Exchange Lands and the U.S. Exchange Lands will be of equal value which may not necessarily result in an acre-for-acre exchange. The Parties also agree the land exchange under this Agreement will not result in any charge against KCC's ANCSA entitlement.

D. Because the number of acres and value of the acreage comprising the U.S. Exchange Lands may be determined following any necessary boundary adjustments described in paragraph L, the number of acres making up the KCC Exchange Lands will be adjusted to equalize the value of the exchange. To accomplish this:

    1. The contemplated conveyances of land may occur sequentially, with conveyance of the U.S. Exchange Lands to KCC to occur first. Within 12 months, and subject to a contaminant survey pursuant to paragraph L, the United States will select lands of equal value for receipt from the KCC Exchange Lands Pool.

    2. The Parties agree that:

        a. The road, if any, constructed on the land conveyed to KCC pursuant to this Agreement (Road) shall be constructed to the standards for a two-way, single- lane road as set forth in the American Association of State Highway and Transportation Officials Guidelines for Geometric Design of Very Low- Volume Local Roads (ADT≤400) (2001). The Road shall be a gravel road (i.e., not surfaced with asphalt or concrete).

b. The United States will have a right of ingress and egress to the road corridor to access Izembek NWR lands.

c. KCC may also bear the cost relating to the remediation of any contaminants or hazardous materials found on KCC Exchange Lands unless such contaminants or hazardous materials were already present on the date that the land was conveyed to KCC or the United States agrees to accept an alternate parcel of equal value that is not contaminated.

d. The United States will bear all costs relating to contaminants surveys, National Historic Preservation Act surveys, appraisals, and remediation, if any, of the U.S. Exchange lands.

e. Each Party is to bear its own attorney's fees and expenses.

3. Upon receipt from KCC of the detailed legal property description of the U.S. Exchange Lands satisfying the requirements of paragraphs D.1 and D.2. above, the United States and KCC will work together to have appraisals prepared of the U.S. Exchange Lands and of the KCC Exchange Lands Pool; if the Parties agree to use the Non-Federal Party process, rather than Federal contracting, then all Parties agree to that process consistent with AVSO guidance on the process. Copies of the completed appraisals will be provided to KCC and its counsel within thirty (30) days after approval of the appraisals by the United States. The appraisal will be revisited, and supplemented as needed, if any boundary adjustment of the U.S. Exchange Lands is necessary pursuant to paragraph L.1.a. of this agreement or as a result of the Section 106 evaluation provided for by paragraph M. Both the US. Exchange Lands and the KCC Lands will be valued as if in private ownership and on the open market. Wilderness restrictions are not to be considered a factor on the U.S. Exchange Lands and the KCC Lands. Both the U.S Exchange Lands and the KCC Lands are to be appraised as though they are free from contaminants and hazardous materials and assuming there are no Section 106 conditions requiring protection. The U.S. Exchange Lands are appraised under the provision that abutting lands, outside the lands delineated in U.S. Survey No. 14495, Alaska may be considered in determination of the highest and best use for the valuation.

4. Following the completion of all contaminant surveys, appraisals, surveys as required by the National Historic Preservation Act, and possible conveyance of the U.S. Exchange Lands as described in subparagraph (1), the United States will select KCC Exchange Lands to be conveyed from the KCC Exchange Lands Pool that are of equal value to the United States Exchange Lands based on the appraisals completed pursuant to paragraph D.3.

E. Notwithstanding the foregoing paragraphs A – D, KCC, in addition to conveying the KCC Exchange Lands, will relinquish its selection rights under ANCSA to 5,430 acres located within Izembek NWR on the east side of Cold Bay, which are identified as "Village Selection – King Cove" and outlined in black on the map attached as exhibit A. The

Parties agree the relinquishment has no monetary value because KCC will be entitled to conveyance of 5,430 acres previously selected, but not yet conveyed under ANCSA, from outside the Izembek NWR.

F. The Parties agree that an abstract of title, title insurance, or other evidence of title to the KCC Exchange Lands, satisfactory to both the Department of the Interior's Solicitor's Office and KCC's counsel, will be obtained by the United States at its expense.

G. The Parties agree that once the legal descriptions are available they will utilize their best efforts and negotiate in good faith the final legal descriptions of the lands to be conveyed.

H. The Parties agree not to do, nor cause others to do, any act by which the value or title to lands owned by them (and referenced in this Agreement) may be diminished or encumbered, during the term of this Agreement. It is further agreed that any loss or damage occurring prior to the exchange by reason of the unauthorized cutting or removal of products therefrom, or because of fire, shall be borne by the owner in title of the loss or damaged land at the time of loss or damage.

I. During the period covered by the Agreement the officers, employees, and accredited agents of the Parties, including the State of Alaska on behalf of either Party, shall, subject to any restrictions required by law and permitting requirements of the land owner, have the right and privilege to enter upon the subject lands described herein in order to conduct physical examination of the U.S. Exchange Lands and the KCC Exchange Lands Pool. The Parties and the State of Alaska shall provide written notice in accordance with paragraph O.10 sufficiently in advance to process a permit application if required, or if not needed at least five (5) days in advance of any site visit.

J. Conveyance by the United States of the U.S. Exchange Lands shall be by patent (preceded by Interim Conveyance if necessary) issued by the Bureau of Land Management. Conveyance of the surface estate by KCC to the United States of the KCC Exchange Lands shall be by Quitclaim Deed and by relinquishment of selection rights, as the case may be, in a form acceptable to the Parties. The Parties agree that if after patent is issued it is found that KCC has previously quitclaimed too few acres, then it will convey by quitclaim additional acres to the United States to equalize the exchange. If at the time of patent it is found KCC has quitclaimed too many acres, then the number of those excess acres will be added to its remaining entitlement under ANCSA.

K. It is mutually understood and agreed by the Parties that this Agreement may not be assigned or transferred in whole or in part by either of the Parties, and any assignment or transfer in violation hereof shall be null and void and of no force or effect.

L. The Parties acknowledge that the proposed exchange includes lands within an area classified as a Formerly Used Defense Site and that the United States is obligated to comply with section 120(h) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. § 9620. The United States will

conduct, at its sole expense, a contaminants survey of all lands to be exchanged between the Parties. In the event potential contamination is found on any of the lands to be exchanged, the following remedies and procedures will apply:

1. If potential contamination is identified on the lands described in U.S. Survey No. 14495, Alaska:
   a. The Parties agree that in the absence of extenuating circumstances such as an extensive area of contamination, the proper remedy will be to make a minor boundary adjustment to the road corridor that avoids the potential contamination and minimizes any increase in acreage to be conveyed by the United States. The United States will endeavor to survey the new description as quickly as possible to provide an adequate legal description for the appraisal of the new lands.
   b. In the event that a boundary adjustment is not possible or practicable, the United States will seek a deferral from the Governor of Alaska in accordance with the requirements of 42 U.S.C § 9620(h)(3)(C) in order to convey the lands in their present state.
2. If the possible contamination is found with KCC Pool Lands:
   a. If the United States determines the possible contamination occurred prior to the conveyance to the patent to KCC for said lands and KCC has not added to the contamination of the lands since it owned the land, the United States will accept the lands in an as-is condition.
   b. If the United States determines the possible contamination has occurred after KCC received the lands, the United States will request substitute lands.

M. The Parties acknowledge that the United States must complete a Section 106 review under the National Historic Preservation Act of the U.S. Exchange Lands. If a review finds the conveyance could adversely affect historic properties, the Parties agree that KCC can request a minor boundary adjustment to avoid the historic property or that the United States may require conditions on the conveyance to mitigate the adverse effects of the transfer.

N. This Agreement shall become effective only upon its execution by both Parties, and the effective date of the Agreement shall be the date upon which the last of the subscribed Parties signs the Agreement.

O. Unless extended by written agreement of the Parties or otherwise terminated pursuant to the terms of this Agreement, this Agreement shall expire on December 31, 2027. If KCC has already received the U.S. Exchange Lands on or before December 31, 2027, but has not conveyed the KCC exchange Lands, the Agreement will stay in effect until KCC has completed the conveyance.

P. General Provisions:

1.    The Parties mutually covenant and agree that this Agreement and any exhibits thereto embody the whole agreement of the Parties regarding the land exchange, and there are no promises, terms, conditions, or obligations other than those contained or referred to in this Agreement.

2.    This Agreement may be amended, modified, or supplemented only by a written amendment signed by the Parties hereto with the effective date of any amendment being the date upon which the last of the subscribed Parties signs the amendment.

3.    The Parties agree that clerical and typographical errors contained herein may be corrected upon written notice to the other Party, unless such errors are deemed substantive or otherwise objected to by any Party by written notice within sixty (60) days of the original notice.

4.    Nothing in the Agreement shall be interpreted to require the obligation or payment of funds by the U.S. Fish and Wildlife Service or other Federal agency in violation of the Anti-Deficiency Act, 31 U.S.C. § 1341.

5.    No Member of, Delegate to, or Resident Commissioner in, Congress shall be admitted to any share or part of this Agreement or to any benefit to arise therefrom unless the share or part or benefit is for the general benefit of a corporation or company.

6.    This Agreement contains the entire agreement between the Parties and supersedes any and all prior written and/or oral agreements. The Parties agree that any oral or written representations made by any Party hereto during the negotiation of this Agreement which are not incorporated by writing into this Agreement are not binding.

7.    The recital clauses set out in this Agreement are intended for convenience only rather than substantive import. The recital clauses shall not be used in the construction or interpretation of this Agreement.

8.    The commitments, obligations, promises, representations, and warranties contained in this Agreement shall survive the closing and delivery of the deeds.

9.    This Agreement may be executed in counterparts, including by facsimile signature, and all such counterparts taken together shall be one and the same instrument.

10. All notices, requests, orders, and other communications under this Agreement shall be in writing unless expressly provided otherwise and shall be deemed to have been duly given if delivered personally to the addressee, upon receipt if mailed by certified or registered mail, return receipt request, with postage prepaid, or upon confirmation of facsimile by the transmitting machine if faxed, as follows:

To: U.S. Fish and Wildlife Service Attn: Chief, Division of Realty 1011 E Tudor Rd., MS 211 Anchorage, Alaska 99503 Fax: 907-786-3901

With a copy to (which shall not be deemed to be requisite

notice): Refuge Manager Izembek National Wildlife Refuge P.O. Box 127 Cold Bay, Alaska 99627 Fax: 907-524-3251

To: King Cove Corporation Attn: President Dean Gould P.O. Box 38 King Cove, Alaska 99612 Fax: 907-497-2444 kcc@arctic.net

With a copy to (which shall not be deemed requisite notice):

King Cove Corporation Attn: Della Trumble P.O. Box 38 King Cove, Alaska 99612 dellat@arctic.net

or to such other addresses as any Party may from time to time designate in a written notice to the others in the manner provided above.

INT-002872

11. Should litigation be brought by either party or by a third party which results in a delay of the times for action set out in this Agreement, the deadline for such action shall be extended for ninety (90) days beyond the date after which the delay caused by such litigation terminates.

12. Time is of the essence of this Agreement. The Parties jointly agree to use their best efforts to expedite all aspects and tasks of this Agreement, including but not limited to appraisals, permits, determination, and any other decision needed to fully implement this Agreement.

13. Should circumstances or events occur that are not covered by this Agreement, the Parties agree to use their best efforts to resolve any problems arising out of such circumstances in a spirit of good faith and fair dealing.

14. If a Clause in this Agreement is determined by final judgment of any court of competent jurisdiction to be unlawful and/or unenforceable, the other Clauses of this Agreement will continue in effect and remain binding on the Parties; provided, however, that either Party may terminate this Agreement within ninety (90) days of such final judgment declaring a Clause unlawful or unenforceable if the Party determines in its sole judgment that the Clause was a fundamental term or condition of this Agreement.

The persons signing below represent that they have legal authority to execute this Agreement on behalf of their respective Federal agency and corporation.

**King Cove Corporation**

Date: _7-12-19_

Chief Executive Officer

**U.S. Department of the Interior**

Date: _07/03/19_

Secretary of the Interior



King Cove – Exhibit A

INT-002874