**UNITED STATES DISTRICT COURT**

**DISTRICT OF ALASKA**

**FRIENDS OF ALASKA NATIONAL WILDLIFE REFUGES, *et al.*,**   )
)
   **Plaintiffs,**      )
)
  **vs.**         )
)
**DAVID BERNHARDT, *et al.*,**  )
)
   **Federal Defendants,**  )
)
   **and**       )
)
**KING COVE CORPORATION, *et al.*,** )
)
   **Intervenor-Defendants.** )
)

**3:19-CV-00216 JWS**

**ORDER AND OPINION**

**[Re: Motion at docket 32]**

## I.  MOTION PRESENTED

At docket 32 Plaintiffs Friends of Alaska National Wildlife Refuges; The Wilderness Society; Defenders of Wildlife; National Audubon Society; Wilderness Watch; Center for Biological Diversity; National Wildlife Refuge Association; Alaska Wilderness League; and Sierra Club (collectively "Plaintiffs") filed a motion for summary judgment.  Defendants David Bernhardt; U.S. Department of the Interior; U.S. Fish and Wildlife Service ("Federal Defendants") opposed the motion at docket 38.  Intervenor-Defendants King Cove Corporation ("KCC"); Agdaagux Tribe of King Cove; and Native Village of Belkofski opposed the motion at docket 39.  Intervenor-Defendant State of Alaska opposed the motion at docket 40.  Plaintiffs replied at docket 43.  Oral argument

was requested but denied as unnecessary to the court's decision in light of the extensive and informative briefing provided.

In conjunction with its motion for summary judgment, Plaintiffs have filed a motion for judicial notice at docket 33. Plaintiffs request that the court take judicial notice of a U.S. Department of Interior decision dated March 11, 2019, because it is an official government document concerning matters of public record and not subject to reasonable dispute. The request, which is unopposed, is granted.

## II.  BACKGROUND

This lawsuit is the third round of litigation in recent years involving efforts to build a road through Izembek National Wildlife Refuge—a 311,000-acre refuge and wilderness area that was established in 1980 as part of the Alaska National Interest Lands Conservation Act ("ANILCA")[1]—in order to connect the City of King Cove ("King Cove") with the City of Cold Bay ("Cold Bay"). The two cities are eighteen miles apart, separated by protected Izembek land.[2] Both cities are accessible only by air and sea, but Cold Bay has an all-weather airport and King Cove does not.[3] King Cove and its related entities, including King Cove Corporation ("KCC"), have long advocated for a road through Izembek in order to access Cold Bay's airport, stressing the importance of a road for purposes of safe, reliable, and more affordable emergency evacuations when severe weather make air and boat travel out of King Cove dangerous and uncomfortable.[4]

---

[1]*See* Pub. L. 96-487, Title II, § 303(3), 94 Stat. 2371, 2390-91 (1980); U.S. Fish & Wildlife Serv., Statistical Data Tables for Fish & Wildlife Service Lands (as of Mar. 27, 2019), 11 [https://perma.cc/S8WR-CQFZ].

[2]ART INT 001270; AR INT 001272 (Vicinity map). Citations to AR refer to the documents complied in 2014 and citations to AR INT refer to the documents complied in 2019.

[3]AR INT 002816; AR INT 001264.

[4]AR INT 001646; AR INT 001270.

-2-

1    A detailed background of Izembek and the King Cove community's efforts to
2 obtain Izembek lands for purposes of constructing a road have been provided in the two
3 prior iterations of this case, the most recent of which was decided not much over a year
4 ago.  The court need not repeat all relevant background here and directs readers to
5 those related cases for further factual development.[5]  Suffice it to say that the
6 Department of Interior ("DOI"), which manages Izembek through the Fish and Wildlife
7 Service ("the Service"), has a long history of considering the impacts of a road through
8 Izembek and ruling against the road based on the detrimental effects it would have on
9 Izembek's ecological resources.[6]

10    Most recently, in 2009, pursuant to the Omnibus Public Land Management Act of
11 2009 ("OPLMA"), Congress tasked the Secretary of the Interior ("Secretary") with
12 reviewing the propriety of a land exchange with KCC and the State of Alaska for
13 purposes of constructing a road through Izembek.[7]  The proposed exchange involved
14 about 200 acres of Izembek land.[8]  The proposed road would have been restricted
15 "primarily to health and safety purposes (including access to and from the Cold Bay
16 Airport) and only for noncommercial purposes."[9]  As required under OPLMA, the DOI
17 prepared an environmental impact statement which evaluated the effects of the
18 proposed land exchange and road construction, as well as the effects of other
19 alternatives, and found that the land exchange for a connecting road "would have major
20 adverse effects to birds and land mammals" and would hinder the

21

22

23    [5]*Agdaagux Tribe of King Cove v. Jewell*, 128 F. Supp. 3d 1176 (D. Alaska 2015);
24 *Friends of Alaska Nat'l Wildlife Refuges v. Bernhardt*, 381 F. Supp. 3d 1127 (D. Alaska 2019).

25    [6]*See* AR 4587-90; AR 9036-43; *see also* AR INT 000058.

26    [7]Pub.L. No. 111-11, Title VI, Subtitle E, 123 Stat. 991, 1177-83 (2009).

27    [8]Pub. L. No. 111-11, Title VI, Subtitle E, § 6401(2)(A), 123 Stat. at 1178.

28    [9]Pub. L. No. 111-11, Title VI, Subtitle E, § 6403(a)(1), 123 Stat. at 1180.

-3-

Service's efforts to meet the purposes of Izembek.[10]  The Secretary thereafter published a 20-page Record of Decision ("2013 ROD") concluding that a road would not be in the public interest and consequently declining the proposed land exchange.[11]  The 2013 ROD explained that construction of a road would be detrimental to "irreplaceable ecological resources that would not be offset by the protection of lands to be received under an exchange."[12]  It identified other environmentally preferable alternatives that would be suitable for providing enhanced connection between King Cove and Cold Bay.[13]  King Cove and its related entities challenged the 2013 ROD; this court, however, granted summary judgment in favor of the government, upholding the 2013 ROD under the APA and finding no violation of NEPA or the OPLMA.[14]

Following the 2016 presidential election, the new Secretary committed to work on a land exchange with KCC.  On January 22, 2018, he entered into an Exchange Agreement pursuant to § 1302(h) of ANILCA ("2018 Exchange Agreement") wherein the government agreed to exchange a corridor of Izembek land—up to 500 acres—in exchange for lands within the exterior boundaries of Izembek and the Alaska Peninsula National Wildlife, as we Refuge ll as for KCC's relinquishment of selection rights to additional Izembek land under ANCSA.[15]  The 2018 Exchange Agreement was intended to facilitate the road connection from King Cove to Cold Bay, which, under the agreement, was to be used "primarily for health, safety, and quality of life purposes

---

[10]Pub. L. No. 111-11, Title VI, Subtitle E, § 6402(b)(2)(a), 123 Stat. at 1178-79; AR 180523-181596; AR 180930.

[11]AR INT 001236-55.

[12]AR INT 001238.

[13]AR INT 001239, 001246, 001247-48, 001255.

[14]*Agdaagux Tribe of King Cove*, 128 F. Supp. 3d at 1200-01.

[15]AR INT 002122-37.

-4-

(including access to and from the Cold Bay Airport) and generally for non-commercial purposes."[16]

The 2018 Exchange Agreement was challenged in this court by Plaintiffs. This court vacated the agreement as unlawful agency action. The court found that the 2018 Exchange Agreement failed to acknowledge the change in DOI policy, provided no reasoned explanation for changing course on DOI's prior determinations, and ignored its prior determinations about the road's environmental impacts on Izembek.[17]

After this court's vacatur of the 2018 Exchange Agreement, the Secretary entered into a new Exchange Agreement with KCC dated June 28, 2019, pursuant to § 1302(h) of ANILCA (the "Exchange Agreement").[18] The Exchange Agreement again commits the federal government to exchange land with KCC for construction of a road through Izembek. However, the new version is accompanied by a memorandum from the Secretary that provides his reasons for entering into the agreement and supporting the construction of the road (the "Memo").[19] Unlike the prior version, the new agreement does not have a provision limiting the use of the road for health and safety purposes, nor is there a prohibition on commercial uses.

## III. STANDARD OF REVIEW

This action arises under the Administrative Procedures Act ("APA"), which provides for judicial review of final agency action.[20] In reviewing an administrative agency decision, "the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make

---

[16]AR INT 002122, 002124.

[17]*Friends of Alaska Nat'l Wildlife Refuges*, 381 F. Supp. 3d at 1143,1144.

[18]AR INT 2865-73.

[19]AR INT 2814-33.

[20]5 U.S.C. §§ 701-706.

-5-

the decision it did."[21]  "[S]ummary judgment is an appropriate mechanism for deciding the legal question of whether the agency could reasonably have found the facts as it did."[22]

Under the APA, courts "hold unlawful and set aside agency action, findings, and conclusions" if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[23]  An agency's action violates this standard "if the agency has . . . offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."[24]  Changes in agency policy may violate this APA standard "if [in changing the policy] the agency ignores or countermands its earlier factual findings without reasoned explanation for doing so."[25]  Agency action taken "without observance of procedure required by law" is also unlawful under the APA.[26] While the court's inquiry must be thorough and careful, the scope of review is nonetheless narrow; the court may not substitute its judgment for that of the agency's.[27]

---

[21]*City & Cnty. of San Francisco v. United States,* 130 F.3d 873, 877 (9th Cir. 1997) (quoting *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769 (9th Cir. 1985)).

[22]*Id.* (quoting *Occidental*, 753 F.2d at 770).

[23]5 U.S.C. § 706(2)(A).

[24]*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983).

[25]*Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 966 (9th Cir. 2015) (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 537 (2009) (Kennedy, J., concurring)).

[26]5 U.S.C. § 706(2)(D).

[27]*Hells Canyon Alliance v. U.S. Forest Serv*., 227 F.3d 1170, 1177 (9th Cir.2000).

-6-

**IV.  DISCUSSION**

**A. Policy change**

The Exchange Agreement represents a change in DOI policy as to the Izembek

road.  The assertion by KCC that the Exchange Agreement represents a new policy

rather than a change in one because it does not actually authorize the building of a road

is without merit.  It is of no consequence that the Exchange Agreement does not

constitute the final step in construction of a road.  The express purpose of the

agreement is to provide the necessary land for such a road, and prior DOI decisions

have declined to approve a transfer of land out of Izembek for the same purpose.

Indeed, the record, prior judicial determinations, and the Federal Defendants' position

confirm the policy change.[28]

In *FCC v. Fox Television Stations, Inc.*,[29] the Supreme Court addressed policy

changes and acknowledged that such changes must, like any agency action, be

adequately explained.  It stated that a reasoned explanation in the context of a policy

change includes (1) an awareness that the agency is changing position; (2) a showing

that the new policy is permissible under the statute; (3) a belief that the new policy is

better; and (4) "good reasons" for the change.[30]  These reasons do not need to be more

detailed than what would be needed to support a newly enacted policy "created on a

blank slate" except when the "new policy rests upon factual findings that contradict

those which underlay its prior policy."[31]  In such situations, a "more substantial

justification" is required.[32]  That is to say, "further justification" is needed when the

[28]Doc. 38 at p.29.

[29]556 U.S. 502 (2009).

[30]*Id.* at 515; *see also Organized Vill. of Kake*, 795 F.3d at 966.

[31]*Fox*, 556 U.S. at 515.

[32]*Organized Vill. of Kake*, 795 F.3d at 966-67 (quoting *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 106 (2015)).

agency "disregard[s] facts and circumstances that underlay or were engendered by the prior policy."[33]

Given that the Secretary supported the Exchange Agreement with an explanatory memo, the Plaintiffs concede that the Secretary has now acknowledged the policy change and articulated his belief that the new policy is the better course of action. They assert, however, that his stated reasons for the exchange do not adequately justify the change in findings and that the Exchange Agreement is impermissible under ANILCA.

### 1. Justifications

The Secretary's primary reason for the change is his focus on the social and economic needs of the King Cove community. He argues that he rebalanced the facts in light of new considerations, and that the Exchange Agreement "strik[es] the proper and appropriate balance between protecting the national interest in the scenic, natural, cultural, and environmental values of the public lands in Alaska and providing an adequate opportunity for satisfaction of the economic and social needs of the Alaska Native people of King Cove."[34] An agency is "entitled . . . to give more weight to socioeconomic concerns . . . even on precisely the same record."[35] Such a "revaluation is well within an agency's discretion."[36] However, as noted above, if the rebalancing to change the weight in favor of socioeconomic concerns requires making factual findings that directly contradict the agency's prior factual findings, then there must be a substantial justification for the switch. Thus, the issue for the court is whether the Memo, which sets forth the Secretary's reasons for rebalancing, rests on factual findings that contradict those in the 2013 ROD and, if so, whether the Memo contains an adequate level of justification for such contrary findings.

---

[33]*Fox*, 556 U.S. at 516.

[34]AR INT 002832.

[35]*Organized Vill. of Kake*, 795 F.3d at 968.

[36]*Id.*

-8-

1   The Memo in support of the Exchange Agreement does not challenge the 2013
2   ROD findings as to the environmental harm that would stem from the construction and
3   use of a road through Izembek.  Instead, the Memo stresses that "human life and
4   safety" must take precedence over environmental degradation and that, despite the
5   decision to place more weight on such safety considerations, the scenic, natural,
6   cultural, and environmental values of Izembek will still be adequately protected.[37]  The
7   Memo states that the balance can be achieved through "the adoption of restrictions on
8   the nature of any road to single-lane gravel construction on which non-medical uses and
9   access would be severely limited" and on the fact that "substantial acreage" will be
10  added to Izembek and the adjacent Alaska Peninsula Wildlife Refuge.[38]  This
11  finding—that the environmental harms to Izembek can be adequately mitigated through
12  restrictions and added acreage—contradict the agency's prior findings made less than a
13  decade ago.

14          In the 2013 ROD, the DOI declined the proposed land exchange even though
15  use of the road would have been limited to "health and safety purposes . . . and only for
16  noncommercial purposes."[39]  It found that the effects of a road of any kind would extend
17  beyond the actual road corridor due to increased human access and off-road use that
18  could not be prevented by regulation and enforcement or roadside barriers.[40]  The
19  Secretary fails to adequately explain what has changed to justify a contrary finding as to
20  the effectiveness of use restrictions.  Indeed, unlike prior iterations of the proposed land
21  exchange, the Exchange Agreement fails to provide any use limitations and the Memo

_____

[37]AR INT 002815, 002832.

[38]AR INT 002832.

[39]AR INT 001237; Pub. L. No. 111-11, Title VI, Subtitle E, § 6403(a)(1), 123 Stat. at 1180.

[40]AR INT 001244.

-9-

fails to explain why use restrictions would now adequately protect Izembek's unique

values.

The DOI also concluded in 2013 that a road through Izembek would "lead to significant degradation of irreplaceable ecological resources that would not be offset by the protection of other lands to be received under an exchange."[41] The Secretary offers no new information or data to justify his contrary finding that the value of the added acreage to the refuge system counters the negative effects of a road through Izembek. He cites to the Land Protection Plan for Izembek, but that plan was prepared in 1998. Indeed, the 2013 ROD acknowledged the significant gain in Izembek's total acreage from the proposed land exchange but ultimately found that the added land would not compensate for what would be lost:

> The lands offered for exchange contain important wildlife habitat but they do not provide the wildlife diversity of the internationally recognized wetland habitat that is proposed for exchange, nor would they compensate for the adverse effects of removing a corridor of land and constructing a road within the narrow, irreplaceable Izembek isthmus.[42]

The DOI also reasoned that the lands to be gained in an exchange are not likely to be developed and thus not in urgent need of protection.[43] The Secretary does not provide any reasons for discounting the DOI's prior conclusion that permanent protection for adjacent lands is not as urgent as protecting the ecological integrity of Izembek as it is.

Another reason behind the Secretary's change in policy is his finding that there are no reasonable transportation alternatives to meet the urgent needs of King Cove residents.[44] This is in direct contrast to the 2013 ROD—which determined that a hovercraft, landing craft, and ferry were all viable transportation options based on the accompanying environmental impact statement—and, therefore, the Secretary's new

---

[41]AR INT 001238.

[42]AR INT 001244.

[43]AR INT 001244.

[44]AR INT 002830-31.

-10-

factual assessment of these marine-based options must be substantially justified. The Memo asserts that this change in position is based on more recent information about the feasibility of non-road options and the "acute necessity" of a road.[45] The information relied upon, however, does not provide the detailed reasoning needed to support the agency's about-face on the issue.

As to the urgency for a road, the Memo references new information provided in KCC's 2019 letter in which KCC asks the Secretary to revisit the issue.[46] In the letter, KCC again outlines the history of the issue and stresses the importance of a road for the community's needs. KCC cites the number of medical evacuations since 2014 and describes a crash at the King Cove airport and a "near miss" medical event.[47] Information about emergency medical evacuations does not raise new issues of urgency that were not fully considered in the 2013 ROD. As noted in that decision, the agency considered the "challenges and complexities" of life in King Cove.[48] It made the decision to decline a land exchange after "a lengthy public process" where it heard from residents about their needs for better transportation and their support for a road.[49] It acknowledged the extreme weather that frequently makes transportation out of King Cove difficult. It considered the medical evacuation benefits of the proposed road, which were analyzed in report dated October 28, 2013.[50] That report specifically acknowledged the community's experience with difficult and failed emergency evacuations, tragedies stemming from travel accidents, and evacuation delays during extreme weather. The DOI nonetheless concluded that these severe difficulties could

---

[45]AR INT 002830-31.

[46]AR INT 002825.

[47]AR INT 002834-46.

[48]AR INT 001237.

[49]AR INT 001238.

[50]AR INT 001254; AR INT 001163-82.

-11-

be adequately lessened through the pursuit of improved marine-based connections between King Cove and Cold Bay.

Relatedly, the Secretary asserts that his new factual position on the viability of marine-based transportation improvements is based on the agency's prior failure to consider the costs of emergency evacuations by the U.S. Coast Guard. He cites new testimony wherein it was estimated that each Coast Guard medevac from King Cove costs about $50,000.[51] Again, however, the medevac issue is not new and was not ignored in the agency's prior policy decision.[52] The 2013 ROD discusses the chosen no-road alternative from the environmental impact statement and acknowledges the Coast Guard's role in providing medevacs via helicopter.[53] Moreover, the Secretary does not explain how these medevac costs factored into his changed decision on viability. That is, he does not provide a new economic analysis of how these costs affect the feasibility of marine-based links to Cold Bay or how these costs would be altered with the addition of a road to Cold Bay.

The Secretary also relies on a 2015 transportation study conducted by the U.S. Army Corps of Engineers to support his finding that non-road alternatives are not reasonable options for the King Cove community. He asserts that the 2015 study concluded that a marine link from King Cove to Cold Bay is costly and insufficiently dependable.[54] The 2015 study, however, does not provide the necessary justification for the Secretary's assertion. The study did not produce any recommendations or draw any conclusions as to whether non-road transportation projects were feasible or

_____

[51]AR INT 002821, 002830.

[52]AR INT 001245.

[53]AR INT 001247.

[54]AR INT 002830.

-12-

viable.[55]  It simply analyzed various non-road alternatives to consider dependability and medevac times, estimate life-cycle costs, and identify risks to project implementation and operation. [56] The study found that one of the marine link routes would have an estimated 75-year life cycle cost of $56.7 million.[57]  In comparison, the road, as noted in the 2013 ROD, would have a 35-year life cycle cost of $34.2 million, which, when considering the estimated annual maintenance costs of $670,000, would amount to about $61 million for 75 years of operation.[58]  The Secretary did not rebut these comparable numbers or provide a different comparison.  That is, he did not conduct or provide further economic analysis or gather new data from King Cove to prove that the costs identified in the study make any marine-based project infeasible when compared to a road.  As for dependability, the study concluded that a marine link would be dependable over 99% of the time, which is comparable to the dependability of the road.[59]  The risks identified by the study for a marine-based transportation project include capital and operational funding, as well as permitting.[60]  The Secretary does not explain how these risks compare to those of a road construction project.

 The Secretary also supports his changed finding on the assertion that the 2013 ROD did not factor in the impacts to Northern Sea Otters from a marine-based transportation route.[61]  That reasoning is insufficient to support a change on the issue of viability.  The prior EIS considered such impacts when assessing the various

---

[55]AR INT 001264.

[56]AR INT 001265, 001276.

[57]AR INT 001265, 001302.

[58]AR INT 001246, 001248; AR 00180633.

[59]AR INT 001265, 001304; AR INT 001246.

[60]AR INT 001303.

[61]AR INT 002821 (Memo at p. 8 n.25).

-13-

alternatives,[62] and there has not been any new weighing of environmental harms that would change the overall decision making picture.  Moreover, the Secretary does not explain how the impacts to the sea otters resulted in his changed finding on the viability of a marine-based solution.

Given the above, the court finds that the Secretary's decision to enter into the Exchange Agreement is arbitrary and capricious under the APA because the Secretary failed to provide adequate reasoning to support the change in policy in favor of a land exchange and a road through Izembek.

### 2. Permissibility under ANILCA

Plaintiffs also assert that the change in policy is not permissible under ANILCA because the Exchange Agreement does not further ANILCA's purposes.  The Exchange Agreement was entered into pursuant to § 1302(h) of ANILCA.[63]  Section 1302(a) of ANILCA authorizes the Secretary to acquire lands within any conservation system unit "in order to carry out the purposes of [the] Act."[64]  Section 1302(h) specifically authorizes exchanges in order to "acquir[e] lands for the purposes of [ANILCA]."[65]  The plain language of the statute therefore requires that a land exchange pursuant to § 1302 of ANILCA be undertaken in order to further the purposes of ANILCA.

As acknowledged by the Ninth Circuit, "Congress enacted ANILCA to further two ends."[66]  The first is to preserve "unrivaled scenic values . . . associated with natural landscapes," unaltered ecosystems, wildlife species and habitat, wilderness values, and

---

[62]AR 179500.

[63]King Cove references ANCSA's exchange provision as providing broad authority to enter into the land exchange. Doc. 39 at 41-42. The Exchange Agreement was not executed under that provision.  The stated authority for the agreement is ANILCA.  AR INT 002865.

[64]16 U.S.C. § 3192(a).

[65]16 U.S.C. § 3192(h).

[66]*Alaska v. Fed. Subsistence Bd.*, 544 F.3d 1089, 1091, 1098 (9th Cir. 2008).

-14-

related recreational and scientific opportunities.[67]  The second purpose is "to provide the opportunity for rural residents engaged in a subsistence way of life to continue to do so."[68]  Izembek was established as a refuge under ANILCA as part of this larger goal of preserving lands and waters in Alaska that contain "nationally significant natural, scenic, historic, archeological, geological, scientific, wilderness, cultural, recreational, and wildlife values."[69]  Congress stated that the specific purposes for establishing and managing Izembek include the conservation of fish and wildlife population and habitats in their natural diversity, the fulfillment of international treaty obligations, continued subsistence use by local residents, and the preservation of water quality and quantity.[70]

The Exchange Agreement and the Memo state that the land exchange furthers ANILCA's purposes by "striking the proper and appropriate balance between protecting the national interest in the scenic, natural, cultural, and environmental values of the public lands in Alaska and providing an adequate opportunity for satisfaction of the economic and social needs of the State of Alaska."[71]  This assertion of purpose, however, is not supported by the record.

The Service and the DOI have recognized that "the heart" of Izembek is the narrow isthmus separating the Izembek Lagoon and Bearing Sea from the Kinzarof Lagoon and the Gulf of Alaska.[72]  The Exchange Agreement cedes a corridor of land through this isthmus for the purpose of building a road.  The DOI has repeatedly found that a road through Izembek and its isthmus would cause significant ecological damage, thereby defeating the purposes outlined above.  The Secretary does not suggest a road

---

[67]16 U.S.C. § 3101(b).

[68]16 U.S.C. § 3101(c).

[69]16 U.S.C. § 3101(a).

[70]ANILCA, Pub.L. No. 96-487, Title III, § 303(3)(B), 94 Stat. 2371, 2391 (1980).

[71]AR INT 002866.

[72]AR INT 001238, 001242; AR 8992-93.

-15-

poses no ecological harm.  Instead he argues that any such harm to this area can be mitigated and is otherwise outweighed by factors that promote ANILCA's values overall.

He asserts that any harm can be lessened through use restrictions, which will adequately protect the wilderness and ecological values of Izembek.  However, as noted above, the Exchange Agreement no longer contains any use restrictions, and the Secretary does not otherwise explain what use restrictions will be effective in protecting the values of Izembek, particularly the all-important isthmus region.

He also asserts that the lost corridor is offset by substantial gains in acreage elsewhere, which will advance the purposes of ANILCA to a greater extent by permanently protecting more land.  In support he cites the Land Protection Plan for Izembek which prioritizes the acquisition of adjacent land.  The reliance on the Land Protection Plan to support his position is flawed given that ultimately, even while prioritizing the acquisition of adjacent land, the plan concluded in that "[t]he proposal to construct a road across both refuge and [KCC] lands is currently the greatest known potential threat to wildlife and wilderness values within the Izembek Complex."[73]  The plan also concluded that any protection actions "should strive to preserve the ecological integrity of the refuge."[74]  While the added lands would gain federal protection, the DOI has already concluded that the value of the added land would not compensate for the loss of land through the isthmus and that these areas were not in danger of development.[75]  The Secretary does not provide any evidence to rebut this prior finding.

The Secretary stresses that one of the "key purposes" of ANILCA is "to protect and enhance the economic and social interests of communities engaged in a traditional and subsistence way of life" and that his rebalancing of the issues to place more weight on the economic and social needs of King Cove residents furthers this aspect of

---

[73]AR INT 000058.

[74]AR INT 000063.

[75]AR INT 001244.

-16-

1    ANILCA.   In support he relies on a portion of ANILCA's statement of purpose in which

2    Congress found as follows:

> [ANILCA] provides sufficient protection for the national interest in the scenic,
> natural, cultural and environmental values on the public lands in Alaska, and
> at the same time provides adequate opportunity for satisfaction of the
> economic and social needs of the State of Alaska and its people; accordingly,
> the designation and disposition of the public lands in Alaska pursuant to this
> Act are found to represent a proper balance between the reservation of
> national conservation system units and those public lands necessary and
> appropriate for more intensive use and disposition, and thus Congress
> believes that the need for future legislation designating new conservation
> system units, new national conservation areas, or new national recreation
> areas, has been obviated thereby.[76]

9    This provision does not state that one of the purposes of ANILCA is to further the

10   economic and social needs of Alaska and its people.  Rather, it is an acknowledgment

11   that, in passing ANILCA, Congress has achieved the proper balance between

12   conservation needs and economic and social needs and that it therefore believes no

13   future legislation designating new conservation areas is needed.  The purpose of the

14   statute is explicitly stated to be preservation and subsistence.[77]

15           Defendants now assert that the Exchange Agreement furthers the subsistence

16   purposes of ANILCA.  However, no such purpose was relied upon or articulated in the

17   Exchange Agreement or Memo.[78]  Moreover, the 2013 ROD indicated that the effects

18   on subsistence use stemming from a land exchange would be neutral.[79]  The Secretary

19   does not point to evidence that counters this finding, nor does he provide analysis to

20

21

22           [76]16 U.S.C. § 3101(d).

23

24           [77]16 U.S.C. § 3101(b), (c); *Alaska v. Fed. Subsistence Bd.*, 544 F.3d 1089, 1091, 1098
     (9th Cir. 2008).

25
           [78]*See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S.
26   29, 43, 50 (1983) (explaining that courts must reject "counsel's *post hoc* rationalizations for
     agency action" and may only uphold agency action "on the basis articulated by the agency
27   itself").

28           [79]AR INT 001254-55.

                                                -17-

explain why a road's benefits would outweigh its detriments in terms of effect on subsistence users and uses.

Given the Exchange Agreement fails to advance the stated purposes of ANILCA, it is not permissible under that statute. Consequently, the agreement and the change of policy it represents constitutes unlawful agency action under the APA.

## B. Title XI of ANILCA

Plaintiffs also assert that the Exchange Agreement violates ANILCA and is void because it was executed without following the procedural mandates of Title XI of ANILCA. Title XI provides the "single comprehensive statutory authority" for the approval of transportation systems within conservation areas such as Izembek.[80] Congress enacted Title XI "to minimize the adverse impacts of siting transportation and utility systems within units established or expanded by [the] Act and to insure the effectiveness of the decisionmaking process."[81] It sets forth a specific agency and public process and requires that each agency involved make specific findings to approve a transportation system through a conservation area.[82] For proposed transportation systems through designated wilderness areas, Title XI requires additional approval by the President and Congress.[83] If Title XI is not followed, the authorization has no "force or effect."[84]

The court agrees with Plaintiffs' position that the Exchange Agreement is in fact an approval of a transportation system that falls within the ambit of Title XI. The Secretary's argument to the contrary elevates form over substance. It is undisputed that the purpose of the Exchange Agreement is to provide a corridor of land through

---

[80]16 U.S.C. §§ 3161(c), 3162(4)(A).

[81]16 U.S.C. § 3161(c).

[82]16 U.S.C. § 3164.

[83]16 U.S.C. § 3166(b).

[84]16 U.S.C. § 3164(a).

-18-

Izembek to facilitate the building of a road. It is the required first step in the completion of such a road. The agreement acknowledges that the land exchange "allows for construction of a road between King Cove and Cold Bay."[85] The Secretary's accompanying Memo states that he agreed to the land exchange due to the "acute necessity . . . for a road connecting King Cove and Cold Bay."[86] King Cove specifically requested the exchange for an "affordable year-round transportation system."[87] Thus, the land exchange constitutes an "authorization . . . without which a transportation system . . . cannot, in whole or in part, be established or operated."[88]

Defendants argue Title XI does not apply to the Exchange Agreement because after the exchange the road will not be located within federal conservation lands. That is, the corridor of land through which the road is proposed to be constructed will not actually be a part of Izembek after the exchange. Such an interpretation of the statute is incorrect and not entitled to deference. Congress's intent was clear—it enacted Title XI as a "single comprehensive statutory authority for the approval" of transportation systems through public lands "to minimize the adverse impacts of siting transportation . . . systems within units established or expanded by [ANILCA]."[89] To make Title XI subordinate to the exchange provision in § 1302(h) would run counter to that intent. As noted by Plaintiffs, "[t]he Secretary's interpretation would nullify the protections Congress established when adopting Title XI by enabling land exchanges to circumvent its procedures."[90] Indeed, under the "well established canon of statutory interpretation," the more specific procedural mandates of Title XI govern over the general authority

---

[85]AR INT 002866.

[86]AR INT 002831.

[87]AR INT 002834.

[88]16 U.S.C. §§ 3164(a), 3162(1).

[89]16 U.S.C. § 3161.

[90]Doc. 43 at p. 18.

-19-

provided in § 1302(h).[91]  This "avoids . . . the superfluity of [the] specific provision [from being] swallowed by the general one," giving effect to every clause of the statute.[92]

Relatedly, Defendants rely on the language of § 1302(h) itself, which authorizes the Secretary to exchange lands "[n]otwithstanding any other provision of law."[93] However, notwithstanding clauses set aside potentially conflicting laws previously enacted, not all legal dictates.[94]  To determine the reach of a particular notwithstanding provision, a court must "tak[e] into account the whole of the statutory context in which it appears."[95]  The court agrees with Plaintiffs' analysis that the notwithstanding provision was meant to exempt land exchanges from the requirement of equal value or complex public interest exchanges that were required by other statutes in place when ANILCA was enacted.[96]  Indeed, it appears that if Congress had intended § 1302(h) to override provisions within ANILCA itself it would have done so explicitly, given that it did so

[91]*See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645-46 (2012) (discussing the "commonplace statutory construction" that the specific governs the general and acknowledging its application when two provisions are both parts of the same statutory scheme).

[92]*Id.* at 645 (acknowledging the "cardinal rule" that courts give effect to every clause and part of a statute).

[93]16 U.S.C. § 3192(h).

[94]*Student Loan Fund of Idaho, Inc. v. U.S. Dep't of Educ.*, 272 F.3d 1155, 1166 (9th Cir. 2001); *U.S. v. Novak*, 476 F.3d 1041, 1046-47 (9th Cir. 2007).

[95]*Novak*, 476 F.3d at 1046.

[96]*Compare* Fed. Land Policy and Mgmt. Act, 43 U.S.C. § 1716(b) (providing that lands exchanged by the Secretary must be of equal value, or the values shall be equalized through monetary payments, but those payments may be waived for public interest exchanges in specific circumstances), *and* Nat'l Wildlife Refuge Admin. Act, 16 U.S.C. § 668dd(b)(3) (authorizing the Secretary to enter into equal value exchanges or equalize value through cash), *with* 16 U.S.C. § 3192(h)(1) (allowing exchanges to be made for less than equal value if the parties agree and the Secretary determines it is in the public interest).  Moreover, §1302(h) was modeled after ANCSA § 22(f), which Congress amended to remove similar restrictions. H.R. Rep. No. 95-1045, pt.I at 211-212 (1978) (modeling ANILCA's exchange provision on ANCSA § 22(f)); ANCSA, Pub. L. No. 94-204, § 17, 89 Stat. 1145, 1156 (1976) (amending § 22(f)).

-20-

elsewhere in ANILCA.[97]  Also, the court must read § 1302(h)'s notwithstanding provision in light of the fact Title XI contains a notwithstanding clause as well: "[n]otwithstanding any provision of applicable law," no action with respect to authorization of a transportation system "shall have any force or effect unless the provisions of this section are complied with."[98]  Interpreting the two notwithstanding clauses to require the Secretary to comply with Title XI in this situation gives meaning to both provisions and is consistent with Congress's intent to provide a single comprehensive system for approving roads through conservation lands.

Defendant State of Alaska argues that the Exchange Agreement is permissible under § 1110 of ANILCA because King Cove is an inholding.  However, this was not the stated basis or authority for the land exchange and the court declines to consider it here.

**C. NEPA and ESA claims**

In light of the court's ruling that the Exchange Agreement violates the APA and ANILCA, it declines to consider the Plaintiffs' NEPA and ESA claims at this time.

**D. Remedy**

Federal Defendants request that in the event the court finds legal error, it should allow additional briefing on the question of remedy so that the court may better weigh the extent of the legal error, equities, and public interest.  Relatedly, KCC argues that "[because] this is a land agreement between the Secretary and an Alaskan Native organization, the Court should . . . resolve ambiguities in favor of the Native organization and allow the parties to remedy any insufficiencies found by the Court."[99]

---

[97]*See* 16 U.S.C. § 3121(b) ("Notwithstanding any other provision of this Act or other law . . . . ); 16 U.S.C. § 3170(a) (same).

[98]16 U.S.C. § 3164(a).

[99]Doc. 39 at pp. 45-46.

-21-

Vacatur is the presumptive remedy under the APA.[100]  A reviewing court is required to "hold unlawful and set aside agency actions, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[101]  A limited exception exists "when equity demands."[102]  The court considers the seriousness of the agency's error and the "disruptive consequences" stemming therefrom.[103]  Here, the errors the court identified are serious and fundamental, and there is no indication that there will be disruptive consequences from setting aside the Exchange Agreement at this point.  Moreover, given the violation of Title XI, the Exchange Agreement and any approvals stemming therefrom have no force or effect.[104]

As noted by the court in its prior decision, the legal errors found do not stem from an interpretation of an ambiguous term in the agreement, and therefore KCC's argument in support of leaving the agreement in place on remand is without merit.[105]

Plaintiffs also request that the court issue an injunction under the ESA.  However, the court declines to rule on Plaintiffs' ESA claim.  Moreover, an injunction is not warranted where "a less drastic remedy [ ] such as partial or complete vacatur . . . [is] sufficient to redress [the aggrieved party's] injury."[106]  Here, the vacatur of the Exchange Agreement and any authorizations issued pursuant to it under the APA and Title XI should provide sufficient relief.

---

[100]*Alliance for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1121 (9th Cir. 2018).

[101]5 U.S.C. § 706(2).

[102]*Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015) (quoting *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995)).

[103]*Id.* (quoting *Cal. Cmtys. Against Toxics v. U.S. EPA*, 688 F.3d 989, 992 (9th Cir. 2012)).

[104] 16 U.S.C. § 3164(a).

[105]*Friends of Alaska Nat'l Wildlife Refuges*, 381 F. Supp. 3d at 1143.

[106]*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165-66 (2010).

-22-

## V.  CONCLUSION

Based on the preceding discussion, Plaintiffs' motion for summary judgment at docket 32 is GRANTED.  The Secretary's decision to enter into the Exchange Agreement with KCC on June 28, 2019, constituted an unlawful agency action in violation of the APA and a violation of Title XI of ANILCA.  Therefore, the Exchange Agreement is set aside and vacated.

DATED this 1st day of June 2020.

/s/ JOHN W. SEDWICK
SENIOR JUDGE, UNITED STATES DISTRICT COURT

-23-